FILED
**United States Court of Appeals**
**Tenth Circuit**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

——————————————

**August 26, 2025**

Christopher M. Wolpert
Clerk of Court

UNITED STATES OF AMERICA,

Plaintiff – Appellant,

v.

JARED MICHAEL HARRISON,

Defendant – Appellee.

No. 23-6028

——————————————

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:22-CR-00328-PRW-1)**

——————————————

Steven W. Creager, Assistant United States Attorney (Robert J. Troester, United States Attorney, with him on the briefs), Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Laura K. Deskin, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellee.

——————————————

Before **ROSSMAN**, **KELLY,** and **MURPHY,** Circuit Judges.

——————————————

**ROSSMAN**, Circuit Judge.

——————————————

Jared Michael Harrison was charged with violating 18 U.S.C. § 922(g)(3), which prohibits firearm possession by "any person . . . who is an unlawful user of or addicted to any controlled substance." He moved to dismiss the indictment under *New York State Rifle & Pistol Ass'n* v. *Bruen*, 597 U.S. 1, 37 (2022), contending the charging statute violates the Second Amendment as applied to non-intoxicated marijuana users. The district court granted the motion. The government now appeals.

The district court comprehensively analyzed the constitutional question. But the district court ruled before the Supreme Court decided *United States* v. *Rahimi*, 602 U.S. 680 (2024), which issued while this appeal was pending and clarified our constitutional inquiry. *Rahimi* instructs "the appropriate analysis [in Second Amendment cases] involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. With the benefit of *Rahimi*, we cannot fully endorse the district court's understanding of the historical record.

According to the district court, our historical tradition of firearm regulation is limited to disarming those who have acted dangerously in the past. But we conclude, contrary to the district court, disarming those believed to pose a risk of *future* danger is consistent with a "principle[] that underpin[s] our regulatory tradition." *Id.* at 692. Still, we cannot yet decide

2

the ultimate constitutional question. To determine whether § 922(g)(3) as applied here is "consistent with" the principle that the government has correctly identified, the government must show non-intoxicated marijuana users pose a risk of future danger. This inquiry, which may involve fact finding, is best suited for the district court. Exercising jurisdiction under 18 U.S.C. § 3731, we therefore reverse and remand for further proceedings consistent with this opinion.

## I[1]

On May 20, 2022, a law enforcement officer from the Lawton, Oklahoma Police Department stopped Mr. Harrison for running a red light. When Mr. Harrison rolled down his window, the officer smelled marijuana. Mr. Harrison told the officer that he worked at a medical marijuana dispensary but did not have a state-issued medical marijuana card. The officer then instructed Mr. Harrison to get out of his car, and he complied.[2] The officer did not conduct a field sobriety test or blood draw. Another officer then arrived, and the two searched Mr. Harrison's car. They found:

---

[1] We take these facts from the district court order's undisputed recitation. *See* App. at 87–88; Op. Br. at 2; Ans. Br. at 3–5. We cite the district court order in the appellate record, App. at 87, but it is also available at *United States* v. *Harrison*, 654 F. Supp. 3d 1191 (W.D. Okla. 2023).

[2] At that point, the officer noticed Mr. Harrison was wearing an ankle monitor pursuant to a charge not before us.

> a loaded revolver on the driver's side floorboard; two
> prescription bottles in the driver's side door, one empty and one
> containing partially smoked marijuana cigarettes; and a
> backpack in the passenger seat. The backpack contained
> marijuana, THC gummies, two THC vape cartridges, and a pre-
> rolled marijuana cigarette and marijuana stems in a tray.

App. at 88. Mr. Harrison was arrested, and Oklahoma charged him with

possession of marijuana, possession of paraphernalia, and failure to obey a

traffic signal.

On August 17, 2022, a federal grand jury returned an indictment

charging Mr. Harrison with violating § 922(g)(3). Section 922(g)(3) provides:

> It shall be unlawful for any person . . . who is an unlawful user
> of or addicted to any controlled substance . . . to ship or
> transport in interstate or foreign commerce, or possess in or
> affecting commerce, any firearm or ammunition; or to receive
> any firearm or ammunition which has been shipped or
> transported in interstate or foreign commerce.

The indictment alleged Mr. Harrison "knowingly possessed a firearm . . .

which was in or affecting interstate commerce," "with knowledge that he

was an unlawful user of marijuana, a controlled substance." App. at 8. The

indictment stated no additional information about Mr. Harrison's

marijuana use or gun possession.[3]

_____

[3] In full, the indictment read:

The Federal Grand Jury charges: COUNT 1. (Possession of a
Firearm by a Prohibited Person) On or about May 20, 2022, in
the Western District of Oklahoma, JARED MICHAEL
HARRISON, with knowledge that he was an unlawful user of

Mr. Harrison moved to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(3)(B). He argued "Section 922(g)(3) unconstitutionally infringes on an individual's right to bear arms under the Second Amendment."[4] App. at 25. Applying the framework of *Bruen*, Mr. Harrison maintained the Second Amendment's text covered his conduct, and "the Government cannot meet its burden to show that § 922(g)(3)'s restrictions are 'consistent with the Nation's historical tradition of firearm

---

marijuana, a controlled substance as defined in Title 21, United States Code, Section 802, knowingly possessed a firearm, to wit: a Rossi, model M68, .38 caliber revolver, bearing serial number AA474050, which was in or affecting interstate commerce in that said firearm had crossed state lines to reach the state of Oklahoma. All in violation of Title 18, United States Code, Section 922(g)(3), the penalty for which is found at Title 18, United States Code, Section 924(a)(2).

FORFEITURE. The allegation contained in this Indictment is hereby re-alleged and incorporated for the purpose of alleging forfeiture. Upon conviction of the offense alleged in Count 1 of this Indictment, JARED MICHAEL HARRISON shall forfeit to the United States any and all firearms and ammunition involved in the commission of the offense. The property subject to forfeiture includes, but is not limited to: 1. a Rossi, model M68, .38 caliber revolver, bearing serial number AA474050; and 2. any and all ammunition and magazines not otherwise specified. All pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c).

App. at 8–9.

[4] Mr. Harrison also argued § 922(g)(3) is unconstitutionally vague in violation of the Fifth Amendment. The district court did not address this argument, and Mr. Harrison does not reprise it on appeal.

regulation.'" App. at 27 (quoting *Bruen*, 597 U.S. at 24). "[E]ven if this Court finds that § 922(g)(3) does not violate the Second Amendment on its face," Mr. Harrison contended, "the statute should not apply to a person like [him], who was merely found with a controlled substance." App. at 29. The government responded Mr. Harrison fell outside the Second Amendment's ambit, which it claimed includes only "law-abiding citizens." App. at 52–55. The government also argued legislatures have long disarmed those believed to "pose a danger to public safety if armed"—including felons, the mentally ill, intoxicated people, Catholics, and loyalists. App. at 62; *see* App. at 183–87, 190, 205. And the government contended § 922(g)(3) is consistent with this tradition as applied to Mr. Harrison. The district court heard argument on the motion.

On February 2, 2023, in a thorough 54-page order, the district court granted Mr. Harrison's motion to dismiss. The district court held the Second Amendment's text covered Mr. Harrison's conduct because he is among "the People" to whom the Amendment refers. The court further held "[a]pplying § 922(g)(3) to Harrison is inconsistent with the Nation's historical tradition of firearm regulation." App. at 96. The government timely appealed.

While the appeal was pending, the Supreme Court decided *Rahimi*, which held 18 U.S.C. § 922(g)(8) does not facially violate the Second Amendment and clarified the methodology for adjudicating Second

Amendment challenges. *See* 602 U.S. at 700, 692; *Rocky Mountain Gun Owners* v. *Polis*, 121 F.4th 96, 113 (10th Cir. 2024) (explaining the "two-part burden-shifting framework first established in *Bruen*" was "later clarified in *Rahimi*"). We then ordered the parties to file supplemental briefs addressing *Rahimi*'s impact on Mr. Harrison's case.

## II

Before addressing the arguments before us, we must explain the scope of Mr. Harrison's Second Amendment challenge. This is a threshold issue because it determines what Mr. Harrison must "establish" in order to "succe[ed]." *Rahimi*, 602 U.S. at 693 (quoting *United States* v. *Salerno*, 481 U.S. 739, 745 (1987)). The parties dispute whether Mr. Harrison brought a facial challenge, an as-applied challenge, or some mixture of the two. *Compare* Ans. Br. at 12 (Mr. Harrison contending § 922(g)(3) "violates the Second Amendment . . . as applied to Mr. Harrison as an alleged marijuana user"), *with* Gov't Supp. Resp. Br. at 3 (the government contending "despite the label Mr. Harrison has used, he has not raised an as-applied challenge"), *and* Oral Argument 1:25–3:00 (government counsel suggesting this case "presents a partial facial challenge, a partial as-applied challenge" (citing *United States* v. *Sup. Ct. of N.M.*, 839 F.3d 888 (10th Cir. 2016)).

"A facial challenge is a head-on attack [of a] legislative judgment, an assertion that the challenged statute violates the Constitution in all, or

virtually all, of its applications." *United States* v. *Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (alteration in original) (quoting *United States* v. *Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring), *vacated*, 552 U.S. 1306 (2008)). To succeed on a facial challenge, Mr. Harrison would need to "establish that no set of circumstances exists under which the Act would be valid." *Rahimi*, 602 U.S. at 693 (quoting *Salerno*, 481 U.S. at 745); *see also Doe* v. *City of Albuquerque*, 667 F.3d 1111, 1122–27 (10th Cir. 2012) (discussing different ways of understanding facial challenges). "[A]n as-applied challenge concedes that the statute may be constitutional in many of its applications, but contends that it is not so under the *particular circumstances* of the case." *Carel*, 668 F.3d at 1217 (quoting *Pruitt*, 502 F.3d at 1171 (McConnell, J., concurring)). These different standards implicate § 922(g)(3) because the statute applies to all "unlawful user[s] of . . . controlled substance[s]," not just marijuana users. And even among individuals who use marijuana, § 922(g)(3) applies to both those who are intoxicated while possessing a firearm and those who are not.

In the district court, Mr. Harrison seemed to challenge § 922(g)(3) both as applied and on its face. *See* App. at 29 ("Even if this Court finds that § 922(g)(3) does not violate the Second Amendment on its face, the statute should not apply to a person like Mr. Harrison . . . ."). The district court adjudicated only Mr. Harrison's as-applied challenge. *See* App. at 99

8

(discussing "§ 922(g)(3)'s application to Harrison"); App. at 125 ("The Second Amendment . . . requires that § 922(g)(3), as applied to Harrison, be consistent with history and tradition[] . . . ."); App. at 126 ("But the United States' own conception of the historical tradition demonstrates why § 922(g)(3) as applied to Harrison is not analogous to these traditions."); App. at 210 (district court stating at motion hearing that "this is an as-applied challenge"). And Mr. Harrison has not objected to the district court's understanding of his argument or reprised any facial challenge on appeal. *See* Harrison Supp. Resp. Br. at 1 ("A facial ruling is not before this court . . . ."); *see also* Ans. Br. at 12 (arguing § 922(g)(3) "violates the Second Amendment . . . as applied to Mr. Harrison"); Harrison Supp. Br. at 1 ("Application of *Rahimi* demonstrates 18 U.S.C. § 922(g)(3) as applied to Mr. Harrison is unconstitutional."). Accordingly, we conclude no facial challenge is before us, and we consider only Mr. Harrison's as-applied challenge. *See Perry* v. *Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) ("This court . . . will not craft a party's arguments for him.").

Mr. Harrison's as-applied challenge concerns the application of § 922(g)(3) to non-intoxicated marijuana users. To be sure, Mr. Harrison's indictment was silent about whether he was intoxicated when the offense conduct occurred. But in the district court, Mr. Harrison suggested he was not intoxicated during his charged possession, the government did not

challenge that understanding, and the district court appeared to accept it. *See* App. at 29 (Mr. Harrison stating he "was merely found with a controlled substance in his vehicle"); App. at 61–64 (the government describing historical laws that disarmed intoxicated people without suggesting Mr. Harrison was intoxicated during his gun possession); App. at 102 (the district court distinguishing § 922(g)(3) from historical laws disarming intoxicated people, because § 922(g)(3) applies "regardless of whether the person is actually intoxicated or under the influence of a controlled substance"). Mr. Harrison's position on appeal proceeds from this factual premise, and we see no reason to reject it. *See* Ans. Br. at 31 n.39 ("Mr. Harrison is not alleged to have been intoxicated at the time he possessed a firearm.").

For the first time in its supplemental briefs on appeal, the government raises two new arguments concerning the scope of Mr. Harrison's challenge. These arguments come too late.

*First*, the government suggests Mr. Harrison cannot litigate an as-applied challenge at this procedural stage. According to the government, "pre-trial as-applied challenges to the constitutionality of a statute are rarely permissible." Gov't Supp. Br. at 5 n.2 (citing *United States* v. *Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010)). In *Pope*, we explained courts typically should not consider pre-trial "motions to dismiss that require resort to facts outside the

indictment and bearing on the general issue" of guilt. 613 F.3d at 1260. But a court may consider facts outside the indictment when "'[1] the operative facts are undisputed and [2] the government fails to object to the district court's consideration of those undisputed facts,' and [3] the district court can determine from them that, '*as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt.'" *Id.* (alterations in original) (quoting *United States* v. *Hall*, 20 F.3d 1084, 1088 (10th Cir. 1994)).

Also, when the government litigates a case in a way that implicitly endorses the district court's resort to facts outside the indictment, and objects only after the case has proceeded on that basis, we have recognized "the government's procedural objection is untimely." *United States* v. *Brown*, 925 F.2d 1301, 1304 (10th Cir. 1991); *Hall*, 20 F.3d at 1087–88 (recognizing the timeliness holding in *Brown*, and allowing resort to facts outside the indictment when "the government did not dispute the facts surrounding the . . . charge"); *see also Pope*, 613 F.3d at 1262 (affirming denial of a motion to dismiss when, prior to appeal, "the government *did* contest the district court's ability to resolve [the] motion on the basis of facts outside [the] indictment"); *see also Lyons* v. *Jefferson Bank & Tr.*, 994 F.2d 716, 721 (10th Cir. 1993) (explaining a party cannot "lose in the district court on one theory of the case, and then prevail on appeal on a different theory").

That is the situation here. In the district court, the government never took issue with Mr. Harrison's ability to bring—or the district court's ability to resolve—an as-applied challenge. *See, e.g.*, App. at 56–65 (government failing to raise this issue in its district court brief). Even on appeal, the government initially accepted that Mr. Harrison was raising an as-applied challenge to § 922(g)(3). *See* Op. Br. at 31 (government arguing certain evidence "has no impact in Mr. Harrison's as-applied challenge"). We thus have no trouble concluding "the government's procedural objection is untimely," meaning Mr. Harrison's as-applied challenge is before us. *Brown*, 925 F.2d at 1304.

*Second*, the government raises a new factual objection—that the record before the district court "permit[ted] an inference that Mr. Harrison was intoxicated." Gov't Supp. Br. at 3; *see* App. at 55–65 (the government failing to suggest this was the case in its district court brief). Again, we cannot endorse the government's effort to raise this new argument in its supplemental briefing on appeal. *See id.*; *Lyons*, 994 F.2d at 721; *State Farm Fire & Cas. Co.* v. *Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) ("[A]ppellant failed to raise this issue in his opening brief and, hence, has waived the point.").

We therefore conclude this case presents a challenge only to § 922(g)(3)'s application to non-intoxicated marijuana users.

### III

We now explain the legal standards applicable to Second Amendment challenges.

We "review challenges to the constitutionality of a statute de novo." *United States* v. *Wilks*, 58 F.3d 1518, 1519 (10th Cir. 1995). "Statutes are presumed constitutional." *United States* v. *Dorris*, 236 F.3d 582, 584 (10th Cir. 2000). "To ascertain the constitutionality of a law burdening an individual's exercise of the Second Amendment, we apply a two-part burden-shifting framework first established in *Bruen* and later clarified in *Rahimi*." *Rocky Mountain Gun Owners*, 121 F.4th at 113.

In *Bruen*, the Supreme Court explained the "standard for applying the Second Amendment is as follows:

> [1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

597 U.S. at 24. We refer to the two parts of this standard as "step one" and "step two." *Rocky Mountain Gun Owners*, 121 F.4th at 113–28; *see also Rahimi*, 602 U.S. at 744 (Jackson, J., concurring) (referring to *Bruen*'s "two-step evaluation").

13

"At step one, the plaintiff is tasked with establishing that the Second Amendment's explicit text, 'as informed by history,' encompasses the conduct they seek to engage in." *Rocky Mountain Gun Owners*, 121 F.4th at 113 (quoting *Bruen*, 597 U.S. at 19). We must "ask (1) whether the challenger is part of 'the people' whom the Second Amendment protects, (2) whether the item at issue is an 'arm' that is 'in common use' today for self-defense, and (3) whether the proposed course of conduct falls within the Second Amendment." *Id.* at 114 (quotation omitted) (citing *Bruen*, 597 U.S. at 31–32). If the plaintiff succeeds, the burden shifts to the government.

At step two, to show a challenged regulation is consistent with our historical tradition, the government must engage in "analogical reasoning." *Bruen*, 597 U.S. at 28, 30. That is, *Bruen* requires the government to point to historical regulations that are analogous to the challenged regulation. *See id.* at 28–29. Whether a historical regulation is analogous to a modern one for purposes of *Bruen* step two—or whether they are "relevantly similar"—depends on "*how* and *why* the regulations burden" the right to bear arms. *Id.* at 29 (emphasis added). We thus ask "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is *comparably justified*." *Id.* (emphasis added). *Bruen* held the government must "identify a well-established and representative historical *analogue*, not a historical *twin*. So

even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30.

To evaluate which way the history cuts, *Bruen* provided another piece of guidance. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century," the Court explained, "the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26 (emphasis added). But "cases implicating unprecedented societal concerns . . . may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 27.

In *Rahimi*, the Supreme Court reinforced and developed *Bruen*'s methodology for analogical reasoning. When considering historical analogues, *Rahimi* instructed, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." 602 U.S. at 692 (emphasis added); *Rocky Mountain Gun Owners*, 121 F.4th at 113 (emphasizing *Rahimi* requires us to find "*principles*" in our historical tradition (quoting *Rahimi*, 602 U.S. at 692)). Justice Sotomayor's

15

concurrence in *Rahimi* further elaborated on how the analogical reasoning must proceed. "The Court's opinion also clarifies an important methodological point that bears repeating: Rather than asking whether a present-day gun regulation has a precise historical analogue, courts applying *Bruen* should 'conside[r] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition.'" *Id.* at 703–04 (Sotomayor, J., concurring) (quoting *id.* at 692 (majority opinion)). The point to remember, therefore, is "[h]istorical regulations reveal a principle, not a mold." *Id.* at 740 (Barrett, J., concurring).

Finally, we must consider what history is relevant to the analogical inquiry. *Bruen* and *Rahimi* provide guidance on this front. Evidence from the founding era—or the years surrounding 1791, when the Second Amendment was first ratified—is most probative.[5] *See Bruen*, 597 U.S. at

---

[5] Deciding which history is relevant to the Second Amendment inquiry is a complex question. Reconstruction-era evidence also could have a role, alongside founding-era evidence. As the Supreme Court has recognized, "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *N.Y. State Rifle & Pistol Ass'n* v. *Bruen*, 597 U.S. 1, 37 (2022). Scholars have contended, for instance, that "[w]hen the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." *Id.* at 38 (quoting Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1439 (2022)).

34. And this makes sense, because we know our objective is to determine what "scope" the Second Amendment was "understood to have *when the people adopted* [*it*]." *Id.* (quoting *District of Columbia* v. *Heller*, 554 U.S. 570, 634–35 (2008)).

Evidence that predates the Second Amendment also bears on the analogical inquiry. In both *Bruen* and its precursor *Heller*, the Supreme Court emphasized we must consider "the historical background of the Second Amendment . . . because it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *Heller*, 554 U.S. at 592; *Bruen*, 597 U.S. at 20. "The Amendment 'was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors.'" *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 599); *see id.* (favorably citing *Heller*'s reliance on "English history dating from the late 1600s, along with American colonial views leading up to the founding"). Of

---

We resolve this case according to evidence surrounding the founding era, which the Supreme Court has made clear is probative. Neither party argues Reconstruction-era history changes the applicable historical principles in any meaningful way. Given this party presentation, we leave the relevance of Reconstruction for another day. *See id.* at 38 ("We need not address this issue today."); *People for Ethical Treatment of Prop. Owners* v. *U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 1008 (10th Cir. 2017) ("If it is not necessary to decide more, it is necessary not to decide more." (quoting *PDK Labs. Inc.* v. *DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring)). This court or the Supreme Court will likely address the relevance of the Reconstruction era when a case requires it.

course, "[h]istorical evidence that long predates [1791] may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* at 34; *see id.* at 35 ("English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution.").

Postenactment history demands similar care. *See id.* ("[W]e must also guard against giving postenactment history more weight than it can rightly bear."). On one hand, "'a regular course of practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms & phrases' in the Constitution," and "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Id.* at 35–36 (first quoting *Chiafalo* v. *Washington*, 591 U.S. 578, 593 (2020); and then quoting *NLRB* v. *Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in the judgment)); *see also id.* at 35 ("It is true that in *Heller* we reiterated that evidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represented a 'critical tool of constitutional interpretation.'" (quoting *Heller*, 554 U.S. at 605)). On the other hand, history from many years after enactment provides mostly "secondary"

evidence of original meaning. *Id.* at 37. And "to the extent later history contradicts what the text says, the text controls."[6] *Id.* at 36.

## IV

Keeping in mind the background law, we now describe the district court's order in detail. The district court concluded § 922(g)(3) violates the Second Amendment as applied to non-intoxicated marijuana users and granted Mr. Harrison's motion to dismiss his indictment.

To start, the court correctly began with the *Bruen* framework. At *Bruen* step one, the district court held "[t]he Second Amendment's plain text covers Harrison's conduct." App. at 93. Mr. Harrison's conduct constituted

---

[6] The Supreme Court's directive that "the text controls," *Bruen*, 597 U.S. at 36, might be hard to reconcile with its stated understanding that the Second Amendment enshrined a "pre-existing right," *id.* at 20 (quoting *District of Columbia* v. *Heller*, 554 U.S. 570, 592 (2008)), and that courts should examine what "scope" that right was "understood to have" at the founding, *id.* at 34 (quoting *Heller*, 554 U.S. at 634). What happens if a court concludes the Founders' understanding of the pre-existing right enshrined in the Second Amendment is not captured by the specific language the Founders used to enshrine that right? How does the constitutional inquiry proceed then—does text still control? Because we can decide this appeal without addressing that issue, or other difficult theoretical questions about the nature of the historical inquiry, we do not explore them in this case. *See also Rahimi*, 602 U.S. at 738–39, 739 n.* (Barrett, J., concurring) (suggesting history "plays two roles": "elucidat[ing] how contemporaries understood the text" and "determining the scope of the pre-existing right that the people enshrined in our fundamental law"—the second of which "walks a fine line between original meaning (which controls) and expectations about how the text would apply (which do not)"); *Range* v. *Att'y Gen. United States*, 124 F.4th 218, 234 n.4 (3d Cir. 2024) (en banc) (Matey, J., concurring) (considering whether "classical authorities discussing natural law" can "inform the determination of written rights").

"'keeping' a firearm," the court reasoned, and he is among the "people" to whom the Second Amendment refers. App. at 93–94. The court supported this conclusion with language in *Heller* and *Bruen* that suggests the word "people" means "all Americans." App. at 94 (quoting *Heller,* 554 U.S. at 580–81; *Bruen*, 597 U.S. at 70). And, as the court also recognized, nobody disputes Mr. "Harrison is an American citizen." App. at 94.

The district court next turned to *Bruen* step two, which requires the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24; App. at 96. Here, the district court first concluded § 922(g)(3) addresses a societal problem that has persisted since the founding, and "the United States has not identified a single historical law that is 'distinctly similar' to § 922(g)(3)." App. at 98.

The court then addressed the government's argument that § 922(g)(3) fits within a historical tradition of disarming those believed to be dangerous. The court acknowledged, as the government had argued, that legislative "limitations on the right to armed self-defense 'were tied to dangerousness.'" App. at 119 (quoting *Folajtar* v. *Att'y Gen. of the U.S.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting), *abrogated by Bruen*, 597 U.S. 1, *as recognized in Range* v. *Att'y Gen. United States*, 124 F.4th 218, 225 (3d Cir. 2024) (en banc)). But in the district court's view, the historical record

showed only "'that the legislature may disarm those who have *demonstrated* a proclivity for violence' through *past* violent, forceful, or threatening conduct." App. at 117–18 (emphasis added) (quoting *Kanter* v. *Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting)); *see also* App. at 118 ("[T]he Constitution permitted the dispossession of *persons who demonstrated* that they would present a danger to the public if armed." (emphasis added) (quoting *Binderup* v. *Att'y Gen. U.S. of Am.*, 836 F.3d 336, 369 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part), *abrogated by Bruen*, 597 U.S. 1, *as recognized in Range*, 124 F.4th at 225 (en banc))).[7] The district court saw nothing in the history that permitted legislatures to disarm people based on "assessments of future risk." App. at 125. It reasoned "stripping a person's fundamental rights based on projected crimes untethered from past dangerous actions is a risky game indeed." App. at 124–25 (quoting *Folajtar*, 980 F.3d at 923 (Bibas, J., dissenting)).

---

[7] In support, the district court emphasized "surety statutes" in the nineteenth century "require[d] certain individuals to post bond before carrying weapons in public," if they had been "threatening to do harm." App. at 118 (quoting *Bruen*, 597 U.S. at 55); *see also Rahimi*, 602 U.S. at 695 (discussing surety statutes). Likewise, historical laws disarming "those who engaged in rebellion . . . demonstrate that 'persons who by their actions . . . betray a likelihood of violence against the state may be disarmed.'" App. at 119 (second alteration in original) (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 727–28 (2009)).

As relevant to this appeal, the court specifically addressed the government's proposed analogies to historical laws disarming the mentally ill, Catholics, and loyalists.[8] The court reasoned "history and tradition would limit disarmament to *dangerous* lunatics," not all "lunatics." App. at 126. The court also concluded laws disarming the mentally ill could not be analogous to laws disarming non-intoxicated marijuana users. The government's argument—that historical laws disarming the mentally ill show legislatures can disarm those with "difficulty exercising self-control"—would "appear[] to have no limit," as it would also apply to those with "autism, attention deficit disorder, and nicotine dependence." App. at 126 (quoting App. at 64). Concerning laws disarming Catholics and loyalists, the court held the Second Amendment "did not incorporate" such laws. App. at 131. The court likewise found laws disarming Catholics and loyalists "were justified on the fear that the covered groups were likely to wage active war," not that they generally posed a risk of danger. App. at 136–37.

Having recognized a tradition of disarming those who were violent, forceful, or threatening *in the past*, but not disarming those likely to pose a

---

[8] The court also specifically addressed the government's proposed analogies to historical laws disarming felons and the intoxicated. *See* App. at 99–117. But the government has not marshaled those laws as potential analogues on appeal.

risk of danger *in the future*, the district court held § 922(g)(3) violated the Second Amendment as applied to non-intoxicated marijuana users like Mr. Harrison. "The use of marijuana," the district court concluded, "is not in and of itself a violent, forceful or threatening act." App. at 124.

V

We endorse much of the district court's analysis and reasoning. At *Bruen* step one, we fully agree with the district court that the Second Amendment applies to Mr. Harrison's conduct. At *Bruen* step two, we agree with the district court in part, as we will explain.

A

At *Bruen* step one, we ask whether "the Second Amendment's plain text covers [Mr. Harrison's] conduct." *Bruen*, 597 U.S. at 24. Like the district court, we conclude it does.

The Second Amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II. All agree Mr. Harrison's conduct—carrying a revolver in his car—constituted "keep[ing]" or "bear[ing]" "Arms." *See Bruen*, 597 U.S. at 21 (explaining "the Second Amendment protects the possession and use of weapons that are 'in common use at the time'" (quoting *Heller*, 554 U.S. at 627)); *Rocky Mountain Gun*

*Owners*, 121 F.4th at 113–14, 116 (describing the relevant inquiries at *Bruen* step one).

The only question is whether Mr. Harrison is among the "people" protected by the Second Amendment's text. Urging reversal, the government insists the Supreme Court has qualified the Second Amendment as applying only to "law-abiding citizens." Op. Br. at 55–60 (citing, *e.g.*, *Heller*, 554 U.S. at 634–35; *Bruen*, 597 U.S. at 9, 15, 29–31, 33 n.8, 38 & n.9, 60, 70; *Voisine* v. *United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting) ("To be constitutional, therefore, a law that broadly frustrates an individual's right to keep and bear arms must target individuals who are beyond the scope of the 'People' protected by the Second Amendment.")). So "unlawful drug users," the government says, "are not part of the 'people.'" Op. Br. at 53. Mr. Harrison insists *Heller* and *Bruen* show he is among the "people." Mr. Harrison adds that, across the Bill of Rights, the word "people" has a broad scope.

We agree with the district court and Mr. Harrison. In *Rocky Mountain Gun Owners*, we concluded law-abiding 18- to 20-year-olds are part of the "people" protected by the Second Amendment. 121 F.3d at 114–16. We also suggested those with prior felony convictions are within the "people." *Id.* at 116. And in *United States* v. *Jackson*, we held those with prior misdemeanor convictions are among the "people." 138 F.4th 1244, 1252 (10th Cir. 2025).

While these cases support our conclusion, they do not conclusively resolve whether Mr. Harrison is part of the "people." Neither case addressed individuals who *currently* violate the law (as opposed to those with prior convictions); in *Jackson*, the government conceded the *Bruen* step one issue, *id.*; and in *Rocky Mountain Gun Owners*, we specifically left open "the definite contours of who 'the people' encompasses," 121 F.4th at 115.

Today, we hold the "people" for purposes of the Second Amendment include, at least, all Americans. With this holding, we join the weight of persuasive authority since *Rahimi*. *See, e.g.*, *United States* v. *Diaz*, 116 F.4th 458, 466 (5th Cir. 2024) ("[A]ll people have the right to keep and bear arms . . . ." (first alteration in original) (quoting *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting))); *United States* v. *Williams*, 113 F.4th 637, 649 (6th Cir. 2024) ("The right thus belongs to 'all Americans.'" (quoting *Heller*, 554 U.S. at 580)); *see also United States* v. *Duarte*, 137 F.4th 743, 752–53 (9th Cir. 2025) (en banc) (finding a defendant is part of "the people" because he "is undoubtedly a member of the national community").

As the district court recognized, a broad reading of "people" follows the Supreme Court's clear directive in its Second Amendment jurisprudence. *Heller* recognized a "strong presumption that the Second Amendment right . . . belongs to all Americans." 554 U.S. at 581; *see also id.* at 580 (suggesting the Second Amendment applies to "all members of

25

the political community"). *Bruen* stated without reservation that the Second Amendment covers "all Americans." *Bruen*, 597 U.S. at 70 (quoting *Heller*, 554 U.S. at 581). And most recently, in *Rahimi*, the Court did not dwell on *Bruen* step one and proceeded straight to *Bruen* step two, essentially assuming Mr. Rahimi was among the "people"—regardless of whether he was "law-abiding." *See Rahimi*, 602 U.S. at 686, 690–99; *id*. at 752 (Thomas, J., dissenting) ("It is . . . undisputed that the Second Amendment applies to Rahimi.").

As the government stresses, the Court has frequently referenced the Second Amendment's application to "law-abiding citizens." *E.g.*, *Heller*, 554 U.S. at 625, 635; *Bruen*, 597 U.S. at 26, 29, 30, 31. But in *Rahimi*, the Court disagreed that its use of the word "'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right" necessarily excluded "citizens who were not 'responsible.'" *Rahimi*, 602 U.S. at 701–02; *see Rocky Mountain Gun Owners*, 121 F.4th at 122 (making this point). That logic forecloses the government's argument Mr. Harrison may be disarmed simply because he is not "law-abiding."[9]

---

[9] The Court has sometimes appeared to use "law-abiding" and "responsible" interchangeably. *E.g.*, *Heller*, 554 U.S. at 635 (explaining the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"); *Bruen*, 597 U.S. at 26, 70 (similarly referring to "law-abiding, responsible citizens").

The government also relies on Justice Thomas's dissent in *Voisine*, which it calls the "clearest statement on the issue." Op. Br. at 57. Justice Thomas wrote, "To be constitutional . . . a law that broadly frustrates an individual's right to keep and bear arms must target individuals who are beyond the scope of the 'People' protected by the Second Amendment." *Voisine*, 579 U.S. at 715 (Thomas, J., dissenting). Whatever this statement may have implied about the scope of the "people" before *Rahimi*, Justice Thomas clarified his approach in his *Rahimi* dissent. He wrote, "[T]he Second Amendment extends to 'the people,' and that 'term unambiguously refers to all members of the political community, not an unspecified subset.'" 602 U.S. at 752 (Thomas, J., dissenting) (quoting *Heller*, 554 U.S. at 580). This is consistent with the conclusion we reach today.

A contrary conclusion would defy law and logic. The First and Fourth Amendments also refer to the "people," and nobody contends only "law-abiding citizens" enjoy the rights protected by these constitutional guarantees. *See* U.S. Const. amend. I (establishing "the right of the people peaceably to assemble"); U.S. Const. amend. IV (establishing "[t]he right of the people to be secure in their persons, houses, papers and effects"). We have specifically recognized "the meaning of the phrase 'the people' does not appear to vary across the Constitution." *Rocky Mountain Gun Owners*, 121 F.4th at 116. It would be "implausible under ordinary principles of

construction" to conclude the word "people" has different meanings across provisions. *Williams*, 113 F.4th at 649; *see also United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (suggesting "'the people' seems to have been a term of art employed in select parts of the Constitution," and "'the people' protected by the Fourth Amendment, and by the First and Second Amendments . . . refers to a class of persons who are part of a national community"). This provides additional reason to doubt the government's attempt to limit the Second Amendment's text.

Next, restricting the Second Amendment to "law-abiding" citizens—as the government urges us to do—would make it harder to administer and would risk turning it into "a second-class right." *Bruen*, 597 U.S. at 70 (quoting *McDonald* v. *City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)). We do not even know precisely what "law-abiding" means. How many laws must someone break to fall outside the Second Amendment's ambit? And how severe must those violations be? The government provides no answers. *See* App. at 95 n.21 (the district court asking "who among us, after all, isn't a 'lawbreaker'?").

In reaching our conclusion, we find instructive how then-Judge Barrett explained the issue. "Some maintain that there are certain groups of people . . . who fall entirely outside the Second Amendment's scope. Others maintain that all people have the right to keep and bear arms but

28

that history and tradition support Congress's power to strip certain groups of that right." *Kanter*, 919 F.3d at 451–52 (Barrett, J., dissenting) (citations omitted). The first approach "uses history and tradition to identify the scope of the right, and the [second] uses that same body of evidence to identify the scope of the legislature's power to take it away." *Id.* at 452. Like then-Judge Barrett, we think "the latter is the better way to approach the problem." *Id.*

We thus discern no error in the district court's conclusion at *Bruen* step one. Mr. Harrison is among the "people" protected by the Second Amendment.

## B

We now move to *Bruen* step two. Here, we engage in what the Supreme Court calls "analogical reasoning." *Bruen*, 597 U.S. at 28–30. The government must marshal historical analogues to demonstrate § 922(g)(3)—in its application to non-intoxicated marijuana users—is consistent with the Nation's historical tradition of firearm regulation.

We first ask whether the statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 26. Recall, if it does, then the lack of a "distinctly similar historical regulation . . . is relevant evidence" § 922(g)(3) violates the Second Amendment. *Id.* The district court reasoned § 922(g)(3) addresses a persistent societal problem, and we agree. And the parties seem to agree there is no historical regulation

"distinctly similar" to § 922(g)(3) as applied to non-intoxicated marijuana users.

We then move to the heart of *Bruen* step two. We ask: Has the government shown § 922(g)(3), as applied here, "is consistent with the principles that underpin our regulatory tradition?" *Rahimi*, 602 U.S. at 692. The district court answered no, but as we will explain, we ultimately conclude otherwise.

**1**

**a**

Under *Bruen* step two, our threshold inquiry focuses on whether § 922(g)(3)—as applied to non-intoxicated marijuana users—"addresses a general societal problem that has persisted since the 18th century." *Bruen*, 597 U.S. at 26. If it does, then the lack of a historical regulation "distinctly similar" to § 922(g)(3)—again, as applied here—is "relevant evidence" the statute violates the Second Amendment. *Id.*

What is the problem addressed by § 922(g)(3)?[10] In the district court's view, § 922(g)(3) concerns "possession of firearms by users of substances

---

[10] Neither the district court nor any party suggests the problem addressed by § 922(g)(3) as applied to non-intoxicated marijuana users is distinct from the problem addressed by § 922(g)(3) as applied to all other drug users. We do not foreclose the future argument that, in its application to a unique drug, § 922(g)(3) could be addressing a distinct societal problem.

with the potential for abuse." App. at 98. Mr. Harrison offers an understanding similar to the district court's. *See* Ans. Br. at 31. The government, meanwhile, tells us § 922(g)(3) addresses the "risk of dangerousness posed by the possession of firearms by individuals who unlawfully use or are addicted to controlled substances." Op. Br. at 7. The government's description of this problem is narrower than the district court's in two important respects. According to the government, § 922(g)(3) addresses a narrow problem of those who use "controlled substances"— which the law defines to exclude alcohol—and specifically those who use those substances "unlawfully." *See* Op. Br. at 7–10. With this understanding, the government suggests the "problem addressed by § 922(g)(3) could not have existed in the 18th century because there were no drug laws." Op. Br. at 7.

We agree with the district court that § 922(g)(3) addresses the dangerous mixture of guns and intoxicants. Recall, *Bruen* asks us to determine whether modern and historical laws face the same "*general* societal problem," which counsels against allowing the government to define the problems addressed by modern laws too narrowly. 597 U.S. at 26 (emphasis added). *Bruen* itself evaluated the purpose of a modern law with a high level of generality—finding a New York regulation addressed the overall problem of "handgun violence" in "urban area[s]." *Id.* at 27

(alteration in original) (quoting *Heller*, 554 U.S. at 634). The government, meanwhile, attempts to define the problem addressed by § 922(g)(3) so narrowly as to precisely match the statute's scope. But if that were permissible, almost no modern gun regulations would address general societal problems that have persisted since the founding.[11]

Having determined § 922(g)(3) generally addresses the dangers of mixing guns and intoxicants, we ask whether the Founders were concerned with a similar "general" problem. They undisputedly were. The district court aptly observed, "[H]istorical prohibitions on the carrying of firearms by intoxicated persons . . . proves" this concern is longstanding. App. at 98; *see* 1 William Waller Hening, *The Statutes at Large: Being a Collection of all the Laws of Virginia* 401–02, Act XII (1823) (1655 law); 5 *The Colonial Laws of New York from the Year 1664 to the Revolution* 244–46, ch. 1501 (1894) (1771 law).

_____

[11] Notably, the government's attempt to define the societal problem more narrowly seems at odds with how it defends § 922(g)(3) in this appeal. According to the government, "Congress' intent in enacting §[] 922(g) . . . was to keep firearms out of the hands of presumptively risky people." Op. Br. at 20 (quoting *Dickerson* v. *New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983)). "[D]rugs and guns are a dangerous combination," the government tells us, because "drug abusers . . . are more likely to have difficulty exercising self-control." Op. Br. at 20 (alterations in original) (first quoting *Smith* v. *United States*, 508 U.S. 223, 240 (1993); and then quoting *United States* v. *Yancey*, 621 F.3d 681, 685 (7th Cir. 2010)). These arguments focus on the dangerous combination of intoxicants and guns—not, as the government suggests, on whether a given intoxicant is "controlled" or whether its use is unlawful.

Consider how colonial New York and Virginia explained laws disarming intoxicated people. New York was concerned about "damages . . . frequently done on . . . New Year's days, by persons . . . with guns and other fire arms and being often intoxicated with liquor, [who] have not only put the inhabitants in great terror, but committed many mischiefs." 5 *Colonial Laws of New York, supra*, at 244–45, ch. 1501 (1771 law) (capitalization modernized). Virginia expressed concern that alarms could not warn against Indian invasion, and the public would waste gunpowder, if men could use firearms while drinking alcohol. *See* 1 Hening, *supra*, at 401–02, Act XII (1655 law). Likewise, as the government itself stresses, the Founders understood drug use to cause "temporary insanity." Op. Br. at 45 (quoting Thomas Cooley*, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 599 n.1 (1868)).

This historical evidence concerns regulations disarming intoxicated people. Here, Mr. Harrison challenges § 922(g)(3) as applied to non-intoxicated marijuana users. But the general problem § 922(g)(3) addresses does not vary based on how the statute is applied. No party contends otherwise. And in *Bruen*, the Court accepted the challenged regulation addressed a persistent societal problem without citing significant founding-era evidence. 597 U.S. at 27. We are therefore satisfied, on the record before

33

us, that § 922(g)(3) addresses a societal problem that has persisted since the founding, including in its application to Mr. Harrison—the dangerous mixture of firearms and intoxicants. *See United States* v. *Veasley*, 98 F.4th 906, 912 (8th Cir. 2024) ("The lesson here is that disarmament is a modern solution to a centuries-old problem.").

### b

The parties seem to agree there is no historical regulation "distinctly similar" to § 922(g)(3) as applied to non-intoxicated marijuana users. *Bruen*, 597 U.S. at 26. Instead, when the Founders addressed the dangerous mixture of firearms and intoxicants, they seemed to disarm only intoxicated people. *Bruen* instructs us to treat this as "relevant evidence" that, in the context litigated here, § 922(g)(3) violates the Second Amendment. *Id.* The parties dispute what it means for the lack of a "distinctly similar" historical regulation to be "relevant evidence" § 922(g)(3) is unconstitutional.

The government contends the lack of a "distinctly similar" historical regulation does not alone determine whether § 922(g)(3) "is consistent with this Nation's historical tradition of firearm regulation"—the question posed by *Bruen* step two. *Id.* at 17. "Regardless of whether § 922(g)(3) addresses a general societal problem that existed in the 18th century," the government explains, "analogical reasoning still applies." Op. Br. at 11. Mr. Harrison insists "the lack of historical laws distinctly similar to § 922(g)(3) is

dispositive" and "*establishes* that § 922(g)(3) is inconsistent with the Second Amendment." Ans. Br. at 31 (emphasis added).[12] We agree with the government.

The Supreme Court has never said the lack of a distinctly similar historical regulation is dispositive of the constitutional question. Rather, *Bruen* described this absence as "relevant evidence," no more and no less. 597 U.S. at 26. And if there were any doubt after *Bruen*, the Court clarified its approach in *Rahimi*. There, the Court engaged in analogical reasoning without even discussing whether the challenged regulation addressed a persistent societal problem, or whether there was a distinctly similar historical regulation, even though the dissent invoked these concepts. *See Rahimi*, 602 U.S. at 693–700; *id.* at 750–51 (Thomas, J., dissenting); *see also Diaz*, 116 F.4th at 471 (stating *Bruen* and *Rahimi* "rejected" the argument that the lack of a distinctly similar law can be dispositive).

"[T]he absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much." *Antonyuk* v. *James*, 120 F.4th 941, 969 (2d Cir. 2024). When a regulation is absent from the historical record, perhaps the Founders believed it was

---

[12] The district court indicated agreement with Mr. Harrison, though its analysis did not turn on this point. *See* App. at 98 (stating "*Bruen* suggests [this inquiry] is dispositive," but "the United States' historical evidence falls short" regardless).

unconstitutional. But this is a limited heuristic. Holding it too closely would improperly "assume[] that founding-era legislatures maximally exercised their power to regulate" and "adopt[] a 'use it or lose it' view of legislative authority," which "originalism does not require." *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring); *Pitsilides* v. *Barr*, 128 F.4th 203, 209 (3d Cir. 2025) ("[W]e remain vigilant not to 'assume[ ] that founding-era legislatures maximally exercised their power to regulate' conduct." (quoting *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring)). There are countless reasons the Founders may not have used a distinctly similar regulation to one used today: they were less concerned with the specific problem than we are, they prioritized legislation in other domains, logistics of enforcement were more tenuous, or non-constitutional policy concerns favored different paths. None of those reasons implicate the Second Amendment. We therefore use the lack of a historical regulation distinctly similar to § 922(g)(3) as a data point in our analogical inquiry.

### 2

We now move to the heart of *Bruen* step two. By examining historical analogues, we ask whether the "principles" in "our regulatory tradition" are "consistent with" Congress's decision to disarm non-intoxicated marijuana users under § 922(g)(3). *Rahimi*, 602 U.S. at 692. Recall, the district court concluded § 922(g)(3) did not fall within a historical tradition of either

disarming the mentally ill or disarming those believed to pose a risk of danger. The government argues these holdings were erroneous. According to the government, § 922(g)(3) "is relevantly similar to" both "laws disarming the mentally ill" and "laws disarming those believed to be dangerous."[13] Op. Br. at 43, 14. We address each argument in turn.

a

Defending the constitutionality of § 922(g)(3), the government first insists our Nation has a broad tradition of disarming the mentally ill. It maintains the Supreme Court acknowledged this tradition in *Heller*, when it stated "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill." 554 U.S. at 626. The government also relies on a Supreme Court case from 1849 discussing an "acknowledged right"—outside the firearm context—to "exclude . . . lunatics." Op. Br. at 44 (quoting *Smith* v. *Turner*, 48 U.S. 283, 463 (1849)); a 1788 New York law allowing the state to seize property from a "lunatick" until "he comes to his right mind," Op. Br. at 44

---

[13] Notably, in the district court, the government argued historical laws disarming the mentally ill were a *subset* of laws disarming the dangerous, not an independent category of analogous laws, as it argues here. *See* App. at 62 (suggesting "the mentally ill . . . pose a danger to public safety if armed"). We need not decide whether the government has waived its new articulation because Mr. Harrison does not argue it has, and we reject the government's argument in any event.

37

(quoting 2 *Laws of the State of New York* 617, ch. 12 (1886) (1788 law)); and a variety of secondary sources, Op. Br. at 43–44 (citing, *e.g.*, Robert Dowlut, Comment, *The Right to Arms: Does the Constitution or Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983); Cooley*, supra*, at 28–29 (1868)).

The government then argues the mentally ill are "relevantly similar" to non-intoxicated marijuana users, such that laws disarming the former support laws disarming the latter. Op. Br. at 45–47. The government defends this analogy by insisting the Founders understood intoxication to be akin to temporary insanity, and "scientific studies have noted the link between mental illness and illicit drug use." Op. Br. at 45 (citing sources). Ultimately, the government argues, § 922(g)(3) matches the "how" and the "why" of a founding-era practice: it disarms a "limited, narrowly tailored" group (the how), because that group is not "responsible," "ordinary," or able to exercise "self-control" (the why). Op. Br. at 46 (quotations omitted). Urging affirmance, Mr. Harrison asks us to endorse the district court's conclusion that laws disarming the mentally ill are not instructive here.[14]

_____

[14] Mr. Harrison also contends historical precedent for disarming the mentally ill is "dubious" in the first place. Ans. Br. at 50; *see* Ans. Br. at 50 ("[O]ne searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." (quoting Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376

We agree with the district court and Mr. Harrison. On the record before us, the government has not shown laws disarming the mentally ill are relevant historical analogues. The government suggests laws disarming the mentally ill reveal a principle that legislatures may disarm those who are not "responsible," "ordinary," or able to exercise "self-control." Op. Br. at 46 (quotations omitted). This analysis relies on constructs the Supreme Court has explicitly refused to endorse. In *Rahimi*, the Court "reject[ed] the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.'" 602 U.S. at 701. *Rahimi* teaches that capacious and subjective factors—like whether a group is "responsible," "ordinary," or able to exercise "self-control"—are unacceptable grounds for stripping the Second Amendment right.[15]

_____

(2009)). We need not assess the historical support for laws disarming the mentally ill, or what *Heller* has to say about such laws, which are issues that may arise in future Second Amendment cases. *See* 18 U.S.C. § 922(g)(4) (disarming "any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution").

[15] Additionally, as the district court recognized here, the government's proposed factors could permit disarming those with "autism, attention deficit disorder, [or] nicotine dependence." App. at 126. The government disputes this conclusion because "none of the conditions cited by the district court were conceptualized as mental disorders when the Second Amendment was ratified." Op. Br. at 49. Yet the government offers no proof marijuana use was considered a mental disorder at the founding. The government also insists autism, attention deficit disorder, and nicotine dependence do not lead people to criminal activity, while drug use and mental illness do. Op. Br. at 50. To the

Further, the government's arguments linking the mentally ill and non-intoxicated marijuana users are unhelpful. For instance, even if the founders viewed *intoxication* as temporary insanity, as the government contends, we do not see how that would apply to *non-intoxicated* marijuana users. *See United States* v. *Connelly*, 117 F.4th 269, 276 (5th Cir. 2024) ("Repeat marijuana users . . . are of sound mind upon regaining sobriety . . . .").[16] No matter what our historical tradition might reveal about disarming the mentally ill, that principle is not broad enough to extend to non-intoxicated marijuana users under § 922(g)(3).

### b

We turn now to the second historical principle the government identifies to justify § 922(g)(3). According to the government, historical regulations reveal the principle that a legislature may disarm those "believed to be dangerous." Op. Br. at 14. The district court agreed with the

---

extent the government is arguing marijuana users are dangerous and can be disarmed on that basis, we address that argument below.

[16] The government likewise cites *Robinson* v. *California*, 370 U.S. 660, 667 (1962), to claim "the Supreme Court has analogized drug addiction and mental illness." Op. Br. at 45. In *Robinson*, the Court merely noted "narcotic addiction . . . is apparently an illness which may be contracted innocently or involuntarily." *Robinson*, 370 U.S. at 667. The government does not explain how this is relevant to our analysis. *See Bronson* v. *Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

40

government insofar as "the Nation's broader historical tradition demonstrate[s] that limitations on the right to armed self-defense 'were tied to dangerousness.'" App. at 119 (quoting *Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting)). But the district court's understanding of "dangerousness" was exclusively backward looking: "'[T]he legislature may disarm those who have *demonstrated* a proclivity for violence' through *past* violent, forceful, or threatening conduct . . . ." App. at 117–18 (emphasis added) (quoting *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting)). The government urges reversal, insisting legislatures throughout our historical tradition have disarmed groups based on a concern about *future* danger. To support this theory, the government points to pre-founding English laws and colonial laws disarming Catholics and loyalists—categories of historical evidence the district court did not find probative. In urging affirmance, Mr. Harrison reprises the district court's reasoning.

We agree with the district court, but only in part. The district court correctly recognized that our Nation's tradition of firearm regulation supports disarming people who are dangerous. The district court was also right that past actions can serve as the basis to conclude an individual is dangerous. *See Jackson*, 138 F.4th at 1254 (explaining the defendant's "acts of domestic violence and his subsequent convictions demonstrate his 'propensity for the use of physical violence against others,'" so he "was

41

disarmed for reasons consistent with this Nation's tradition of firearm regulation" (quoting *United States* v. *Rogers*, 371 F.3d 1225, 1229 (10th Cir. 2004))). But, as we will explain, the government has identified historical analogues that reveal another key principle underpinning our Nation's history of firearm regulation: legislatures may disarm those believed to pose a risk of *future* danger. We thus agree with the district court about one reason "why" our predecessors disarmed certain individuals—to prevent dangerous people from possessing arms—but disagree about "how" they made those determinations—they looked both backward *and* forward. *See Bruen*, 597 U.S. at 29 (instructing courts to focus on "how and why . . . regulations" disarm).

In recognizing a historical principle that legislatures may disarm those believed to pose a risk of future danger, we join many other circuit courts that have understood the history the same way. *See Williams*, 113 F.4th at 657 ("This historical study reveals that governments in England and colonial America long disarmed groups that they deemed to be dangerous. . . . [G]overnments labeled whole classes as *presumptively* dangerous." (emphasis added)); *Duarte*, 137 F.4th at 761 (en banc) ("[F]our centuries of unbroken Anglo-American history shows that legislatures consistently disarmed entire categories of people who were *presumed* to pose a special risk of misusing firearms." (alteration in original) (emphasis

added) (quoting *Range*, 124 F.4th at 273 (en banc) (Krause, J., concurring in the judgment))); *United States* v. *Perez-Garcia*, 96 F.4th 1166, 1189 (9th Cir. 2024) ("[F]ounding-era legislatures categorically disarmed *groups whom they judged to be a threat* to the public safety." (emphasis added) (quoting *Kanter*, 919 F.3d at 458) (Barrett, J., dissenting)); *United States* v. *Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable *risk of danger* if armed." (emphasis added)); *United States* v. *Hunt*, 123 F.4th 697, 707 (4th Cir. 2024) ("A determination of dangerousness was sometimes made by status . . . and sometimes by conduct . . . . Those historical restrictions swept broadly, disarming all people belonging to groups that were, *in the judgment of those early legislatures, potentially* violent or dangerous." (emphasis added));[17]

---

[17] The Eighth Circuit and the Fourth Circuit have considered endorsing a more expansive principle of disarmament. Both have written legislatures may disarm those who have violated "legal norms, not merely to address a person's . . . propensity for violence." *United States* v. *Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024); *United States* v. *Hunt*, 123 F.4th 697, 707 (4th Cir. 2024) (quoting *Jackson*, 110 F.4th at 1127). They have framed danger-focused disarmament as a more modest way of understanding the history. *See Jackson*, 110 F.4th at 1126–28 (calling the danger rationale "narrower" and finding it still supported the challenged regulation); *Hunt*, 123 F.4th at 707–08 (similar). We state no opinion on the broader principle referenced by the Eighth and Fourth circuits, as the government has not asserted it in this case. *See Bruen*, 597 U.S. at 24 ("The government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.").

*Zherka* v. *Bondi,* No. 22-1108-CV, 2025 WL 1618440, at *16 (2d Cir. June 9, 2025) ("[B]efore, during, and shortly after the Founding, legislative bodies regulated firearms by prohibiting their possession by categories of persons *perceived to be* dangerous." (emphasis added)); *see also Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("[T]he legislature may disarm those who have demonstrated a proclivity for violence *or* whose possession of guns would *otherwise* threaten the public safety. This is a category . . . [that] includes dangerous people who have not been convicted of felonies . . . ." (emphasis added)); *Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting) ("Violence was one ground for fearing danger, as were disloyalty and rebellion." (emphasis added)); *Binderup*, 836 F.3d at 368 (en banc) (Hardiman, J., concurring in part) ("'[F]rom time immemorial, various jurisdictions recognizing a right to arms have . . . taken the step of forbidding *suspect groups* from having arms,' and 'American legislators at the time of the Bill of Rights seem to have been aware of this tradition.'" (second alteration in original) (emphasis added) (quoting Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009)))[18]; *cf. United States* v.

---

[18] Throughout this section, we extensively cite then-Judge Barrett's dissent in *Kanter* v. *Barr*, 919 F.3d 437 (2019), Judge Bibas's dissent in *Folajtar* v. *Att'y Gen. of the United States*, 980 F.3d 897 (3d Cir. 2020), and Judge Hardiman's partial concurrence in *Binderup* v. *Att'y Gen. U.S. of Am.*,

*Harris*, No. 21-3031, 2025 WL 1922605 (3d Cir. July 14, 2025) (concluding, in a challenge to the constitutionality of § 922(g)(3), the history shows "[d]rug users can be disarmed based on the *likelihood* that they will physically harm others if armed" (emphasis added)). Although most of these cases did not involve § 922(g)(3), they interpreted our Nation's history of gun regulation using the methodology of *Bruen* and *Rahimi*, so they are highly instructive.

### i

At the outset, Mr. Harrison raises an argument rooted in *Rahimi* that we must address. According to Mr. Harrison, *Rahimi* already forbids disarmament based on *legislative* judgments about risk. He says *Rahimi* limited disarmament to situations involving "a *judicial* finding" that an individual poses a threat. Harrison Supp. Resp. Br. at 6 (emphasis added).

We disagree with Mr. Harrison's reading of *Rahimi*. In *Rahimi*, the Supreme Court recognized historical laws "confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Rahimi*, 602 U.S. at 698. To be sure, *Rahimi* concerned § 922(g)(8)(C)(i), a law that disarms

---

836 F.3d 336 (3d Cir. 2016) (en banc). We find instructive these non-precedential writings because the district court and the parties relied on them, and they engaged in careful historical analysis. *See also, e.g.*, *United States* v. *Williams*, 113 F.4th 637 (6th Cir. 2024) (extensively citing these sources).

someone only if a *judge* finds they pose a risk of danger, while this case involves § 922(g)(3), a law that disarms those whom a *legislature* found pose a risk of danger. *Id.* at 688–89, 698–99.[19] But *Rahimi* expressly declined to address whether legislative judgments of danger can justify disarmament. The Supreme Court instead clarified that it did "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 602 U.S. at 698; *see* Gov. Supp. Resp. Br. at 4 (highlighting this excerpt from *Rahimi*).

Following *Rahimi*, we must answer in the first instance whether it is "consistent with the principles that underpin our regulatory tradition" for a legislature to disarm those it believes to pose a risk of future danger. *Id.* at 692. Turning to that question, we agree with the government that the answer is yes.

### ii

Turning to the history, we begin in England.[20] *See Bruen*, 597 U.S. at 20 ("The Amendment 'was not intended to lay down a novel principle but

---

[19] This court has also upheld a firearm regulation that requires a *judicial* finding of danger. *See United States* v. *Gordon*, 137 F.4th 1153, 1154, 1157 (10th Cir. 2025) (upholding § 922(g)(8)(C)(ii) against a facial challenge).

[20] The Supreme Court has acknowledged "historical analysis can be difficult; it sometimes requires resolving threshold questions, and making

rather codified a right inherited from our English ancestors.'" (quoting

*Heller*, 554 U.S. at 599)). The Militia Act of 1662 permitted government

officials "to search for and seize all arms in the custody or possession of any

person or persons whom [the official] shall judge dangerous to the peace of

---

nuanced judgments about which evidence to consult and how to interpret it." *Bruen*, 597 U.S. at 25 (quoting *McDonald* v. *City of Chicago*, 561 U.S. 742, 803–04 (2010) (Scalia, J., concurring)). We certainly agree. Judges are not trained historians. Neither are most lawyers. But "[o]nly a professional historian would know how to evaluate often-conflicting claims about the social, cultural, and legal landscape of an earlier period, and that person likely would not jump to any conclusions without devoting significant time to an evaluation of original sources." *Atkinson* v. *Garland*, 70 F.4th 1018, 1028–29 (7th Cir. 2023) (Wood, J., dissenting); *see also id.* ("Historiographers would caution us that the choice of sources, facts, organizational principles, and theories, all contribute to the final narrative."); Jonathan D. Martin, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts*, 78 N.Y.U. L. Rev. 1518, 1535 (2003) ("The complexity of the past, the indeterminacy of the historical record, and the contingency of human experience push historians toward a method that produces knowledge that is necessarily multivalent, subtle, and revisable.").

Yet the Supreme Court has instructed that, when it comes to the Second Amendment, history is at the heart of constitutional adjudication. Given these dynamics, we must be mindful of our limitations as we attempt to implement the prescribed methodology. *See United States* v. *Daniels*, 77 F.4th 337, 359–60 (5th Cir. 2023), *vacated*, 144 S. Ct. 2707 (2024) (Higginson, J., concurring) ("[C]ourts are laboring to give meaning to the *Bruen* requirement of 'historical inquiry.'"); *United States* v. *Perez-Garcia*, 96 F.4th 1166, 1174 (9th Cir. 2024) (recognizing "extensive historical analysis" depends on "research resources" and "amici historians"). To that end, in this opinion, we have leaned on primary sources, the work of professional historians, widely cited legal scholarship, and the decisions of other courts that have studied the historical evidence to the best of their ability.

the kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13, 5 Statutes of the Realm 360 (capitalization and spelling modernized). This provides early evidence that individuals believed to pose a risk of danger may be disarmed. Because the Militia Act did not limit disarmament to those who had acted dangerously in the past, it outlines a more expansive principle of disarmament than the district court acknowledged.

Mr. Harrison argues the 1689 English Bill of Rights casts some doubt on the Militia Act's relevance. The English Bill of Rights—which contains the "predecessor to our Second Amendment," *Heller*, 554 U.S. at 593—guaranteed "that the subjects which are Protestants may have arms for their defence suitable to their conditions, and as allowed by law." 1 W. & M., ch. 2, § 7; *see Bruen*, 597 U.S. at 44 (calling the English Bill of Rights "a watershed"). Assuming the English Bill of Rights cabined the Militia Act, it does not seem to have abrogated the Militia Act. *Compare Rahimi*, 602 U.S. at 694 (suggesting the English Bill of Rights was a "rebuke" of some of the conduct enabled by the Militia Act), *and Connelly*, 117 F.4th at 278 (stating the English Bill of Rights "qualified" the Militia Act), *with* Joyce Lee Malcolm, *To Keep and Bear Arms* 123 (1994) ("As it turned out, the Militia Act of 1662 was to remain in force with only insignificant changes for many years to come."), *and Perez-Garcia*, 96 F.4th at 1187 ("Use of the Militia Act provisions allowing search and seizure of weapons from disaffected persons

48

'continued unabated' after the adoption of the 1688–89 English Bill of Rights." (quoting Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019))); *see also Calendar of State Papers, Domestic Series, of the Reign of William III, 1 April, 1700–8 March, 1702*, at 234 (1937) (showing, in 1701, William III instructed government officers to "search . . . for arms in the possession of any persons whom they judge dangerous, and seize such arms according to law"). We are in good company extracting relevant historical evidence from the Militia Act. *See Williams*, 113 F.4th at 651; *Perez-Garcia*, 96 F.4th at 1187; *Jackson*, 110 F.4th at 1126; *see also Kanter*, 929 F.3d at 456 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting).

Under the English Bill of Rights itself, legislatures could disarm those believed to pose a risk of future danger. The document was palpably limited. A "principle that arms-bearing was constrained 'by Law' remained," *Rahimi*, 602 U.S. at 694, and the document's terms mentioned only Protestants. This was no accident. Parliament explicitly *disarmed* Catholics unless they swore a loyalty oath. 1 W. & M., ch. 15, § 3, 6 Statutes of the Realm 71–72 (1688); *see* Malcolm, *supra*, at 122 ("About a month after Parliament passed the Declaration of Rights, it took up the problem of disarming Catholics.").

It appears Parliament disarmed Catholics because of a concern that Catholics—given their status as Catholics—posed a risk of danger. *See* Malcolm, *supra*, at 122 ("Prevention of a Catholic counter-revolution was of paramount concern."); 4 William Blackstone, *Commentaries on the Laws of England* 54 (16th ed. 1825) (1769) (suggesting the English disarmed Catholics because they threatened "subversion of the civil government"); *see also* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 723 (2009) ("In short, the stated principle supporting the disability was cause to fear that a person, although technically an English subject, was because of his beliefs effectively a resident enemy alien liable to violence against the king."). Of course, as hardly requires mention, "not all . . . Catholics in England . . . were violent." *Jackson*, 110 F.4th at 1128.

Again, we are not alone in using England's disarmament of Catholics to inform the original scope of the Second Amendment. *See id.* at 1126; *Williams*, 113 F.4th at 651; *Duarte*, 137 F.4th at 759 (en banc); *Zherka*, 2025 WL 1618440, at *13; *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) ("And—perhaps unsurprisingly because they were *presumptively* thought to pose a [] threat or terror—Parliament also disarmed Catholics." (emphasis added)). "To be sure, the American experience does not map on exactly to the English one. . . . Still, the American version [of the right to arms] was

derived from its English predecessor, which makes English practice instructive." *Kanter*, 919 F.3d at 457 n.5 (Barrett, J., dissenting) (citation omitted).

In any event, "[w]hile many practices didn't survive the odyssey from the Old World to the New, the desire to promote peace by disarming dangerous groups arrived intact." *Williams*, 113 F.4th at 652. First are three colonial laws disarming Catholics, continuing the English tradition apace. *See* 5 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 627 (1898) (1759 law) (declaring "[t]hat all arms . . . any papist or reputed papist within this province hath or shall have in his house . . . shall be taken from such papist or reputed papist"); 7 William Waller Hening, *The Statutes at Large: Being a Collection of all the Laws of Virginia* 35–38 (1820) (1756 law); 52 *Archives of Maryland* 454 (1935) (1756 law).[21] These colonies disarmed Catholics because they concluded "it is dangerous at this time to permit Papists to be armed." 7 Hening, *supra*, at 35 (1756 law); *see also Williams*, 113 F.4th at 653 (concluding the historical record shows

---

[21] This Maryland law may never have had binding effect. *Compare* Robert H. Churchill*, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 n.57 (2007) *with* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). Regardless, it sheds light on the founding-era understanding of the fundamental right to bear arms.

"Pennsylvanians believed that such measures were absolutely necessary to protect against Catholic-led violence" (quotation omitted)). As in England, "not all Catholics" in the colonies "were violent." *Jackson*, 110 F.4th at 1128. Other circuits have, again, found these laws instructive. *Id.* at 1126; *Williams*, 113 F.4th at 653; *Perez-Garcia*, 96 F.4th at 1187; *Duarte*, 137 F.4th at 759 (en banc); *Zherka*, 2025 WL 1618440, at *14.

Turning next to the revolution, the government highlights a tradition of disarming loyalists because they were believed to pose a risk of danger. The Continental Congress "recommended to the several [colonies], immediately to cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America." 4 *Journals of the Continental Congress* 205 (1776). Many young states complied. 9 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 348 (1903) (1779 law) (empowering officials "to disarm any person or persons who shall not have taken any oath or affirmation of allegiance"); 9 William Waller Hening, *The Statutes at Large: Being a Collection of all the Laws of Virginia* 281–82 (1821) (1777 law); 24 *The State Records of North Carolina* 89 (1905) (1777 law); *Acts of the General Assembly of the State of New Jersey* 90 (1777 law); 5 *The Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 479, ch. 21 (1886) (1776 law). Pennsylvania's law is especially probative as to the original scope of the Second Amendment,

because Pennsylvania disarmed loyalists soon *after* it enshrined a "right to bear arms." Pennsylvania Declaration of Rights, XIII (1776); *see Williams*, 113 F.4th at 654 n.11 (making this point). "[C]onfiscation of guns from those who refused to swear an oath of allegiance was meant to 'deal with [a] *potential* threat . . . .'" *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (emphasis added) (quoting Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004)); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 265 (2020) (concluding "the justification" for these laws "was always that those being disarmed were dangerous"). But "not all early Americans who declined to swear an oath of loyalty . . . were violent." *Jackson*, 110 F.4th at 1128.

We join others in using colonial laws disarming loyalists to discern our Nation's historical tradition of gun regulation. *Id.* at 1126–28; *Williams*, 113 F.4th at 653–54; *Perez-Garcia*, 96 F.4th at 1187; *Duarte*, 137 F.4th at 759 (en banc); *Zherka*, 2025 WL 1618440, at *15; *see also Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting) ("Loyalists were *potential* rebels who were dangerous *before* they erupted into violence. . . . To ensure peace and safety, the colonies had to disarm them." (emphasis added)); *Binderup*, 836 F.3d at 368 (en banc) (Hardiman, J., concurring in part) ("[A]lthough these

Loyalists *were neither criminals nor traitors*, American legislators had determined that permitting these persons to keep and bear arms posed a *potential* danger." (emphasis added) (quoting *NRA* v. *ATF*, 700 F.3d 185, 200 (5th Cir. 2012))).

Mr. Harrison does not dispute the existence of these English laws and colonial laws disarming Catholics and loyalists. At most, relying on a sentence in *Rahimi*, he contends disarming "political opponents" was "largely eliminated" in the colonies. Harrison Supp. Br. at 7 (quoting *Rahimi*, 602 U.S. at 694). We are not persuaded this gives us good reason to disregard the significant historical evidence marshaled by the government—particularly given the methodology *Bruen* and *Rahimi* prescribe.

In sum, "Colonial era laws thus demonstrate that England's history and tradition of disarming dangerous individuals continued across the Atlantic Ocean. Colonial governments frequently deemed entire groups too dangerous to possess weapons." *Williams*, 113 F.4th at 654. And "every categorical disarmament law was overbroad—sweeping in law-abiding people who were not dangerous, violent, untrustworthy, or unstable." *Duarte*, 137 F.4th at 761 (en banc) (quoting *Range*, 124 F.4th at 267 (en

banc) (Krause, J., concurring)).[22] Recall, *Bruen* requires courts to assess "why" and "how" historical regulations burdened the right to bear arms. 597

---

[22] Additionally, "[p]recursors to the Second Amendment proposed in state ratifying conventions also suggest that the founding generation believed legislatures could disarm individuals deemed dangerous." *Perez-Garcia*, 96 F.4th at 1188.

Most relevant here, in Massachusetts, Samual Adams proposed "that the said Constitution be never construed to authorize Congress to . . . prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 681 (1971) (emphasis added). And the Pennsylvania Minority proposed an addition stating "the people have a right to bear arms . . . and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals*." *Id.* at 665 (emphasis added); *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (emphasizing same). Neither proposal conditioned disarmament on an individual's prior dangerous conduct. Indeed, the Pennsylvania proposal expressly permitted disarmament independent of prior conduct. It sanctioned disarmament "for crimes committed, *or* real danger of public injury." Schwartz, *supra*, at 665 (emphasis added); *see Williams*, 113 F.4th at 655 ("Thus, in Pennsylvania, as in the colonies and England before that, governing officials were aware that some individuals were too dangerous to possess firearms.").

"While the proposing delegates failed to get these amendments into state or federal constitutions, these provisions still reveal a great deal about the Second Amendment." *Williams*, 113 F.3d at 655. These proposals are probative because the "Amendment codified a pre-existing and widely understood right, [so] it's unlikely that 'different people of the founding period had vastly different conceptions' of that right's scope." *Id.* at 655 (quoting *Heller*, 554 U.S. at 604–05); *see also Binderup*, 836 F.3d at 367–68 (en banc) (Hardiman, J., concurring in part) ("[I]t is telling that in the crucibles of the ratifying conventions, such public declarations of the scope of the right to keep and bear arms did not provoke any apparent disagreement."); *Kanter*, 913 F.3d at 455 (Barrett, J., dissenting) (explaining "these proposals may 'indicate some common if imprecise understanding at the Founding regarding the boundaries of a right to keep and bear arms'" (quoting Marshall, *supra*, at 713)). *Contra* App. at 115–17 (the district court dismissing these analogues).

U.S. at 29. The colonial laws manifest a "why"—preventing dangerous people from possessing firearms—that aligns with the district court's reasoning. But these laws also reflect a "how"—legislatures disarming those believed to pose a risk of future danger—which is broader than what the district court allowed.

### iii

As we have explained, the district court's conclusion—that legislatures may only disarm those who have acted dangerously *in the past*—did not fully reflect the historical laws in the record, which govern our inquiry at *Bruen* step two. *See Bruen*, 597 U.S. at 24, 28–29. One key reason the district court rejected a broader principle of disarmament is that it dismissed the relevance of laws disarming Catholics and loyalists. We

---

We also recognize the government does not marshal these sources on appeal, and *Bruen* held "[c]ourts are . . . entitled to decide a case based on the historical record compiled by the parties." *Bruen*, 597 U.S. at 25 n.6. But *Bruen* did not say courts *must* confine their inquiry to sources marshaled by the parties. *See In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1182 (10th Cir. 2023) (explaining preservation doctrines are generally "prudential norms"). Here, we exercise our discretion to consider this evidence because the district court discussed it extensively, and it only confirms the conclusion we have already reached.

now explain why these laws are probative historical analogues, and the district court's contrary view was mistaken.

*First*, the district court thought the Founders intended to repudiate the principle behind disarming Catholics and loyalists. According to the district court, James Madison critiqued "the European monarchical practice of being 'afraid to trust the people with arms.'" App. at 133 (quoting The Federalist No. 46 (James Madison)). That Madison critiqued European monarchies for restricting the right to bear arms, however, does not show the Founders sought to disclaim numerous laws passed in their own colonies.

*Second*, the district court reasoned, if laws disarming Catholics and loyalists could serve as historical analogues, "then the Second Amendment would provide virtually no limit on Congress's discretion." App. at 134. The court doubted the Framers "incorporated such a trojan horse into the Second Amendment." App. at 133; *see* Ans. Br. at 43 (similar).

Here, we must conclude the district court's reasoning departed from the methodology required by *Bruen* and affirmed in *Rahimi*. The Supreme Court has instructed, when it comes to interpreting the Second Amendment, historical evidence is our primary tool. The Court has directed us to examine "the historical background of the Second Amendment," because "[t]he Amendment 'was not intended to lay down a novel principle but

rather codified a right inherited from our English ancestors.'" *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592, 599). And the Court has stated we must "rel[y] on history to inform the meaning of [the] constitutional text"—including whether the Second Amendment repudiated some historical practice. *Id.* at 25; *see also id.* (concluding this historical methodology is "more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments'" (quoting *McDonald*, 561 U.S. at 791 (plurality opinion))).

"To be sure, the historical understanding that legislatures have discretion to prohibit possession of firearms by a category of persons . . . who pose an unacceptable risk of dangerousness may allow greater regulation than would an approach that employs means-end scrutiny with respect to each individual person who is regulated." *Jackson*, 110 F.4th at 1129. But we agree with our sister circuits that this "result is a product of the method of constitutional interpretation endorsed by *Bruen*." *Id.*; *see Duarte*, 137 F.4th at 762 (en banc) (same). Thus, without historical evidence that the Founders repudiated the principle behind disarming Catholics and loyalists, the district court could not assume they did. *See Zherka*, 2025 WL

1618440, at *20 ("The test that *Bruen* requires us to apply uses history as its guide, not policy concerns.").[23]

*Third*, the district court determined "the disarmament of Catholics and loyalists 'involved wholesale deprivation' of other civil liberties as well." App. at 134 (quoting Marshall, *supra*, at 726). The court asked, "If such laws cannot create a historical tradition in the First Amendment context, how

---

[23] We acknowledge the district court's understandable reluctance to give credence to offensive laws. But *Bruen* instructs us to draw abstract principles from this history. That means we will sometimes feel tension between the inquiry *Bruen* requires and our other constitutional and human commitments. For better or worse, that is what *Bruen* requires. *See generally* Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan. L. Rev. Online 30 (2023).

In any event, laws disarming Catholics and loyalists would be legally problematic because of how we understand *other* constitutional provisions, not the Second Amendment. The laws can therefore reveal the original understanding of the Second Amendment. *See Jackson*, 110 F.4th at 1127 ("While some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms."); *Williams*, 113 F.4th at 656 ("Classifying people as dangerous simply because of their race or religion was wrong from the beginning and unconstitutional from 1868. Nevertheless, these pre-Fourteenth Amendment laws provide insight into how early Americans conceived of the right to bear arms embodied in the Second Amendment."); *United States* v. *Duarte*, 137 F.4th 743, 760 (9th Cir. 2025) (en banc) ("[M]any of these laws would likely be unconstitutional today under *other* parts of the Constitution. But these laws are reflective of American history and tradition."); *Zherka* v. *Bondi*, No. 22-1108-CV, 2025 WL 1618440, at *13 (2d Cir. June 9, 2025) ("Many of those laws are offensive to contemporary moral sensitivities, or might well be deemed unconstitutional today on First and Fourteenth Amendment grounds. They are, however, relevant to the Second Amendment historical analysis that *Bruen* requires we conduct.").

could they do so in the Second?" App. at 134–35. We decline to define the First Amendment entirely by reference to English and colonial law because the Supreme Court has not required it. For instance, in the First Amendment context, the Supreme Court has told us "[c]ontent-based laws— those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163 (2015). That is simply a different question than whether a regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

*Fourth*, the district court observed "these laws were largely passed either during the Seven Years War or . . . the Revolutionary War," but "[t]imes of war tend to bring out the worst in governments, at least when it comes to civil liberties." App. at 135. The court stated "we do not look to *Korematsu* to determine when the government may discriminate based on race." App. at 135. We respectfully reject this reasoning. As the government persuasively argues, "[R]ights do not mysteriously disappear during times of war." Op. Br. at 36 (citing *Ex Parte Milligan*, 71 U.S. 2, 120–21 (1866)); *see Milligan*, 71 U.S. at 120–21 ("The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all

circumstances."). We denounce *Korematsu* because it "was gravely wrong the day it was decided," not because it was decided during war. *Trump* v. *Hawaii*, 585 U.S. 667, 710 (2018). The Supreme Court has not called for an exception to this rule—that wartime law is still law—in the Second Amendment context.

*Fifth*, as to laws disarming Catholics, the district court added "it appears that only two American colonies" ever enacted them, making any purported tradition questionable. App. at 135–36 (citing *Bruen*, 597 U.S. at 46 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.")). The court also noted "at the time these provisions were enacted, the operative rights-protecting document was the English Bill of Rights," which meant Catholics were "not protected by the right to armed self-defense" in the first place. App. at 136.

We need not decide whether "three colonial regulations" can ever establish a historical tradition. *Bruen*, 597 U.S. at 46; *see Rahimi*, 602 U.S. at 745–46 (Jackson, J., concurring) (identifying the "unresolved question[]" of "how many analogues add up to a tradition"). This is because the few colonial laws disarming Catholics were not isolated. They joined a larger body of laws revealing a singular principle: the founding generation and their English ancestors permitted legislatures to disarm those believed to pose a risk of future danger. If we refused to group such similar laws

together, then we could never find a tradition of anything. *See Rahimi*, 602 U.S. at 704 (Sotomayor, J., concurring) (suggesting courts should not "pick[] off the Government's historical sources one by one, viewing any basis for distinction as fatal"); *Perez-Garcia*, 96 F.4th at 1191 ("[The defendants'] divide-and-conquer approach to the historical evidence misses the forest for the trees."). As for the district court's statement that the English Bill of Rights excluded Catholics, we are not sure why that makes the colonial disarmament of Catholics less probative. Rather, it appears to only deepen the historical tradition of disarming those believed to pose a risk of danger. *Bruen*, 597 U.S. at 34.

*Sixth*, and finally, the district court reasoned laws disarming Catholics and loyalists "were justified on the fear that the covered groups were likely to wage active war . . . . This is a radically different justification than the justification for § 922(g)(3)." App. at 136–37. On this approach, laws disarming Catholics and loyalists could only justify modern laws disarming those who are dangerous in a similar way. Regarding *Bruen*'s "how" and "why" inquiries, the district court understood laws disarming Catholics and loyalists to involve a narrower "why" than § 922(g)(3) ever could—the focus of the historical laws was to disarm those who might wage war. *Bruen*, 597 U.S. at 29. The government, alternatively, reads these laws

62

to show that legislatures may generally "disarm those believed to pose a greater risk of danger." Op. Br. at 42.

With the guidance of *Rahimi*, we land closer to the government. Determining the level of generality at which to define historical principles is no easy task. Concurring in *Rahimi*, Justice Jackson observed the Court has not "adequately clarified" "the level of generality at which a court evaluates [historical] sources." 602 U.S. at 745 (Jackson, J., concurring). Justice Barrett concluded "harder level-of-generality problems can await another day." *Id.* at 740 (Barrett, J., concurring). And Justice Kavanaugh similarly acknowledged the "important question[]" of "the level of generality at which to define a historical practice." *Id.* at 724 n.4 (Kavanaugh, J., concurring) (discussing post-ratification history); *see also United States* v. *Morton*, 123 F.4th 492, 498 n.2 (6th Cir. 2024) (asking the Supreme Court to clarify the level of generality at which to understand "laws that forbade Catholics, seditious libelers, Native Americans, loyalists, individuals who had engaged in 'actual rebellion,' and Black people from possessing firearms").

But *Rahimi* suggests the government's proposed level of generality is correct. For one, *Rahimi* repeated multiple times that historical laws need not be "twin[s]" of modern laws. *Rahimi*, 602 U.S. at 692, 701. That *Rahimi* directed us toward "principles" is also important. *Pitsilides*, 128 F.4th at

210 ("[O]ur inquiry into *principles* that underlie our regulatory tradition does not reduce historical analogizing to an exercise in matching elements of modern laws to those of their historical predecessors."); *Rahimi*, 602 U.S. at 703 (Sotomayor, J., concurring) (emphasizing *Bruen* does not require the government to identify "a precise historical analogue"). The word "principle" suggests a higher level of generality than the district court invoked.

The specific mode of reasoning used in *Rahimi*—the way the Court generalized from historical laws in that case—is instructive and further supports the government's position. *Rahimi* upheld a law that disarms individuals based on their risk of committing family violence. *See Rahimi*, 602 U.S. at 684–85 (citing 18 U.S.C. § 922(g)(8)). Yet the Supreme Court justified its decision in part by reference to historical "going armed" laws—which disarmed those who threatened the "public order," *not* those who threatened family violence.[24] *Id.* at 697–99 (quoting *State* v. *Huntly*, 25 N.C.

---

[24] Going armed laws prohibited "fighting *in public*," "'arm[ing]' oneself 'to the Terror of the People,'" and "riding or going armed . . . [to] terrify[ ] the good people of the land." *Rahimi*, 602 U.S. at 697 (first, third, and fourth alterations in original) (emphasis added) (first quoting Theodore Barlow, *The Justice of Peace: A Treatise Containing the Power and Duty of that Magistrate* 11 (1745); and then quoting 4 William Blackstone, *Commentaries on the Laws of England* 149 (16th ed. 1825) (1769)). "Such conduct disrupted the 'public order' . . . ." *Id.* (quoting *State* v. *Huntly*, 25 N.C. 418, 421 (1843)). Justice Thomas's dissent emphasized the public nature of going armed laws in contending they presented no analogy for § 922(g)(8). As he wrote, these laws "had a distinct justification from § 922(g)(8) because they regulated only

418, 421 (1843)). *Rahimi* understood historical laws that disarmed a specific kind of dangerous person—one who threatened public disorder—to illustrate a principle about disarming dangerous people more generally. *Id.* at 698 ("Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be. Its prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the . . . going armed laws represent." (citation omitted)); *see also id.* at 704 (Sotomayor, J., concurring) ("Here, for example, the Government has not identified a founding-era or Reconstruction-era law that specifically disarmed domestic abusers, but it did not need to do so." (citation omitted)).

The government asks us to do something similar. Laws disarming Catholics and loyalists were focused on war-related violence, like going armed laws were focused on public disorder. We are comfortable generalizing from the former, just as *Rahimi* generalized from the latter. We thus conclude laws disarming Catholics and loyalists reveal a tradition of disarming those believed to pose a risk of danger, regardless of whether the perceived danger is related to waging war.

---

certain public conduct that injured the entire community." *Id.* at 768 (Thomas, J., dissenting).

We acknowledge the Fifth Circuit, in holding § 922(g)(3) violated the Second Amendment as applied to non-intoxicated marijuana users, looked at the history differently.[25] *See Connelly*, 117 F.4th at 278–82; *see also United States* v. *Hemani*, No. 24-40137, 2025 WL 354982, at *1 (5th Cir. Jan. 31, 2025) (per curiam) (summarily affirming under *Connelly* the dismissal of an indictment charging a violation of § 922(g)(3)), *petition for cert. filed* (U.S. June 2, 2025) (No. 24-1234). When considering whether laws disarming Catholics and loyalists provided historical analogues to § 922(g)(3), the Fifth Circuit stated, "Laws disarming dissidents were passed during wartime or periods of unprecedented societal upheaval. . . . So too with laws disarming religious minorities." *Id.* at 278. It continued, "Marijuana users are not a class of political traitors, as English Loyalists were perceived to be. Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists." *Id.* The court

---

[25] The Eighth Circuit has also concluded § 922(g)(3) is unconstitutional as applied to some non-intoxicated marijuana users. *United States* v. *Cooper*, 127 F.4th 1092, 1096 (8th Cir. 2025). The Third Circuit, meanwhile, has suggested § 922(g)(3) may be constitutional as applied to some non-intoxicated marijuana users. *United States* v. *Harris*, No. 21-3031, 2025 WL 1922605, at *5 (3d Cir. July 14, 2025). Regardless, these two courts did not address the historical analogues that form the basis of our analysis, such as colonial laws disarming Catholics and loyalists. *See id.* at *2–4; *Cooper*, 127 F.4th at 1095–96. And to be clear, we do not here decide the ultimate question of whether § 922(g)(3) is constitutional as applied to any non-intoxicated marijuana users. We hold only that, with the historical evidence properly understood, further consideration is necessary to resolve the ultimate question.

ultimately found laws disarming Catholics and loyalists did not reveal a general principle that legislatures may disarm those believed to be dangerous. *See id*. The dissent finds the Fifth Circuit's view persuasive. *See* Dissent at 6 ("I think the Fifth Circuit [in *Connelly*] got it right in holding that § 922(g)(3), as applied to a non-intoxicated marijuana user, goes much further than our history and tradition allow.").

But in our view, the Fifth Circuit's narrow reading failed to heed the Supreme Court's instruction that "a 'historical *twin*' is not required." *Rahimi*, 602 U.S. at 701 (quoting *Bruen*, 597 U.S. at 30); *see also id*. ("For its part, the Fifth Circuit . . . read *Bruen* to require a 'historical twin' rather than a 'historical analogue.'" (quoting *Bruen*, 597 U.S. at 30)). Likewise, we conclude the Fifth Circuit did not interpret laws disarming Catholics and loyalists with the same level of generality that *Rahimi* used to interpret going armed laws. *See id*.

Historical laws disarming Catholics and loyalists may be imperfect sources, but we find they are instructive under the analysis *Bruen* and *Rahimi* require.

## VI

We now explain why remand is necessary. Pursuant to *Rahimi*, the government has articulated a "principle[] that underpin[s] our regulatory tradition" that may be "consistent with" the challenged regulation. *Id*. at

67

692. History shows legislatures can disarm those believed to pose a risk of future danger. We respectfully part ways with the district court's contrary view. That said, we still cannot answer the ultimate constitutional question before us. Rather, with the history correctly understood, the district court must inquire into whether non-intoxicated marijuana users pose a risk of future danger.

The record suggests the parties attempted to engage in this inquiry in the district court. The government asserted it is "dangerous" for "habitual drug users" like Mr. Harrison "to possess deadly firearms." App. at 64 (quoting *Yancey*, 621 F.3d at 685). In support, the government highlighted opinions from other courts collecting "academic research confirm[ing] the connection between drug use and violent crime." *Yancey*, 621 F.3d at 686; *see* App. at 63–64 (citing sources). Though he did not point to contrary evidence, Mr. Harrison insisted the government's assertions about drug users were "highly debatable." App. at 85. The district court recognized the government was attempting to defend the constitutionality of the statute as applied by showing drug users pose a risk of danger. App. at 124 (acknowledging "the United States points out" its cited cases "are backed up by social science, statistics, and predictions about future crime"). But relying on its understanding of the history, the district court determined it

was legally irrelevant whether non-intoxicated marijuana users pose a risk of future danger.[26] *See* App. at 124–25.

Contrary to the district court's view, this inquiry *is* legally relevant— and critical to the methodology announced in *Bruen* and clarified in *Rahimi*. The Supreme Court has emphasized the Second Amendment "is not 'a second-class right'" or a matter of complete "legislative interest balancing." *Bruen*, 597 U.S. at 70, 26 (quoting *McDonald*, 561 U.S. at 780); *see also Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *Williams*, 113 F.4th at 660 ("If courts uncritically deferred to Congress's class-wide dangerousness determinations, disarmament laws would most often be subject to rational-basis review . . . that [would] run[] headlong into *Heller* . . . [and] allow

---

[26] The district court also thought *Bruen* only allowed courts to look at history. As it wrote, "[O]ne opinion in *Bruen* looked to statistics, expert opinions, and predictive judgments, but that opinion was the dissent." App. at 125 (citing *Bruen*, 597 U.S. at 83–91, 99–102 (Breyer, J., dissenting)). But this is not what *Bruen* teaches. *Bruen* forbids courts from looking at such evidence to *replace* the historical inquiry. *See Bruen*, 597 U.S. at 17 ("[T]he government may not *simply posit* that the regulation promotes an important interest." (emphasis added)). Nothing in *Bruen* prevents courts from looking at such evidence to determine if a modern regulation is *consistent with* a historical principle. Rather, as the government explains, such evidence can "inform the modern side of the analogical reasoning required by the history-based *Heller*/*Bruen* test." Reply Br. at 25.

legislatures to define away a fundamental right."); *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting) ("The legislature must be able to justify its designation . . . ."). We see no evidence the Founders understood legislatures to have complete discretion in selecting whom to disarm. That the Founders disarmed Catholics and loyalists—groups the broader community understood to be dangerous—does not show legislatures can disarm anyone at all. Indeed, historical legislatures often did not categorically disarm those who "demonstrate[d] that their particular possession of a weapon posed no danger to peace." *Williams*, 113 F.4th at 657; *see Range*, 124 F.4th at 275 (Krause, J., concurring) ("Under categorical disarmament laws, where an individual was presumed to pose a special risk to society by virtue of his membership in a particular group and thus was lawfully disarmed as an initial matter, there was typically a mechanism for him to petition and attempt to rebut that presumption . . . ."); *see, e.g.*, 9 *Statutes at Large of Pennsylvania*, *supra*, at 348 (1779 law) (permitting those who swore oaths to the union to retain their arms); 9 Hening, *supra*, at 282 (1777 law) (same); 7 Hening, *supra*, at 35 (1756 law) (permitting Catholics to retain their arms if they took an oath of allegiance); 1 W. & M., ch. 15, § 3, 6 Statutes of the Realm 72 (1688) (same). In short, the Supreme Court's Second Amendment jurisprudence and the historical record itself show complete deference to the legislature would be inappropriate.

Accordingly, in this case, the district court should have inquired into whether the government could justify its assertion that non-intoxicated marijuana users pose a risk of danger. *See Bruen*, 597 U.S. at 24 (placing burden on government at *Bruen* step two). We find instructive that the Eighth Circuit has called for a similar inquiry in a similar context. In *Worth* v. *Jacobson*, the court considered a Second Amendment challenge to Minnesota's ban on 18 to 20-year olds from carrying firearms. 108 F.4th 677, 683–84 (8th Cir. 2024). Minnesota defended the law by arguing "if the state deems a group of people to pose a risk of danger, it may ban the group's gun ownership." *Id.* at 693. But the Eighth Circuit required Minnesota to "support its claim with . . . evidence." *Id.* at 694. The court of appeals continued, "A legislature's ability to deem a category of people dangerous based only on belief would subjugate the right to bear arms." *Id*. We agree.

The parties ask us to engage in this inquiry in the first instance on appeal. The government maintains "for those who unlawfully use marijuana, like Mr. Harrison, research 'amply demonstrate[s] a connection between marijuana use specifically and violence.'" Op. Br. at 21 (alteration in original) (quoting *United States* v. *Carter*, 750 F.3d 462, 467 (4th Cir. 2014)) (also citing studies). Mr. Harrison contends "marijuana users are not in a class of dangerous people." Ans. Br. at 40 (citing additional studies).

71

But the prudent course is to remand for the district court to make the determination under the correct view of the law, particularly since factfinding may be required.[27] *United States* v. *Hasan*, 609 F.3d 1121, 1129 (10th Cir. 2010) ("When the court of appeals notices a legal error, it is not

---

[27] The dissent "disagree[s] with the court's decision to remand the case in a manner which allows the government a fresh start in its prosecution of Mr. Harrison." Dissent at 1. Our colleague in dissent is right to be wary of permitting the government a second bite at the apple. *See Baroid Div. of NL Indus., Inc.* v. *Occupational Safety & Health Rev. Comm'n*, 660 F.2d 439, 448 (10th Cir. 1981) ("[T]he remand is not to provide an opportunity for the [litigant] to get a second bite at the apple by attempting to show . . . [what] he did not attempt to show at the first hearing."). But the majority opinion authorizes no such thing.

As we have already explained, the government may not relitigate whether Mr. Harrison was in fact intoxicated. *See supra* at 12 (rejecting as "waived" the "government's effort to raise this new argument in its supplemental briefing on appeal"). We remand only for the district court to inquire into "whether non-intoxicated marijuana users pose a risk of future danger." *Supra* at 68. That inquiry is legally relevant, as we have explained, but was prematurely halted due to the district court's misreading of the historical record. *See supra* at 69–71. Still, the dissent concludes remand "opens the door to factfinding on a forfeited issue." Dissent at 4. But in the district court, the government explained a "user" does not need to be "high all the time." App. at 47. And in discussing the purpose of Section 922(g)(3), the government identified Congress's intent to prohibit firearm possession by "drug abusers," "unlawful users," "habitual drug users," "narcotics addicts," and other "presumptively risky people." App. at 63–64. These terms encompass non-intoxicated individuals. Context confirms this understanding. The government prosecuted this case from the outset under a theory of non-intoxication. The government's late-stage "*new* argument," *supra* at 12 (emphasis added)—that perhaps Mr. Harrison was actually intoxicated at the time of the offense—is "new" precisely because the government had been arguing under an assumption of non-intoxication all along.

ordinarily entitled to weigh the facts itself and reach a new conclusion; instead, it must remand to the district court for it to make a new determination under the correct law."); *Brammer-Hoelter* v. *Twin Peaks Charter Acad.*, 602 F.3d 1175, 1180 n.1 (10th Cir. 2010) ("It is not within the province of this court to find facts on appeal . . . ."). The Third Circuit recently ordered a similar remand in a Second Amendment challenge to § 922(g)(3). *See Harris*, 2025 WL 1922605, at *8 (remanding to the district court to consider, as relevant here, "[w]hether use of [a given] drug affects a person's judgment, decision-making, attention, inhibition, or impulse control," and "[t]he long-term physical and mental effects of the use of that drug"); *see also Cooper*, 127 F.4th at 1097 ("The district court's task on remand is to figure out which side of the Second Amendment line Cooper's case falls on.").[28]

---

[28] Crucially, we do not decide how the government must make its showing. Some courts have emphasized historical disarmament laws "swept broadly," and "[n]ot all persons disarmed under historical precedents . . . were violent or dangerous persons," meaning the government need not provide particularized evidence to support a challenged law as applied. *Hunt*, 123 F.4th at 707; *Jackson*, 110 F.4th at 1128; *see Duarte*, 137 F.4th at 761 (en banc); *Zherka*, 2025 WL 1618440, at *19 (explaining historical "statutes . . . disarmed whole classes of individuals based on a status that the legislature perceived as dangerous"). But the Sixth Circuit has observed "individual members of [disarmed] groups" could historically "demonstrate that they were not dangerous, thereby restoring their ability to keep arms," meaning "individuals must have a reasonable opportunity to prove that they don't fit the class-wide generalization." *Williams*, 113 F.4th at 654, 661; *see, e.g.*, 9 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 348 (1903) (1779 law); *see also*

\* \* \*

Ultimately, we agree with much of the district court's analysis: Mr. Harrison is among "the People" protected by the Second Amendment, so the government must justify § 922(g)(3) by showing it is consistent with our tradition of firearm regulation; § 922(g)(3) lacks a distinctly similar regulation despite addressing a persistent societal problem, which is relevant evidence it violates the Second Amendment as applied; and the government cannot justify § 922(g)(3) by analogizing to laws disarming the mentally ill. We break from the district court in a narrow way. We hold the historical tradition supports a principle that legislatures may disarm those believed to pose a risk of future danger. And we further hold the district court must inquire into the government's assertion that non-intoxicated marijuana users pose a risk of danger.

## VII

We **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

---

*Williams*, 113 F.4th at 662 (suggesting that, if the defendant is in a class the government has found dangerous, "the burden rests on [the defendant] to show he's not dangerous"). We will leave these issues, and the development of the record, to the district court on remand.

No. 23-6028, <u>United States v. Jared Michael Harrison</u>

**KELLY**, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's holdings that Mr. Harrison is properly mounting an as-applied challenge to § 922(g)(3), that he is among "the People" protected by the Second Amendment, and that the government cannot justify § 922(g)(3) by analogy to laws disarming the mentally ill. However, I disagree with the court's conclusion that § 922(g)(3)'s disarmament of Mr. Harrison as a non-intoxicated marijuana user could be consistent with the principles underpinning this Nation's history and tradition of firearms regulation. I also disagree with the court's decision to remand the case in a manner which allows the government a fresh start in its prosecution of Mr. Harrison.

**I.     Section 922(g)(3)'s disarmament of marijuana users regardless of their present intoxication is inconsistent with the historical record.**

Beginning with the historical record, the societal problem posed by "the dangerous mixture of guns and intoxicants" is not a novel one. Ct. Op. at 31–34. The court recognizes this and thoroughly recounts the history of intoxication laws from the Founding.[1] <u>See id.</u> Suffice it to say that these intoxication laws reveal a clear principle: the Founders addressed the dangerous mixture of guns and intoxicants by disarming only <u>actively</u> intoxicated persons. <u>United States v. Cooper</u>, 127 F.4th 1092, 1096 (8th Cir. 2025) ("[I]ntoxication has been prevalent throughout our nation's history, but earlier

---

[1] While the government "has not marshaled those laws as potential analogies on appeal," Ct. Op. at 22 n.8, we may still properly consider them because the district court did so after input from the parties. <u>See</u> App. 128–37; <u>Tesone v. Empire Mktg. Strategies</u>, 942 F.3d 979, 991–92 (10th Cir. 2019).

generations addressed that societal problem by restricting when and how firearms could be used, not by taking them away." (quotations omitted)); United States v. Connelly, 117 F.4th 269, 280–82 (5th Cir. 2024) (explaining that historical intoxication laws support only "banning the carry of firearms while actively intoxicated").

By disarming those who may use drugs from time to time regardless of their present intoxication, § 922(g)(3) "goes much further" than the historical intoxication laws that existed at the Founding. Connelly, 117 F.4th at 281–82. The Supreme Court has warned that "[e]ven when a law regulates arms-bearing for a permissible reason, [] it may not be compatible with the [Second Amendment] if it does so to an extent beyond what was done at the founding." United States v. Rahimi, 602 U.S. 680, 692 (2024); see also New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 26–27 (2022). Yet the court describes this tension as a mere "data point" in its analogical inquiry. Ct. Op. at 36. It explains that the absence of a distinctly similar historical intoxication law could also be evidence that the Founders simply did not "'maximally exercise their power to regulate.'" Id. (quoting Rahimi, 602 U.S. at 739–40 (Barrett, J., concurring)). One can of course imagine "countless reasons" why a legislature might not regulate in a specific manner. Id. But, in my view, speculation cannot outweigh evidence that when the Founders did act, they regulated in a distinct manner.

## II.    Historical laws disarming Catholics and loyalists do not justify § 922(g)(3) as applied to non-intoxicated marijuana users.

Rather than attempt to square § 922(g)(3) with the above principle, the court extracts from historical laws disarming Catholics and loyalists in times of war the

principle that Congress may disarm those it believes to pose a risk of future danger.  Id. at 46–56.  But Catholics and loyalists were disarmed because they were "seen as potential insurrectionists" in times of war — a classification which we cannot attribute to non-intoxicated marijuana users.  Connelly, 117 F.4th at 278; App. at 136–37.  Unlike the court, I am not "comfortable" with this level of generality.  Ct. Op. at 65.  Rather, I agree with the Fifth Circuit that "we must ask: why were the groups disarmed at the Founding considered to be dangerous and therefore disarmed, and is that 'why' 'relevantly similar' to § 922(g)(3)?"  Connelly, 117 F.4th at 278.  Because that "why" is not "relevantly similar," analogizing to these laws fails at Bruen step two.  Id.

　　　　To be sure, dangerousness is a "touchstone" of disarmament under the Second Amendment.  See Pitsilides v. Barr, 128 F.4th 203, 210 (3d Cir. 2025) (quotations omitted).  The Supreme Court has not precisely instructed us as to the level of generality at which we may draw principles from historical laws.  Ct. Op. at 63–64.  And this seems to be a case where "reasonable minds [might] disagree about how broad or narrow the controlling principle should be."  Rahimi, 602 U.S. at 740 (Barrett, J., concurring).  But we should resist invoking the principle of dangerousness "at such a high level of generality that it waters down the right" to bear arms.  Id.

　　　　The elephant in the room here is that marijuana, despite being a Schedule I controlled substance under federal law, is "legal" to some extent in most states.  See State Medical Cannabis Laws, Nat'l Conf. of State Legislatures (June 27, 2025), https://www.ncsl.org/health/state-medical-cannabis-laws.  The regulatory landscape in this circuit alone is a patchwork.  See id.  The district court aptly observed that "[t]here

3

are likely nearly 400,000 Oklahomans who use marijuana under state-law authorization." App. at 126. Mr. Harrison himself even told the officer who pulled him over that he was on his way to work at a medical marijuana dispensary. Id. at 87. I do not read Bruen to endorse analogical reasoning which effectively writes Congress a "blank check" to disarm so many Americans, many of whom may be under the assumption that marijuana laws have been reformed. 597 U.S. at 30; see also United States v. Harris, 144 F.4th 154, 177 (3d Cir. 2025) (Ambro, J., concurring in part and dissenting in part) (warning against reasoning that "authorizes legislatures to suspend the constitutional rights of so many for such common behavior").

### III.    The court's remand allows the government to assert untimely arguments.

Finally, the scope of the court's direction to the district court on remand is problematic. The court remands for the district court to "inquire into whether non-intoxicated marijuana users pose a risk of future danger." Ct. Op. at 68. How the government will make this showing on remand remains to be seen. See id. at 73 n.27. Regardless, this case has never been about the future dangers posed by Mr. Harrison's marijuana use — but the court's remand makes it so.

This opens the door to factfinding on a forfeited issue. Mr. Harrison does not dispute that he is a marijuana user.[2] Oral Arg. at 18:10–18:23. And the government has

---

[2] Another panel of this court recently clarified that an "unlawful user" under § 922(g)(3) is "someone who, on a regular and ongoing basis, uses a controlled substance during the same time as his firearm possession" and whose use is "unauthorized by law." United States v. Davey, No. 24-3132, 2025 WL 2405322, at *4–5 (10th Cir. Aug. 20, 2025) (quotations omitted).

prosecuted Mr. Harrison from the position that, to obtain a conviction under § 922(g)(3), it needed only show that he was a "user" of marijuana contemporaneous with his firearm possession.  See App. 123; Aplt. Supp. Br. at 9.  At the district court, the government never sought to introduce evidence that Mr. Harrison's marijuana use makes him a danger to others, it never argued that such evidence was necessary to obtain a conviction, and it never so much as requested an evidentiary hearing on the issue.  App. 55–65; Oral Arg. at 10:50–11:15.  Thus, any evidence about Mr. Harrison's actual marijuana use beyond the fact that he is a "user" comes too late in this as-applied challenge.  The government should be left with the record that it made (or rather neglected to make) and it should not be given a fresh start in its prosecution of Mr. Harrison.  See United States v. Malone, 937 F.3d 1325, 1327 (10th Cir. 2019).

The same is true about evidence which the government might introduce to show that non-intoxicated marijuana users categorically pose a risk of future danger.  At best, the government analogized "habitual" drug users to the mentally ill and pointed to pre-Bruen cases which reasoned that drug users are more likely than non-users to engage in gun violence.  App. 63–64, 124.  I believe that the district court was correct to reject the government's invitation to strip away Mr. Harrison's Second Amendment rights based only on abstract statistics and "projected" dangerousness.  Id. at 124 (quotations omitted).  Remanding for factfinding on these issues puts a tremendous burden on Mr. Harrison, one which is inappropriate given that it is the government's burden to justify § 922(g)(3)'s application in response to his Second Amendment challenge.  Rahimi, 602 U.S. at 691.  To do so — especially given the government's failure to introduce

5

evidence regarding Mr. Harrison's actual marijuana use — more closely resembles the prior means-end scrutiny than it does the Bruen framework.

In sum, though I commend the scholarship of the court's opinion, I cannot agree with its reading of the historical record.  I think the Fifth Circuit got it right in holding that § 922(g)(3), as applied to a non-intoxicated marijuana user, goes much further than our history and tradition allow.  And the scope of the court's remand allows the government to assert untimely arguments.  Because I would affirm the district court's dismissal of the indictment against Mr. Harrison, I respectfully dissent.