No. 23-6028

# In the United States Court of Appeals for the Tenth Circuit

UNITED STATES OF AMERICA, PLAINTIFF-APPELLANT,

V.

JARED MICHAEL HARRISON, DEFENDANT-APPELLEE.

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

THE HONORABLE PATRICK R. WYRICK
DISTRICT JUDGE

D.C. No. CR-22-328-PRW

APPELLANT'S APPENDIX

ROBERT J. TROESTER
United States Attorney

AUSA NAME
Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
Telephone (405) 553-8700
Attorneys for Plaintiff-Appellee

# **Index**

Page

District Court Docket Sheet ......................................................................... 3

Indictment (Doc. 1) (filed 8/17/22) ............................................................ 8

Motion to Dismiss (Doc. 17) (filed 10/11/22) ........................................... 10

Response to Motion to Dismiss (Doc. 25) (filed 10/31/22) ....................... 32

Reply to Response to Motion to Dismiss (Doc. 31) (filed 11/21/22) ........ 67

Order Dismissing Indictment (Doc. 36) (filed 2/3/23) ............................. 87

Notice of Appeal (Doc. 37)  (filed 3/3/23) ............................................... 141

Motion Hearing Transcript (hearing held 11/30/22) ............................... 143

APPEAL,CLOSED,DET,_RLR

## U.S. District Court
## Western District of Oklahoma[LIVE] (Oklahoma City)
## CRIMINAL DOCKET FOR CASE #: 5:22−cr−00328−PRW−1

Case title: USA v. Harrison

Date Filed: 08/17/2022

Date Terminated: 02/03/2023

---

Assigned to: Judge Patrick R Wyrick

Appeals court case number: 23−6028 Tenth Circuit

**Defendant (1)**

| | | |
|---|---|---|
| **Jared Michael Harrison**<br>*TERMINATED: 02/03/2023* | represented by | **J.P. Hill**<br>Federal Public Defender<br>Federal Public Defender<br>215 Dean A McGee Ave<br>Room 109<br>Oklahoma City, OK 73102<br>405−609−5930<br>Fax: 405−609−5932<br>Email: jp_hill@fd.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender*<br><br>**Laura K Deskin**<br>Office of the Federal Defender<br>215 Dean A. McGee<br>Room 109<br>Oklahoma City, OK 73102<br>405−609−5944<br>Email: laura_deskin@fd.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:924(d) & 28:2461(c)<br>CRIMINAL FORFEITURE | |
| 18:922(g)(3) POSSESSION OF A FIREARM BY A PROHIBITED PERSON<br>(1) | |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

App. 003

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

| | | |
|---|---|---|
| **United States of America** | represented by | **Stephanie Powers**<br>DOJ–USAO<br>210 Park Avenue<br>Suite 400<br>Oklahoma City, OK 73102<br>405–553–8700<br>Email: stephanie.powers2@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |
| | | **David M McCrary**<br>US Attorney's Office–OKC<br>210 W Park Ave<br>Suite 400<br>Oklahoma City, OK 73102<br>405–553–8845<br>Fax: 405–553–8888<br>Email: david.mccrary@usdoj.gov<br>*ATTORNEY TO BE NOTICED* |
| | | **Steven W Creager**<br>US Attorney's Office–OKC<br>210 W Park Ave<br>Suite 400<br>Oklahoma City, OK 73102<br>405/553–8726<br>Fax: 405–553–8888<br>Email: steven.w.creager@usdoj.gov<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 08/17/2022 | 1 | INDICTMENT as to Jared Michael Harrison (1) count(s) 1 and criminal forfeiture. (Attachments: # 1 Criminal Cover Sheet 1 – Jared Michael Harrison) (so) (Entered: 08/17/2022) |
| 09/19/2022 | 3 | ** SEALED DOCUMENT ** CJA 23 Financial Affidavit by Jared Michael Harrison. (rb) (Entered: 09/19/2022) |
| 09/19/2022 | 4 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER J.P. Hill for Jared Michael Harrison. Signed by Magistrate Judge Amanda Maxfield Green on 9/19/2022. (rb) (Entered: 09/19/2022) |
| 09/19/2022 | 5 | MINUTE ENTRY for proceedings held before Magistrate Judge Amanda Maxfield Green:Arraignment as to Jared Michael Harrison (1) Count 1 held on 9/19/2022. Not Guilty Plea entered by Jared Michael Harrison on count 1. Detention Hearing set for 9/23/2022 11:00 AM in Courtroom 101 before Magistrate Judge Amanda Maxfield Green. Jury Trial set for 11/1/2022 09:00 AM in Courtroom 503 before Judge Patrick R Wyrick. (rb) (Entered: 09/19/2022) |
| 09/19/2022 | 6 | ORDER OF TEMPORARY DETENTION as to Jared Michael Harrison. Signed by Magistrate Judge Amanda Maxfield Green on 9/19/2022. (rb) (Entered: 09/19/2022) |
| 09/19/2022 | 7 | DPPA–ORDER as to Jared Michael Harrison. Signed by Magistrate Judge Amanda Maxfield Green on 9/19/2022. (rb) (Entered: 09/19/2022) |

| 09/19/2022 | 8 | NOTICE OF HEARING as to Jared Michael Harrison Detention Hearing set for 9/23/2022 11:00 AM in Courtroom 101 before Magistrate Judge Amanda Maxfield Green. (rb) (Entered: 09/19/2022) |
|---|---|---|
| 09/19/2022 | 9 | Arrest WARRANT Returned Executed on 09/19/2022 in case as to Jared Michael Harrison. (so) (Entered: 09/20/2022) |
| 09/20/2022 | 10 | ENTRY OF ATTORNEY APPEARANCE: J.P. Hill appearing for Jared Michael Harrison (Hill, J.P.) (Entered: 09/20/2022) |
| 09/23/2022 | 11 | MINUTE ENTRY for proceedings held before Magistrate Judge Amanda Maxfield Green:Detention Hearing as to Jared Michael Harrison held on 9/23/2022. Defendant detained pending trial. (rb) (Entered: 09/23/2022) |
| 09/23/2022 | 12 | ORDER OF DETENTION PENDING TRIAL as to Jared Michael Harrison. Signed by Magistrate Judge Amanda Maxfield Green on 9/23/2022. (rb) (Entered: 09/23/2022) |
| 10/07/2022 | 13 | NOVEMBER CRIMINAL DOCKET: Docket Call set for 10/26/2022 01:30 PM in Courtroom 503 before Judge Patrick R Wyrick. Jury Trial set for 11/1/2022 09:00 AM in Courtroom 503 before Judge Patrick R Wyrick. (ks) (Entered: 10/07/2022) |
| 10/11/2022 | 15 | JOINT DISCOVERY STATEMENT by Plaintiff United States of America (Powers, Stephanie) (Entered: 10/11/2022) |
| 10/11/2022 | 16 | AMENDED NOVEMBER CRIMINAL DOCKET: Docket Call set for 10/26/2022 01:30 PM in Courtroom 503 before Judge Patrick R Wyrick. Jury Trial set for 11/1/2022 09:00 AM in Courtroom 503 before Judge Patrick R Wyrick. (ks) (Entered: 10/11/2022) |
| 10/11/2022 | 17 | MOTION to Dismiss *the Indictment Based on the Unconstitutionality of 18 U.S.C. 922(g)(3)* by Jared Michael Harrison. (Hill, J.P.) (Entered: 10/11/2022) |
| 10/17/2022 | 18 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 17 MOTION to Dismiss *the Indictment Based on the Unconstitutionality of 18 U.S.C. 922(g)(3)* by United States of America as to Jared Michael Harrison. (Powers, Stephanie) (Entered: 10/17/2022) |
| 10/17/2022 | 19 | ORDER granting 18 the United States' Unopposed Motion for Extension of Time to Respond to Defendant's Motion to Dismiss, as to Jared Michael Harrison (1). The United States shall file its response to Mr. Harrison's motion to dismiss on or before October 28, 2022. Signed by Judge Patrick R Wyrick on 10/17/2022. (ks) (Entered: 10/17/2022) |
| 10/21/2022 | 20 | WAIVER of Speedy Trial by Jared Michael Harrison (Hill, J.P.) (Entered: 10/21/2022) |
| 10/21/2022 | 21 | UNOPPOSED MOTION to Continue *Jury Trial with Brief in Support* by Jared Michael Harrison. (Hill, J.P.) (Entered: 10/21/2022) |
| 10/24/2022 | 22 | ORDER granting 21 defendant's unopposed motion to continue, Striking the case from the Court's November 2022 Trial Docket; Striking the docket call set for this case on October 26, 2022; Resetting the case on the Court's December 2022 Trial Docket; and Resetting the deadline for pretrial motions and notices to November 14, 2022 (as more fully set out in order), as to Jared Michael Harrison (1). Signed by Judge Patrick R Wyrick on 10/24/2022. (ks) (Entered: 10/24/2022) |
| 10/24/2022 | | Set/Reset Deadlines/Hearings as to Jared Michael Harrison: Jury Trial RESET on the December 2022 trial docket (12/6/2022 09:00 AM) in Courtroom 503 before Judge Patrick R Wyrick. (ks) (Entered: 10/24/2022) |
| 10/28/2022 | 23 | MOTION for Leave to File *Oversized Brief* by United States of America as to Jared Michael Harrison. (Powers, Stephanie) (Entered: 10/28/2022) |
| 10/31/2022 | 24 | ORDER granting 23 the United States' Motion for Leave to File Oversized Brief, as to Jared Michael Harrison (1). Signed by Judge Patrick R Wyrick on 10/31/2022. (ks) (Entered: 10/31/2022) |
| 10/31/2022 | 25 | RESPONSE to Motion by United States of America as to Jared Michael Harrison re 17 MOTION to Dismiss *the Indictment Based on the Unconstitutionality of 18 U.S.C. 922(g)(3)* (Powers, Stephanie) (Entered: 10/31/2022) |

| 10/31/2022 | 26 | MOTION for Leave to File *Reply to United States' Response in Opposition to Defendant's Motion to Dismiss the Indictment as Unconstitutional (Doc. No. 25)* by Jared Michael Harrison. (Hill, J.P.) (Entered: 10/31/2022) |
|---|---|---|
| 10/31/2022 | 27 | ORDER granting 26 defendant's motion for leave to file a reply to United States' Response in Opposition to Defendant's Motion to Dismiss the Indictment as Unconstitutional, as to Jared Michael Harrison (1). Defendant's reply due on or before November 21, 2022. Signed by Judge Patrick R Wyrick on 10/31/2022. (ks) (Entered: 10/31/2022) |
| 11/04/2022 | 28 | DECEMBER CRIMINAL TRIAL DOCKET: Docket Call set for 11/30/2022 01:30 PM in Courtroom 503 before Judge Patrick R Wyrick. Jury Trial set for 12/6/2022 09:00 AM in Courtroom 503 before Judge Patrick R Wyrick. (ks) (Entered: 11/04/2022) |
| 11/15/2022 | 29 | NOTICE OF HEARING ON MOTION in case as to Jared Michael Harrison re 17 Defendant's Motion to Dismiss : Motion Hearing set for 11/30/2022 01:30 PM in Courtroom 503 before Judge Patrick R Wyrick. (ks) (Entered: 11/15/2022) |
| 11/17/2022 | 30 | ENTRY OF ATTORNEY APPEARANCE David M McCrary appearing for USA. (McCrary, David) (Entered: 11/17/2022) |
| 11/21/2022 | 31 | REPLY TO RESPONSE to Motion by Jared Michael Harrison re 17 MOTION to Dismiss *the Indictment Based on the Unconstitutionality of 18 U.S.C. 922(g)(3)* (Deskin, Laura) (Entered: 11/21/2022) |
| 11/22/2022 | 32 | ENTRY OF ATTORNEY APPEARANCE: Laura K Deskin appearing for Jared Michael Harrison (Deskin, Laura) (Entered: 11/22/2022) |
| 11/28/2022 | 33 | ENTER ORDER (Text Only) – The Docket Call scheduled for Wednesday, November 30, 2022 at 1:30 p.m. is hereby STRICKEN; a hearing on dft's motion to dismiss is currently set for November 30, 2022; trial scheduled to be determined after hearing (This is a text only docket entry; there is no document associated with this entry), as to Jared Michael Harrison. Signed by Judge Patrick R Wyrick on 11/28/2022. (ks) (Entered: 11/28/2022) |
| 11/30/2022 | 34 | MINUTE ENTRY for proceedings held before Judge Patrick R Wyrick: Motion Hearing as to Jared Michael Harrison held on 11/30/2022 re 17 Motion to Dismiss *the Indictment Based on the Unconstitutionality of 18 U.S.C. 922(g)(3)* filed by Jared Michael Harrison. The Court takes the matter under advisement. The Court strikes the case from the December Trial Docket. (Court Reporter Emily Cripe) (ks) (Entered: 11/30/2022) |
| 11/30/2022 | | Terminate Deadlines and Hearings as to Jared Michael Harrison: (ks) (Entered: 11/30/2022) |
| 01/04/2023 | 35 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Jared Michael Harrison held on 11/30/2022 before Judge Patrick R. Wyrick. Court Reporter Emily Cripe, Telephone number 4056095094. Transcript of: Motion Hearing Volume: I of I Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/25/2023. Redacted Transcript Deadline set for 2/6/2023. Release of Transcript Restriction set for 4/4/2023. (ec) (Entered: 01/04/2023) |
| 02/03/2023 | 36 | ORDER granting 17 Defendant's Motion to Dismiss the Indictment (as more fully set out in the order), as to Jared Michael Harrison (1). Signed by Judge Patrick R Wyrick on 2/3/2023. (ks) (Entered: 02/03/2023) |
| 03/03/2023 | 37 | NOTICE OF APPEAL by United States of America as to Jared Michael Harrison re 36 Order on Motion to Dismiss (McCrary, David) (Entered: 03/03/2023) |
| 03/03/2023 | 38 | PRELIMINARY RECORD LETTER – Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 37 Notice of Appeal (Attachments: # 1 Attachment 1 – Preliminary Record on Appeal)(kb) (Entered: 03/03/2023) |

| 03/03/2023 | 39 | Tenth Circuit USCA Case Number 23−6028 as to Jared Michael Harrison for 37 Notice of Appeal filed by United States of America. Criminal case docketed. Preliminary record filed. DATE RECEIVED: 03/03/2023. Notice of appearance, transcript order form, docketing statement, and disclosure statement due on 03/17/2023 for United States of America. Notice of appearance and appointment motion due 03/17/2023 by Jared Michael Harrison. [23−6028] (kb) (Entered: 03/06/2023) |
| --- | --- | --- |
| 03/17/2023 | 40 | ENTRY OF ATTORNEY APPEARANCE Steven W Creager appearing for USA. (Creager, Steven) (Entered: 03/17/2023) |
| 03/17/2023 | 41 | TRANSCRIPT Order Form by United States of America re 37 Notice of Appeal that transcripts are not necessary. See order form for dates and proceedings. (Creager, Steven) (Entered: 03/17/2023) |
| 03/17/2023 | 42 | TRANSCRIPT LETTER advising No transcript is necessary re 37 Notice of Appeal filed by United States of America. The record is ready for appeal purposes. (kb) (Entered: 03/17/2023) |



**IN THE UNITED STATES DISTRICT COURT FOR THE**

**WESTERN DISTRICT OF OKLAHOMA**

FILED

AUG 17 2022

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA
BY _____ , DEPUTY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| -vs- | ) | No. CR 22-328 PRW |
| | ) | |
| **JARED MICHAEL HARRISON,** | ) | **Violations:**   18 U.S.C. § 922(g)(3) |
| | ) | 18 U.S.C. § 924(d) |
| **Defendant.** | ) | 28 U.S.C. § 2461(c) |

## I N D I C T M E N T

The Federal Grand Jury charges:

### COUNT 1
### (Possession of a Firearm by a Prohibited Person)

On or about May 20, 2022, in the Western District of Oklahoma,

------------------------------ **JARED MICHAEL HARRISON,** ------------------------------

with knowledge that he was an unlawful user of marijuana, a controlled substance as

defined in Title 21, United States Code, Section 802, knowingly possessed a firearm, to

wit: a Rossi, model M68, .38 caliber revolver, bearing serial number AA474050, which

was in or affecting interstate commerce in that said firearm had crossed state lines to reach

the state of Oklahoma.

All in violation of Title 18, United States Code, Section 922(g)(3), the penalty for

which is found at Title 18, United States Code, Section 924(a)(2).

App. 008

## FORFEITURE

The allegation contained in this Indictment is hereby re-alleged and incorporated for the purpose of alleging forfeiture.

Upon conviction of the offense alleged in Count 1 of this Indictment, **JARED MICHAEL HARRISON** shall forfeit to the United States any and all firearms and ammunition involved in the commission of the offense.

The property subject to forfeiture includes, but is not limited to:

1.  a Rossi, model M68, .38 caliber revolver, bearing serial number AA474050; and

2.  any and all ammunition and magazines not otherwise specified.

All pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

FOREPERSON OF THE GRAND JURY

ROBERT J. TROESTER
United States Attorney

STEPHANIE POWERS
Special Assistant United States Attorney

App. 009

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATE OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CR-22-328-PRW** |
| | ) | |
| **JARED MICHAEL HARRISON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>DEFENDANT'S MOTION TO DISMISS THE INDICTMENT BASED ON THE
UNCONSTITUTIONALITY OF 18 U.S.C. § 922(g)(3) WITH BRIEF IN SUPPORT</u>**

App. 010

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. ii

**INTRODUCTION** .................................................................... 1

**STATEMENT OF FACTS** ........................................................ 2

**ARGUMENT & AUTHORITY** ................................................. 3

I.    Section 922(g)(3) Violates Mr. Harrison's Due Process Rights
      Because the Statute is Unconstitutionally Vague,
      Both Facially and as Applied ................................................ 3

      a.  Section 922(g)(3) is facially void because the text is ambiguous .................... 4

      b.  Judicial attempts to salvage § 922(g)(3) violate the Separation of Powers ........ 9

      c.  Section 922(g)(3) is unconstitutionally vague as applied to Mr. Harrison ....... 10

II.   Section 922(g)(3) Unconstitutionally Infringes on an Individual's Right
      To Bear Arms Under the Second Amendment ........................................ 11

      a.  The Second Amendment's plain text covers conduct at issue
          in § 922(g)(3) ........................................................... 12

      b.  The Government cannot meet its burden to show that
          § 922(g)(3)'s restrictions are "consistent with the Nation's
          historical tradition of firearm regulation ........................................ 13

**CONCLUSION** .................................................................... 16

**CERTIFICATE OF SERVICE** ................................................ 19

App. 011

## TABLE OF AUTHORITIES

### FEDERAL CASES

*District of Columbia v. Heller*
554 U.S. 570 (2008) .................................................................................. 11, 12, 14, 15

*Huddleston v. United States*
415 U.S. 814 (1974) ............................................................................................... 7

*Johnson v. United States,*
576 U.S. 591 (2015) ............................................................................................ 4, 8

*Kolender v. Lawson,*
461 U.S. 352 (1983) .............................................................................................. 4

*McDonald v. City of Chicago, Ill.*
561 U.S. 742 (2010) ............................................................................................ 11

*Muscarello v. U.S.*
524 U.S. 125 (1998) ............................................................................................ 13

*New York States Rifle and Pistol Association v. Bruen,*
142 S. Ct. 2111 (2022).................................................................................*passim*

*Rehaif v. United States*
139 S. Ct. 2191 (2019)........................................................................................ 8, 9

*Sessions v. Dimaya*
138 S. Ct. 1204 (2018)........................................................................................ 8, 10

*United States v. Davis,*
139 S. Ct. 2319 (2019)........................................................................................ 9, 10

*United States. v. Jackson,*
280 F.3d 403 (4th Cir. 2002) .................................................................................. 6

*United States v. Morales-Lopez,*
2022 WL 2355920 (D. Utah June 30, 2022) .......................................................... 4, 5

*United States v. Patterson,*
431 F.3d 832 (5th Cir. 2005) .................................................................................. 6

App. 012

*United States v. Turnbull,*
349 F.3d 558 (8th Cir. 2003) .................................................................... 6

*United States v. Yancey,*
621 F.3d 681 (7th Cir 2010) ..................................................................... 6

## CONSTITUTION AND STATUTES

18 U.S.C. § 922(g)(1) ................................................................................ 6

18 U.S.C. § 922(g)(3) ........................................................................*passim*

18 U.S.C. § 922(g)(4) ................................................................................ 6

18 U.S.C.  924(a)(2) .................................................................................. 8

U.S. Const., amend. II .............................................................................. 11

U.S. Const., amend.  V ......................................................................... 1, 3

*Gun Control Act of 1968*
Pub. L. 90-618, 82 Stat. 121 ..................................................................*14*

## FEDERAL RULES

Rule 12(b)(3)(B), Federal Rules of Criminal Procedure ............................ 1

## OTHER AUTHORITIES

114 Cong. Rec. 13647 (1968) ................................................................... 7

4 William Blackstone, *Commentaries of the Laws of England* 21 (1769) .......................... 9

Cornell, Saul, *Commonplace of Anachronism: The Standards Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 Const. Comment. 221 (1999) ............................................................. 15

H.R. REP 91-5149, 91st Cong., 2d Sess. 1970 ........................................ 7

H.R. REP 99-495, 99th Cong., 2d Sess. 1986 ......................................... 7

H.R. REP 115-437, 115th Cong., 1st Sess. 2017 ..................................... 8

App. 013

S.Rep. No. 1501, 90th Cong., 2d Sess. 1968.........................................................................7

App. 014

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATE OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CR-22-328-PRW** |
| | ) | |
| **JARED MICHAEL HARRISON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT BASED ON THE UNCONSTITUTIONALITY OF 18 U.S.C. § 922(g)(3) WITH BRIEF IN SUPPORT

### INTRODUCTION

The Defendant, Jared Michael Harrison, moves the Court, pursuant to Federal Rules of Criminal Procedure 12(b)(3)(B), to dismiss the Indictment, which charges possession of a firearm while being an unlawful user of marijuana, in violation of 18 U.S.C. § 922(g)(3). The Court should dismiss the Indictment because § 922(g)(3) is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. The statute fails to give ordinary people fair notice of the conduct it punishes because it does not define the term "unlawful user." Thus, a citizen must guess at what point he or she, after unlawfully using a controlled substance, may lawfully possess a firearm.

The statute is also unconstitutional in light of the U.S. Supreme Court's recent ruling in *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). The restriction contained in § 922(g)(3) prohibits possession of a firearm for any person "who is an unlawful user of or addicted to a controlled substance." Because the Government cannot demonstrate that prohibiting such conduct is consistent with the Nation's historical

App. 015

tradition of firearm regulation, the Indictment must be dismissed.

## STATEMENT OF FACTS

On May 20, 2022, Jared Harrison was pulled over in Lawton, Oklahoma, for failing to stop at a red light. The officer approached the vehicle and asked Mr. Harrison to roll down his window. After Mr. Harrison complied, the officer claimed he could smell the odor of marijuana coming from the vehicle. Upon further questioning, Mr. Harrison stated that he did not have a medical marijuana card and was headed to work at Vertical Vibez, a local dispensary.

At the officer's request, Mr. Harrison exited the vehicle. The officer observed that Mr. Harrison was wearing an ankle monitor. He advised that he was on probation in Texas for aggravated assault; however, Mr. Harrison was actually on bond pending trial. (*State v. Harrison*, F22-125-363 – Denton County District Court, Denton, Texas). Mr. Harrison was searched and nothing illegal was found on his person. No field sobriety tests were conducted, nor was a blood draw requested.

After a second officer arrived, Mr. Harrison's vehicle was searched. Officers observed a revolver laying on the driver's side floor board and a backpack on the passenger seat. The backpack contained several marijuana products including a glass jar containing 35.4 grams of loose marijuana, a prescription bottle containing 23.8 grams of marijuana, an empty prescription bottle, THC gummies, a pre-rolled marijuana cigarette, and two THC vape cartridges. Some of the containers had Vertical Vibez labels. The marijuana cigarette was found on a tray along with some marijuana stems.

Mr. Harrison was arrested at the scene. On May 23, 2022, he was charged in

App. 016

Comanche County District Court with Possession of Marijuana (District Court Case No. CM-22-745), Possession of Paraphernalia (District Court Case No. CM-22-746), and Failure to Obey a Traffic Signal (District Court Case No. TR-2022-1150). All three cases are pending. On August 17, 2022, a grand jury returned an Indictment, charging Mr. Harrison with possessing a firearm, "with knowledge that he was an unlawful user of marijuana." (ECF #1).

## ARGUMENT & AUTHORITY

Section 922(g)(3) is unconstitutional for two reasons, First, the statute violates the Due Process Clause of the Fifth Amendment because, facially, and as applied, the statute is so vague that it fails to provide fair notice of the acts prohibited and allows for arbitrary and discriminatory enforcement. Second, § 922(g)(3) violates the Second Amendment, facially, and as applied, because historical traditions do not support prohibiting persons who are accused of being a "user of" or "addicted to" a controlled substance from possessing firearms.

**I.      Section 922(g)(3) Violates Mr. Harrison's Due Process Rights because the Statute is Unconstitutionally Vague, both Facially and as Applied.**

Section 922(g)(3) prohibits possession of a firearm where an individual is found to be "addicted to" or an "unlawful user of" a controlled substance. However, the statue itself fails to define what it means to be an addict, or one who unlawfully uses a controlled substance, thereby creating several vagueness problems.

The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. CONST., amend. V. Courts have long held

App. 017

3

that "the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague, that it fails to give ordinary people fair notice of the conduct it punishes or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 596 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983)). In addition to violating due process guarantees, vague laws contravene the basic tenet of the separation of powers doctrine. *U.S. v. Davis,* 139 S. Ct. 2319, 2325 (2019) (affirming that vague laws allow "relatively unaccountable police, prosecutors, and judges," rather than elected representatives, to define the law thereby undermining "democratic self-governance"); see also *Kolender*, 461 U.S. at 358 ("[I]f the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, [it would] substitute the judicial for legislative department"). Thus, where a law is so vague it violates a defendant's due process rights, "the role of courts under our constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again." *Davis* at 2323.

### a. Section 922(g)(3) is facially void because the text is ambiguous.

Congress' decision not to define the key terms within § 922(g)(3) renders the statute facially invalid because it fails to provide individuals of common intelligence notice as to whether they fall within its proscribed class. As written, § 922(g)(3) must be stricken as facially void-for-vagueness. *See*, *United States v. Morales-Lopez*, No. 2:20-CR-00027-JNP, 2022 WL 2355920, at *8 (D. Utah June 30, 2022).

While the statute does reference a definition of "controlled substance," it provides

App. 018

no such definition for the terms "addicted to" or "unlawful user." "In interpreting statutes, it is the duty of the court to give effect, if possible, to every clause and word of a statute." *Morales-Lopez* at 8. "Here the legislature included two categories of individuals covered by the statute." *Id.* "Thus, the court must give independent meaning to unlawful user and a person addicted to a controlled substance." *Id.*

The term "addict" is defined as: (1) "one exhibiting a compulsive, chronic, physiological or psychological need for a habit-forming substance, behavior, or activity," or (2) one strongly inclined to do, use, or indulge in something repeatedly." *See* Miriam-Webster.com (2022) (definition of "addict"). However, the statute does not establish when a behavior becomes compulsive or chronic, or how an individual prosecutor, judge, or jury, will determine when a behavior, or activity, has become a physiological or psychological need or habit. Also, the statute fails to clarify exactly what the government must prove. Must there be some overt act or is an attempt sufficient? Is the inclination to use a substance without action enough to deprive one of their constitutional rights? Similarly, how can a defendant know if they are "strongly inclined" to do, use, or indulge in something repeatedly without further clarification?

Turning to the term "user," it must be something less than an addict. *Morales-Lopez* at 8. The dictionary simply defines the term as: "one who uses." See Miriam-Webster.com (2022) (definition of "user"). Section 922(g)(3), therefore, prohibits firearm possession by one who unlawfully "uses" a controlled substance, but does not clarify if there are any temporal constraints on when such use took place. Thus, on its face, the statute would prohibit anyone who has ever unlawfully used a controlled substance from possessing a

App. 019

firearm. Without a temporal link or defined threshold for determining when the prohibited status begins, individuals are left to read § 922(g)(3) with the understanding that "once a user, always a user."

In *Morales-Lopez*, the District Court stated, "this court finds an interpretation that would make gun possession at any point in a person's life after a single instance of ingesting drugs absurd." *Id*. at 8. In assessing the constitutionality of § 922(g)(3), the Seventh Circuit noted unlawful drug users "could regain [their] right to possess a firearm by simply ending [their] drug abuse." *United States v. Yancey*, 621 F.3d 681, 696 (7th Cir. 2010). The Fourth Circuit concluded, "[s]ection 922(g)(3) does not forbid possession of a firearm *while unlawfully using* a controlled substance. Rather the statute prohibits *unlawful users* of controlled substances…from possessing firearms. *U.S. v. Jackson*, 280 F.3d 403, 406 (4th Cir. 2002). Moreover, several circuits, including the Fifth, have rejected such an expansive interpretation of § 922(g)(3) recognizing that a temporal nexus must be read into the statute to avoid rendering it unconstitutional. See *United States v. Patterson*, 431 F.3d 832, 839 (5th Cir. 2005) (upholding § 922(g)(3) against an "as applied" vagueness challenge) (citing *United States v. Turnbull*, 349 F.3d 558, 561 (8th Cir. 2003) (citations omitted)). Thus, the plain language of the statute renders § 922(g)(3) unworkable because it subject to multiple interpretations each more problematic and ambiguous than the last.

Turning to the context of the broader statute, the vagueness concerns of § 922(g)(3) are compounded. Unlike § 922(g)(1) (possession of a firearm by a felon) or § 922(g)(4) (possession of a firearm by one adjudicated as a mental defective or who has been committed to a mental institution), § 922(g)(3) has no adjudication requirement or

App. 020

6

prerequisite of a discrete act, such as commitment to an institution, prior to receiving the restricted status.  Without a discernable threshold for when one obtains the status "addict" or "unlawful user of" a controlled substance, it cannot be said that the statue is unambiguous, nor does it provide an ordinary person notice of the statutory proscriptions.

Likewise, Congressional intent sheds no light on the ambiguities. The legislative record indicates that "the principal purpose of the federal gun control legislation… was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (quoting S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968). U.S.Code Cong. & Admin. News 1968, p. 4410; *see also*, Congressman Celler, the House Manager ,114 Cong. Rec. 13647, 21784 (1968) ("No one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses, from buying, owning, or possessing firearms. This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons."). Subsequent legislative history of § 922(g)(3), however, is telling. Since its passage, Congress has amended § 922(g)(3) several times but at no time has it clarified what it means to be "addicted to" or "an unlawful user of" the prohibited substance(s). *See e.g.*. H.R. REP. 99-495, 99th Cong., 2d Sess., 14, 1986 U.S.C.C.A.N. 1327, 1340 (expanding the list of substances prohibited under § 922(g)(3)); H.R. REP. 91-1549, 91st Cong., 2d Sess., 1970 U.S.C.C.A.N. 4007, 4011(prohibiting the sale of explosives to "drug addicts"). Congress did, however, provide guidance under the National Instant Criminal Background Check System Improvement Amendments Act of 2007 in which it stated that

App. 021

a record, for purposes of § 922(g)(3):

> identifies a person who is an unlawful user of, or addicted to a controlled substance (as such terms "unlawful user" and "addicted" are respectively defined in regulations implementing section 922 (g)(3) of title 18, United States Code, as in effect on the date of the enactment of this Act) as demonstrated by arrests, convictions, and adjudications, and whose record is not protected from disclosure to the Attorney General under any provision of State or Federal law.

H.R. REP. 115-437, 20. Though this, too, fails to supply a definition for what it means to be a "addicted to" or "an unlawful user of" a controlled substance, Congress has, at the very least, demonstrated that it is possible and desirable for the Attorney General to obtain verifiable information establishing a history of drug use as it relates to § 922(g)(3). It follows then that Congress has the ability, as well as the constitutional mandate, to abandon § 922(g)(3) or amend it so an ordinary person understands its proscription and ensures against arbitrary enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

From legislative history it is clear that Congress intended to bar certain classes of people from possessing of a firearm. Yet how to identify this class, and how one may evaluate their risk of entering this class, remains unanswered. *e.g. Johnson v. U.S.,* 576 U.S. at 598. (finding the residual clause of the Armed Career Criminal Act void for vagueness and noting the clause "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony"). "Without knowledge of [their criminal] status, [a] defendant may well lack the intent needed to make [their] behavior wrongful." *Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019). In its *Rehaif* decision, the Supreme Court held that prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), requires that the government "prove both that the defendant knew he possessed a firearm and that he knew he belonged

App. 022

8

to the relevant category of persons barred from possessing a firearm." *Id.* Scienter requirements, such as the one examined in *Rehaif*, are consistent with the understanding that, underlying criminal law, is the principle of "a vicious will." *Id.* at 2196 (citing 4 William Blackstone, Commentaries on the Laws of England 21 (1769)). Thus, in any case charged under § 922(g)(3) the Government must establish, beyond a reasonable doubt, that the defendant knew he fell within the statute's proscribed class.

Mr. Harrison demonstrates that the plain language of the statute, congressional history, and judicially created definitions, all fail to provide an individual with notice of their status as an "unlawful user." This exact observation underscores the vagueness problem at the core of § 922(g)(3). Without comprehensible statutory definitions, it is unclear when a person begins, or ends, use of a controlled substance that prohibits possession of firearm. Unless one first knows their status as a prohibited person, they cannot knowingly commit a violation of § 922(g)(3). The constitutional infirmities of § 922(g)(3) are so grave they render the statute meaningless and unenforceable. Because the statutory language of § 922(g)(3) is so vague it fails to provide an ordinary person fair warning about what the law demands of them including whether they fall within a prohibited status under the statute, it must be found unconstitutionally vague.

### b.  Judicial attempts to salvage § 922(g)(3) violate the Separation of Powers.

In *Davis,* the Supreme Court rejected the notion of judicial intervention aimed at saving a vague law. *See Davis*, 139 S. Ct. at 2323 ("Only the people's elected representatives in Congress have the power to write new federal criminal laws"). In part, this mandate exists to "[guard] against arbitrary or discriminatory law enforcement by

App. 023

9

insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 138 S. Ct. at 1212.

As examined above, both the plain language of the statute, as well as legislative history of § 922(g)(3), fail to provide insight into exactly which class of people Congress intended to exclude from those who may exercise their Second Amendment rights. There is nothing contained within the statute, or history, to support the judicially created definitions of "addicted to" and "unlawful user." Section 922(g)(3) may only be rectified, as it relates to a void for vagueness challenge, through congressional action addressing the statutory deficiencies. Congress' decision not to do so, especially when it has taken steps to clarify similar terms in other contexts, is not an invitation to the courts to abandon judicial restraint. *Davis*, 139 S. Ct. at 2333. The continued attempts to judicially define and salvage § 922(g)(3) are not only futile, they are an unconstitutional violation of the Separation of Powers doctrine. As such, the statute, as written by Congress, must be stricken as void for vagueness.

### c. Section 922(g)(3) is unconstitutionally vague as applied to Mr. Harrison.

Section 922(g)(3) is unconstitutionally vague, as applied, because Mr. Harrison did not have fair notice that he was prohibited from possessing a firearm if determined to be an unlawful user of marijuana. Further, Mr. Harrison could not have known if he even qualified as an unlawful user of marijuana. Because Congress has not given the term "unlawful user" substantive meaning, Mr. Harrison could not have understood that he potentially fell within § 922 (g)(3)'s prohibited class based on the language of the statute alone.

App. 024

Looking then to the definitions set forth by the various circuits, and considering the Government's potentially admissible evidence, Mr. Harrison's history does not establish that he is one who "regularly engages" in unlawful use of a controlled substance "over a period of time proximate to or contemporaneous" with his arrest in the present matter. Mr. Harrison does not have a demonstrable criminal history of regular use of any controlled substance. There is no evidence that he has ever received treatment for drug use. Additionally, while he was arguably in possession of marijuana products, there is no evidence that he ever consumed any of the products. At the time of his arrest he did not demonstrate any signs of being under the influence of a controlled substance. The facts are insufficient to establish that Mr. Harrison was an unlawful user of a controlled substance as defined by the Courts. Despite the plain language of the statute, and judicially created definitions, § 922(g)(3) remained so vague it failed to give Mr. Harrison fair notice that he fell within the statue's prohibited class, and any enforcement of the statute against Mr. Harrison was arbitrary.

## II.   Section 922(g)(3) Unconstitutionally Infringes on an Individual's Right to Bear Arms Under the Second Amendment.

The Second Amendment to the United States Constitution "confer[s] an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). This right "shall not be infringed." U.S. CONST. amend. II. The right to keep and bear arms is fundamental, applicable against state and local governments, and entitled to the same protections as other fundamental rights enshrined in the Constitution. *See, McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010). Still, Congress passed § 922(g)(3), a law that

App. 025

strips citizens of rights guaranteed to them by the Second Amendment without any historical precedent. The criminalization of the possession of firearms falls within the scope of the Second Amendment. Thus, the blanket prohibition on firearm possession by those who are unlawful users of or addicted to a controlled substance is unconstitutional under the Supreme Court's new *Bruen* analysis.

After, the U.S. Supreme Court's *Heller* decision in 2008, "most federal appellate courts applied a two-step framework using a means-ends analysis to determine the constitutionality of § 922(g) restrictions on Second Amendment rights." *U.S. v. Jackson*, CR-22-59-D – Order dated 8/19/2022 (ECF #45).  However, in *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), the Court adopted a new standard for determining the constitutionality of regulation based on the Second Amendment. The Court stated,

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation."

*Id.* at 2129-30.

Therefore, the first step in the Court's analysis is to determine whether the plain text of the Second Amendment covers a defendant's conduct.

### a.  The Second Amendment's plain text covers conduct at issue in § 922(g)(3).

In *Bruen,* the Court stated that the Second and Fourteenth Amendments "protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122. The decision further acknowledged "that the right to "bear arms" refers to the right to "wear,

App. 026

bear, or carry…upon the person or in the clothing or in a pocket, for the purpose…of being armed and ready for offensive or defensive action in a case of conflict of another." *Id*. At 2134. (quoting *Muscarello v. U.S.*, 524 U.S. 125, 143 (1998). Section 922(g)(3) is a complete bar on firearm possession. It is not limited by the type of firearm or the purpose for which the firearm might be used. Nor is it limited to firearms possessed in a particular public area. It applies with equal force to firearms kept in the home for self-defense.  A person's ability to possess a firearm for self-defense is the central component of the Second Amendment right. Thus, the conduct of any individual charged under this statute is clearly covered by the plain text of the Second Amendment.

### b.  The Government cannot meet its burden to show that § 922(g)(3)'s restrictions are "consistent with the Nation's historical tradition of firearm regulation."

The second step of the *Bruen* analysis places the burden on the government to demonstrate that the regulation is consistent with the "Nation's historical tradition of firearm regulation." Under *Bruen's* new model, disarmament laws that address persistent social problems require evidence that similar provisions existed at the time of ratification. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen* at 2131. With this understanding, the government clearly cannot meet its burden to show that the Nation's history, particularly around the passage of the Second Amendment, supports firearm restrictions for those addicted to, or who unlawfully used, a controlled substance.

App. 027

As in *Heller* and *Bruen*, historical examples of regulations offered by the government must be "distinctly similar" to § 922(g)(3) because the restriction does not address "unprecedented societal concerns or dramatic technological changes[.]" See *Bruen*, 142 S. Ct. at 2132–33. There are no "distinctly similar" regulations from the founding. Indeed, the history of barring firearm possession by those who use or are addicted to controlled substances (or narcotics in general) is limited and relatively recent. Congress first passed § 922(g)(3) in 1968. *See* Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. § 921 *et seq*.). This was the first time in the Nation's history that Congress enacted such a ban. The government cannot rely on the passage of a mid-twentieth century statute to establish a long-standing historical tradition dating back to the enactment of the Second Amendment. See *Bruen*, 142 S. Ct. at 2137. In fact, the Supreme Court specifically declined to consider any twentieth century evidence offered by the respondents in *Bruen*, noting it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* 142 S. Ct. at 2154, n. 28.

Nor can the Government rely on the general pronouncement by the Supreme Court in *Heller* that presumptively lawful regulatory measures include: "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller* at 626-27. The list does not include those who are accused of being an unlawful user of a controlled substance. Those regulations would not be "distinctly similar" to § 922(g)(3) to address a "general societal problem." Even if § 922(g)(3) were a uniquely modern regulation, such that the

App. 028

Court could expand its historical analysis to include merely similar historical analogues, those longstanding regulations are not "relevantly similar" because they do not impose a comparable burden or evince comparable justifications. See *Bruen*, 142 S. Ct. at 2132-33. While the examples provided by the Court in *Heller* were not exhaustive, they generally all comport with a historical principle of disarming select groups for the sake of public safety. *See NRA*, 700 F.3d at 200-01 (citing Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 231–36 (1999)). There is no comparable "public safety" justification for disarming all drug users. Moreover, the Supreme Court has since explained that the "government may not simply posit that the regulation promotes an important interest." *Bruen*, 142 S. Ct. at 2126. Therefore, the Government cannot rely on general public safety justifications to uphold § 922(g)(3).

Even if this Court finds that § 922 (g)(3) does not violate the Second Amendment on its face, the statute should not apply to a person like Mr. Harrison, who was merely found with a controlled substance in his vehicle and who has no criminal history of using controlled substances. This set of circumstances is not "distinctly similar" or even "relevantly analogous" to founding era prohibitions on the right to bear arms. Though intoxicants existed at the founding, the government cannot establish that eighteenth century history supports stripping a man of his ability to defend himself because he possessed an intoxicant. Because the Government cannot establish that § 922(g)(3) is consistent with the Nation's historical tradition of firearm regulation it violates the Second Amendment facially and as applied to Mr. Harrison.

App. 029

## <u>CONCLUSION</u>

Section 922(g)(3) is unconstitutionally vague and fails to given adequate notice of the conduct it prohibits. Further, it impermissibly restricts a person from exercising their right to defend themselves, their families, and their homes. Because there is no historical precedent to support the regulation, the provision is unconstitutional and the Indictment against Mr. Harrison should be dismissed.

Respectfully submitted

s/ *J.P. Hill*
J.P. HILL, OBA No. 31085
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL PUBLIC DEFENDER ORGANIZATION
WESTERN DISTRICT OF OKLAHOMA
215 Dean A. McGee, Suite 109
Oklahoma City, OK 73102
Telephone: 405-609-5941
Fax: 405-609-5932
jp_hill@fd.org
Counsel for Defendant

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 11th day of October 2022, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant: Stephanie Powers, Assistant United States Attorney.

s/ *J.P. Hill*
J.P. HILL

App. 030

App. 031

# IN THE UNITED STATES DISTRICT COURT FOR THE

## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | )   No.  **CR-22-328-PRW** |
| | ) |
| JARED MICHAEL HARRISON, | ) |
| | ) |
| Defendant. | ) |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT AS UNCONSTITUTIONAL

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

STEPHANIE POWERS
Oklahoma Bar No. 22892
Special Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
Stephanie.powers2@usdoj.gov

App. 032

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

FACTUAL BACKGROUND ................................................................................... 2

DISCUSSION ......................................................................................................... 3

I.   Mr. Harrison's Vagueness Challenge to Section 922(g)(3) as Applied
     is Premature ............................................................................................... 3

     A. Section 922(g)(3) is Not Facially Vague. ........................................... 4

     B. Section 922(g)(3) is Not Facially Invalid ........................................... 6

II.  Section 922(g)(3) Does Not Violate the Second Amendment .................. 9

     A. Under *Bruen*, a gun restriction violates the Second Amendment only if
        it burdens conduct covered by the Amendment's text and is inconsistent
        with the nation's historical tradition of firearm regulation .............. 10

     B. The text of the Second Amendment does not encompass possessing a
        firearm as an unlawful user or addict of a controlled substance ........ 12

        i.   The party challenging a firearm regulation bears the initial burden of
             showing that the Second Amendment's text covers the conduct at issue ... 12

        ii.  The Second Amendment's plain text does not cover possessing a
             firearm as an illegal drug user or addict ........................................ 13

     C. Section 922(g)(3) is consistent with the nation's historical tradition of
        firearm regulations ............................................................................. 16

        i.   Under step two of the *Bruen* test, this Court must determine whether
             Section 922(g)(3) is analogous to "relevantly similar" historical
             firearm regulations ........................................................................ 17

        ii.  Firearm regulations in America have historically prohibited certain
             presumptively risky persons—including lawbreakers and those with
             dangerously impaired judgment or mental ability—from bearing arms ..... 18

        iii. Section 922(g)(3) is "relevantly similar" to an analogous tradition of
             firearm restrictions in America ...................................................... 23

App. 033

CONCLUSION ............................................................................................... 27

CERTIFICATE OF SERVICE ....................................................................... 27

App. 034

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Federal Cases

*Beers v. Att'y Gen. United States*,
   927 F.3d 150 (3d Cir. 2019) ........................................................................ 22

*Cook v. United States*,
   140 S. Ct. 41 (2019) ...................................................................................... 7

*D.C. v. Heller*,
   554 U.S. 570 (2008) ............................................................................. *passim*

*Dickerson v. New Banner Inst., Inc.*,
   460 U.S. 103 (1983) ..................................................................................... 24

*Harmon v. City of Norman, Oklahoma*,
   981 F.3d 1141 (10th Cir. 2020) ................................................................... 13

*Holder v. Humanitarian Law Project*,
   561 U.S. 1, 130 S. Ct. 2705, 177 L.Ed.2d 355 (2010) .................................. 5

*Hollis v. Lynch*,
   827 F.3d 436 (5th Cir. 2016) ....................................................................... 14

*Johnson v. United States*,
   576 U.S. 591 (2015) ....................................................................................... 7

*Libertarian Party of Erie Cnty. v. Cuomo*,
   970 F.3d 106 (2d Cir. 2020) ........................................................................ 14

*Maynard v. Cartwright*,
   486 U.S. 356, 108 S. Ct. 1853, 100 L.Ed.2d 372 (1988) ........................... 5, 6

*McDonald v. City of Chicago, Ill.*,
   561 U.S. 742 (2010) ............................................................................. *passim*

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
   700 F.3d 185 (5th Cir. 2012) ....................................................................... 20

*New York State Rifle and Pistol Association v. Bruen*,
   142 S. Ct. 2111 (2022) ........................................................................ *passim*

App. 035

*Sabri v. United States*,
  541 U.S. 600 (2004) ........................................................................ 5

*Scarborough v. United States*,
  431 U.S. 563 (1977) ...................................................................... 25

*United States v. Been*,
  CR-22-268-J, Doc. 30, (W.D. Okla. October 21, 2022) ........................ 9, 25

*United States v. Bena*,
  664 F.3d 1180 (8th Cir. 2011) ...................................................... 19, 22

*United States v. Carpio-Leon*,
  701 F.3d 974 (4th Cir. 2012) ............................................................ 20

*United States v. Carter*,
  750 F.3d 462 (4th Cir. 2014) .............................................................. 9

*United States v. Cheeseman*,
  600 F.3d 270 (3d Cir. 2010) ............................................................. 24

*United States v. Cook*,
  914 F.3d 545 (7th Cir. 2019) .............................................................. 7

*United States v. Cook*,
  970 F.3d 866 (7th Cir. 2020) .............................................................. 5

*United States v. Covington*,
  395 U.S. 57 (1969) ........................................................................... 3

United States v. Daniels,
  No. 22-CR-58-LG-RHWR, 2022 WL 2654232 (S.D. Miss. July 8, 2022) ........... 25, 26

*United States v. Dugan*,
  657 F.3d 998 (9th Cir. 2011) ......................................................... 9, 25

*United States v. Easter*,
  981 F.2d 1549 (10th Cir. 1992) ......................................................... 7

*United States v. Edwards*,
  540 F.3d 1156 (10th Cir. 2008) ....................................................... 16

*United States v. Emerson*,
  270 F.3d 203 (5th Cir. 2001) ........................................................... 22

App. 036

*United States v. Focia*,
    869 F.3d 1269 (11th Cir. 2017) ................................................................. 14

*United States v. Johnson*,
    875 F.3d 360 (7th Cir. 2017) ...................................................................... 5

*United States v. May*,
    538 F. App'x 465 (5th Cir. 2013) ............................................................... 9

*United States v. Morales-Lopez*,
    2022 WL 2355920, (D. Utah June 30, 2022) ............................................. 5

*United States v. Patterson*,
    431 F.3d 832 (5th Cir. 2005) .................................................................... 16

*United States v. Reed*,
    114 F.3d 1067 (10th Cir. 1997) ......................................................*passim*

*United States v. Reese*,
    627 F.3d 792 (10th Cir. 2010) .................................................................. 14

*United States v. Richard*,
    350 F. App'x 252 (10th Cir. 2009) ............................................................ 9

*United States v. Salerno*,
    481 U.S. 739 (1987) .................................................................................... 5

*United States v. Seay*,
    620 F.3d 919 (8th Cir. 2010) ............................................................... 9, 24

*United States v. Seiwert*,
    No. 20-CR-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) ........... 25, 26

*United States v. Stupka*,
    418 F. Supp. 3d 402 (N.D. Iowa 2019) ..................................................... 7

*United States v. Terrell*,
    172 F.3d 880 (10th Cir. 1999) .................................................................... 7

*United States v. Turner*,
    842 F.3d 602 (8th Cir. 2016) ..................................................................... 4

*United States v. Waldo*,
    No. 19-03117-01-CR-S-RK, 2020 WL 2617134 (W.D. Mo. Jan. 22, 2020) ................. 7

App. 037

*United States v. Yancey*,
  621 F.3d 681 (7th Cir. 2010) ..................................................................*passim*

## Federal Statutes

18 U.S.C. § 922(g)(3) ...................................................................................... 1

## State Statutes

ARK. CODE ANN. § 5-73-309.............................................................................. 15

Kansas Gen. Stat., Crimes & Punishments § 282 (1868)................................ 22

TEX. GOV'T CODE ANN. § 411.172(a)(6) .......................................................... 15

## Federal Rules

Fed. R. Crim. P. 12(d) ...................................................................................... 4

## Federal Regulations

7 C.F.R. § 478.11............................................................................................ 16, 25

## <u>Legislative Acts</u>

1878 Miss. Laws 175–76 § 2............................................................................ 23

1883 Mo. Laws 76, § 1 .................................................................................... 23

1883 Wis. Sess. Laws 290 ............................................................................... 23

1890 Okla. Sess. Laws 495, art. 47, § 4 ......................................................... 23

1899 S.C. Acts 97, No. 67, § 1 ........................................................................ 23

Act XII of March 10, 1655,
  1655 Va. Laws 401 ....................................................................................... 22

Gun Control Act of 1968, Pub.L. 90-618, § 102, 82 Stat. 1213........................ 4

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662)...................................... 17

## Legislative History

S. REP. NO. 90-1501 (1968)............................................................................. 24

App. 038

## Other Authorities

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662 (1971) ................ 19

Carlton F.W. Larson, *Four Exceptions in Search of A Theory*: District of Columbia v.
   Heller *and Judicial Ipse Dixit*,
   60 Hastings L.J. 1371 (2009) ........................................................................ 22

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second
   Amendment*,
   82 Mich. L.Rev. 203 (1983) ......................................................................... 21

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons
   from Possessing Firearms,*
   20 Wyo. L. Rev. 249 (2020) ........................................................................ 19

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo–
   American Right* 123 (1994) ......................................................................... 19

Patrick J. Charles, "*Arms for Their Defense*"?: *An Historical, Legal, and Textual
   Analysis of the English Right to Have Arms and Whether the Second Amendment
   Should Be Incorporated in McDonald v. City of Chicago,*
   57 Clev. St. L. Rev. 351 (2009) ................................................................... 19

Richard Moran, *The Origin of Insanity As A Special Verdict: The Trial for Treason of
   James Hadfield*,
   19 Law & Soc'y Rev. 487 (1985) ................................................................. 21

Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges
   Reign?*,
   36 Okla. L.Rev. 65 (1983) ........................................................................... 21

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the
   Legislative Power of the States of the American Union* 29 (1st ed. 1868) ........................ 20

App. 039

On August 17, 2022, Defendant Jared Michael Harrison was charged in a single-count Indictment (Doc. 1) with possessing a firearm as an unlawful drug user in violation of 18 U.S.C. § 922(g)(3). On October 11, 2022, Mr. Harrison filed a motion to dismiss the Indictment as unconstitutional (Doc. 17). Mr. Harrison first argues that § 922(g)(3) is unconstitutionally vague—both facially and as-applied. Then, relying on the United States Supreme Court's recent decision in *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), Mr. Harrison argues that § 922(g)(3) violates the Second Amendment.

This Court should deny Mr. Harrison's motion to dismiss. As to Mr. Harrison's vagueness challenge, any as-applied challenge is premature at this juncture, and should be denied.   Moreover, the Tenth Circuit has previously rejected a facial challenge to § 922(g)(3), nothing that a facial challenge to the statute is improper in the first instance. *See United States v. Reed*, 114 F.3d 1067, 1068–70 (10th Cir. 1997).  As to Mr. Harrison's second claim, nothing in *Bruen* casts new doubt on the constitutionality of § 922(g)(3), a statute previously upheld, repeatedly, by federal courts as permissible under the Second Amendment. In *Bruen*, the Supreme Court clarified the two-part test that applies to a Second Amendment challenge to a firearm restriction. The test looks both to the text of the Second Amendment and the history of firearm regulations in America. Section 922(g)(3) satisfies both parts of the *Bruen* test. First, because the plain text of the Second Amendment does not encompass the possession of a firearm by unlawful drug users and addicts, § 922(g)(3) does not even prohibit conduct protected by the Amendment. Second, even if the Second Amendment covered the conduct prohibited by § 922(g)(3), the statute is

App. 040

nonetheless consistent with a long tradition of disarming lawbreakers—or persons otherwise deemed dangerously irresponsible or unvirtuous—and is therefore constitutional.

## FACTUAL BACKGROUND

On May 20, 2022, a Lawton Police Department officer pulled over Mr. Harrison for a traffic violation. Upon approaching the vehicle, the officer detected a order of both burnt and raw marijuana coming from the vehicle. When asked about the smell and whether he possessed a medical marijuana card, Mr. Harrison—the sole occupant of the vehicle—denied a card and then told the officer that he was heading to work at a dispensary. When the officer asked Mr. Harrison to exit the vehicle and then advised him that his vehicle was going to be searched, Mr. Harrison's behavior changed, and he became visibly nervous. He did, however, admit that the vehicle belonged to him. Upon exiting the vehicle, the officer noted that Mr. Harrison was wearing an ankle monitor. Mr. Harrison advised that he was on probation in Texas for aggravated assault; however, in reality, Mr. Harrison was actually out on bond pending trial.

Once Mr. Harrison was out of the vehicle, a search was conducted, and law enforcement discovered, *inter alia*, a loaded Rossi revolver in the rear driver's side floorboard; one empty prescription bottle that appeared to come from a dispensary inside the driver's side door compartment; one prescription bottle containing pieces of partially smoked marijuana cigarettes inside the driver's side door compartment; and a backpack containing four vape pen cartridges, with two labeled as containing THC, an empty prescription bottle from a dispensary, a mason jar containing 35.4 grams of marijuana, a

App. 041

2

"Nerd Drops" prescription bottle from a dispensary containing 55.9 grams of THC edibles, a clear baggie containing what appears to the THC edible gummies weighing 46.2 grams, a metal tray with a lid containing a pre-rolled marijuana cigarette and marijuana stems in the backpack and a blue prescription bottle containing 23.8 grams of marijuana.

Mr. Harrison was subsequently arrested.  He was later charged in this case with a single count of being an illegal drug user in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3).  (Doc. 1.)

<u>**DISCUSSION**</u>

I.   **Mr. Harrison's Vagueness Challenge to Section 922(g)(3) as Applied is Premature**

Mr. Harrison first argues that his indictment should be dismissed because his § 922(g)(3) is unconstitutionally vague, both facially and as applied. (Doc. 17 at 3-11.) Rule 12(b)(1) of the Federal Rules of Criminal Procedure allows for a challenge to the indictment through pretrial motion that the "court can determine without a trial on the merits." Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington,* 395 U.S. 57, 60 (1969).

The Tenth Circuit has addressed a pretrial motion challenge to § 922(g)(3) on vagueness grounds, holding "that it was error to consider the challenge at the preliminary stage of the proceedings, as was done here." *Reed*, 114 F.3d at 1070. The Court further set

App. 042

3

out that "such a sensitive and fact intensive analysis as that undertaken by the district court should be based only on the facts as they emerge at trial." *Id.*

The Eighth Circuit has likewise come to the same conclusion in addressing a vagueness as applied challenge to § 922(g)(3). *United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016). "We conclude that a trial on the merits was needed to decide Turner's pretrial motion to dismiss. . . . Indeed, Rule 12 contemplates that district courts may sometimes make factual findings when ruling on pretrial motions and requires that the court state its essential findings on the record. Fed. R. Crim. P. 12(d). Courts may not, however, make factual findings when an issue is inevitably bound up with evidence about the alleged offense itself." *Id.* (citing *United States v. Grimmett*, 150 F.3d 958, 962 (8th Cir. 1998) and *United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994) (internal quotations omitted)).

Clearly, any evaluation of Mr. Harrison's vagueness as applied challenge requires a detailed examination of the facts and evidence of the instant case. Any such evaluation at the pretrial stage is premature and should be deferred.

### A.      Section 922(g)(3) is Not Facially Vague.

Section 922(g)(3) has been on the federal books since 1968. *See* Gun Control Act of 1968, Pub.L. 90-618, § 102, 82 Stat. 1213, 1220. Mr. Harrison's motion lacks even a single controlling case that holds this statute is unconstitutional on its face. This is telling as it indicates that the statute, in its 50-plus years of existence, has routinely withstood scrutiny against claims that it is unconstitutional on its face.

App. 043

Because of this, Mr. Harrison argues general principles of vagueness and asks this Court to follow with the one federal district court that made a post-trial finding of unconstitutionality. *United States v. Morales-Lopez*, 2022 WL 2355920, (D. Utah June 30, 2022). The more prudent path would be to follow Tenth Circuit precedent along with numerous other courts to uphold § 922(g)(3).

Courts have historically analyzed the Fifth Amendment (due process) question of vagueness under an as applied standard.[1]   It must be noted that "[f]acial challenges . . . are . . . to be discouraged." *Sabri v. United States*, 541 U.S. 600, 608–09 (2004). Facial challenges "are best when infrequent" and "are especially to be discouraged" when application of the challenged statute to the case at hand would be constitutional when the facts are eventually developed. *Id.* at 608. Not surprisingly, then, "[a] facial challenge to a legislative Act is the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

In the present case, § 922(g)(3), a legislative Act, is not so vague as to be constitutionally deficient under Tenth Circuit precedent, either facially or as applied, because this statute gives ordinary people fair notice of the conduct it punishes.

---

[1]     The general practice, outside of the First Amendment context, has been to consider the purported vagueness of a statute in light of the facts of the particular case—i.e., as applied—rather than in the abstract. *See, e.g., Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S. Ct. 1853, 1857–58, 100 L.Ed.2d 372 (1988); *United States v. Johnson*, 875 F.3d 360, 370 (7th Cir. 2017). "This means, of course, that a litigant challenging the statute ordinarily must show that it is vague as applied to him; and if the statute undoubtedly applies to his conduct, he will not be heard to argue that the statute is vague as to one or more hypothetical scenarios." *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020); *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19, 130 S. Ct. 2705, 2718–19, 177 L.Ed.2d 355 (2010).

App. 044

## B.      Section 922(g)(3) is Not Facially Invalid

As noted above, the general practice, outside of the First Amendment context, has been to consider the purported vagueness of a statute in light of the facts of the particular case—i.e., as applied—rather than in the abstract. *See, e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). The Tenth Circuit has held that "[a] vagueness challenge" in the context of § 922(g)(3) "cannot be aimed at the statute on its face but must be limited to the application of the statute to the particular conduct charged" because First Amendment values are not implicated. *Reed* 114 F.3d at 1070. In *Reed*, the defendant was indicted on multiple counts that alleged he was an unlawful user of a controlled substance in possession of a firearm in violation of § 922(g)(3). Prior to trial, the defendant moved to dismiss those charges arguing that the statute was unconstitutionally vague on its face. The trial court dismissed five such counts, ruling that the statute was vague, performing a quasi-as applied analysis based on the government's proffer, because the statute purportedly provided "no guidance as to how nearly contemporaneous the two elements" (unlawful drug user and weapon possession) must be. The Tenth Circuit ruled that the district court erred "in treating defendant's motion to dismiss as an 'as applied' challenge, when the motion clearly raised only an *invalid* facial attack." *Id*. at 1068 (emphasis added).

The reason the facial attack was invalid is because a "vagueness challenge in this context [§ 922(g)(3)] cannot be aimed at the statute on its face but must be limited to the application of the statute to the particular conduct charged." *Id*. at 1070. Furthermore, the Court held that the "fact intensive analysis" should be based on the facts "as they emerge at trial." *Id*. Additionally, the Tenth Circuit has found that "§ 922(g)(3) is not facially

App. 045

vague, and a charge of vagueness is to be examined in light of the facts of the case at hand."
*United States v. Terrell*, 172 F.3d 880 (10th Cir. 1999) (unpublished) (referencing *Reed*,
114 F.3d at 1070, and *United States v. Easter*, 981 F.2d 1549, 1557 (10th Cir. 1992)).

Since 2017, courts have rejected similar facial challenges. *See, e.g.*, *United States
v. Cook*, 914 F.3d 545, 549–55 (7th Cir. 2019) (rejecting facial challenge to § 922(g)(3)
and holding that *Johnson v. United States*, 576 U.S. 591 (2015), did not "alter the general
rule that a defendant whose conduct is clearly prohibited by a statute cannot be the one to
make a facial vagueness challenge"), *vacated on other grounds* by *Cook v. United States*,
140 S. Ct. 41 (2019); *United States v. Waldo*, No. 19-03117-01-CR-S-RK, 2020 WL
2617134, at *2–3 (W.D. Mo. Jan. 22, 2020) ("Since *Johnson* was decided, however, the
Eighth Circuit has held that a defendant must first show that Section 922(g)(3) is vague as
applied to his own conduct before he may raise a facial challenge."); *United States v.
Stupka*, 418 F. Supp. 3d 402, 406–13 (N.D. Iowa 2019) (concluding "that there are
instances in which a facial void-for-vagueness challenge is permissible without regard to
an as-applied challenge," but holding that defendant's challenge to § 922(g)(3) was "not
one of those instances" because it was "an attack on language, rather than an attack on
process").

Moreover, the plain language of the statute supports a finding that the statute is
facially valid. As was outlined above, the core of conduct meant to be prohibited by
§ 922(g)(3) is "[i]f one regularly uses . . .  [a] controlled substance other than as directed
by a physician, he may not possess a firearm so long as the use persists." *Cook*, 914 F.3d
at 554.

App. 046

Mr. Harrison complains that the statute fails to define what constitutes an "unlawful user." (Doc. 17 at 7.) The fact that a plain term like "unlawful user of a controlled substance" is not defined does not make that term overly broad. Also, failing to define a term like this within a statute does not make it unconstitutional since many statutes rely on the plain meaning of the words employed by the legislature. Here, the plain meaning of the word "unlawful" means illegal or illicit. This means that the drug use must be illegal in nature. So, not any person who uses a controlled substance qualifies for this first part of the status; only those whose use is unlawful.

Secondly, a person must be a "user." User means the person must actually ingest an illicit controlled substance. The term is present sense, which means they must be, at the time, an unlawful user. User also fairly connotes regular and ongoing use, which is what courts have often relied on in drafting jury instructions. This is because, it is not unlawful "use," meaning past use or only one-time use; single or irregular use is insufficient under the plain language of the statute reigning in his claims of over broadness. User is also a colloquial term that the public understands in the context of a drug user, based on ordinary human experience. This does not mean that the person is high all the time, or using every second of the day, but that the person is a regular drug user.

The statute prohibits an unlawful user of a controlled substance from possessing a firearm. It is that plain and simple, and its meaning requires no speculation. It means that if someone is an unlawful user (present tense, regular, ongoing use, that is more than one single or past use of a controlled substance that is illicit for them) they cannot possess a

App. 047

8

firearm. Each of these three things (unlawful, user, and possession of a firearm) are all facts for a jury to determine based upon their plain and ordinary meanings.

Finally, another court in this district recently rejected a substantively identical argument—both a facial and as-applied challenge—in *United States v. Been*, CR-22-268-J, Doc. 30, (W.D. Okla. October 21, 2022). This Court should follow Judge Jones's lead and do the same here.

## II.   Section 922(g)(3) Does Not Violate the Second Amendment

Section 922(g)(3) prohibits any person who is "an unlawful user of or addicted to any controlled substance" from possessing a firearm. Mr. Harrison argues that § 922(g)(3) violates the Second Amendment under the two-step test announced in *Bruen*. *See* Def.'s Mot. to Dismiss at 1–2 (Doc. 17).[2] Under *Bruen*, this Court must first ask whether "the Second Amendment's plain text" covers the "individual[] conduct" at issue in § 922(g)(3). 142 S. Ct. at 2126. If it does, this Court must then determine if § 922(g)(3) is "consistent with the Nation's historical tradition of firearm regulation." *Id*. If it is, then § 922(g)(3) does not violate the Second Amendment.

---

[2]     Prior to *Bruen*, yet after *D.C. v. Heller*, 554 U.S. 570 (2008), every circuit court to consider the question (including a panel of the Tenth Circuit) held that Section 922(g)(3) does not violate the Second Amendment. *See United States v. Carter*, 750 F.3d 462, 466–68 (4th Cir. 2014); *United States v. Dugan*, 657 F.3d 998, 999–1000 (9th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 683–87 (7th Cir. 2010); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010); *United States v. May*, 538 F. App'x 465, 466 (5th Cir. 2013) (unpublished); *United States v. Richard*, 350 F. App'x 252, 260 (10th Cir. 2009) (unpublished). These decisions remain persuasive, especially in how—anticipating *Bruen*—they analogize Section 922(g)(3) to firearm restrictions against felons and the mentally ill.

App. 048

This Court could deny Mr. Harrison's motion to dismiss under either step of the *Bruen* test. The Second Amendment's text does not encompass possessing a firearm as an unlawful drug user or addict; as the Supreme Court and federal circuit courts have repeatedly explained, the Second Amendment instead guarantees "'the right of *law-abiding, responsible* citizens to use arms' for self-defense." *Id.* at 2131 (quoting *Heller*, 554 U.S. at 635). Moreover, in any event, § 922(g)(3) is consistent with a longstanding historical tradition in America of disarming presumptively risky persons, namely, felons, the mentally ill, and the intoxicated.

### A.   Under *Bruen*, a gun restriction violates the Second Amendment only if it burdens conduct covered by the Amendment's text and is inconsistent with the nation's historical tradition of firearm regulation

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In *D.C. v. Heller*, the Supreme Court recognized that the Second Amendment guarantees an individual right of "law-abiding, responsible citizens" to keep a handgun in the home for self-defense. 554 U.S. 570, 635 (2008); *see McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (applying the same Second Amendment right against the states). However, the Court emphasized in *Heller* that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. In fact, the Court insisted that its decision in *Heller* did not call into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and governmental buildings, or laws imposing conditions and qualifications on the

App. 049

commercial sale of arms." *Id*. at 626–27. A plurality of the Court later "repeat[ed] those assurances" in *McDonald*. 561 U.S. at 786; *see also id*. ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" (quoting *Heller*, 554 U.S. at 626)).

In *Bruen*, the Supreme Court "made . . . more explicit" the applicable test in a Second Amendment challenge to a firearm regulation. 142 S. Ct. at 2134. As the Court explained, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2129–30.

Applying this test, the Court in *Bruen* held unconstitutional a New York state law that required residents to show "proper cause" to obtain a license to carry a firearm outside their homes. *Id*. at 2123. The Court first concluded that the Second Amendment's plain text covered the conduct at issue because petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id*. at 2134. Moving to step two of the test, the Court embarked on a "long journey through the Anglo-American history" of the public carrying of firearms. *Id*. at 2156. The Court concluded that New York failed to meet its "burden to identify an American tradition justifying the State's proper-cause requirement." *Id*.

App. 050

**B.    The text of the Second Amendment does not encompass possessing a firearm as an unlawful user or addict of a controlled substance**

Under the first step of the *Bruen* test, this Court must determine whether the Second Amendment's text covers (and thus presumptively protects) the prohibited conduct at issue. Here, it does not. The Second Amendment's text does not encompass keeping and bearing arms as an unlawful drug user or addict. Mr. Harrison fails to show otherwise—as it is likely his burden to do under *Bruen*.

**i.    The party challenging a firearm regulation bears the initial burden of showing that the Second Amendment's text covers the conduct at issue**

The parties in *Bruen* did not dispute that the conduct at issue—law-abiding citizens publicly carrying handguns for protection—fell within the ambit of the plain text of the Second Amendment. Understandably, then, the Supreme Court did not explicitly address which party bears the burden at the first step of the *Bruen* test. However, in elaborating on the second step of the *Bruen* test, the Court nonetheless strongly implied that this initial burden at step one rests with the challenger of a firearm restriction.

In *Bruen*, the Court stated that, at step two, the government must establish that a challenged law is consistent with the nation's historical tradition of firearm regulation. In this regard, the Court noted that the *Bruen* standard "accords with how we protect other constitutional rights," especially "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id*. at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635). This Court should take seriously how the

App. 051

Supreme Court—first in *Heller*, later in *Bruen*—likened constitutional challenges arising under the Second Amendment with those arising under the First Amendment.

If the two types of constitutional challenges are as analogous as the Supreme Court has suggested, then the party challenging a firearm regulation bears the initial burden of showing that the Second Amendment's text actually covers the conduct at issue. After all, a party challenging a purported restriction on the freedom of speech must show that the Free Speech Clause even applies in the first place. *See, e.g.*, *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct." (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984))); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies.").

Similarly, here, Mr. Harrison should bear the burden of showing that the Second Amendment even encompasses the right to possess a firearm as an unlawful drug user. Yet Mr. Harrison fails to satisfy this burden, or even really attempt to do so. *See* Def.'s Mot. to Dismiss at 12–13 (Doc. 17).

### ii.   The Second Amendment's plain text does not cover possessing a firearm as an illegal drug user or addict

The Supreme Court repeatedly stated in *Heller* and *Bruen* that the Second Amendment right to bear arms belongs to law-abiding, responsible citizens. *See, e.g.*, *Heller*, 554 U.S. at 635 (concluding that the Second Amendment "surely elevates above all other interests the right of *law-abiding, responsible citizens* to use arms in defense of hearth

App. 052

13

and home") (emphasis added); *Bruen*, 142 S. Ct. at 2122 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, *law-abiding citizen* to possess a handgun in the home for self-defense." (emphasis added)); *id.* ("[O]rdinary, *law-abiding citizens* have a similar right to carry handguns publicly for their self-defense." (emphasis added)); *id.* at 2131 (noting that the Second Amendment "'surely elevates above all other interests the right of *law-abiding, responsible citizens* to use arms' for self-defense" (emphasis added) (quoting *Heller*, 554 U.S. at 635)); *id.* at 2156 (concluding that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents *law-abiding citizens* with ordinary self-defense needs from exercising their right to keep and bear arms" (emphasis added)).[3] Since *Heller* was decided, circuit courts across the country have reiterated this essential point. *See, e.g.*, *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010) (noting that the "core purpose of the right [guaranteed by the Second Amendment] was to allow 'law-abiding, responsible citizens to use arms'" (quoting *Heller*, 554 U.S. at 635)); *Hollis v. Lynch*, 827 F.3d 436, 445 (5th Cir. 2016) ("[The Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." (quoting *Heller*, 554 U.S. at 625)); *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017) ("At its core . . . the Second Amendment protects the right of law-abiding, responsible citizens."); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 127 (2d Cir. 2020) ("[W]e have interpreted the core Second Amendment right

---

[3]     The majority opinion in *Bruen* makes more than ten references to "law-abiding" citizens in describing the boundary of the right to bear arms guaranteed by the Second Amendment.

App. 053

identified in *Heller* to be the 'right of law-abiding, responsible citizens.'" (quoting *United States v. Jimenez*, 895 F.3d 228, 234 (2d Cir. 2018))).

Notably, in *Bruen*, the Supreme Court expressly endorsed so-called "shall-issue" firearm-licensing regulations that "require applicants to undergo a background check or pass a firearms safety course . . . to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see id.* at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible."). As Justice Kavanaugh explained in his concurrence (joined by the Chief Justice), the shall-issue regimes "are constitutionally permissible" even though they "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring); *see id.* ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes . . . may continue to do so."). In deeming constitutional these "shall-issue" licensing regimes, the Court merely reiterated that the Second Amendment's text does not extend to arms bearing by irresponsible lawbreakers, including unlawful drug users or addicts.[4]

A person who violates § 922(g)(3) is not a law-abiding, responsible citizen, and his conduct—bearing arms while unlawfully using drugs—simply is not covered by the

---

[4] Many of these same state "shall-issue" licensing regimes explicitly restrict the rights of unlawful drug users and addicts to carrying firearms. *See, e.g.*, ARK. CODE ANN. § 5-73-309; TEX. GOV'T CODE ANN. § 411.172(a)(6).

Second Amendment's text. Section 922(g)(3) applies to anyone "who is an unlawful user of or addicted to any controlled substance," as defined under the federal Controlled Substances Act. The law requires "a temporal nexus between the drug use and firearm possession." *United States v. Edwards*, 540 F.3d 1156, 1162 (10th Cir. 2008); *see also* 7 C.F.R. § 478.11 (defining "unlawful user" in § 922(g)(3) as a "current user" whose "unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct"); *United States v. Patterson*, 431 F.3d 832, 839 (5th Cir. 2005) (collecting cases defining unlawful drug user under § 922(g)(3) and explaining that the law requires "contemporaneousness and regularity" in unlawful drug use). A current and regular unlawful drug user or addict is not a law-abiding, responsible citizen, and the Second Amendment's text does not encompass his right to bear arms.

In sum, then, *Heller* and *Bruen* make clear that the Second Amendment guarantees the right of law-abiding, responsible citizens to keep and bear arms. Section 922(g)(3) prohibits a certain type of lawbreaking, presumptively risky citizens—unlawful drug users or addicts—from possessing a firearm. For that reason, then, § 922(g)(3) does not prohibit conduct encompassed by the Second Amendment. This Court may therefore uphold § 922(g)(3) and deny Mr. Harrison's motion to dismiss on the first step of the *Bruen* test.

### C.   Section 922(g)(3) is consistent with the nation's historical tradition of firearm regulations

Mr. Harrison's motion to dismiss fares no better under the second step of the *Bruen* test. Although § 922(g)(3) was first enacted in 1968, it is consistent with a long tradition

App. 055

16

of prohibiting certain presumptively risky persons—including lawbreakers and those with dangerously impaired judgment or mental ability—from bearing arms.

> ### i.   Under step two of the *Bruen* test, this Court must determine whether Section 922(g)(3) is analogous to "relevantly similar" historical firearm regulations

In *Bruen*, the Supreme Court acknowledged that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." 142 S. Ct. at 2132. As a result, certain modern firearm regulations "were unimaginable at the founding," primarily because they address specific contemporary problems not rampant in earlier eras. *Id*. When confronting such "present-day firearm regulations," the appropriate inquiry at step two of the *Bruen* test is "reasoning by analogy." *Id*. That is, a court must determine "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," which requires determining "whether the two regulations are 'relevantly similar.'" *Id*. (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).

Yet, as the Supreme Court noted, this inquiry demands "some metric enabling the analogizer to assess which similarities are important and which are not." *Id*. (quoting Frederick Schauer & Barbara Spellman, *Analogy, Expertise, and Experience*, 84 U. Chi. L. Rev. 249, 254 (2017)). Fortunately, the Supreme Court identified two metrics in *Bruen*: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133 (emphasis added). Therefore, "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is *comparably justified* are 'central considerations when engaging in an analogical

App. 056

17

inquiry.'" *Id.* (quoting *McDonald*, 561 U.S. at 767). As a result, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

Under *Bruen*, then, the relevant question is not whether § 922(g)(3)—or other laws banning unlawful drug users from bearing arms—existed since the nation's founding. Instead, the appropriate analogical inquiry must focus instead on whether § 922(g)(3) is "relevantly similar" to historical firearm regulations in the *burden* it imposes and in its *justification*. Importantly, the government must merely "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133.

       **ii.**     **Firearm regulations in America have historically prohibited certain presumptively risky persons—including lawbreakers and those with dangerously impaired judgment or mental ability—from bearing arms**

For centuries, Anglo-American law has categorically limited the gun rights of certain presumptively dangerous persons to promote public safety. In seventeenth-century England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). The 1689 English Bill of Rights—which *Heller* identified as a "predecessor of our Second Amendment," 554 U.S. at 593—provided that English subjects "may have Arms for their Defence *suitable to their Conditions*, and as allowed by Law." *Id.* (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441) (emphasis added). Simply put, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected

App. 057

18

persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo–American Right* 123 (1994); Patrick J. Charles, "*Arms for Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 Clev. St. L. Rev. 351, 376, 382–83 (2009).

The English colonies in North America—and later the states of the newly-independent America—carried forward this tradition. One illustrative example (which *Heller* characterized as a "Second Amendment precursor," 554 U.S. at 604), is "The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787," signed by Pennsylvania delegates to the Constitutional Conventional who voted against ratification of the Constitution, due to the absence of a Bill of Rights. The "Address" declared that "the people have a right to bear arms for the defense of themselves . . . and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals*." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971) (emphasis added). Once ratified, the Second Amendment incorporated "a common-law tradition that permit[ted] restrictions directed at citizens who [were] not law abiding and responsible" and "'[did] not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, Law & Contemp. Probs. 146 (Winter 1986)).

App. 058

By the second half of the nineteenth century, American jurist Thomas M. Cooley could proclaim (in a treatise *Heller* described as "massively popular," 554 U.S. at 616) that certain persons—namely, "the idiot, the lunatic, and the felon, on obvious grounds"—had long been "almost universally excluded" from exercising certain civic rights in America, including the right to bear arms. Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868). Not surprisingly, then, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010)); *see Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 201 (5th Cir. 2012) (noting that "at the time of the founding, 'the right to arms was inextricably and multifariously linked to that of civic virtu (i.e., the virtuous citizenry),' and that '[o]ne implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue.'" (quoting Don Kates & Clayton Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1359–60)).

This broad tradition—limiting gun rights to responsible, law-abiding, mentally-competent citizens—produced many specific firearm restrictions that targeted certain presumptively dangerous persons. Three notable examples are restrictions against felons, the mentally ill, and the intoxicated.

App. 059

20

One of the nation's most deeply rooted firearm restrictions is the "longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626; *see* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L.Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century . . . excluded . . . felons [from possessing firearms]."); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L.Rev. 203, 266 (1983) ("Founders [did not] consider felons within the common law right to arms."). Firearm regulations targeting felons exemplify the link that Americans have historically drawn between the right to bear arms and the concept of virtuous, law-abiding citizenry. Americans have long justified laws prohibiting felons from possessing firearms by invoking the idea that "someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use," and thus, if armed, would pose a unique danger to the public. *Yancey*, 621 F.3d at 685.

Americans also have traditionally viewed the mentally ill as persons who cannot bear arms without posing real danger to public safety. *See Heller*, 554 U.S. at 626 (noting the "longstanding prohibitions on the possession of firearms by . . . the mentally ill"); *McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by . . . the mentally ill.'" (quoting *Heller*, 554 U.S. at 626)). As a general matter, in England, justices of the peace could lock up "dangerous lunatics" and seize their property. *See* Richard Moran, *The Origin of Insanity As A Special Verdict: The Trial for Treason of James Hadfield*, 19 Law & Soc'y Rev. 487 (1985) (citing Vagrancy Act of 1744, 17 Geo.

App. 060

2, c. 5.). Similarly, "in eighteenth-century America, justices of the peace were authorized to lock up 'lunatics' who were 'dangerous.'" Carlton F.W. Larson, *Four Exceptions in Search of A Theory*: District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009). As the Third Circuit has aptly concluded, in reflecting on this historical tradition, "if taking away a lunatic's liberty was permissible, then we should find the 'lesser intrusion' of taking his or her firearms was also permissible." *Beers v. Att'y Gen. United States*, 927 F.3d 150, 158 (3d Cir. 2019); *see United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001) (noting how "lunatics" and "those of unsound mind" were historically prohibited from possessing a firearm); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) (concluding that historically "the right to arms does not preclude laws disarming . . . the mentally unbalanced").

Finally, state laws have also historically prohibited carrying a firearm while under the influence of alcohol. In 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing." Act XII of March 10, 1655, 1655 Va. Laws 401, 401–02. In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894)). After the ratification of the Fourteenth Amendment in 1868, which extended the Second Amendment to the states, *see McDonald*, 561 U.S. at 742, many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishments § 282 (1868) (providing that "any person under the influence of intoxicating drink" may not "carr[y] on his person a

App. 061

pistol … or other dangerous weapon"); 1878 Miss. Laws 175–76 § 2 (making it unlawful to sell pistols and certain knives to a "person intoxicated"); 1883 Mo. Laws 76, § 1 (prohibiting carrying a dangerous weapon "when intoxicated"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."); 1890 Okla. Sess. Laws 495, art. 47, § 4 (forbidding officers from "carrying … arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road).

Importantly, the *justification* for all three prohibitions has historically been the same: felons, the mentally ill, and the intoxicated are presumptively risky persons who pose a danger to public safety if armed.

### iii.   Section 922(g)(3) is "relevantly similar" to an analogous tradition of firearm restrictions in America

The historical tradition of gun regulations prohibiting felons, the mentally ill, and the intoxicated from possessing firearms is "relevantly similar" to § 922(g)(3). *Bruen*, 142 S. Ct. at 2132. All the restrictions impose a comparable *burden*: they categorically prohibit certain persons from possessing firearms. And they all proceed under a comparable *justification*: they protect public safety by keeping guns out of the hands of presumptively dangerous persons, namely, lawbreakers and persons with impaired judgment or mental ability.

App. 062

23

Congress enacted § 922(g)(3) for precisely this purpose, and it justified the law in these terms. *See, e.g.*, S. REP. NO. 90-1501, at 22 (1968) ("The ready availability, that is, the ease with which any person can anonymously acquire firearms (including criminals, juveniles without the consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others *whose possession of firearms is similarly contrary to the public interest*) is a matter of serious national concern.") (emphasis added). As the Supreme Court has concluded, "Congress' intent in enacting § 922(g) . . . was to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc*., 460 U.S. 103, 113 (1983). Lower federal courts have likewise often reached the same conclusion. *See, e.g.*, *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) ("[I]n passing § 922(g)(3), Congress expressed its intention to keep firearms out of the possession of drug abusers, a dangerous class of individuals."); *United States v. Cheeseman*, 600 F.3d 270, 280 (3d Cir. 2010) (noting "Congress' intent to keep firearms out of the possession of drug abusers, a dangerous class of individuals").

In light of Congress's justification for § 922(g)(3), it is easy to see why "[k]eeping guns away from habitual drug abusers is analogous to disarming felons." *Yancey*, 621 F.3d at 684. As previously discussed, ample historical scholarship has established that the Second Amendment right to bear arms was closely tied to the concept of a virtuous citizenry and to the notion that the government could disarm lawbreaking or otherwise unvirtuous citizens who posed a risk to public safety. And so, in prohibiting felons from bearing arms, "Congress sought . . . to keep guns out of the hands of those who have

App. 063

24

demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Scarborough v. United States*, 431 U.S. 563, 572 (1977). This justification undergirds both longstanding firearm restrictions against felons and § 922(g)(3). The notion that "someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use . . . applies with equal force to Congress's extension of the firearms ban to another category of habitual criminals with § 922(g)(3)." *Yancey*, 621 F.3d at 685.

Section 922(g)(3) is likewise analogous in its justification to laws disarming the mentally ill or intoxicated. As one circuit court has aptly explained, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id.*; *see United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) (noting, in upholding § 922(g)(3), that "habitual drug users, like . . . the mentally ill, more likely will have difficulty exercising self-control, particularly when they are under the influence of controlled substances"). In this regard, it is notable that federal regulations define "unlawful user" in § 922(g)(3) as, in part, one who has "lost the power of self-control with reference to the use of controlled substance." 7 C.F.R. § 478.11.

Since *Bruen* was decided, every district court that has ruled on a Second Amendment challenge to § 922(g)(3) has upheld the law. *See Been*, No. 22-CR-268-J, Doc. 30 (W.D. Okla. Oct. 21, 2022); *United States v. Seiwert*, No. 20-CR-443, 2022 WL 4534605, at *2 (N.D. Ill. Sept. 28, 2022); *United States v. Daniels*, No. 22-CR-58-LG-RHWR, 2022 WL 2654232, at *4 (S.D. Miss. July 8, 2022). More to the point, most courts have explicitly upheld § 922(g)(3) as relevantly similar to historic firearm restrictions

App. 064

against felons and the mentally ill. *See, e.g.*, *United States v. Seiwert*, No. 20 CR 443, 2022 WL 4534605, at *2 (N.D. Ill. Sept. 28, 2022) ("[Section] 922(g)(3) is relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness."); *United States v. Daniels*, No. 22-CR-58-LG-RHWR-1, 2022 WL 2654232, at *4 (S.D. Miss. July 8, 2022) (comparing § 922(g)(3) to "analogous statutes which purport to disarm persons considered a risk to society—whether felons or alcoholics—were known to the American legal tradition," and concluding that "922(g)(3) passes constitutional muster under the legal framework articulated in *Heller* and *Bruen*").

App. 065

## CONCLUSION

Section 922(g)(3) is unambiguous and satisfies the test announced in *Bruen* and therefore does not violate the Second Amendment. The conduct prohibited by § 922(g)(3)—possessing a firearm as an unlawful drug user or addict—does not burden conduct protected by the Second Amendment's plain text. And, in any event, the prohibition is consistent with an analogous tradition of firearm restrictions in America. The United States therefore respectfully requests that this Court deny Mr. Harrison's motion to dismiss the Indictment as unconstitutional.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney


*s/ Stephanie Powers*
STEPHANIE POWERS
Oklahoma Bar No. 22892
Special Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
Stephanie.powers2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant: J.P. Hill, counsel for Defendant Jared Michael Harrison.

*s/ Stephanie Powers*
STEPHANIE POWERS
Special Assistant United States Attorney

App. 066

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. CR-22-328-PRW |
| v. | ) | |
| | ) | |
| JARED MICHAEL HARRISON  , | ) | |
| | ) | |
| *Defendant*. | ) | |

## DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO HIS MOTION TO DISMISS THE INDICTMENT BASED ON THE UNCONSTITUTIONALITY OF 18 U.S.C. § 922(g)(3)

Respectfully submitted,

 /s/ *Laura K. Deskin*
Laura K. Deskin
Research and Writing Specialist

 /s/ *J. P. Hill*
J.P. Hill
Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Phone: (405) 609-5930
Fax: (405) 609-5932
Laura_Deskin@fd.org
JP_Hill@fd.org

1

App. 067

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................... ii

**ARGUMENT IN REPLY** ........................................................................................ 1

   I.   Vagueness Challenge to § 922(g)(3) ............................................................. 1

   II.  *Bruen* Challenge ............................................................................................ 3

     a.   The Plain Text of the Second Amendment Covers the Conduct Prohibited by § 922(g)(3). ....................................................................................................... 3

     b.   The government has not proven that § 922(g)(3) is consistent with the Nation's historical tradition of firearm regulation. ................................................. 10

**CONCLUSION** ..................................................................................................... 16

**CERTIFICATE OF SERVICE** .............................................................................. 17

App. 068

# TABLE OF AUTHORITIES

## Cases

*Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) ........................................................ 15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................. passim

*Folajtar v. Att'y. Gen. of the U.S.*, 980 F.3d 897 (3d Cir. 2020) ................................ 15, 16

*Johnson v. United States*, 576 U.S. 591 (2015) ................................................................. 1

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ................................................................. 16

*Kolender v. Lawson*, 461 U.S. 352 (1983) ........................................................................ 2

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) .............................................. 4, 16

*Robinson v. California*, 370 U.S. 660, 667 (1962) .......................................................... 14

*Sessions v. Dimaya*, 138 S. Ct 1204 (2018) ..................................................................... 1

*United States v. Morales-Lopez*, 2022 WL 2355920 (D. Utah June 30, 2022) .............. 1, 2

*United States v. Quiroz*, __F. Supp. 3d ___, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) ................................................................................................................ 12, 16

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ................................................. 9, 11

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ................................................. 4

## Federal Statutes

18 U.S.C. § 922(g)(3) ........................................................................................................ 3

## Other Authorities

Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009) ........................... 13

Joyce Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 136 (1994) ........................................................................................................................ 5

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 161–64 (2007) .................................................................................................. 12

Stephen Halbrook, *The Founders' Second Amendment* 251 (2d ed. 2019) .............. passim

THE FEDERALIST No. 46, at 299 (James Madison) (Clinton Rossiter ed., 1961) ............. 11

## Constitutional Provisions

U.S. Const., amend. II ....................................................................................................... 3

App. 069

## ARGUMENT IN REPLY

**I.    Vagueness Challenge to § 922(g)(3)**

Just as in *Morales-Lopez*, the case in which Judge Parrish of the Utah District Court found 18 U.S.C. § 922(g)(3) to be unconstitutionally vague, the government here contends that a defendant may not bring a facial challenge to § 922(g)(3) arguing he is limited to an as-applied challenge. *See United States v. Morales-Lopez*, 2022 WL 2355920, at *2 (D. Utah June 30, 2022). The defendant therein responded just as we will here: "[F]acial attacks are rare but permissible where a statute is tainted by 'hopeless indeterminacy.'" *Id.*, citing *Johnson v. United States*, 576 U.S. 591, 598 (2015). While *Johnson* did not explicitly discard the rule that a litigant whose conduct is clearly prohibited by a statute cannot successfully bring a facial vagueness challenge, it does call into question the current rule established by the Tenth Circuit, as well as the Second, Fourth, Fifth, Seventh, Eighth, Ninth, and the Federal Circuit Court of Appeals. *Morales-Lopez* notes that the current rule established by the circuit courts raises "a logical quandary," and that "*Johnson*, properly applied resolves the quandary presented by … cases applying the old rule—it allows a defendant to bring a facial challenge without regard to the particular facts of his case." *Morales-Lopez, supra*, at *5; *see also Johnson*, 576 U.S. at 624–25, 636–37 (Alito, J., dissenting) (recognizing that the majority's expansion of the vagueness doctrine had upended the "well-established rule" that vagueness challenges to statutes which do not involve the First Amendment must be examined on an as-applied basis). *See also Sessions v. Dimaya*, 138 S. Ct 1204, 1212 (2018) (considering facial challenge without requiring an as-applied challenge).

App. 070

The government next argues that § 922(g)(3) is not vague because *courts* have identified an ascertainable "core" of conduct that (g)(3) prohibits. The question is not, however, whether courts can fathom workable definitions in a particular case; it is whether ordinary people can understand how to avoid breaking the law. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The problem is, as Judge Parrish in *Morales-Lopez* explained, the statute fails to give notice of the conduct it prohibits by failing to define both "user" and the requisite temporal proximity. *Morales-Lopez, supra*, at *8-*9. Applying various canons of construction, the court explained that "unlawful user" must cover something more than single use but something less than the distinct alternate category "addict." *Id*. at *8, *11. The statute provides no further guidance for defining covered conduct within that "chasm." *Id*. at *8. Resort to dictionary definitions is of no help: "user" connotes neither regular nor irregular use "rendering it impossible for ordinary persons to understand when the statute might apply to their level of drug use." *Id*. And because the term "user" does not connote regular and ongoing use, the ordinary person cannot know at what point he may lawfully possess a firearm after using a controlled substance. *Id* at *9. What period of sobriety renders a person no longer a "user"?  There is no answer to that question. *See id*. at *11. The "I know it when I see it" approach espoused by the government is no notice at all. As Judge Parrish observed, "Rather than insisting that the legislature enunciate a clear standard to which an ordinary person can conform her behavior, these courts determine *ex post* that the defendant's behavior violated the statute." *Id*. at *9.

Mr. Harrison urges this Court to follow Judge Parrish's well-reasoned opinion finding "922(g)(3) is unconstitutionally vague both because it fails to give ordinary people

App. 071

fair notice of what conduct it prohibits and because it invites courts, rather than the legislature, to decide what constitutes a crime." *Morales-Lopez*, *supra*, at *8.

## II.   *Bruen* Challenge

### a.   The Plain Text of the Second Amendment Covers the Conduct Prohibited by § 922(g)(3).

There does not appear to be dispute that § 922(g)(3) is a complete ban on "keep[ing] and bear[ing]" firearms. The statute prohibits the mere possession of firearms, even at the defendant's own home. *See* 18 U.S.C. § 922(g)(3) ("It shall be unlawful for any person … (3) who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . to . . . possess in or affecting commerce, any firearm or ammunition."). The dispute in coverage is instead over *who* has a right to keep and bear arms. The Second Amendment answers this simply: the people.

The Second Amendment's plain text provides an individual right that "belongs to all Americans." *Heller*, 554 U.S. at 581. The government instead claims this right belongs only to "law-abiding, responsible citizens" to the exclusion of all others. Gov. Resp. at 10, 13–15 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). The government's proposed limitation on the scope of the Second Amendment finds no support in constitutional text. The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of *the people* to keep and bear Arms, shall not be infringed." U.S. Const., amend. II (emphasis added).

There is no textual reading of the Second Amendment that cabins the right to "law-abiding, responsible citizens" alone. If there is any tension between the Supreme Court's

App. 072

shorthand description in *Heller* of what the Second Amendment protects and the actual text of the amendment, the text prevails. *Compare Heller*, 554 U.S. at 635 (The Second Amendment "surely elevates above all other interests the right of law-abiding responsible citizens to use arms in defense of hearth and home") *with Bruen*, 142 S. Ct. at 2134 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."). While *Heller* made passing reference to "law abiding, responsible citizens," 554 U.S. at 635, it was not in the context of defining the term "the people." Only Justice Stevens' dissent described it as such. *Id.* at 644. Indeed, to restrict "the people" to only the "law-abiding" is inconsistent with *Heller*'s decision to give the phrase "the people" in the Second Amendment the same meaning it carries in other amendments passed at the same time.

In the Constitution, "the people" is a "term of art" and means "all members of the political community, *not an unspecified subset*." *Heller*, 554 U.S. at 580–81 (emphasis added); *accord United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (The term "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."). The First, Second, Fourth, Ninth, and Tenth Amendments all refer to "the people." There is no cause, or textual support, to claim that "the people" means something different as used in the Second Amendment. The Second Amendment is "not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. 2111, 2156 (quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010)).

App. 073

The government's attempt to limit the applicability of the Second Amendment to people it deems "law abiding" or "responsible" has no support in the history books either. If the founding generation had intended to protect a right to bear arms for only *some* of the citizens, or to make that right subject to Congressional judgment about who should, and who should not, be trusted with firearms, they could have saved themselves a lot of trouble. They already had a ready-made template in England's 1689 Declaration of Rights:

> That the Subject *which are Protestants*, may have Arms for their Defence *suitable to their Conditions, and as allowed by Law.*

*Heller*, 554 U.S. at 593 (emphases added) (quoting 1 W. & M., ch. 2, § 7, in Eng. Stat. at Large 441). That provision "has long been understood to be the predecessor to our Second Amendment." *Id*. Even 100 years after its adoption, this provision was so well known to James Madison that he mentioned its shortcomings "[i]n his notes for a speech introducing what became the Bill of Rights." Stephen Halbrook, *The Founders' Second Amendment* 251 (2d ed. 2019) (quoting Notes for a Speech in Congress, June 8, 1979, 12 *The Papers of James Madison* 193 (Charles F. Hobson, et al. eds. 1979)). The "fallacies" of the declaration included the fact that it was only an Act of Parliament (and thus could be overcome when Parliament wanted) and it only protected the rights of *some* of the citizens—protestants. *Id*.

The "American drafters" of the Bill of Rights "adopted some English rights verbatim," but "the language of the two pronouncements on arms differs markedly and importantly." Joyce Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 136 (1994). "The American language is much broader" than its British predecessor,

5

App. 074

in part because it "claims for the 'the people'–presumably regardless of their religion, state, or condition—a right to keep and carry weapons that the government, or at least the federal government, must not breach, unless one restricts the entire right to members of a well-regulated militia." *Id*. at 137.

The founding generation understood that the English Declaration gave the government too much power to disarm its subjects, under the pretense of combatting lawbreaking. The English government, for example, could seize people's guns to enforce (or on the pretense of enforcing) hunting laws. Halbrook, *supra*, at 311. The American Bill of Rights, by contrast, did not "permit *any* prohibition of arms to the people." *Id*. at 312 (quoting 1 Williams Blackstone, *Commentaries* 315–16 (St. George Tucker ed. 1803)).

There were also proposals in America to protect some, but not all, citizens' rights to own guns. At the Pennsylvania convention to consider ratification of the unamended Constitution, 46 delegates voted to ratify it and 23 delegates voted not to ratify without a separate bill of rights. Halbrook, *supra*, at 194. Those who lost the vote published a "dissent," and that dissent included a demand for a separate bill of rights. *Id.* One of those proposed amendments would have protected the people's right to own and carry firearms, but that right could be lost "for crimes committed" or "danger of public injury":

> 7. That the people have a right to bear arms for the defence of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, *unless for crimes committed, or real danger of public injury from individuals*; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil powers.

App. 075

Halbrook, *supra*, at 194 (emphasis added) (internal citation omitted).

In the Massachusetts ratification convention, Samuel Adams proposed a slightly different formulation of the right: "peaceable" citizens could never be disarmed:

> And that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States*, who are peaceable citizens*,  from keeping their own arms . . . ."

Halbrook, *supra*, at 205 (emphasis added) (internal citation omitted). Adams's proposal—like the Pennsylvania Dissenters' earlier suggestion—failed to secure majority support even within the single convention in which it was proposed. *Id.* at 205–06.

Several other state conventions *did* vote in favor of individual-rights amendments, including amendments protecting the right to weapons of self-defense. But they all suggested amendments *without* Pennsylvania's and Massachusetts's limiting language:

- New Hampshire: "Congress shall never disarm any citizen, *unless such as are or have been in actual rebellion*." Halbrook, *supra*, at 213 (emphasis added);

- Virginia: "That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free state . . . ." Halbrook, *supra*, at 230;

- New York: "That the people have a right to keep and bear arms; that a well regulated militia, including the body of the people capable of bearing arms, is the proper, natural, and safe defence of a free state." Halbrook, *supra*, at 239 & n.26; and

- North Carolina: That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free state . . . . Halbrook, *supra*, at 246 & n.74.

App. 076

The most important thing to know about the "limiting language" proposed in Pennsylvania, Massachusetts, and New Hampshire, is that it "did not find its way into the Second Amendment." *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (Sykes, J., dissenting).

After these proposals, Congress got to work on the Bill of Rights. No version of the Second Amendment introduced in Congress included the limiting language proposed in Pennsylvania, Massachusetts, or New Hampshire. There was no suggestion that the right should be limited to "peaceable," "law-abiding," or "responsible" citizens. In fact, there is contemporaneous evidence that such a proposal would have been rejected. As *Heller* recognized, 554 U.S. at 589, James Madison's "original draft of the Second Amendment" included a "conscientious-objector clause":

> The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: *but no person religiously scrupulous of bearing arms shall be compelled to render military service in person.*

Halbrook, *supra*, at 252 (emphasis added); *see also Heller*, 554 U.S. at 589 (quoting this same draft). Massachusetts Representative Elbridge Gerry vigorously objected to the freedom-of-conscience provision *because* it might give the Government too much power to decide who could be disarmed:

> This declaration of rights, I take it, is intended to secure the people against the mal-administration of the government; if we could suppose that, in all cases, the rights of the people would be attended to, the occasion for guards of this kind would beremoved. Now, I am apprehensive, sir, that this clause would give an opportunity to the people in power to destroy the

App. 077

> constitution itself. *They can declare who are those religiously scrupulous, and prevent them from bearing arms*.

Halbrook, *supra*, at 266 (emphasis added) (quoting 11 *Documentary History of the First Federal Congress of the United States of America* 1286 (Bickford et al. eds. 1992)). The Senate later deleted the conscientious objector clause, and both houses adopted the final version of the amendment that was ratified by the states. Halbrook, *supra*, at 274, 278.

This history shows that the Founders knew how to adopt a more limited right (if they had wanted), and even had access to language *proposing* more limited guarantees. They could have followed the English Declaration and guaranteed a right to bear arms "as allowed by Law," which would give Congress the same power that the British Parliament had to decide who should and should not be trusted with guns. They could have taken Samuel Adams's suggestion and protected only "peaceable" citizens' right to keep guns. They even could have provided for a revocable right that could be completely lost upon conviction of a crime, presentation of danger, or participation in rebellion, as the Pennsylvania Dissenters or New Hampshire majority suggested. None of those proposals made the final cut. *See Skoien*, 614 F.3d at 648 (Sykes, J., dissenting). The text ultimately adopted and ratified "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.

In sum, the "plain text of the Second Amendment" offers protection to all of the "people," not just those deemed "law-abiding" or "responsible" by the Government. Mr. Harrison, being a member of "the people" of this country, presumptively, maintains a right to possess firearms. The question then becomes whether the government can show that §

9

App. 078

922(g)(3) is consistent with the nation's historical tradition of firearms regulation. *See Bruen*, 142 S.Ct. at 2135.

**b. The government has not proven that § 922(g)(3) is consistent with the Nation's historical tradition of firearm regulation.**

Because the conduct prohibited by § 922(g)(3) is covered by the plain text of the Second Amendment, the government is required to "affirmatively prove" that § 922(g)(3) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. In *Bruen*, Justice Thomas opined that this historical analysis might sometimes be straightforward. For example, "when a challenged regulation addresses a societal problem that has persisted since the 18th century, the lack of a <u>distinctly similar</u> historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id* at 2131 (emphasis added). "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is constitutional." *Id*. When faced with an "unprecedented societal concern[]" and considering "modern regulations that were unimaginable at the founding," courts are to reason by analogy, considering whether the modern regulation is "relevantly similar" to an historical analogue. *Id*. at 2132.

The purpose of the historical inquiry is to determine whether a regulation comports with the understanding of the Second Amendment *at the time it was enshrined in the Constitution*. However desirable or wise a law may be in today's world is not relevant. According to our Supreme Court, what matters is whether the founders addressed the

App. 079

problem by distinctly similar means. If the "perceived societal problem" was confronted by the founders, but they either did not address it, or addressed it through "materially different means," the statute at issue is unconstitutional. *Id*. at 2131.The government instead clings to the exact type of means-end rationale that was repudiated by *Bruen*.

Section 922(g)(3) is an attempt to address a problem that existed in 1791: firearm violence by those who, by virtue of intoxication, are likely to demonstrate disinhibition or lack of self-control. The government fails to identify a single historical source from the time of the American Colonies or the early Republic disarming citizens, in the home or elsewhere, based on being a mere user of intoxicants. *See Bruen*, 142 S. Ct. at 2135. The lack of a distinctly similar regulation prohibiting mere users of intoxicants from possessing firearms establishes that § 922(g)(3) is inconsistent with the Second Amendment.

Without that, the government relies on an alleged "tradition" permitting total bans on firearm possession by people the government deems "dangerous." Gov. Resp. at 18–19. As an initial matter, it is not at all clear that this is an appropriate level of generalization for *Bruen*'s purposes. One could just as easily say that there is a tradition of disarming people that the governing authorities wanted to disarm. The government cites to 1689 and the English "tradition" of disarming those perceived as "threatening to the crown." Gov. Resp. at 18-19. That "tradition" is the very practice our founders repudiated with the adoption of the Second Amendment. Thus, for example, in *The Federalist* No. 46, James Madison contrasted the "advantage . . . the Americans possess" (under the proposed constitution) with the circumstances in "several kingdoms of Europe . . .[where] the

App. 080

governments are afraid to trust the people with arms." THE FEDERALIST No. 46, at 299

(James Madison) (Clinton Rossiter ed., 1961).

It no surprise that the Government has not identified a single historical law that

burdened the right of an American so severely under comparable circumstances. Indeed,

from 1607–1815, American legislatures *refused* to regulate the possession or ownership of

firearms by "the body politic," including even "dangerous" citizens. Robert H. Churchill,

*Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The*

*Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 161–64 (2007). Judge

David Counts of the Western District of Texas recently recognized this in his recent order

finding 18 U.S.C. § 922(n) unconstitutional. *See United States v. Quiroz*, __F. Supp. 3d

___, 2022 WL 4352482 at *6 (W.D. Tex. Sept. 19, 2022).

Rather than preemptive disarmament, American tradition reflects "robust use of the

colonial and early national states' police power to regulate the *use* of guns." Churchill,

*supra*, at 164 (emphasis added). The laws the government cites typify that pattern: they

punish the *misuse* of weapons "to promote public safety and to protect private property."

*Id*. at 155. Contrary to the government's claim, the historical laws differ markedly from §

922(g)(3) on *Bruen*'s "how and why" metrics. *Bruen*, 142 S. Ct. at 2133.18 U.S.C. § 922

is a product of the Gun Control Act of 1968. At the time of the enactment, this law

prohibited people under indictment for, or who were convicted of a crime punishable be

imprisonment for at least a year from receiving, shipping, or transporting a firearm. 82 Stat.

§§ 922(d)(1),(g)(1). This same section also prohibited the *sale or receipt of firearms* to a

person who was an "unlawful user of or addicted to marijuana or any depressant or similar

App. 081

drug … or narcotic drug" and those who "ha[d] been adjudicated as a mental defective or ha[d] been committed to any mental institution." 82 Stat. §§ 922(d)(3)–(4). It was not until 1986 that § 922(g)(3) was amended to prohibit the possession of firearms by drug users and addicts. PL 99–308 (S 49), PL 99–308, May 19, 1986, 100 Stat 449.  Blanket disarmament of drug users is a modern invention entirely, not in keeping with our nation's history.

The government states that 922(g)(3) is "analogous in its justification to laws disarming the mentally ill or intoxicated." Gov. Resp. at 25. Citing a law review article but no actual laws, the government states that "in eighteenth-century America, justices of the peace were authorized to lock up 'lunatics' who were 'dangerous.'" Gov. Resp. at 22.  That full quote from the Hastings Law Journal is actually: "in eighteenth-century America, justices of the peace were authorized to "lock up" "lunatics" who were "dangerous to be permitted to go abroad." Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009). It seems that, according to the Law Review article cited by the government, that lunatics were not simply disarmed completely at any rate. It was only those deemed too dangerous "to go abroad." But the government would nevertheless have this Court rule that, since lunatics were locked up in eighteenth century America, a state which naturally comes with disarmament, then in 1986 it was permissible for Congress to pass a law imposing a flat ban on drug users possessing firearms, because drug users are like lunatics. But our country does not equate drug addicts with eighteenth century lunatics. Nor does it treat them the same. Drug users are not "analogous to" lunatics for numerous obvious reasons. Of

13

App. 082

particular import, unlike eighteenth century lunatics, drug users and addicts cannot be "locked up" just for being drug users and addicts. The Supreme Court recognizes this as abhorrent to our Constitution, especially because drug addiction is an illness "which may be contracted innocently or involuntarily." *Robinson v. California*, 370 U.S. 660, 667 (1962). In 1962, it found a statute criminalizing addiction as a violation of the Eighth Amendment, stating that even "one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.* Just as it is cruel and unusual to subject drug users and addicts to imprisonment for their illness, so too it offends Second Amendment, to ban them from possessing a firearm in self-defense, whether in the cover of their own home or not, wherever they may be, whether the possession is actual or constructive.

The government also analogizes to state laws prohibiting <u>carrying</u> firearms <u>while intoxicated</u>. The laws it cites only ban carrying or using firearms while <u>under the influence</u>, some applicable only to public or peace officers. Such statutes do not evince a "comparable" burden to that of § 922(g)(3). *Id*. at 2131–32. The latter denies the right to possess any gun at all, in any setting, for any purpose. It thus represents a total infringement of the core right to possess guns in the home for self-defense. By contrast, the burden imposed by the statutes cited by the government are more modest. It applies only outside the home, and only when someone is carrying or using a firearm while actually intoxicated. The core right to self-defense recognized by *Heller* was left firmly intact. That the societal concern surrounding the idea of intoxicated people bearing arms was addressed "through materially different means" is further evidence the modern regulation is unconstitutional. *Bruen*, 142 S.Ct. at 2131.

App. 083

And even if they imposed comparable burdens, regulations from the latter half of the nineteenth century "come too late" to establish a historical tradition of disarming users of intoxicants. *Id*. at 2137. Justice Barrett's *Bruen* concurrence, like the opinion itself, suggests that 1791 (when the Bill of Rights was ratified) is the correct date for assessing the scope of permissible federal regulation of an individual right. *Id*. at 2137–39 (opinion); 2163 (Barrett, J., concurring). As Justice Barrett cautioned that *Bruen* "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id*. at 2163 (Barrett, J., concurring).

The government is essentially espousing a "virtue" theory of disarmament that "is not supported by history. *See Binderup v. Att'y Gen.*, 836 F.3d 336, 371–73 (3d Cir. 2016) (Hardiman, J., concurring) ("We have found no historical evidence on the public meaning of the right to keep and bear arms indicating that "virtuousness" was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*.") As Judge Bibas from the Third Circuit stated in his dissent in a pre-*Bruen* opinion that upheld the constitutionality of §922(g)(1), "This idea that the Second Amendment belong only to the virtuous "rests on strained readings of colonial laws and ratifying conventions perpetuated by scholars and courts' citing one another's faulty analyses." *Folajtar v. Att'y. Gen. of the U.S.*, 980 F.3d 897, 919 (3d Cir. 2020) (Bibas, J., dissenting).

The government would retort drug users should be stripped of their Second Amendment right because such people are "dangerous." Only if having the *potential* to

App. 084

engage in faulty decision-making (by virtue of being a drug user) makes one categorically dangerous. That concept in and of itself is highly debatable. Regardless, at the time of our founding, the "dangerousness" with which the founders were concerned was not the potential for faulty decision-making. The "dangerousness" of concern at the time of the founding was as to those who refused to swear a loyalty oath (while at times exempting weapons for defense of house and self). *See Kanter v. Barr*, 919 F.3d 437, 457–58 (7th Cir. 2019) (Barrett, J., dissenting). The concern was as to those who presented a perceived threat to the government itself. Dangerousness throughout English and early American history was tied to disloyalty—e.g., those sympathetic to the Crown during the Revolution. *Folajitar*, 980 F.3d at 913–915 (Bibas, J., dissenting); *see also Kanter*, 919 F.3d at 455–56 (Barrett, J., dissenting). Section 922(g)(3)'s burden on drug users is not even close to being "comparably justified" and thus not "relevantly similar to those regulations." *See Bruen*, 142 S. Ct. at 2133.

## CONCLUSION

The Second Amendment is not a "second class right." *McDonald*, 561 U.S. at 780. *Bruen* made clear that courts can no longer balance away an infringement on the Second Amendment. Although "judicial deference to legislative interest balance is understandable—and, elsewhere, appropriate—it is not deference that the constitution demands here." *Bruen*, 142 S. Ct. at 2131. As the District Court for the Western District of Texas concluded, "After *Bruen*, the Government must prove that laws regulating conduct covered by the Second Amendment's plain text align with this Nation's historical tradition. The Government does not meet that burden." *Quiroz*, 2022 WL 4352482, at *13.

App. 085

This Court should find § 922(g)(3) unconstitutional accordingly.


Respectfully submitted,

/s/ *Laura K. Deskin*
Laura K. Deskin
Research and Writing Specialist

/s/ *J. P. Hill*
J.P. Hill
Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Phone: (405) 609-5930
Fax: (405) 609-5932
Laura_Deskin@fd.org
JP_Hill@fd.org


## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2022, I electronically transmitted the attached document to the Clerk of the Court using the ECF system for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant(s):

Stephanie Powers, Stephanie.powers2@usdoj.gov


s/ *Laura K. Deskin*
LAURA K. DESKIN

App. 086

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-22-00328-PRW |
| | ) | |
| JARED MICHAEL HARRISON, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Jared Michael Harrison's Motion to Dismiss the Indictment (Dkt. 17), which argues that the statute he is charged with violating, 18 U.S.C. § 922(g)(3), is unconstitutionally vague, in violation of the Due Process Clause, and unconstitutionally infringes upon his fundamental right to possess a firearm, in violation of the Second Amendment. For the reasons given below, the motion is **GRANTED**.

### Background

#### I.    The Facts as Alleged.

On May 20, 2022, Harrison was pulled over by an officer of the Lawton Police Department for failing to stop at a red light. When Harrison rolled down his window to speak to the officer, the officer smelled marijuana and questioned Harrison about the source of the smell. Harrison told the officer that he was on his way to work at a medical marijuana dispensary, but that he did not have a state-issued medical-marijuana card.

App. 087

1

The officer asked Harrison to step out of his car. When he did, the officer noticed that Harrison was wearing an ankle monitor. Harrison told the officer that he was on probation in Texas for an aggravated assault.[1] The officer searched Harrison and found no contraband. The officer did not conduct a field sobriety test, nor did he request a blood draw to determine if Harrison was under the influence of marijuana or some other unlawful substance.

Another officer arrived, and the two officers searched Harrison's car. They found a loaded revolver on the driver's side floorboard; two prescription bottles in the driver's side door, one empty and one containing partially smoked marijuana cigarettes; and a backpack in the passenger seat. The backpack contained marijuana, THC gummies, two THC vape cartridges, and a pre-rolled marijuana cigarette and marijuana stems in a tray.

Harrison was arrested at the scene. The next day, the State of Oklahoma charged Harrison with possession of marijuana, possession of paraphernalia, and failure to obey a traffic signal. Harrison is awaiting trial on those charges. Then, on August 17, 2022, a federal grand jury returned an indictment charging Harrison with possessing a firearm with knowledge that he was an unlawful user of marijuana, in violation of 18 U.S.C. § 922(g)(3).

---

[1] It turns out this wasn't completely accurate; Harrison was actually on bond pending trial in Texas for that aggravated assault. Harrison and another man are alleged to have shot into a crowd at a college party, seriously wounding at least one partygoer. It is not clear from the available records in the Texas case whether any conditions of release were imposed on Harrison other than the location monitoring.

App. 088

## II.     The Arguments.

Harrison argues that the indictment should be dismissed for both Due Process Clause and Second Amendment reasons. Because the Court resolves the motion on Second Amendment grounds, the Court won't reach Harrison's Due Process claim or describe Harrison's argument in that regard.

As for the Second Amendment, Harrison argues he has the right to possess a firearm and that § 922(g)(3) infringes upon that right. Relying primarily on *New York State Rifle & Pistol Association v. Bruen*,[2] Harrison argues that the Second Amendment's plain text covers his conduct (possessing a handgun), and that the government cannot affirmatively prove that restrictions like § 922(g)(3) are part of the historical traditions that define the outer bounds of the right to keep and bear arms.

First, says Harrison, neither text nor history and tradition support the notion that only "law-abiding" individuals are part of the people protected by the Second Amendment. Second, Harrison argues that the government cannot point to any historical law on all fours with § 922(g)(3), much less a "tradition" of such laws. And while *Bruen* may not require the government to identify "a historical twin" to § 922(g)(3), where the societal problem addressed by § 922(g)(3)—users of illicit substances possessing guns—is nothing new, the government must identify "distinctly similar" laws in our Nation's history and tradition. And this it cannot do, says Harrison.

---

[2] 142 S. Ct. 2111 (2022).

App. 089

3

The United States disagrees. First, it argues, Harrison is not part of "the people" protected by the Second Amendment because he is not "a law-abiding citizen." This being so, the government argues, the burden never shifts to it to affirmatively prove that restrictions like § 922(g)(3) are part of the historical traditions that define the outer bounds of the right to keep and bear arms. And even if it did, there is a historical tradition of preventing "presumptively risky" people like felons and the mentally ill from possessing firearms, and for purposes of the Second Amendment, concludes the government, marijuana users are no different from those because they are similarly "unvirtuous."

### *Discussion*

### I.   *18 U.S.C. § 922(g)(3).*

Many people are at least vaguely familiar with the idea that convicted felons can't possess a firearm. 18 U.S.C. § 922(g)(1) is the federal statute making such firearm possession unlawful, and prosecutions under that subsection make up the overwhelming majority of prosecutions brought under § 922 (about 79%).[3] But § 922 contains many lesser-known provisions that prohibit other classes of people from possessing or receiving a firearm. 18 U.S.C. § 922(g)(3), the prohibition at issue here, for example, prohibits possession of firearms by users of substances made unlawful by the federal Controlled Substances Act. It is rarely used by prosecutors, as it accounts for only about 5% of prosecutions brought under § 922.[4]

---

[3] United States Sentencing Commission, *What Do Federal Firearms Offenses Really Look Like?* 24 (July 2022).

[4] *Id.*

Section 922(g)(3) does not have deep roots; it wasn't enacted by Congress until the Gun Control Act of 1968.[5] The statute initially prohibited any individual who was "an unlawful user of or addicted to marihuana or any depressant or stimulant drug . . . or narcotic drug" from receiving a firearm,[6] but it was amended in 1986 to broadly prohibit the receipt *or possession* of a firearm by any person who "is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))."[7] In its modern form, § 922(g)(3) thus strips a person of their fundamental right to possess a firearm the instant the person becomes an "unlawful user" of marijuana. And in the United States' view, all users of marijuana are "unlawful users."

*II. Second Amendment.*

   *A.* New York State Rifle & Pistol Association, Inc. v. Bruen.

   The Second Amendment to the United States Constitution protects "the right of the people to keep and bear Arms."[8] Because the "central component" of this right is individual self-defense,[9] the Second Amendment guarantees an individual's right to keep and bear

---

[5] Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220–21. The 1968 act originally placed the prohibition in subsection (h)(3). The Firearm Owners' Protection Act, enacted in 1986, reorganized the prohibition to its modern location in subsection (g)(3).

[6] *Id.*

[7] Firearm Owners' Protection Act, Pub. L. No. 99-308, §§ 102(6)(B), (D), 100 Stat. 449, 452 (1986).

[8] U.S. Const. amend. II.

[9] *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008).

arms for self-defense,[10] a conclusion the Supreme Court reached after examining the text and history of the Second Amendment in *District of Columbia v. Heller*.[11] But after *Heller*, federal courts strayed from that textual and historical approach and "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny."[12]

The Supreme Court flatly rejected that approach in *New York State Rifle & Pistol Association, Inc. v. Bruen*, holding that the lower courts' two-step framework was "one step too many."[13] The Court thus explained that

> [w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[14]

This motion is one of a flood of motions that have been filed in this district and nationwide challenging the constitutionality of various subparts of 18 U.S.C. § 922 in light of *Bruen*'s directive that lower courts change their ways. No longer should lower courts evaluating firearm restrictions "defer to the determinations of legislatures," because while

---

[10] *Bruen*, 142 S. Ct. at 2122.

[11] 554 U.S. 570 (2008). *See Bruen*, 142 S. Ct. at 2128–29; *Heller v. District of Columbia*, 670 F.3d 1244, 1273 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller* established that the scope of the Second Amendment right—and thus the constitutionality of gun bans and regulations—is determined by reference to text, history, and tradition.").

[12] *Bruen*, 142 S. Ct. at 2125.

[13] *Id.* at 2127.

[14] *Id.* at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)).

App. 092

"that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not the deference that the Constitution demands."[15] And while "end-justifies-the-means" rationalizations should generally be understood as antithetical to the rule of law, *Bruen* now leaves no doubt that such rationalizations have no place in our Second Amendment jurisprudence.

The question here is thus whether stripping someone of their right to possess a firearm solely because they use marijuana is consistent with the Nation's historical tradition of firearm regulation. If it is not, then § 922(g)(3) cannot be constitutionally applied to Harrison—no matter the reasonableness of the policy it embodies.

B. *The Second Amendment's plain text covers Harrison's conduct.*

The first step is to determine whether the Second Amendment's plain text covers Harrison's conduct of possessing a handgun. It does. To be clear, the United States argues that the relevant conduct is "keeping and bearing arms *as an unlawful drug user or addict*,"[16] but there are problems with that characterization. Though Harrison was found while carrying his firearm, he has been charged under a statute that criminalizes mere possession, so at trial the United States would have to prove only that Harrison possessed the gun—the fact he was carrying or "bearing" the firearm would not matter for purposes of conviction. Accordingly, for purposes of analyzing § 922(g)(3), the relevant conduct is possessing or "keeping" a firearm, rather than carrying or "bearing" a firearm.

---

[15] *Id.* at 2131.

[16] United States' Resp. (Dkt. 25), at 20 (emphasis added).

App. 093

7

Moreover, the Supreme Court has held that "'the people' . . . unambiguously refers to all members of the political community, not an unspecified subset," further explaining that the term refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[17] The Court thus concluded that there is a "strong presumption" that the Second Amendment right to keep and carry handguns publicly for self-defense "belongs to all Americans."[18]

No one disputes that Harrison is an American citizen who has resided in the United States his entire life, which under Supreme Court precedent would make him part of the "national community," and thus part of "the people" to whom the Second Amendment guarantees the right to keep arms.[19] The United States argues, however, that marijuana

---

[17] *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)).

[18] *Id.* at 581; *Bruen*, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions."(quoting *Heller*, 554 U.S. at 581)). *See Kanter v. Barr*, 919 F.3d 437, 451–53 (7th Cir. 2019) (Barrett, J., dissenting) ("There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. . . . Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. . . . These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away. In my view, the latter is the better way to approach the problem. . . . In addition to being analytically awkward, the 'scope of the right' approach is at odds with *Heller* itself. There, the Court interpreted the word 'people' as referring to 'all Americans.'").

[19] *Cf. United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) ("This court declines to read 'the people' so narrowly. Instead, it follows

users are lawbreakers, and lawbreakers aren't part of "the people" whose rights are protected by the Constitution.[20] But this is precisely the sort of carving out of a subset from "all Americans" that the *Heller* Court rejected.[21]

---

courts from within the Tenth Circuit, which have observed that 'convicted felons fall within "the people" as contemplated by the First and Fourth Amendments.' Applying the presumption of consistent usage, they have 'decline[d] to carve out felons from the scope of the Second Amendment's protection of "the people,"' and this court does the same." (quoting *United States v. Coombes*, No. 22-CR-00189, --- F. Supp. 3d ----, ----, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022)); *Coombes*, 2022 WL 4367056, at *4 ("[I]t is clear that convicted felons fall within 'the people' as contemplated by the First and Fourth Amendments. Based on existing precedent and well-established canons of construction, the court declines to carve out felons from the scope of the Second Amendment's protection of 'the people.'"); *United States v. Gray*, No. 22-CR-00247-CNS, 2022 WL 16855696, at *2 (D. Colo. Nov. 10, 2022) ("The Court adopts the analysis of its sister district courts within the Tenth Circuit and finds that Defendant is covered by the Second Amendment's plain text.").

[20] On this point, the United States points to *Bruen*'s description of the plaintiffs in that case as "ordinary, law-abiding, and adult citizens." *Bruen*, 142 S. Ct. at 2134. But that description can't be read as breaking new ground with respect to who make up "the people" protected by the Second Amendment. First, *Bruen* noted that it was undisputed that the plaintiffs in that case were part of the people protected by the Second Amendment, so at best, the United States is relying on dicta. But even so, the United States is reading too much into the dicta because immediately after describing the plaintiffs, the *Bruen* Court cited *Heller*'s holding that "the people" includes "all members of the political community," not just "an unspecified subset." *Id.* (citing *Heller*, 554 U.S. at 580). Thus, this reference in dicta to "law-abiding citizens" cannot possibly be read as overturning the very holding upon which it relies. *See Denezpi v. United States*, 142 S. Ct. 1838, 1847–48 (2022) (explaining that stray statements "[r]ead in isolation . . . . cannot overcome the holdings of our cases, not to mention the text of the Clause").

[21] Frankly, it's not even clear this is carving out a "subset," as much as an outright declaration of the federal government's belief that it can deprive practically *anyone* of their Second Amendment right. Who among us, after all, isn't a "lawbreaker"? For sure, there may well exist some adult who has never exceeded the speed limit, changed lanes without signaling, or failed to come to a complete stop at a stop sign, but they are few and far between.

App. 095

Moreover, the United States' approach shoehorns the government's historical-tradition burden onto *Bruen*'s initial presumption, a presumption based simply on the Second Amendment's plain text. Indeed, as support for excluding marijuana users from "the people," the government relies on a purported historical tradition of regulating firearm use by felons, intoxicated persons, and the mentally ill. But *Bruen* makes clear that the first step is one based solely on the text of the Second Amendment to determine if it presumptively protects an individual's conduct—a presumption that the United States can *then* rebut with history and tradition. Here, because the Second Amendment's plain text covers Harrison's conduct—possessing a handgun for self-defense—"the Constitution presumptively protects that conduct."[22]

C. *Applying § 922(g)(3) to Harrison is inconsistent with the Nation's historical tradition of firearm regulation.*

Given that the Second Amendment presumptively protects Harrison's conduct, the burden shifts to the United States to demonstrate that prohibiting marijuana users from possessing firearms is "consistent with the Nation's historical tradition of firearm regulation."

This inquiry is "fairly straightforward" when the challenged regulation addresses a "general societal problem that has persisted since the 18th century," because there "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."[23] And "if earlier

---

[22] *See Bruen*, 142 S. Ct. at 2129–30.

[23] *Id.* at 2131.

App. 096

generations addressed the societal problem, but did so through materially different means," that too is evidence that the modern regulation is unconstitutional.[24]

But where the challenged regulation implicates "unprecedented societal concerns or dramatic technological changes," a "more nuanced approach" might be required.[25] Given the novelty of the societal concern, it would be impossible to identify a "historical twin" to the challenged law, so the United States need not do so.[26] But it still must identify a historical tradition of laws that are sufficiently analogous, and that turns on whether the historical laws "impose[d] a comparable burden on the right of armed self-defense" and were "comparably justified."[27] Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," historical analogues in existence near the time the Second Amendment was adopted in 1791 are of primary relevance.[28]

---

[24] *Id.*

[25] *Id.* at 2132.

[26] *Id.* at 2133. While the job of performing these comparisons is necessarily left to the lower courts, *Bruen* provided one instructive example of historical laws that might be sufficiently analogous to a modern restriction, despite not being a "twin." Historical laws restricting the carrying of firearms in "sensitive places" like "legislative assemblies, polling places, and courthouses" were generally accepted as lawful, so modern restrictions restricting carrying in new "sensitive places" (an airport, for example) might well be lawful also. *Id.* Thus, despite not being an *exact* match to the historical law, the modern law would pass muster so long as it imposed a comparable burden and was comparably justified.

[27] *Id.* (internal quotations and citations omitted). Importantly, this analysis "does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 2133 n.7.

[28] *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35) (emphasis in original). *Bruen* explained that "[t]he job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies." *Id.* at 2130 n.6 (emphasis in

App. 097

Here, the societal problem addressed by § 922(g)(3), possession of firearms by users of substances with the potential for abuse,[29] is not new. The United States' reliance on historical prohibitions on the carrying of firearms by intoxicated persons (more on that later) proves the point. Those historical prohibitions are the product of our Nation's long history of people using substances that might intoxicate and impair judgment. Yet the United States has not identified a single historical law that is "distinctly similar" to § 922(g)(3)—which *Bruen* suggests is dispositive.[30] The United States instead relies solely on laws that are admittedly distinct, but, in its view, close enough for purposes of the analogical reasoning utilized when examining regulations aimed at novel societal problems. But even if the possession of firearms by users of certain substances were a brand-new societal problem, the United States' historical evidence falls short.

     *1.   Categories of Presumptively Risky Persons.*

The United States first argues that § 922(g)(3) is sufficiently analogous to historical regulations on three categories of "presumptively risky persons": the intoxicated, convicted

---

original). This legal inquiry is guided by "evidentiary principles and default rules," including the principle of party presentation. *Id.* (quoting William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019)). The Court will thus decide this legal question based on the arguments and historical record the parties have compiled in their respective briefs and during oral argument. *See id.* ("[I]n our adversarial system of adjudication, we follow the principle of party presentation. Courts are thus entitled to decide a case based on the historical record compiled by the parties.") (internal quotations and citations omitted).

[29] Potential for abuse is the driving factor when it comes to whether a substance is "controlled" under the Controlled Substances Act. *See* 21 U.S.C. § 811.

[30] *See Bruen*, 142 S. Ct. at 2131.

App. 098

12

felons, and the mentally ill. But none of these "identify a well-established and representative historical analogue" to § 922(g)(3)'s application to Harrison.[31]

*a. Historical Restrictions on Intoxicated Persons.*

To begin, the United States points to seven laws—one 1655 law from colonial Virginia and six state or territorial laws enacted between 1868 and 1899—that it argues "categorically prohibit[ed]" the intoxicated "from possessing firearms."[32] But the government overstates its case. The laws it relies on materially differ from the application of § 922(g)(3) to Harrison in regard to both of *Bruen*'s "central consideration[s]": "the

---

[31] *See id.* at 2133 (emphasis omitted).

[32] United States' Resp. (Dkt. 25), at 30–31. For purposes of the Second Amendment analysis, the Court assumes, without deciding, that these seven historical laws were consistent with the Second Amendment's original meaning. Historical regulations are, of course, only significant for purposes of determining the original meaning of the Second Amendment to the extent that the jurisdictions that enacted the regulations also recognized an individual right to keep and bear arms. The Second Amendment was not in place when the 1655 Virginia law was enacted—the English Bill of Rights wasn't either. Nor was the Second Amendment incorporated against the states at the time the six post-Civil War laws were enacted. *See State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (rejecting a Second Amendment challenge to the Missouri law discussed below on the grounds that "[t]he second amendment to the constitution of the United States is a restriction upon the powers of the national government only, and is not a restriction upon state legislation"); *see also United States v. Cruikshank*, 92 U.S. 542, 553 (1875). The United States has not attempted to demonstrate whether the six states or territories who passed these laws recognized an individual right to keep and bear arms under their respective state constitutions. Having done the work itself, however, the Court found at least one state high court that concluded one of these laws was consistent with the state constitution's individual right to bear arms guarantee. *See Shelby*, 2 S.W. at 468–69. And at least one modern jurist applying a text, history, and tradition test, and relying on some of the laws identified by the United States, found an Ohio law prohibiting a "person, *while under the influence* of alcohol or any drug of abuse," from carrying or using any firearm consistent with the Second Amendment. *See State v. Weber*, 168 N.E.3d 468, 489–96 (Ohio 2020) (DeWine, J., concurring in judgment) (emphasis added).

App. 099

burden on the right of armed self-defense" imposed by the regulation and the justification for the burden.[33]

Start with comparing the burden each of these laws placed on the right of armed self-defense vis-à-vis the burden imposed by § 922(g)(3). The seven laws the United States identifies imposed a far narrower burden and, as a result, left ample room for the exercise of the core right to armed self-defense. First, the restrictions imposed by each law only applied while an individual was actively intoxicated or actively using intoxicants.[34] Under these laws, no one's right to armed self-defense was restricted based on the mere fact that

---

[33] *Bruen*, 142 S. Ct. at 2133.

[34] 1 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* 401–02, Act XII (1823) (prohibiting "shoot[ing] any gunns *at drinkeing* (marriages and ffuneralls onely [sic] excepted)"); *General Statutes of the State of Kansas* 378, ch. 31, § 282 (John M. Price et al. eds., 1868) ("[A]ny person *under the influence of intoxicating drink* . . . carrying on his person a pistol . . . or other deadly weapon, shall be subject to arrest upon charge of misdemeanor[.]"); *Revised Code of the Statute of Laws of the State of Mississippi* 776, ch. 77, § 2986 (J.A.P. Campbell ed., 1880) ("It shall not be lawful for any person to sell to any . . . *person intoxicated*, knowing him to be . . . *in a state of intoxication*" any concealable, deadly weapon.); *Supplement to the Revised Statutes of Wisconsin* 848, ch. 181, § 4397b(3) (A. L. Sanborn & J. R. Berryman eds., 1883) ("It shall be unlawful for any person *in a state of intoxication* to go armed with any pistol or revolver."); 1 *Revised Statutes of the State of Missouri* 854, ch. 47, § 3502 (Samuel C. Major et al. eds., 1889) ("If any person . . . shall have or carry any [deadly or dangerous weapon] upon or about his person *when intoxicated, or under the influence of intoxicating drinks* . . . shall, upon conviction, be punish by a fine . . . or by imprisonment[.]"); *Statutes of Oklahoma 1890* 495, ch. 25, art. 47, § 4 (Will T. Little et al. eds., 1891) (prohibiting "any public officer" from "carrying" certain specified arms, including a pistol or revolver, "*while under the influence of intoxicating drinks*"); 2 *Code of Laws of South Carolina* 318, ch. 12, § 252 (1902) ("Code of Laws of South Carolina") ("Any person who shall, without just cause or excuse, or *while under the influence, or feigning to be under the influence, of intoxicating liquors*, engaged in any boisterous conduct, or who shall, without just cause or excuse, discharge any gun, pistol or other firearm while upon or within fifty yards of any public road or highway, except upon his own premises, shall be guilty of a misdemeanor[.]") (all emphases added).

App. 100

he or she was a user of intoxicants.[35] Second, none of the laws appear to have prohibited

the mere possession of a firearm.[36] Third, far from being a total prohibition applicable to

all intoxicated persons in all places, all the laws appear to have applied to public places or

activities (or even a narrow subset of public places),[37] and one only applied to a narrow

---

[35] When asked at argument whether the United Sates was "able to find even a single law that prohibited a person, not [an] intoxicated person, but a person who uses intoxicants, even when sober, from possessing a gun," counsel for the United States responded "No." Tr. of Oral Arg. (Dkt. 35), at 37.

[36] Three of the laws clearly only prohibited carrying a firearm. Little et al., *supra* note 34, at 495 ("carrying"); Sanborn & Berryman, *supra* note 34, at 848 ("to go armed"); Price et al., *supra* note 34, at 378 ("carrying"). Two laws seem to have even permitted carrying but prohibited discharging the firearm. Hening, *supra* note 34, at 401–02 ("shoot[ing] any gunns at drinkeing (marriages and ffuneralls onely [sic] excepted)"); Code of Laws of South Carolina, *supra* note 34, at 318 ("discharge any gun, pistol or other firearm while upon or within fifty yards of any public road or highway, except on his own premises"). And one law prohibited only the sale of firearms to persons intoxicated and did not regulate the intoxicated person's carry, possession, or use. Campbell, *supra* note 34, at 776. The one possible exception is the Missouri law, which made it unlawful for "any person" to "*have or carry* any [deadly or dangerous weapon] upon or about his person when intoxicated, or under the influence of intoxicating drinks." Major et al., *supra* note 34, at 854 (emphasis added). But the broader context of that provision seems to suggest that it only applied to "having" a firearm in a public place, i.e., carrying the firearm, and even then, the law may have provided an exception for self-defense. *Shelby*, 2 S.W. at 469 (describing the law as targeting "[t]he mischief to be apprehended from an intoxicated person going abroad with fire-arms"). In any event, even if the Missouri law did prohibit possession even in the home, one law cannot possibly create a constitutionally significant, "well-established" historical tradition. *See Bruen*, 142 S. Ct. at 2133, 2142. And even if it could, the law would have prohibited possession only while a person was actively intoxicated or actively using intoxicants.

[37] The carry laws would have only applied to public places, and at least one of the laws only applied to certain public places. *See* Code of Laws of South Carolina, *supra* note 34, at 318 (prohibiting the "discharge [of] any gun, pistol or other firearm *while upon or within fifty yards of any public road or highway, except on his own premises*") (emphasis added); *see also* Little et al., *supra* note 34, at 496, ch. 25, art. 47, § 7 (not identified by the United States, but prohibiting carrying a firearm into "any place where intoxicating liquors are sold"). Little is known about the 1655 Virginia law, but it appears that "shoot[ing] any

subset of intoxicated persons.[38] Importantly, none appear to have prohibited the possession of a firearm in the home for purposes of self-defense.

Where the seven laws the United States identifies took a scalpel to the right of armed self-defense—narrowly carving out exceptions but leaving most of the right in place—§ 922(g)(3) takes a sledgehammer to the right. Recall that § 922(g)(3) imposes the most severe burden possible: a total prohibition on possessing any firearm, in any place, for any use, in any circumstance—regardless of whether the person is actually intoxicated or under the influence of a controlled substance.[39] It is a complete deprivation of the core right to possess a firearm for self-defense, turning entirely on the fact that an individual is a user of marijuana. Section 922(g)(3)'s "burden on the right of armed self-defense" is thus not "comparable" to the seven historical intoxication laws.[40]

_____

gunns at drinkeing" referred to a social activity, and the law specifically carved out shooting and drinking at weddings and funerals.

[38] The Oklahoma law, for example, only applied to "public officer[s]," leaving the rest of the intoxicated public untouched. Little et al., *supra* note 34, at 495.

[39] *See* 27 C.F.R. § 478.11 ("Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before . . . . A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm.").

[40] *Bruen*, 142 S. Ct. at 2133. The United States suggests that § 922(g)(3) imposes a narrow burden on the right to possess a firearm because it does not permanently deprive the marijuana user of the right. Rather, a person may regain their right to possess a firearm by stopping their use of marijuana. But while theoretically impermanent, the deprivation imposed by § 922(g)(3) is significantly greater than the historical intoxication laws because even if one stops their use of a controlled substance, they could be deprived of their right to armed self-defense for up to a year after their last use. *See* 27 C.F.R. § 478.11 ("An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time, e.g., a conviction for use or possession of a controlled substance within the past year

App. 102

The justifications for these laws also differ substantially from § 922(g)(3). The only pre-Civil War law the United States points to—the most relevant period under *Bruen*[41]—is the 1655 Virginia law. But as the law itself explained, the justification for the restriction was the fear that the "frequent shooting of gunns [sic] in drinking" would inhibit the ability of the colonists to defend against Indian attacks by (1) drowning out warning shots, which were "the only means for the discovery of [Indian] plots" to attack, and (2) by wasting gun powder "in vaine [sic]" that was essential to the militia's ability to fight off Indian attacks.[42] So, unlike § 922(g)(3), which is justified by concerns that marijuana users are "presumptively risky persons" who accordingly should never possess a gun for any purpose at any time (even when they are sober), the Virginia law's justification had nothing to do with the status of the persons firing the guns or even the fact that they were intoxicated. The six post-Civil War laws were also based on a different justification than § 922(g)(3). Each was concerned with the danger of persons who were actively intoxicated or actively

---

. . . or persons found through a drug test to use a controlled substance unlawfully, provided that the test was administered within the past year."). The deprivation imposed by the historical intoxication laws, on the other hand, ceased the moment the person sobered up.

[41] *See Bruen*, 142 S. Ct. at 2136; *id.* at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution against giving postenactment history more weight than it can rightly bear." (internal quotation marks omitted)).

[42] Hening, *supra* note 34, at 401–02. *See* Ann E. Tweedy, *"Hostile Indian Tribes, Outlaws, Wolves, Bears, Grizzlies and Things Like That?" How the Second Amendment and Supreme Court Precedent Target Tribal Self-Defense*, 13 U. Pa. J. Const. L. 687, 698 (2011).

App. 103

17

using intoxicants,[43] and none imposed restrictions on a user of intoxicants when they were sober.

The United States also points to a New York law from the colonial era that was passed "for the prevention" of "great Damages . . . frequently done" around the New Year's holiday "by persons going from House to House, with Guns and other Fire Arms and being often intoxicated with Liquor."[44] The law appears to have prohibited *all persons* from "fir[ing] or discharg[ing] any Gun . . . in any House Barn or other Building or before any

---

[43] Hening, *supra* note 34, at 401–02 (prohibiting "shoot[ing] any gunns *at drinkeing* [sic]"); Price et al., *supra* note 34, at 378 ("[A]ny person *under the influence of intoxicating drink* . . . carrying on his person a pistol . . . or other deadly weapon, shall be subject to arrest upon charge of misdemeanor[.]"); Campbell, *supra* note 34, at 776 ("It shall not be lawful for any person to sell to any . . . *person intoxicated*, knowing him to be . . . *in a state of intoxication*" any concealable, deadly weapon.); Sanborn & Berryman, *supra* note 34, at 848 ("It shall be unlawful for any person *in a state of intoxication* to go armed with any pistol or revolver."); Major et al., *supra* note 34, at 854 ("If any person . . . shall have or carry any [deadly or dangerous weapon] upon or about his person *when intoxicated, or under the influence of intoxicating drinks* . . . shall, upon conviction, be punish by a fine . . . or by imprisonment[.]"); Little et al., *supra* note 34, at 495 (prohibiting "any public officer" from "carrying" certain specified arms, including a pistol or revolver, "*while under the influence of intoxicating drinks*"); Code of Laws of South Carolina, *supra* note 34, at 318 ("Any person who shall, without just cause or excuse, or *while under the influence, or feigning to be under the influence, of intoxicating liquors*, engaged in any boisterous conduct, or who shall, without just cause or excuse, discharge any gun, pistol or other firearm while upon or within fifty yards of any public road or highway, except upon his own premises, shall be guilty of a misdemeanor[.]") (all emphases added). Again, at argument, the United States conceded that it has been unable to identify a single pre-twentieth century law that prohibited the possession of firearms by a person who used intoxicants even when that person was sober. *See* Tr. of Oral Arg. (Dkt. 35), at 37.

[44] 5 *The Colonial Laws of New York from the Year 1664 to the Revolution* 244, ch. 1501, (1894) ("Colonial Laws of New York").

App. 104

Door or in any Garden, Street, Lane or other Inclosure [sic] on" the "eve of the last Day of December, and on the first and second Days of January."[45]

The United States' reliance on this law is unclear: It includes the law as an example of "state laws [that] have historically prohibited carrying a firearm while under the influence of alcohol."[46] But as explained above, the law applied to *all* persons, not just intoxicated persons or those who use intoxicants.[47] And it is difficult to see how this law could indicate any sort of "well-established,"[48] constitutionally relevant tradition of regulation: The law was in effect for only two years, applied to only certain places in one county and two towns, and restricted the discharge of firearms for only three days a year.

---

[45] *Id*. at 245.

[46] United States' Resp. (Dkt. 25), at 30.

[47] The law purported to apply to "any Person or Persons of any Age or Quality whatsoever." Colonial Laws of New York, *supra* note 44, at 245. It seems doubtful that such a law would even be constitutional today. To the extent that the law actually prohibited the entirety of the non-intoxicated public from using firearms for purposes of self-defense, it would almost certainly be unconstitutional under *Heller* and *Bruen*. Although not identified by the United States, it appears that New York passed a somewhat similar law in 1785. *See The Laws of the State of New York Compromising the Constitution, and the Acts of the Legislature, Since the Revolution, From the First to the Fifteenth Session* 188–89, ch. LXXXI (Thomas Greenleaf ed., 1792). That law remarkably makes no reference to alcohol or intoxication at all, stating merely that "great dangers have arisen, and mischief been done by the pernicious practice of firing guns, pistols, rockets, squibs and other fire-works, on the eve of the last day of December, and first and second days of January." *Id.* This latter law seems to confirm that the New Years-related laws had little to do with the intoxicated status of the person firing or discharging a firearm, further weakening any attempt to rely on the laws as analogues to § 922(g)(3).

[48] *Bruen*, 142 S. Ct. at 2133.

b. *Convicted Felons*.

Next, the United States argues that § 922(g)(3) is analogous to the Nation's "deeply rooted" tradition of disarming convicted felons because unlawful users of controlled substances have engaged in felonious conduct (because they must possess the substance in order to use it, and possession is a felony under the Controlled Substances Act), even if never prosecuted and convicted for *that* conduct.[49]

But § 922(g)(3) is quite different from even modern felon-in-possession statutes. For starters, the laws significantly differ in the process by which one is deprived of the right to armed self-defense. Section 922(g)(1), the modern federal felon-in-possession provision, only prohibits possession of a firearm *after* an individual has been convicted of a felony offense.[50] The deprivation of the fundamental right thus occurs only after an individualized, adversarial proceeding that complies with the requirements of due process. Section 922(g)(3), however, is an outlier in our legal tradition in that it deprives persons of a fundamental right with *no* pre-deprivation process. Process is only afforded after the fact, and only to a tiny fraction of those whose rights have been stripped—those that the United States has selected for prosecution and punishment.

But even if after-the-deprivation process is sufficiently analogous to pre-deprivation process, under *Bruen* the question then becomes whether prohibiting a person from possessing a firearm solely on the basis of engaging in felonious conduct—i.e., they use

---

[49] United States' Resp. (Dkt. 25), at 29.

[50] 18 U.S.C. § 922(g)(1).

App. 106

20

marijuana—"is consistent with this Nation's historical tradition of firearm regulation."[51]

It is to that question the Court now turns.

> *i.* Heller *did not answer the question in this case.*

The United States insists that *Heller* deemed all restrictions on the possession of firearms by those who engage in felonious conduct consistent with the Second Amendment, so there's no need to engage in *Bruen*'s historical-tradition analysis. *Heller*, however, did no such thing; it instead said something more restrained, that "nothing in our opinion should be taken to cast doubt on *longstanding* prohibitions on the possession of firearms by felons"—hardly an endorsement of any and all such prohibitions dreamed up by modern legislatures.[52] And even then, the Court did not place an absolute stamp of approval on such prohibitions: those prohibitions are merely "presumptively lawful,"[53] implying that some could be unconstitutional in some circumstances.[54] Nor did the *Heller*

---

[51] *Bruen*, 142 S. Ct. at 2126.

[52] *Heller*, 554 U.S. at 626 (emphasis added). *See Folajtar v. Att'y Gen. United States of Am.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("*Heller* limited its remark to 'longstanding' bans. Longstanding bans are centuries old, not within living memory.").

[53] *Heller*, 554 U.S. at 627 n.26. *See Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting) ("*Heller*'s aside also described the bans as only presumptively lawful." (cleaned up)).

[54] *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("*Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge."). *Cf. United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011). Even pre-*Bruen* cases that narrowly construed the right recognized by *Heller* implicitly recognized this very point. Take, for example, several pre-*Bruen* as-applied challenges to the federal felon-in-possession law, § 922(g)(1), which, far from merely quoting *Heller*'s "longstanding prohibitions on the possession of firearms by felons" language and moving on, went on to determine whether applying the law was constitutional in the context of the particular underlying felony at issue. *See, e.g.*, *Binderup v. Att'y Gen. United States of Am.*,

Court say anything about prohibitions on those who have engaged in conduct that may be felonious, rather than prohibitions on *felons* (i.e., those previously convicted of a felony).

The first caveat, that the prohibition on possession by a felon be longstanding, makes sense. If not for this limitation, a legislature could circumvent the Second Amendment by deeming every crime, no matter how minor, a felony, so as to deprive as many of its citizens of their right to possess a firearm as possible. Imagine a world where the State of New York, to end-run the adverse judgment it received in *Bruen*, could make mowing one's lawn a felony so that it could then strip all its newly deemed "felons" of their right to possess a firearm.[55] The label "felony" is simply "too easy for legislatures and prosecutors to manipulate."[56]

Remarkably, when presented with this lawn-mowing hypothetical argument, and asked if such an approach would be consistent with the Second Amendment, the United

---

836 F.3d 336, 351 (3d Cir. 2016) (en banc) (holding that the challengers' crimes, which met Congress's definition of a felony for purposes of § 922(g)(1), "were not serious enough [crimes] to strip [the challengers] of their Second Amendment rights"); *id.* at 360 (Hardiman, J., concurring in part & concurring in judgments); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("I agree with the majority that *Heller*'s dictum does not settle the question before us."). The same is true for challenges to other § 922(g) provisions. *See, e.g.*, *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (noting that this language in *Heller* is "not dispositive").

[55] While this hypothetical may seem far-fetched, it captures the broader point that "today, a felony is whatever the legislature says it is. The category is elastic, unbounded, and manipulable by legislatures and prosecutors." *Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting). In Oklahoma, for example, adultery is a felony punishable by up to five years' imprisonment. Okla. Stat. tit. 21, § 872. Examples in other states include opening a bottle of ketchup at the store and placing it back on the shelf or reading someone else's email without permission. *See Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting).

[56] *Folajtar*, 980 F.3d at 920 (Bibas, J., dissenting).

App. 108

States said "yes."[57] So, in the federal government's view, a state or the federal government *could* deem anything at all a felony and then strip those convicted of that felony—no matter how innocuous the conduct—of their fundamental right to possess a firearm.[58] Why? Because courts must defer to a legislature's judgments about what is and is not a felony, says the United States. It's as if *Bruen*'s command regarding the inappropriateness of such deference to legislative judgments has been lost in translation.[59] In a sense, one must applaud the United States for its steadfast commitment to its legal position. But "giv[ing] legislatures unreviewable power to manipulate the Second Amendment by choosing a label"[60] is inconsistent with the entire point of constitutionalizing a fundamental right in the first place: to restrain a legislature's ability to infringe that right through legislation.[61] What would remain of the Second Amendment if the Court were to accept the United States' view that a legislature could prohibit the exercise of the right it protects simply by

---

[57] Tr. of Oral Arg. (Dkt. 35), at 52–53.

[58] Bear in mind that the United States' theory would likewise allow Congress to add any substances it wishes to Schedule I of the Controlled Substances Act's schedule of drugs, and then disarm citizens of their right to possess a firearm based on their use of that substance. Imagine Congress deeming aspirin a Schedule I controlled substance. Having placed aspirin on Schedule I, any user of that substance would be automatically stripped of their Second Amendment right by operation of § 922(g)(3).

[59] *See* 142 S. Ct. at 2131.

[60] *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting). *See id.* at 920 ("Disarming all felons not only ignores history, but also gives legislatures unfettered power over a fundamental right.").

[61] *Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."). *See id.* at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.").

App. 109

declaring anything or everything a felony? Nothing. Maybe that is what the federal government desires, but it is hardly what the Constitution requires.[62]

> *ii.* *There is no historical tradition of disarming a person solely based on that person having engaged in felonious conduct.*

What common sense suggests, our Nation's history and tradition of firearm regulation confirms: Whether a law burdening the right to keep and bear arms is consistent with the Second Amendment does not turn on legislative labels, but rather on the actual nature of the societal problem the law is designed to address and the actual burdens that the law imposes.

Recall that *Heller* and *Bruen* instructed that the scope of the Second Amendment is defined by the understanding of the right by the people who adopted it.[63] But as far as the Court is aware, no scholar has been able to identify a single colonial or state law in seventeenth, eighteenth, or nineteenth-century America that prohibited a person from possessing any firearm merely because that person engaged in conduct that a legislature has labeled as felonious.[64] Nor has the United States pointed to any such laws here. And

---

[62] *Heller* itself rejected a very similar argument, explaining that an interpretation of the Second Amendment that would give Congress plenary power to exclude large groups of citizens from the scope of the right would be inconsistent with the historical underpinnings of the Second Amendment and the concerns of the founding generation. *See* 554 U.S. at 599–600.

[63] *See Bruen*, 142 S. Ct. at 2136 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." (quoting *Heller*, 554 U.S. at 634–635) (emphasis in original)).

[64] *See* Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1374 (2009); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708

App. 110

24

while the laws it does point to don't go nearly that far, the United States nonetheless argues that they establish a history and tradition of stripping people of their Second Amendment right for engaging in any conduct that a legislature says is felonious. The analogy, however, falls apart under scrutiny.

*Thomas Cooley*. The United States first relies on a 1983 article by Robert Dowlut. In a single, three-sentence paragraph, Dowlut argued that "Colonial and English societies of the eighteenth century . . . excluded . . . felons" from the right to keep and bear arms.[65] Dowlut's article, however, does not discuss or cite a single seventeenth, eighteenth, or nineteenth-century law or case demonstrating that point.[66] In fact, he relies on a lone source for this proposition: the 1903 edition of Thomas Cooley's famed treatise on state constitutional law.[67] Elsewhere in its brief, the United States relies on the same Cooley

---

(2009) ("Though recognizing the hazard of trying to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I."); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws."); *Folajtar*, 980 F.3d at 912, 914–15 (Bibas, J., dissenting).

[65] United States' Resp. (Dkt. 25), at 29 (quoting Robert Dowlut, *The Right to Arms: Does the Constitution or Predilection of Judges Rein?*, 36 Okla. L. Rev. 65, 96 (1983)).

[66] The accompanying footnote cites three nineteenth-century southern state constitutions, but those sources are cited merely for the proposition that the right was limited to free white men prior to the enactment of the Fourteenth Amendment. *See* Dowlut, *supra* note 65, at 96 n.147. These sources say nothing about felons.

[67] *Id*. The first edition of Cooley's treatise was initially published in 1868, and as such, has long been considered a helpful source in interpreting the state of American constitutional law at the time of the Fourteenth Amendment's enactment. It is the 1868 edition that the United States relies on elsewhere in its brief. *See* United States' Resp. (Dkt. 25), at 28. The quotations below are taken from the 1868 edition. But to be clear, in the passages relevant

passage, which it claims stands for the proposition that "certain persons—namely, 'the idiot, the lunatic, and the felon, on obvious grounds'—had long been 'almost universally excluded' from exercising certain civic rights in America, including the right to bear arms."[68]

The problem is that the Cooley passage doesn't actually say anything about the right to keep and bear arms.[69] Instead, the passage falls in the middle of Cooley's discussion of who may "participat[e] in the government"—that is, who may hold office or "exercise the elective franchise."[70] Cooley's point in the passage is that "in every State, although all persons are under the protection of the government, and obliged to confirm their action to its laws, there are some who are altogether excluded from participation in the government."[71] His reference to "the idiot, the lunatic, and the felon"—the passage the United States and Dowlut rely on—comes in reference to "[c]ertain classes [that] have been almost universally excluded" from voting because "they lack either the intelligence, the virtue, or the freedom of action *essential to the proper exercise of the elective franchise*."[72] While this passage may suggest a tradition of stripping felons of their right to vote, it does

---

to this case, there are no material distinctions between the 1868 edition and the 1903 edition cited by Dowlut.

[68] United States' Resp. (Dkt. 25), at 29.

[69] Tellingly, Cooley does have a passage exclusively devoted to the right to keep and bear arms; that passage says nothing about the exclusion of felons. *See* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 350 (Lawbook Exch. ed. 2011) (1868).

[70] *Id*. at 28–29. *See* Marshall, *supra* note 64, at 709.

[71] Cooley, *supra* note 69, at 28.

[72] *Id*. at 29 (emphasis added).

App. 112

nothing to prove a tradition of stripping Second Amendment rights from those who have engaged in felonious conduct.[73]

*Founding-Era Punishments for Felonies and Ratification Convention Proposals.* The United States next relies on a paragraph in a 1983 article by Don Kates, where Kates argued "that the Founders" did not "intend[] to confer" the Second Amendment right upon felons.[74] Kates, however, does not cite a single Founding-era law or case supporting this proposition. Instead, he supports the proposition elsewhere in the paragraph by appealing to two arguments: (1) that because the "law punished felons with automatic forfeiture of all goods, usually accompanied by death[,] [w]e may presume that persons confined in gaols awaiting trial on criminal charges were also debarred from the possession of arms"; and (2) that "[a]ll the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent."[75] Kates's arguments have garnered significant criticism.[76] And for good reason.

---

[73] Nor does depriving felons of the right to vote on the theory that they "lack virtue" support depriving felons of the right to bear arms on the same basis. *See Kanter*, 919 F.3d at 462–64 (Barrett, J., dissenting) (explaining that virtue-based exclusions "are associated with civic rights," like the right to vote, and that "virtue exclusions don't apply to individual rights," like the Second Amendment). Cooley himself distinguished between the right to vote, Cooley, *supra* note 69, at 29–30, 599, and "The Constitutional Protections to Personal Liberty," *id.* at 295–350, which included the "Right to bear arms," *id.* at 350. And rightly so: "The right to vote is historically and textually distinct from the Second Amendment." *Binderup*, 836 F.3d at 369 n.14 (Hardiman, J., concurring in part & concurring in judgments).

[74] Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983).

[75] *Id.*

[76] *See, e.g.*, Marshall, *supra* note 64, at 714; Larson, *supra* note 64, at 1374.

App. 113

27

Start with Kates's reliance on the punishment of felons at the Founding. "The premise of this argument—that the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries—is shaky."[77] And "[b]y the time the Constitution was ratified, James Wilson observed that while the term 'felony' was once 'very strongly connected with capital punishment,' that was no longer true."[78] So while death remained a possible punishment for many felonies, death "no longer inevitably followed a felony conviction."[79]

This poses a problem for Kates's theory because there existed felons at the Founding who were not put to death, so any deprivation of those felons' right to armed self-defense would have been effectuated by some means other than their death. In a later article, Kates defended his original position by arguing that felons, even if not actually put to death, were subject to "civil death," which in turn stripped them of personal rights, including the right to bear arms.[80] But the American version of civil death did not deprive felons of all rights.[81] And depriving someone of a right based on civil death also "required explicit statutory authorization."[82] But neither Kates nor any other scholar (at least as this Court is aware)

---

[77] *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).

[78] *Id.* at 459.

[79] *Id. See Folajtar*, 980 F.3d at 920 (Bibas, J., dissenting) (explaining that "[e]ven before the Founding, the link between felonies and capital punishment was frayed" and that "[e]ven crimes that were capital in theory often were not in practice").

[80] *See* Don B. Kates, *A Modern Historiography of the Second Amendment*, 56 UCLA L. Rev. 1211, 1231 n.100 (2009).

[81] *Kanter*, 919 F.3d at 460 (Barrett, J., dissenting).

[82] *Id.*

App. 114

has identified a single Founding-era law depriving felons of the right to keep and bear arms as a consequence of civil death.

Kates's reliance on three ratification convention proposals—from New Hampshire, Massachusetts, and Pennsylvania—fairs no better. Kates alleged that certain language in these proposals would have excluded felons from the right to armed self-defense, and that as a result, the Second Amendment would have been understood to permit legislatures to deprive persons of the right to armed self-defense solely based on felony status. But for several reasons, these three proposals provide little guidance as to the meaning of the language that was actually adopted by the people in 1791. As then-Judge Barrett explained:

> First, none of the relevant limiting language [in these proposals] made its way into the Second Amendment. Second, only New Hampshire's proposal—the least restrictive of the three—even carried a majority of its convention. Third [and contrary to Kates's allegation], proposals from other states that advocated a constitutional right to arms did not contain similar language of limitation or exclusion. And finally, similar limitations or exclusions do not appear in any of the four parallel state constitutional provisions enacted before ratification of the Second Amendment.[83]

In any event, none of these proposals likely would have been understood to sweep in all felonious conduct. The New Hampshire proposal only applied to those who "are or have been in actual rebellion."[84] The *unsuccessful* proposal at the Massachusetts

---

[83] *Id.* at 455 (cleaned up).

[84] 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891). "Thus, while this proposal reflects support for disarming rebels, it does not say anything about disarming those who have committed other crimes, much less nonviolent ones." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). *See Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting); Larson, *supra* note 64, at 1375 ("Rebellion is only one type of felony, and the explicit limitation to rebellion strongly suggests that extension to any other felony would be inappropriate.").

App. 115

convention sought to limit the right to "peaceable citizens";[85] but that term "was not a synonym for 'non-felons' or even 'non-criminals.'"[86] So, although it swept more broadly than the New Hampshire proposal, the Massachusetts proposal did not exclude "all criminals, or even all felons."[87] It only "would have disarmed those who caused physical disruption and threatened public safety."[88] And the Pennsylvania Minority's proposal, which the United States relies on elsewhere in its brief, seems to most naturally be read as only excluding "those who pose[d] a danger to public safety, whether or not they have committed a crime."[89] Some have disagreed with this reading of the Pennsylvania proposal, arguing that it did sweep in all felons.[90] But even if that were the case, the Pennsylvania proposal, on its own, cannot support the United States' theory: "[I]t was suggested by a *minority* of the Pennsylvania ratifying convention that failed to persuade its own state, let alone others. A single failed proposal is too dim a candle to illumine the Second Amendment's scope."[91]

---

[85] 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971).

[86] *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

[87] *Id.* at 455.

[88] *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting).

[89] *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

[90] *See, e.g.*, *Range v. Att'y Gen. United States*, 53 F.4th 262, 280 (3d Cir. 2022) (per curiam), *reh'g en banc granted, opinion vacated sub nom. Range v. Att'y Gen. United States of Am.*, No. 21-2835, --- F.4th ----, 2023 WL 118469 (3d Cir. Jan. 6, 2023).

[91] *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting) (emphasis in original). The "Minority" apparently constituted only about one-third of the convention, twenty-three people total. *See The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents*, THE PENNSYLVANIA PACKET, AND DAILY ADVERTISER, Dec. 18, 1787, at 1–3; Marshall, *supra* note 64, at 712. While it's true, as the

App. 116

These three proposals, therefore, do not establish that a person could be deprived of the right to bear arms at the Founding merely by engaging in felonious conduct. "The concern common to all three is not about felons in particular or even criminals in general."[92] Rather, the common concern was persons who "threatened violence" and posed a risk of causing "public injury."[93] Persons engaging in felonious conduct as a category are both underinclusive and overinclusive of that group. The commission of some felonies indicates no particular risk of future dangerousness. But the past conduct of many non-felons, such as a domestic-violence misdemeanant, can demonstrate that such a person poses a significant risk of causing public injury. Felony status alone, therefore, does not map onto the convention proposals' concerns.

    iii.    *History and tradition support disarming persons who have demonstrated their dangerousness through past violent, forceful, or threatening conduct.*

While our Nation's history and tradition does not support disarming a person merely because they have engaged in felonious conduct, it does support a different proposition: "that the legislature may disarm those who have demonstrated a proclivity for violence"

---

United States points out, that "*Heller* identified this report as 'highly influential' in the run-up to the Second Amendment," *Heller* "did so in the context of concluding that the Amendment codified an individual right not limited to militia service. There is no reference in *Heller* to the 'unless' clause in the Pennsylvania dissenters' proposal, and needless to say, this limiting language did not find its way into the Second Amendment." *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) (internal citation omitted).

[92] *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

[93] *Id.*

through past violent, forceful, or threatening conduct (or past attempts at such conduct).[94]

Or, to put it another way, "the historical record" demonstrates "that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed."[95] A few examples of historical restrictions on firearm possession or use illustrate the point.

Take the laws limiting the right to carry a firearm while actively intoxicated discussed above. The justification for these laws? The danger that could be caused by an intoxicated person carrying a firearm in crowded areas.[96] Or take the surety statutes that were enacted in a few states in the mid-to-late nineteenth century. These laws purported to "require[] certain individuals to post bond before carrying weapons in public."[97] What did these laws target? "[T]hose threatening to do harm."[98] A person was required to post a bond "only when 'attended with circumstances giving just reason to fear that he purpose[d]

---

[94] *Id.* at 454. To be certain, the Nation's history and tradition does support the proposition that some persons that engage in felonious conduct can be deprived of the right to possess firearms. But that is not because those persons engaged in conduct that a legislator had defined as a felony; it is because a person's past conduct demonstrates that there are good reasons to think that such a person poses a risk of causing "public injury." *Id.* at 456. "[T]he historical limits on the Second Amendment" thus "protect us from felons, but only if they are dangerous." *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting).

[95] *Binderup*, 836 F.3d at 369 (Hardiman, J., concurring in part & concurring in judgments).

[96] *See Shelby*, 2 S.W. at 469.

[97] *Bruen*, 142 S. Ct. at 2148.

[98] *Id.*

to make an unlawful use of [firearms.]'"[99] Laws targeting those who engaged in rebellion were also justified on the grounds that such persons posed a danger to public safety. These laws demonstrate that "persons who by their actions . . . betray a likelihood of violence against the state may be disarmed."[100]

These examples and the Nation's broader historical tradition demonstrate that limitations on the right to armed self-defense "were tied to dangerousness."[101] That is not to say that governments are limited to these exact prohibitions.[102] But the justification of modern restrictions still must be analogous to the justifications of Founding-era restrictions: some likelihood of dangerousness demonstrated through past violent, forceful, or threatening conduct.

As previously discussed, *Heller* explained that longstanding prohibitions on possession of firearms by felons are "presumptively lawful."[103] History and tradition's focus on those who have demonstrated a proclivity for violence through past violent, forceful, or threatening conduct is entirely consistent with *Heller*'s statement because the identified *longstanding* restrictions on receipt or possession of firearms applied only to those dangerous felons.

---

[99] *Id.* (quoting William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829)).

[100] Marshall, *supra* note 64, at 727–28.

[101] *Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting).

[102] *See Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) ("[N]o one has suggested that the legislative role ended in 1791[.]").

[103] 554 U.S. at 627 n.26.

App. 119

Before 1934, Congress largely stayed out of nationwide firearms regulation. In 1932, Congress passed what appears to be its first prohibition on the possession of firearms based on a prior conviction. The law prohibited any person previously convicted of a "crime of violence" from possessing a pistol in the District of Columbia.[104] By limiting the ban on possession to those convicted of a crime of violence—a category including "any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary"[105]—the statute only swept in those who had a history of committing or attempting to commit violent, forceful, or threatening acts.

The first major nationwide prohibition on the basis of a prior conviction was enacted in 1938, when Congress passed the Federal Firearms Act ("FFA").[106] As relevant here, that act made it "unlawful for any person *who has been convicted of a crime of violence* . . . to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."[107] But again, by limiting the statute's reach to crimes of violence, Congress only placed the prohibition on those who had a history of committing violent,

---

[104] Act of July 8, 1932, ch. 465, § 3, 47 Stat. 650, 651 (1932).

[105] *Id.* § 1.

[106] An Act to Regulate Firearms in Commerce, Pub. L. No. 75-785, 52 Stat. 1250 (1938).

[107] *Id.* § 2(f). While the statute only prohibited receipt of a firearm, "the possession of a firearm" was "presumptive evidence" a firearm was received in interstate commerce. *Id.*

App. 120

34

forceful, or threatening acts.[108] Thus, felons who did not commit violent or dangerous crimes were permitted to receive (and possess) firearms. The longest-standing felony-related federal firearms prohibition only applied to persons "who ha[d] previously, by due process of law, been shown to be aggressors against society."[109]

It was not until 1961—just fifteen years before the adoption of the ordinances invalidated in *Heller*—that Congress dropped the crime-of-violence requirement from federal law. The 1961 Amendments to the FFA replaced the then-existing category of prohibited persons, those convicted of a "crime of violence," with a prohibition on persons who had previously been convicted of a "crime punishable by imprisonment for a term exceeding one year."[110] Thus, it was not until 1961 that Congress, for the first time, prohibited persons from receiving a firearm solely on the basis of the person having been convicted of a felony, regardless of whether the felony conviction signified that the person exhibited a likelihood of future violence or force.[111]

---

[108] *Id.* § 1(6) (defining "crime of violence" to include "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year"). "Of these, housebreaking is likely the only misdemeanor. The rest of the listed crimes are serious violent felonies." *Skoien*, 614 F.3d at 649 n.8 (Sykes, J., dissenting).

[109] *United States v. Tot*, 131 F.2d 261, 266 (3d Cir. 1942), *rev'd on other grounds*, 319 U.S. 463 (1943).

[110] An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961).

[111] *See Skoien*, 614 F.3d at 640 (majority opinion) (noting that "the [1938] Federal Firearms Act covered only a few violent offenses; the ban on [receipt] by *all* felons was not enacted until 1961").

App. 121

The history of state prohibitions largely mirrors the federal story. Before World War I, most state-level regulation "remain[ed] faithful to 'the rule in America' of only regulating 'firearms which may be concealed on the person.'"[112] However, the rise in crime brought on by Prohibition led some states to consider expanding restrictions to include prohibitions on possession or ownership of certain firearms. Indiana, Oregon, and Michigan appear to have been the first states with state constitutional arms protections to have passed prohibitions on the possession of firearms on the basis of prior criminal conduct, doing so in 1925.[113] But like the original FFA, those prohibitions only applied to dangerous persons, i.e., those who had been convicted of a "crime of violence."[114] Between 1925 and 1938, several other state and territorial jurisdictions with constitutional arms protections adopted similar provisions.[115]

Because all these longstanding prohibitions focused on dangerousness exhibited by past violent, forceful, or threatening conduct, "[d]ispossession on the basis of a conviction for these sorts of crimes comports with the original public understanding of the scope of the right to keep and bear arms."[116]

---

[112] Marshall, *supra* note 64, at 701.

[113] *Id.* at 701–02.

[114] *Id.*

[115] *Id.* at 705.

[116] *Binderup*, 836 F.3d at 375 (Hardiman, J., concurring in part & concurring in judgments).

App. 122

    *iv.*    *Total prohibitions on the right to possess a firearm merely on the basis of a person being a user of marijuana do not fall within the tradition of disarming persons who have demonstrated their dangerousness through past violent, forceful, or threatening conduct.*

As explained above, there is little existing historical evidence to support the proposition that a legislature can deprive persons who engage in felonious conduct of the right to possess arms "simply because of their [implicit] status as felons."[117] Rather, the Nation's historical tradition of firearm regulation demonstrates that Congress may disarm those who have demonstrated a proclivity for violence through past violent, forceful, or threatening conduct (or past attempts at such conduct).[118] Harrison may well have such a proclivity, but the mere fact that he uses marijuana does not tell us that.[119]

It bears repeating that all the United States would have to prove at trial to justify depriving Harrison of his right to possess a firearm is that he is a user of marijuana. But the mere use of marijuana carries none of the characteristics that the Nation's history and

---

[117] *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting).

[118] None of this is to suggest that a legislature may not punish an individual's use of a firearm to further some other criminal act. *See, e.g.*, 18 U.S.C. § 924(c). There appears to be a historical tradition of punishing such conduct. *See, e.g.*, *Range*, 53 F.4th at 281 (discussing colonial and early state laws that authorized the seizure or forfeiture of guns used to commit misdemeanor hunting offenses); *Bruen*, 142 S. Ct. at 2141–42, 2146 (discussing the common law crime of going armed to the terror of the people (codified by the English Statute of Northampton), which prohibited carrying firearms "with evil intent or malice" or "for a 'wicked purpose' with a 'mischievous result'"). The key point here is that § 922(g)(3) does not require any proof that a firearm is possessed to facilitate or further the use of marijuana.

[119] That Harrison may have other characteristics that indicate he may fall within the category of persons Congress may disarm is irrelevant in this case. All the United States would have to prove at trial to justify depriving Harrison of his right to possess a firearm is that he is a user of marijuana, so the United States must justify depriving Harrison of his right to armed self-defense on that basis alone.

App. 123

tradition of firearms regulation supports. The use of marijuana—which can be bought legally (under state law) at more than 2,000 ordinary store fronts in Oklahoma[120]— is not in and of itself a violent, forceful, or threatening act. It is not a "crime of violence." Nor does it involve "the actual use or threatened use of force."[121]

That Congress may have passed § 922(g)(3), as the United States suggests, with some vague relation to public safety or "the public interest" does not change this conclusion.[122] It is not appropriate for a court to "reflexively defer to [a legislative] label when a fundamental right is at stake."[123] And the use of marijuana does not become a violent, forceful, or threatening act merely because a legislature says that it is.

The United States also points to several pre-*Bruen* cases that speculate (under the judicial interest-balancing approach *Bruen* rejected) that users of controlled substances may be more likely than non-users "to engage in illegal and violent gun use" in the future.[124] The statements in these cases, the United States points out, are backed up by social science, statistics, and predictions about future crime. But "stripping a person's fundamental rights based on projected crimes untethered from past dangerous actions is a

---

[120] As of January 2020, the Oklahoma Medical Marijuana Authority reported granting licenses to 2,242 dispensaries. *See* Janice Francis Smith, *'Astonishing': State leads nation in number of cannabis dispensaries*, The Journal Record (Feb. 5, 2020).

[121] *See Binderup*, 836 F.3d at 376 (Hardiman, J., concurring in part & concurring in judgments).

[122] *See id.* ("The Government's unremarkable observation that Maryland's [gun] licensing requirement relates to public safety does not make Suarez's offense a violent crime.").

[123] *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting). *See Bruen*, 141 S. Ct. at 2131.

[124] United States' Resp. (Dkt. 25), at 33 (quoting *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010)).

App. 124

risky game indeed."[125] That is why *Bruen* rejected the very interest-balancing approach that the United States asks the Court to adopt.[126] True, one opinion in *Bruen* looked to statistics, expert opinions, and predictive judgments, but that opinion was the dissent.[127] The Second Amendment demands more than the United States' interest-balancing approach that is based on speculative assessments of future risk and "back-of-the-envelope math."[128] It requires that § 922(g)(3), as applied to Harrison, be consistent with history and tradition's focus on violent, forceful, or threatening conduct. It is not.

   *c. The Mentally Ill.*

   Next, the United States argues that § 922(g)(3) is analogous to "longstanding prohibitions on the possession of firearms by . . . the mentally ill."[129] According to the United States, the "traditional[] view[]" amongst Americans is that the "mentally ill" are "persons who cannot bear arms without posing real danger to public safety."[130] To support this proposition, the United States points to pre-colonial and colonial practices that severely curbed the liberty of "lunatics," particularly the ability to "lock up 'dangerous lunatics' and

---

[125] *Folajtar*, 980 F.3d at 923 (Bibas, J., dissenting) (emphasis omitted).

[126] *Bruen*, 142 S. Ct. at 2125–31.

[127] *See id.* at 2163–67, 2173–74 (Breyer, J., dissenting).

[128] *Ass'n of New Jersey Rifle and Pistol Clubs Inc. v. Att'y Gen. of New Jersey*, 974 F.3d 237, 260 (3d Cir. 2020) (Matey, J., dissenting), *cert. granted*, *judgment vacated sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (2022).

[129] United States' Resp. (Dkt. 25), at 29 (quoting *Heller*, 554 U.S. at 626).

[130] *Id.*

App. 125

seize their property."[131] And if governments could lock up dangerous lunatics, the United States argues, then it certainly would have been permissible to disarm such persons.

But the United States' own conception of the historical tradition demonstrates why § 922(g)(3) as applied to Harrison is not analogous to these traditions. Under the United States' own theory, history and tradition would limit disarmament to *dangerous* lunatics. And as explained above, the mere use of marijuana does not indicate that someone is in fact dangerous, let alone analogous to a "dangerous lunatic." There are likely nearly 400,000 Oklahomans who use marijuana under state-law authorization. Lumping all those persons into a category with "dangerous lunatics," as the United States' theory requires, is a bridge too far.

The United States responds by advancing a somewhat different argument: that drug users, like the mentally ill, "have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."[132] But that argument appears to have no limit. The Diagnostic and Statistical Manual of Mental Disorders, for example, lists autism, attention deficit disorder, and nicotine dependence as mental disorders.[133] All those groups "have difficulty exercising self-control," and yet, it is hard to see how any of those groups could be categorically prohibited from the right to armed self-defense on that basis.[134]

---

[131] *Id.*

[132] *Id.* at 33 (quoting *Yancey*, 621 F.3d at 685).

[133] *See* American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 56, 68, 645 (5th ed., text revision, 2022).

[134] This is yet another attempt by the United States to transform distinct historical examples into roving warrants applicable to whatever conduct it desires. The trick goes something

*2. Restrictions on "Unvirtuous" Persons.*

The United States also argues that "ample historical scholarship has established that the Second Amendment right to bear arms was closely tied to the concept of a virtuous citizenry and to the notion that the government could disarm lawbreaking or otherwise unvirtuous citizens who posed a risk to public safety."[135] And since Congress could view marijuana users as "unvirtuous," § 922(g)(3) falls within that historical tradition. But there are two problems with this argument.

First, under the United States' own conception of the historical tradition, such restrictions would only apply to those who are both unvirtuous and dangerous. And as explained above, because the mere use of marijuana does not involve violent, forceful, or threatening conduct, a user of marijuana does not automatically fall within that group.

Second, the idea that the Second Amendment incorporates some "vague 'virtue' requirement" is "belied by the historical record"[136] and inconsistent with *Heller* itself:

> Although courts, scholars, and litigants have cited this supposed limitation, this virtuous-citizens-only conception of the right to keep and bear

---

like this: Take a historical example that applied to a distinct class of persons (e.g., dangerous lunatics), extract from it a broad principle (e.g., concerns about people "lacking self-control"), and then fit into that broad category whole new classes of people (e.g., marijuana users), even if they aren't remotely the sort of persons that were historically regulated.

[135] United States' Resp. (Dkt. 25), at 32.

[136] *Binderup*, 836 F.3d at 358 (Hardiman, J., concurring in part & concurring in judgments); *id*. at 372 ("We have found no historical evidence on the public meaning of the right to keep and bear arms indicating that 'virtuousness' was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*."); *Folajtar*, 980 F.3d at 919 (Bibas, J., dissenting) ("The focus on virtue rests on strained readings of colonial laws and ratifying conventions perpetuated by scholars and courts' citing one another's faulty analyses.").

App. 127

arms is closely associated with pre-*Heller* interpretations of the Second Amendment by proponents of the 'sophisticated collective rights model' who *rejected* the view that the Amendment confers an individual right and instead characterized the right as a 'civic right exercised by citizens, not individuals who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia.[137]

But *Heller* "expressly rejects the argument that the Second Amendment protects a purely civic right. It squarely holds that 'the Second Amendment confer[s] *an individual right* to keep and bear arms[.]"[138] And because "virtue exclusions don't apply to individual rights, they don't apply to the Second Amendment."[139] Therefore, the limits on the right protected by the Second Amendment "are not defined" by a person's "lack of virtue or good character."[140] "The right historical test is not virtue, but dangerousness" as exhibited by past violent, forceful, or threatening conduct.[141]

### 3. Restrictions on Slaves, Indians, Catholics, and Loyalists.

In its defense of § 922(g)(3), the United States retreats even further. At argument, the United States pointed to a variety of rather ignominious historical restrictions that it argues demonstrates a historical tradition permitting legislatures to disarm those whom the

---

[137] *Binderup*, 836 F.3d at 371 (Hardiman, J., concurring in part & concurring in judgments) (cleaned up). *See id.* at 372 n.18; *Kanter*, 919 F.3d at 462–64 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting).

[138] *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting) (quoting *Heller*, 554 U.S. at 595) (internal citation omitted).

[139] *Id.*

[140] *Id.* at 464.

[141] *Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting).

App. 128

42

legislature views as "untrustworthy": namely, slaves, Indians, Catholics, and loyalists.[142] Since Congress could equally view drug users as "untrustworthy," so the argument goes, then these historical regulations provide constitutional cover for § 922(g)(3). The United States' reliance on these laws is concerning, but in any event, they do not support the constitutionality of § 922(g)(3).

*a. Slaves and Indians.*

To start, historical restrictions on slaves and Indians provide no insight into the constitutionality of § 922(g)(3). That is because neither slaves nor Indians were understood to be a part of the "political community" of persons protected by the Second Amendment.[143]   Slaves, of course, were not made a part of the political community until the post-Civil War amendments and thus did not hold any Second Amendment rights—a point infamously, yet explicitly, made by *Dred Scott v. Sanford* itself.[144] Indians, likewise,

---

[142] *See Range*, 53 F.4th at 274 ("[T]he pertinent historical periods were replete with laws 'relevantly similar' to the modern prohibition on felon firearm possession because they categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact.").

[143] *Heller*, 554 U.S. at 580. *Cf. United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("[W]e would also have to recognize that groups like women, Native Americans, and blacks may not have been part of the political community at the time of the founding.").

[144] 60 U.S. (9 How.) 393, 416–17 (1857) (explaining that "at the time the Constitution was adopted, and long afterwards . . . it cannot be believed that the large slaveholding States regarded [African Americans, whether free or enslaved] as included in the word citizens, or would have consented to a Constitution which might compel them to receive them in that character from another State. For if they were so received, and entitled to the privileges and immunities of citizens . . . [i]t would give to persons of the negro race . . . the full liberty . . . to keep and carry arms wherever they went"). *See McDonald v. City of Chicago*, 561 U.S. 742, 822–23, 844–50 (2010) (Thomas, J., concurring in part & concurring in judgment); *Bruen*, 142 S. Ct. at 2150.

App. 129

were also generally not considered to be a part of the political community protected by the Second Amendment;[145] in fact, all Indians did not become citizens until long after African Americans. The Fourteenth Amendment's Citizenship Clause, which granted citizenship to newly freed slaves, was initially interpreted not to sweep in all Indians.[146] It was not until the adoption of the Indian Citizenship Act of 1924 that "all non-citizen Indians born within the territorial limits of the United States" were granted citizenship and brought within the political community protected by the Second Amendment.[147] Thus, historical restrictions on these groups provide little insight into the meaning of the Second Amendment because the ratifying public would not have understood those group to be protected by the Second Amendment.

   b. *Catholics, Loyalists, and Others Deemed Untrustworthy.*

   The United States' reliance on laws restricting the rights of Catholics, loyalists, and others deemed untrustworthy similarly misses the mark. And its reliance on these various pre-constitutional practices requires the Court to address a broader conceptual point. According to the United States' theory, all pre-1789 practice is entitled to equal weight. That is, if colonial or pre-1789 state governments imposed a restriction on firearms, the Second Amendment must be understood to have incorporated those restrictions.

---

[145] *See Dred Scott*, 60 U.S. (9 How.) at 404.

[146] *See* U.S. Const. amend. XIV, § 1; *see also Elk v. Wilkins*, 112 U.S. 94 (1884).

[147] Pub. L. No. 68-175, 43 Stat. 253 (1924).

The problem with this argument is that, as *Bruen* explained, "when it comes to interpreting the Constitution, not all history is created equal."[148] And while the Second Amendment and other provisions of the Bill of Rights were intended to codify pre-existing rights,[149] the Constitution and Bill of Rights did not incorporate all pre-1789 practice. That is because the liberty-protecting provisions of the Constitution were responding to both ancient *and* recent abuses. The Framers themselves recognized that colonial and early state governments repeatedly violated the liberty-protecting provisions of the English and state bills of rights.[150] Writing just nine years after the adoption of the Bill of Rights, Justice Samuel Chase explained that "[t]here is . . . a material difference between laws passed by the individual states, during the revolution, and laws passed subsequent to the organization of the federal constitution. Few of the revolutionary acts would stand the rigorous test now applied" under the federal Constitution.[151] A few examples from other constitutional provisions demonstrate this point in relation to both colonial and pre-1789 state practice.

---

[148] *Bruen*, 142 S. Ct. at 2136; *id.* at 2133 ("[C]ourts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

[149] *Heller*, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." (emphasis in original)).

[150] *See, e.g.*, Michael Kent Curtis, *Free Speech*, *"The People's Darling Privilege": Struggles for Freedom of Expression in American History* 47 (2000) ("[I]t was after acts like the suppression of the Tory press, loyalty oaths, the searches of Quakers, and a Massachusetts legislative declaration finding certain persons guilty of treason, that Madison noted that one objection to a bill of rights was that state bills of rights had been repeatedly violated.").

[151] *Cooper v. Telfair*, 4 U.S. (4 Dall.) 14, 19 (1800).

App. 131

Like the Second Amendment, the Fourth Amendment also "codified a *pre-existing* right."[152] But in many ways, the Fourth Amendment was ratified, in part, to respond to very recent abuses that occurred in the colonial era. As the Supreme Court has explained, "the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity."[153] Thus, even though the Fourth Amendment "codified a *pre-existing* right,"[154] no one would suggest that the colonial-era practices of writs of assistance and general warrants were incorporated into the Fourth Amendment.

The same is true for pre-1789 state practice. After independence, many of the newly independent states adopted constitutions containing provisions analogous to those found in the subsequent federal Constitution. But those states repeatedly violated the clear import of many of those provisions, including the freedom of the press, the right against unreasonable searches, and protections against bills of attainder.[155] Some aspects of the federal Constitution were even specifically designed to respond to recent state abuses. Take the Contracts Clause, which was adopted to respond to "an ignoble array of legislative schemes for the defeat of creditors and the invasion of contractual obligations" that

---

[152] *Heller*, 554 U.S. at 592 (emphasis in original).

[153] *Riley v. California*, 573 U.S. 373, 403 (2014).

[154] *Heller*, 554 U.S. at 592 (emphasis in original).

[155] *See* Curtis, *supra* note 150, at 7.

App. 132

persisted throughout the states following the Revolutionary War.[156] It would make little sense to understand any of these clauses as incorporating—rather than repudiating—such pre-1789 state practice.

It is difficult to think that the public who adopted the Second Amendment intended to incorporate the Catholic and loyalist type of pre-constitutional restrictions—and the United States' broader theory of legislatively determined "untrustworthiness"—into the federal Constitution. First, key framers were critical of analogous trustworthiness approaches. For example, in Federalist 46, James Madison himself criticized the European monarchical practice of being "afraid to trust the people with arms."[157]

Second, it would be odd indeed for the Framers to have incorporated such a trojan horse into the Second Amendment. The purpose of enshrining a right into the Constitution is to limit the discretion of a legislature.[158] But if the United States' theory is correct and

---

[156] *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 427 (1934).

[157] *The Federalist No. 46*, at 299 (James Madison) (Clinton Rossiter ed., 1961).

[158] *See Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."); *id.* at 634–35. This aspect of our Nation's Constitution is an important departure from English practice—a point that is lost on the United States and the *Range* panel it relies on. Relying on seventeenth-and eighteenth-century Parliamentary practice, *Range* says that this practice "reveals the 'historical understanding,' that the legislature—Parliament—had the power and discretion to determine who was sufficiently loyal and law-abiding to exercise the right to bear arms," and then concludes that American legislatures therefore must also have such discretion under the Second Amendment. 53 F.4th at 275 (internal citation omitted). But *Range*'s analysis ignores the fact that in the British system, Parliament is supreme. Accordingly, the Second Amendment's predecessor in the English Bill of Rights, which declared that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law," "like all written English rights," "was held only against the Crown, not Parliament." *Heller*, 554 U.S. at 593. Our system is much different.

App. 133

all a legislature must do to prohibit a group of persons from possessing arms is to declare that group "untrustworthy," then the Second Amendment would provide virtually no limit on Congress's discretion. The Framers weren't perfect, but they also weren't fools.

Third, the disarmament of Catholics and loyalists "involved wholesale deprivation" of other civil liberties as well.[159] So, if these laws "justified an exception to the Second Amendment" based on a legislature's decision that a group of persons is "untrustworthy," the laws would "also justify exceptions to other basic rights" on that basis, including "basic First, Fourth, and Fifth Amendment rights."[160] Today, we would not allow the government to shut down news outlets because the persons running the outlet could not be trusted, even though Revolutionary War-era Virginia did just that to Loyalists and Pennsylvania the same to Quakers.[161] If such laws cannot create a historical tradition of regulation in the

---

Here, the Constitution is supreme. Not Congress. Not state legislatures. Thus, *Range*'s absolute legislative-discretion principle is based on a faulty conflation of two entirely different constitutional systems and is inconsistent with the very foundations of our Nation's constitutional structure.

[159] Marshall, *supra* note 64, at 726.

[160] *Id*. at 725.

[161] *Id*. at 725 n.158. The United States points out that the 1776 Pennsylvania Constitution had a right-to-bear-arms provision. And so, according to the United States, Pennsylvania's Revolutionary War-era acts to disarm certain groups should be particularly insightful as to the meaning of the Second Amendment. But the same 1776 Constitution had a provision that emphatically declared, in the immediately preceding provision, "[t]hat the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained." Pa. Const. of 1776, ch. I, § XII. It is difficult to think of a more empathic protection of the freedom of the press, and yet, Pennsylvania suppressed Tory and Quaker speech and presses. If these revolutionary-era speech-suppressing laws cannot create a historical tradition of regulation in the First Amendment context, how could they do so in the Second?

App. 134

First Amendment context, how could they do so in the Second?[162] In America, these laws were largely passed either during the Seven Years War or "in the darkest days of an existential domestic war," the Revolutionary War.[163] Times of war tend to bring out the worst in governments, at least when it comes to civil liberties. Many governmental acts that violate core constitutional protections are approved of at that time and justified based on military necessity. Because of this harsh reality, today, we do not look to *Korematsu* to determine when the government may discriminate based on race. Nor do we rely on World War I-era laws that criminalized political dissent to determine the scope of the First Amendment.[164] We should be mindful of these realities in the Second Amendment context as well.

In any event, the laws restricting the rights of Catholics and loyalists from keeping and bearing arms cannot provide the basis for a historical analogue to § 922(g)(3). At the outset, it seems doubtful that the colonial restrictions on Catholics provide any insight into the meaning of the Second Amendment.[165] First, it appears that only two American

---

[162] *Cf. Bruen*, 142 S. Ct. at 2130 (comparing *Bruen*'s history-and-tradition test with the Supreme Court's use of historical evidence to determine the reach of the First Amendment's protections).

[163] *See* Marshall, *supra* note 64, at 721–25.

[164] *See, e.g.*, *Gilbert v. Minnesota*, 254 U.S. 325 (1920); *Debs v. United States*, 249 U.S.211 (1919).

[165] To the extent the United States seeks to rely on laws of Parliament relating to Catholics from the seventeenth and eighteenth century, those sources are particularly dubious in interpreting the scope of the Second Amendment. *Cf. Bruen*, 142 S. Ct. at 2136 (explaining that English practices that were "never . . . 'acted upon or accepted in the colonies'" are to be given little weight (quoting *Dimick v. Schiedt*, 293 U.S. 474, 477 (1935)). There is little to no evidence that many of these laws, including the infamous 1688 parliamentary act

App. 135

colonies—Virginia in 1756 and Pennsylvania in 1759—ever acted to disarm Catholics.[166] Two laws in place during time of war hardly demonstrate a course of consistent practice sufficient to establish a constitutionally significant tradition.[167] Second, at the time these provisions were enacted, the operative rights-protecting document was the English Bill of Rights, which limited the right "to have arms" to Protestants.[168] Catholics were thus excluded from the protections of the right. Laws applying to a group that was not protected by the right to armed self-defense cannot provide any insight into that right's scope.

But even if they could, the colonial laws targeting Catholics and loyalists cannot possibly serve as constitutionally relevant analogues to § 922(g)(3) because the justifications for these laws—one of the two central considerations under *Bruen*—are dissimilar. These colonial laws were justified on the fear that the covered groups were

disarming Catholics, were ever understood to be in force in the colonies. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 n.47 (2007).

[166] *See* 5 *The Statutes at Large of Pennsylvania from 1682 to 1801* 627 (W. Stanley Ray ed., 1898); Churchill, *supra* note 165, at 157 & n.47. There is some disagreement over whether Maryland may have also disarmed Catholics during this period. *Compare Range*, 53 F.4th at 276–77, *and* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020), *with* Churchill, *supra* note 165, at 157 n.47. But the difference between two and three isn't large enough to be of constitutional significance. *See infra* note 167.

[167] *See Bruen*, 142 S. Ct. at 2142 ("For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation." (emphasis in original)). *Cf. NLRB v. Noel Canning*, 573 U.S. 513, 524–26 (2014); *id.* at 572–74 (Scalia, J., concurring in judgment); William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 16–18 (2019).

[168] *See Heller*, 554 U.S. at 592–93.

App. 136

likely to wage active war against the colonies or interfere with the colonists' war efforts.[169] This is a radically different justification than the justification for § 922(g)(3).

### 4. Restrictions in Modern Shall-Issue Regimes.

Finally, the United States points to restrictions in some modern "shall-issue" regimes that it argues are analogous to § 922(g)(3). According to the United States, *Bruen* placed a constitutional stamp of approval on all aspects of every modern shall-issue regime. And since some modern shall-issue regimes have prohibitions analogous to § 922(g)(3), the United States argues, *Bruen* also necessarily approves of § 922(g)(3).

The United States points to two specific restrictions. The first is an Arkansas statute that prohibits those who "chronically or habitually abuse a controlled substance to the extent that his or her normal faculties are impaired" from receiving a permit to carry a concealed handgun.[170] Arkansas, however, does not prohibit such persons from possessing a firearm.[171] Nor does there appear to be any restriction on such a person openly carrying a firearm. The second law is a Texas statute that prohibits "chemically dependent

---

[169] *See Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting).

[170] Ark. Code Ann. § 5-73-309(7).

[171] *See* Ark. Code Ann. § 5-73-103(a).

person[s]" from receiving a permit to carry a handgun.[172] But like Arkansas, Texas does not prohibit such persons from possessing a firearm.[173]

The United States' reliance on these laws is misguided for at least two reasons. First, it is not clear that *Bruen* placed a constitutional stamp of approval on all aspects of every modern shall-issue regime, particularly given that no such regulation was at issue in the case. Nor is it at all clear that these particular aspects of shall-issue regimes garnered any serious attention. And the majority explicitly noted the possibility that some aspects of shall-issue regimes could in fact be unconstitutional in some circumstances.[174] Given the wide variety of provisions in some forty-three shall-issue states, it would seem imprudent to suggest that the Court meant to ratify all aspects of every shall-issue regime. Thus, this Court is "reluctant to place more weight on these passing references than the [Supreme] Court itself did."[175]

---

[172] Tex. Gov't Code Ann. § 411.172(a)(6). A "chemically dependent person" is defined as "a person who frequently or repeatedly becomes intoxicated by excessive indulgence in alcohol or uses controlled substances or dangerous drugs so as to acquire a fixed habit and an involuntary tendency to become intoxicated or use those substances as often as the opportunity is presented." *Id.* § 411.171(2).

[173] *See* Tex. Penal Code Ann. § 46.04.

[174] *See Bruen*, 142 S. Ct. at 2138 n.9.

[175] *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) (discussing *Heller*'s similar passage regarding certain restrictions).

App. 138

Second, putting aside issues of timing[176] and whether these two laws demonstrate a well-established tradition,[177] and assuming these laws are consistent with the Second Amendment, the restrictions in the two shall-issue regimes the United States points to are not sufficiently analogous to § 922(g)(3). That is because—like the historical intoxication restrictions discussed above—the Arkansas and Texas laws impose a much narrower burden on the right of armed self-defense than the burden imposed by § 922(g)(3).[178] Both of these laws impact only the right to *carry* a *handgun*, and the Arkansas law prohibits only a certain type of carry. These laws thus preserve the right to defend oneself with other types of firearms. And importantly, neither law prohibits possession of a firearm, preserving the right to use a firearm in the home for purposes of self-defense. These laws, therefore, unlike § 922(g)(3)—which, again, totally deprives the covered person of the right to armed self-defense using any type of gun, under all circumstances, and in all places—leave ample room for the exercise of the core right to armed self-defense.

---

[176] It appears that the first shall-issue regime was enacted in Washington State in 1961. *See* David B. Kopel, *Restoring the Right to Bear Arms:* New York State Rifle & Pistol Association v. Bruen, 2022 Cato Supreme Ct. Rev. 305, 325–26. Although the United States has made no attempt to establish when the drug-related restrictions were included within such laws, it appears that Washington's 1961 shall-issue law prohibited persons with a "record of . . . drug addiction" from carrying a pistol. *See* R.C.W. 9.41.070 (Supp. 1961). It is worth noting that such persons were permitted to *possess* a pistol under the same law. *See* R.C.W. 9.41.040 (Supp. 1961). In any event, it is difficult to understand how laws passed 170 years after the Second Amendment could provide any insight into "the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137.

[177] *Cf. Bruen*, 142 S. Ct. at 2133, 2142; *Noel Canning*, 573 U.S. at 524–26; *id.* at 572–74 (Scalia, J., concurring in judgment); Baude, *supra* note 167, at 16–18. The United States has not attempted to demonstrate how many shall-issue regimes have similar restrictions.

[178] *See Bruen*, 142 S. Ct. at 2133.

App. 139

*Conclusion*

None of this is to say that the government cannot play a role in protecting the public from dangerous persons possessing firearms. It can, and it should. For example, if the State of Texas thought that Harrison's alleged involvement in a shooting demonstrated that Harrison was a danger to the public, it could have demonstrated to a Texas judge—in an individualized proceeding of which Harrison would have been given notice and the opportunity to be heard—that Harrison ought to be jailed while awaiting trial for that shooting. The Constitution, after all, permits pre-trial detention, and such detention would be a highly effective means of furthering the government's interest in protecting the public from a gun-toting Harrison. But that didn't happen; Harrison was released pending trial in Texas. And so here we are, with the federal government now arguing that Harrison's mere status as a user of marijuana justifies stripping him of his fundamental right to possess a firearm. For all the reasons given above, this is not a constitutionally permissible means of disarming Harrison.

Because the Court concludes that 18 U.S.C. § 922(g)(3) violates Harrison's Second Amendment right to possess a firearm, the Court declines to reach Harrison's vagueness claim. The Motion to Dismiss the Indictment is **GRANTED.** Accordingly, the Indictment is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** this 3rd day of February 2023.

_____

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

App. 140

54

# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  CR-22-328-PRW** |
| | ) | |
| **JARED MICHAEL HARRISON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>NOTICE OF APPEAL</u>

Plaintiff, United States of America, pursuant to 18 U.S.C. § 3731, appeals to the

United States Court of Appeals for the Tenth Circuit from the order dismissing the

indictment with prejudice, Doc. 36, entered on February 3, 2023.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

<u>s/DAVID McCRARY</u>
DAVID McCRARY (MA 683086)
Assistant U.S. Attorney
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
david.mccrary@usdoj.gov

App. 141

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

J.P. Hill and Laura K. Deskin, counsel for Jared Michael Harrison.

s/DAVID McCRARY
Assistant U.S. Attorney

App. 142

1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE WESTERN DISTRICT OF OKLAHOMA

3

UNITED STATES OF AMERICA,          )

4                                   )
                                    )
5            Plaintiff,             )
                                    )
6    vs.                            )        CASE NO. CR-22-328-PRW
                                    )
7                                   )
JARED MICHAEL HARRISON,             )
8                                   )
                                    )
9                                   )
             Defendant.             )
10                                  )

11

                        *  *  *  *  *  *

12

                  TRANSCRIPT OF MOTION PROCEEDINGS

13

              BEFORE THE HONORABLE PATRICK R. WYRICK

14

                  UNITED STATES DISTRICT JUDGE

15

                      NOVEMBER 30, 2022

16

                      *  *  *  *  *  *  *

17

18

19

20

21

22

23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

```
 1                        APPEARANCES

 2   FOR THE GOVERNMENT:

 3        Mr. David McCrary
          Ms. Stephanie Powers
 4        Assistant United States Attorney
          U.S. Attorney's Office
 5        210 West Park Avenue, Suite 400
          Oklahoma City, Oklahoma 73102
 6

 7
     FOR THE DEFENDANT:
 8
          Ms. Laura Deskin
 9        Mr. J.P. Hill
          Assistant United States Public Defender
10        215 Dean A. McGee Avenue, Suite 109
          Oklahoma City, Oklahoma 73102
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        (Proceedings had on November 30, 2022.)

2            THE COURT:  This is criminal case 22-328, United

3    States vs. Jared Michael Harrison.  This matter comes on on

4    defendant's motion to dismiss the indictment.

5        Counsel for the government, make your appearance, please.

6            MR. McCRARY:  David McCrary and Stephanie Powers on

7    behalf of the United States.

8            THE COURT:  For the defendant?

9            MR. HILL:  J.P. Hill and Laura Deskin for

10   Mr. Harrison.

11           THE COURT:  Afternoon to all, and I see that

12   Mr. Harrison is present in person.

13       I think the best way to proceed, given that we had pretty

14   substantive briefing and I have, obviously, had a running start

15   on at least these 922 issues because I have had this -- a

16   related challenge in another case, is rather than allowing,

17   like, up-front argument, which I don't think is really going to

18   serve us well, is to just -- I'm going to keep both of you at

19   your microphone and just let me ask questions for a while,

20   because I really want to work through this be sure that I

21   understand the positions of the parties and do our -- do our

22   best to understand where -- where we're postured and otherwise.

23       So is -- Ms. Deskin, are you going to be doing the talking

24   for the defendant?

25           MS. DESKIN:  I am.

```
 1                    THE COURT:  All right.  Afternoon.
 2          And Mr. McCrary?
 3                    MR. McCRARY:  Yes, Your Honor.
 4                    THE COURT:  Let's start with -- defendant leads
 5    with the vagueness challenge, posturing as both a facial and
 6    as-applied vagueness challenge.  Are we all in agreement that,
 7    at least as to the as-applied vagueness challenge, that that's
 8    premature as of now?
 9                    MS. DESKIN:  Yes.  Under Reid, it definitely is.
10                    THE COURT:  Okay.  The disagreement is with respect
11    to the facial challenge, and the government's response is that
12    that too is premature; correct?
13                    MR. McCRARY:  Correct, Your Honor.
14                    THE COURT:  As I understand the current state of
15    Tenth Circuit case law, I mean, I think it's against the
16    defendant here.  We have the decision that's currently on
17    appeal out of Utah.  You know, I checked on the status of that.
18    I think we had an opening brief.  We haven't had the response
19    brief.  I don't even know if it's going to be argued, so I
20    don't think we're going to get a decision there anytime soon.
21    But my best guess is, if I were a betting man, I'm betting on
22    reversal in that case.
23          So what I want to understand about the government's
24    position here is is it your position that, outside of the First
25    Amendment context, we can never have a facial challenge to a
```

1    statute?

2              MR. McCRARY:  Your Honor, I think that the

3    government would assert that it recognizes that in Johnson

4    there was an exception that was made, but that that -- that

5    exception is limited to a constitutional conundrum of the

6    Court's own making in that particular instance by application

7    of the categorical approach to the ACCA.  There was an

8    additional level of vagueness which the Court itself indicated

9    separated it from any sort of analysis that was based on actual

10   facts.

11             THE COURT:  Right.

12             MR. McCRARY:  And that's why it created this

13   specific carve-out, if you will.

14        And then separate and apart from that, all the other

15   courts to have considered the application of Johnson in a

16   broader context have held that it is limited to that specific

17   set of facts.

18             THE COURT:  Okay.  And so outside of that, you

19   know, ACCA context and the -- you know, the categorical

20   approach problem, there can never be a facial challenge to a

21   statute outside of the First Amendment -- facial vagueness

22   challenge, I'm sorry, I should say?

23             MR. McCRARY:  That is the current state of the law

24   as the government understands it, Your Honor.

25             THE COURT:  I mean, I think Morales-Lopez makes

1    some decent points with respect to sort of the logic of that

2    position, I think.  It doesn't seem to me that if -- what if I

3    had just a hopelessly vague statute, is it really true that no

4    challenge can be brought to that law until after we have had a

5    trial?

6              MR. McCRARY:  Your Honor, I would submit that, even

7    post-Johnson where there are questions of hopelessly vague

8    assertions, that there is the underlying question of the core

9    conduct of the individual and whether or not somebody who's

10   operating within the core conduct of illegality should be able

11   to raise that, even if you wanted to allow for a facial

12   challenge for somebody on the fringes.  Where somebody is

13   within the core conduct, it's plain the Tenth Circuit has

14   recently concluded, that you cannot raise a facial challenge

15   without an as-applied challenge.  And because we believe that

16   Mr. Harrison's conduct falls within the core conduct prohibited

17   by 922(g)(3), even if, in the abstract, this Court were to

18   consider it a circumstance in which it might consider a facial

19   challenge, this is not that case.

20             THE COURT:  Okay.  Why is it that we allow facial

21   vagueness challenges in the First Amendment context?

22             MR. McCRARY:  Apart from the fact that the Supreme

23   Court says we can?

24             THE COURT:  Well, yeah.  I mean, what's the

25   rationale?

1              MR. McCRARY:  I think that the rationale in the

2     facial vagueness context is that -- for First Amendment, if I

3     am recalling correctly -- and I will say that, you know, I'm

4     sure that there are better scholars than I at this particular

5     issue -- that when the --

6              THE COURT:  The First Amendment is always tough,

7     so.

8              MR. McCRARY:  When the First Amendment is applied,

9     we're talking about individuals challenging the statute where

10    their conduct is -- is being -- oftentimes it's prospective

11    conduct that they wish to challenge.  Right.  Like I want to --

12    in the case of a -- a case I was just reading, New York had a

13    pricing scheme that they wanted to allow, you know, individuals

14    for -- to not differentiate between credit card fees and actual

15    cash-based fees.

16             THE COURT:  Well, would it be fair to say that the

17    concern there is with the chilling effect that a potentially

18    vague law has on the exercise of that fundamental right?

19             MR. McCRARY:  I think that that is fair.

20             THE COURT:  Because that's kind of how I have

21    always understood the First Amendment context.  We have that

22    concern, and that's why we allow someone to bring a facial

23    vagueness challenge even, if potentially their speech doesn't

24    fall within the potentially vague portion.  It's because we

25    have that concern that this vague law chills what would

```
 1  otherwise be constitutionally protected conduct.
 2              MR. McCRARY:  I could -- I will agree with that.
 3              THE COURT:  So there was, like, some intuitive
 4  appeal, to me, to the idea that the only other constitutional
 5  right that I can think of that sort of falls within that bucket
 6  of a right that guaranteed -- or a guarantee of a right of an
 7  individual to engage in a certain kind of conduct is the Second
 8  Amendment.  I was thinking about the Fourth Amendment, the
 9  Eighth Amendment, the Sixth Amendment.
10              MR. McCRARY:  I think that there are -- I mean, we
11  could go for, like, the 21st Amendment if you really wanted to
12  talk about chilling effects.  There are other constitutional
13  circumstances in which you might have a chilling effect by
14  virtue of regulation.
15              THE COURT:  Maybe, but can you really think of
16  another right that, okay, it's an individual's right to engage
17  in blank conduct?  I couldn't.  And as I was going through
18  looking at the various options, it did seem to me that the
19  rationale that would apply in the First Amendment context might
20  well fit in the Second Amendment context.
21              MR. McCRARY:  I mean, I suppose it would also apply
22  in the Third Amendment as well.
23              THE COURT:  You think?  Because that's really --
24  that prevents the government -- but that's no affirmative right
25  of the individual to do something.  It's preventing the
```

1    government from housing troops -- quartering troops in their

2    house.  There's really no conduct that's chilled by me as the

3    individual citizen in the Third Amendment context.

4        Anyways, a lot of this is just thinking through these

5    issues out loud because I think that's foreclosed by Tenth

6    Circuit precedent.  I'm just not convinced by the Tenth Circuit

7    precedent, is what I'm saying.  And I do think that there are

8    some problems with that precedent, and maybe you can take that

9    up.  But it does seem to me that the facial vagueness challenge

10   in the Second Amendment context is currently foreclosed by

11   Tenth Circuit precedent.  And unless they change their mind in

12   this district of Utah case that's up on appeal, that's where we

13   stand.

14       Any response to that?

15           MS. DESKIN:  I would just say that the district of

16   Utah apparently did not feel bound by pre-Johnson precedent and

17   viewed Johnson as an appeal to our traditional vagueness

18   doctrine.  When you read it, you know, I was -- it seems that

19   that judge -- it's pretty convincing.  But this Court -- I

20   mean, you are not -- there's no -- I think if you ruled in our

21   favor, it's not necessarily going against Tenth Circuit

22   precedent considering Johnson at this point.  So Utah felt that

23   it was following precedent set by Johnson in the vagueness

24   context, so it can be construed that way if you were to follow

25   that path.

```
 1              THE COURT:  And the way I read the Morales-Lopez
 2    decision was I was not convinced by its reliance on Johnson
 3    because I think I agree with sort of the way government counsel
 4    has characterized, you know, what Johnson did with respect to
 5    vagueness, but rather, that really Morales-Lopez was premised
 6    on a fundamental disagreement with the old Tenth Circuit case
 7    law --
 8              MS. DESKIN:  Correct.
 9              THE COURT:  -- and what they called, you know, the
10    logical sort of trap that they talked about that -- that that
11    judge talked about in that case.
12              MR. McCRARY:  I would also just note for the record
13    that I believe the Morales-Lopez case predated the Tenth
14    Circuit decision in Wells, which then reaffirmed that facial
15    challenges can only be brought under the First Amendment.
16              THE COURT:  Right.  So, I mean, I think we have
17    Tenth Circuit precedent that says no as of now, and it seems
18    unlikely to me that we're going to get a change in that
19    respect.
20         But let's just go ahead and, just for purposes of
21    understanding where everyone stands, let's talk about the
22    vagueness challenge and make sure I understand defendant's
23    position.  You spend some time, at least in the opening brief,
24    talking about the "addicted to" portion of the statute, but my
25    understanding is that's not in play here.  The indictment
```

1    specifically omits -- indicting omits indicting Mr. Harrison

2    under that portion of 922(g)(3).

3              MS. DESKIN:  Yes, I believe that's correct.

4              THE COURT:  So it's only -- the vagueness challenge

5    here is to "unlawful user," and it's really those two terms

6    that are at issue; correct?

7              MS. DESKIN:  Yes.

8              THE COURT:  Okay.  Back to you, Mr. McCrary.  What

9    does "unlawful" mean, in the government's view?

10             MR. McCRARY:  So "unlawful" as defined by the Tenth

11   Circuit means something -- it recognizes the ability of a

12   licensed physician to prescribe a controlled substance.  If one

13   is not using a controlled substance pursuant to a lawful

14   prescription, then they are an unlawful user.

15             THE COURT:  Okay.  So -- well, let me ask you this

16   then: what, then, of a holder of a medical marijuana card from

17   the state of Oklahoma?  Are they in violation of 922(g)(3)?

18   Are they an unlawful user?

19             MR. McCRARY:  They are, Your Honor, because even

20   under the existing medical marijuana regime, there is a federal

21   prohibition on using marijuana.

22             THE COURT:  Right.  But --

23             MR. McCRARY:  And -- and, in fact, I believe that

24   currently, just by virtue of notice, people who are provided

25   with medical marijuana cards are put on notice that it is still

1   unlawful federally and, therefore, would know --

2          THE COURT:  Can we square that with that Tenth

3   Circuit definition you just gave, which I think comes from

4   maybe that ATF regulation?  Because an Oklahoma medical

5   marijuana user is using pursuant to a doctor's prescription.

6          MR. McCRARY:  That is true.  I would actually

7   direct this Court's attention to a recent decision out of the

8   Northern District of Florida, *Fried vs. Garland*.  In that

9   particular case there were people who were the holders of

10  medical marijuana cards who wished to bring challenges based on

11  the 922(g)(3) prohibition.  They ultimately found, at least the

12  Northern District of Florida did, found that there was no

13  problem with comporting the idea that it is illegal federally

14  into the fact that somebody might have a medical marijuana

15  card.

16         THE COURT:  Do we have concerns -- and maybe I'm

17  just indicating that I maybe have some concerns -- even in

18  light of what you say about medical marijuana cardholders being

19  given notice that this creates an issue for them with respect

20  to gun possession, does this weird world we live in with

21  respect to federal nonenforcement of the CSA with respect to

22  marijuana in Oklahoma, for those who are licensed or have a

23  card, does it create a vagueness and notice problem such, you

24  know, where we talk about the citizenry maybe thinking, "Well,

25  this is lawful, I am a lawful user," and not understanding the

1    distinction?

2              MR. McCRARY:  Your Honor, I think that -- I would

3    first remind us that that is not the play where we are here.

4              THE COURT:  I understand.  But I'm talking about

5    vagueness now, and I wanted to talk just a little bit sort of

6    assuming that we could have a vagueness challenge.  I don't

7    think we can.  But assuming we can have a vagueness challenge,

8    that the facial vagueness would -- we could talk about this.

9              MR. McCRARY:  Fair enough.

10       In that particular case, I still don't believe that there

11   is an issue with the supposition that somebody could be

12   provided a prescription by a doctor that is still of an illegal

13   substance and that person have a vagueness concern on a facial

14   level.

15       Now, you might have a valid question as to whether or not

16   as applied there is a vagueness issue.  But facially speaking,

17   the idea that -- that somebody who is an unlawful user who's

18   not using it in conformity with, you know, a regular -- I

19   believe the actual term used by the Tenth Circuit is "who on a

20   regular and ongoing basis uses a controlled substance in a

21   manner other than prescribed by a licensed physician."  That's

22   the exact language.

23             THE COURT:  But again, I keep going back to, like,

24   I can't square that with Oklahoma's regime because it is

25   prescribed by a licensed physician, and doesn't that

1    immediately just create a vagueness problem?

2              MR. McCRARY:  I don't think that it does because

3    the ultimate drug which is being prescribed by a licensed

4    physician is a controlled substance which is illegal under no

5    context federally -- I mean, legal under no context federally.

6              THE COURT:  Could you read what the Tenth Circuit

7    said one more time, how it defined "unlawful"?

8              MR. McCRARY:  "Who uses a controlled substance in a

9    manner other than prescribed by a licensed physician."

10             THE COURT:  It doesn't say anything about it has to

11   be a substance that can never be prescribed legally.  It just

12   says a controlled substance prescribed by a doctor.

13             MR. McCRARY:  Correct, but that presupposes a world

14   in which a doctor could, for instance, prescribe cocaine --

15             THE COURT:  Right, but it also --

16             MR. McCRARY:  -- or methamphetamine, and yet those

17   are blanketly illegal at a federal level.  There is no -- no

18   consistent and -- and recognized medicinal use at the federal

19   level, so that if there is a question of what authority exists,

20   ultimately for purposes of a determination as to whether or not

21   something is illegal or legal, I would submit that the, for

22   lack of a better term, the supremacy clause wins here.

23             THE COURT:  I mean, I get all that, but I guess

24   what I'm saying is, like, how does Average Joe marijuana user

25   know all this?  Because, you know, the issue is they say just

1    the world "unlawful" in the statute is unclear what that means.

2    And in light of this, like I said, somewhat confusing world we

3    live in where the Federal Department of Justice is declining to

4    prosecute these cases, it does seem as though someone might go,

5    "Well, I don't know what unlawful means."  And then you say,

6    "Well, we know what it means because the Tenth Circuit has said

7    so."  But when we look at the Tenth Circuit definition, it also

8    creates a problem because it says "a controlled substance other

9    than one prescribed by a physician," and marijuana is

10   prescribed by a physician.

11       So again, I'm Joe Citizen on the street with a marijuana

12   card, how would I know that I'm an unlawful user?

13           MR. McCRARY:  I suppose because the entire concept

14   of the -- as other -- otherwise prescribed by a controlled --

15   "prescribed by a licensed physician" is meant to carve out

16   traditional pharmaceuticals that are -- are not regulated in

17   the same way that, for instance, a Schedule I narcotic is.

18       So at the precipice of this question is -- is the fact

19   that at a federal level there is no lawful use of marijuana.

20   If a state decides to separate and regulate down below, then

21   perhaps, you know, that state can choose not to enforce it.

22   But federally the decision of the United States not to enforce

23   marijuana laws does not make those laws invalid in any

24   capacity.

25           THE COURT:  I get that.  And help me out, so --

1   again, I dealt with some of these issues a long time ago when,

2   like, the Cole memorandum and some of those later ones were

3   controlling.  We have, like, the Sessions memorandum from '18

4   that rescinded all those.  There's been no subsequent, like,

5   policy or memorandum from DOJ; right?

6           MR. McCRARY:  Except, one might argue, the

7   Rohrabacher Amendment that controls our spending.

8           THE COURT:  Okay.  There's that.

9       So at this point there's no, like, DOJ policy on this

10  issue of nonenforcement of federal laws?  It's just, at this

11  point, a practice, I guess?

12          MR. McCRARY:  That's effectively the case.

13          THE COURT:  But it's safe to say that -- well, you

14  may only know about your district, but how many possessors of

15  marijuana who have a medical marijuana card from the state of

16  Oklahoma have been prosecuted by the federal authorities?

17          MR. McCRARY:  For simple possession of marijuana?

18  To the best of my knowledge, none.

19          THE COURT:  Right.  So it's -- like, we're just not

20  prosecuting those, period?  Okay.

21      But again, I keep going back to that problem of the

22  definition, and this is the ATF definition as well as -- and

23  the Tenth Circuit definition, I think, just parrots that ATF

24  regulation, conditions unlawfulness on it's just a controlled

25  substance in a manner other than as prescribed by a licensed

1    physician.  It turns the lawfulness of use of the controlled
2    substance on its prescription by a physician, not on anything
3    else.
4         MR. McCRARY:  But there is, I suppose, going back
5    to the underlying point -- and this is, I think, just where the
6    crux of the matter is -- is that we, by virtue of
7    nonenforcement, do not render legal that which is illegal.  We
8    can choose not to --
9         THE COURT:  I totally agree with that.
10         MR. McCRARY:  -- enforce that and --
11         THE COURT:  Totally agree.  We're talking about the
12    vagueness, though.  And, how, like, I would be on notice as --
13    I think we're approaching 400,000 medical marijuana cards
14    issued in the state of Oklahoma.
15         MR. McCRARY:  Certainly a lot.  Yes.
16         THE COURT:  How do those 400,000 people, how are
17    they on notice that if they carry a gun -- and I think ATF
18    statistics say about 55 percent of adults in Oklahoma possess a
19    gun.
20         MR. McCRARY:  If not higher.
21         THE COURT:  Okay.  So let's say we're talking
22    200,000 people who are currently federal outlaws who could be
23    thrown in federal prison if prosecuted.  That's your position?
24         MR. McCRARY:  Depends on whether or not they are
25    regular, ongoing users of medical marijuana.

1           THE COURT:  I'm guessing if we have a medical

2   marijuana card, we probably are.  Presumptively are; right?

3   How are they on notice that they're an unlawful user?  Because

4   it seems to me that they're -- just Average Joe guy on the

5   street's like, "I'm a lawful user.  The feds have said they're

6   not going to prosecute me.  I have a prescription from a doctor

7   and a card from the state of Oklahoma.  I'm a lawful user."

8           MR. McCRARY:  Well, I think, again, there is --

9   perhaps street knowledge of the feds not prosecuting you

10  doesn't affect your, you know, reasonable knowledge; right?

11  Just because you hear somebody's not going to get prosecuted

12  doesn't make that true.

13          THE COURT:  Okay.  But let's go with --

14          MR. McCRARY:  It is possible that there is exposure

15  for all 200,000 people that you just indicated.  And the

16  possibility of exposure, whether or not those people are

17  prosecuted -- because people can choose to prosecute people or

18  not all the time, that's the essence of prosecutorial

19  discretion, I suppose -- doesn't change the underlying question

20  or fact that in any of these instances it is and has

21  historically been broadly known that marijuana is illegal

22  federally.

23      I think, for instance, if you look at the 2019 --

24          THE COURT:  But so it -- I mean, so is an opioid,

25  so is a benzodiazapine, but if I have a prescription, it's

1    lawful use.  And the definition, the ATF regulation that has

2    been parroted by the Tenth Circuit just says "controlled

3    substance as prescribed by a doctor."  That's lawful use.  If

4    it's prescribed by a doctor, it's lawful use.  Not prescribed

5    by a doctor, it's unlawful use.

6         And again, that presumes, again, that doctors can't

7    prescribe heroin, they can't prescribe, you know, cocaine, but

8    doctors in our current regime at least, can prescribe

9    marijuana.  Now you're saying, well, under federal law that's

10   still an unlawful prescription.

11              MR. McCRARY:  Correct.

12              THE COURT:  But that's not what the definition is.

13   The definition just turns on the fact of a prescription.  So

14   again, how would I know?  Let's say that even if I'm -- I'm Joe

15   Citizen who decides he's really going to do his research and,

16   like, look up -- get on Westlaw and look up the Tenth Circuit

17   case and he reads that, or he pulls up the ATF regulation and

18   reads that, he's like, "I'm good.  This is lawful use."

19              MR. McCRARY:  Whether or not that's true, though,

20   doesn't render the statute indeterminately vague at the end of

21   the day.  I mean, you have as-applied challenges to answer this

22   very specific question.  There is a broad set of core conduct

23   which can be and is recognized under the current statute.

24              THE COURT:  I get that.  We're talking about

25   something that's ancillary to the core issue here, but I still

1   think it's a very interesting question.

2            MR. McCRARY:  I certainly agree, and I wish I had a

3   better answer for you.

4            THE COURT:  Let's talk about use -- or "user."  I'm

5   sorry.  What does "user" mean?

6            MR. McCRARY:  "User" means somebody who, by the

7   Tenth Circuit's own definition, has a -- both regularity and

8   contemporaneousness to the possession of the firearm.  It's

9   somebody who cannot be a one-off user, nor is it the case that

10  simply because you used in the past doesn't mean that you can't

11  in the future cease to be a user.  That's why the word "is" is

12  included in the statute, "is an unlawful user of a controlled

13  substance."

14           THE COURT:  Do we have case law that sort of, like,

15  delineates the bounds of what if I haven't used for a month?

16  What if I used for six months straight and then stopped for a

17  month?  If I stopped being a user, if it's been a week, I mean,

18  where is the line?

19           MR. McCRARY:  So that's a fair question, and one

20  that -- you know, where I think that -- I would point out that

21  that has been brought repeatedly as an as-applied challenge.  I

22  would also note that repeatedly it's been rejected by courts as

23  an as-applied challenge.  I think that the idea --

24           THE COURT:  Have they had, like, a case on the

25  margins, where it's like the guy who smoked weed but it's been

1  two months, I haven't used in two months?  Have they had one of

2  those cases where they have really had to kind of, like, define

3  where the margins are?

4          MR. McCRARY:  I am unaware of one of those, but I

5  would also point out that there's, you know, plenty of

6  jurisprudence that suggests that, like, just because there is a

7  case on the margin does not render, you know, the overall

8  definition of a statute unconstitutionally vague.  There will

9  always be marginal cases.  But what is true here is there's a

10 core, again going back to a core set of conduct, it can be and

11 is regularly recognized, it's a -- a statute which has, I

12 think, for lack of a better term, faced these as-applied

13 challenges repeatedly and courts have found with little

14 problem, with the exception of the Morales-Lopez case, an

15 ability to define what a user is, even recognizing that there

16 are people who claim that they may not have used relatively

17 recently.  I was reading one, and I believe it's the Edwards

18 decision out of the Tenth Circuit, where there was the last

19 known use was a month beforehand.

20          THE COURT:  Okay.

21          MR. McCRARY:  But when he was caught, he had

22 marijuana on him, but there just wasn't any proof that he had

23 been using it is the argument.

24          THE COURT:  Yeah.  So in a case like this where

25 Mr. Harrison is alleged to have -- I don't think he ever

```
 1   admitted to being a user.
 2              MR. McCRARY:  That is correct.
 3              THE COURT:  But there was maybe, like, a partially
 4   smoked joint in the car or --
 5              MR. McCRARY:  When the officer approached, he
 6   smelled both raw and burnt marijuana.  There was --
 7              THE COURT:  Was there a passenger in the car?
 8              MR. McCRARY:  There was no passenger.
 9              THE COURT:  No passenger, just Mr. Harrison.
10              MR. McCRARY:  And in addition, there was a
11   partially burnt marijuana stub in there.  There was also other
12   evidence of marijuana use clearly, being vape pens, THC,
13   edibles, gummies, et cetera.
14        But I think that this is -- you know, this goes to a
15   question, and I would just say that this goes to a point as to
16   why these challenges are best brought as an as-applied
17   challenge rather than a facial challenge, because we're having
18   this discussion, as proffered here I would note that my
19   co-counsel here today had received discovery, which she's
20   producing to defendant, which indicate, from a phone that was
21   seized from him prior, more than a year's worth of, you know,
22   regular marijuana use.
23              THE COURT:  Yeah.  I mean, I -- I wasn't sure -- I
24   have seen some of these cases where the person gets blood
25   tested.  Was that done?
```

```
 1                    MR. McCRARY:  No, that was not done here --

 2                    THE COURT:  But most of the time what happens is

 3      you get the phone and there's, like, 50 pictures of the

 4      defendant smoking with dates on the pictures and things like

 5      that --

 6                    MR. McCRARY:  Correct.

 7                    THE COURT:  -- is the proof.  And at which point

 8      you would say, "Well, no matter where the margins of user is,

 9      this person's a user of marijuana."  And you would be able to

10      prove that at trial, that would be the -- so you would say he

11      falls within the core -- core conduct?

12                    MR. McCRARY:  Correct.

13                    THE COURT:  And you would say that is also true of

14      the unlawful portion because he's admittedly not the holder?

15      Even if there may be problems with respect to holders of a

16      card, he's not a holder of a card?

17                    MR. McCRARY:  Correct.

18                    THE COURT:  Okay.  Response?

19                    MS. DESKIN:  Well, the idea that over 200,000

20      people in Oklahoma --

21                    THE COURT:  He's not one of those 200,000, though.

22                    MS. DESKIN:  Right, but that's as an as-applied.

23      And regarding facially and why a facial challenge should be

24      appropriate here is because of all the conversations that

25      you-all just had.  What does it mean?  If I smoked marijuana,
```

1  you know, last Friday and Monday, do I now have to get rid of

2  my guns?  Do I -- you know, where -- where are the lines as to

3  this?  It's -- to the people who have this Second Amendment

4  right, when did they know when they need to get rid of their

5  guns?  When they have lost the right to defend themselves in

6  their own home by virtue of this use, what -- what are the

7  bounds of that?  It's completely undefined.

8       It's -- it is this sort of "I know it when I see it" type

9  of analysis that we should not be engaging in.  I think it's

10  too -- it's too broad and it doesn't -- it's not constrained

11  enough.  Even in the -- the court in Utah complained that she

12  had trouble even creating the jury instruction on it with

13  guidance from the Tenth Circuit, and that the jury itself came

14  back, "What do you mean by this?"

15       You know, what -- so it's -- it seems arbitrary.  And if

16  hundreds of hundreds of thousands, you know, maybe over a

17  million or more -- I have no idea how many medical marijuana or

18  legally recreational marijuana users there are in the country

19  or on the state level -- if they are potentially in violation

20  of 922(g)(3) and the United States wants to tell everybody,

21  "well, you know, you might be, you might be -- you might fall

22  under this definition, we're not willing to tell you exactly

23  when, but you could be," I mean, is the -- that's creating an

24  environment where, if you use marijuana or you have been

25  prescribed a drug by a doctor and maybe you are abusing that

1    drug, taking it outside of the -- over -- overusing it, you

2    better get rid of your guns, but it's unclear at what point you

3    need to do that.

4            THE COURT:  Well, let's say that I think there is

5    decent merit to a lot of that.  I have, obviously, sort of been

6    talking to Mr. McCrary, I think you kind of sensed that I have

7    some discomfort with this and that idea.  But at least here,

8    you know, the indicted conduct, the alleged conduct does seem

9    to fall within the core conduct prohibited by the unlawful user

10   prohibition.  I mean, I think there's problems with "addicted

11   to" as well, but it's not at play here.

12       But at least with respect to Mr. Harrison, and my

13   understanding here, is this question of lawfulness versus

14   unlawfulness, not really relevant to him.  He's clearly an

15   unlawful user, unlawful.  And then whether he's a user or not,

16   the allegations, at least at this point in the indictment, are

17   that he is.  And I don't -- I haven't heard anything that would

18   suggest to me that his case is on the margins or falls outside

19   of that core conduct.

20       So while I think that there are some good arguments to be

21   made because I think that there is a good point, particularly

22   with respect to those who hold doctor prescriptions, you know,

23   in the state of Oklahoma, and who may not be on fair notice,

24   I'm concerned about the fact that they are -- the only thing

25   standing between them and federal prison is the current DOJ's

```
 1   decision not to prosecute them, that that has a significant
 2   chilling effect on the fundamental right potentially, and for
 3   many of the reasons we would allow it under the First
 4   Amendment, perhaps a facial challenge should be allowed under
 5   the Second Amendment, but it's foreclosed by certain precedent
 6   as of now.  So I think those are all arguments you're going to
 7   have to make on appeal.
 8               MS. DESKIN:  Right.  That's fair enough.  That's
 9   been preserved.
10               THE COURT:  Mr. McCrary?
11               MR. McCRARY:  I'm -- I'm actually -- I'm curious
12   though, I'm -- I want to continue the conversation.  We can do
13   it some other time --
14               THE COURT:  No.  No, let's -- we're here.
15               MR. McCRARY:  So, you know, you're worried about a
16   chilling effect of --
17               THE COURT:  There is -- I think I know what you're
18   going to say, which is if I don't know about it how could it
19   have a chilling effect.  I think the not knowing about it has
20   the chilling effect, which is the concern that I'm not exactly
21   sure of what my status are, or maybe I -- yeah, I see what
22   you're saying.  If I think I'm lawful, I'm just going to keep
23   carrying my gun.
24               MR. McCRARY:  Correct.  And if you're -- if you
25   think you might be unlawful, then you perhaps are on notice
```

1     that you are actually an unlawful user of a --

2             THE COURT:  Might be.  I'm talking -- with the

3     chilling effect, I'm talking about that subset of those who

4     think that, that hypothetical person I said who maybe did a

5     little research, and I think that they're getting mixed signals

6     with respect to what "unlawful" means, both from the ATF

7     regulation and the Tenth Circuit's precedence, and as well just

8     from the current DOJ, I'm not going to say policy because

9     whatever it -- DOJ practice of nonenforcement I think sends --

10    causes that person to not know their status and to potentially

11    have a chilling effect.

12        So I think there's two classes of people I'm concerned

13    about: those who are completely oblivious to the fact that

14    they're currently in violation of federal law and have been

15    stripped of their Second Amendment right, and those who are

16    concerned that they may be but can't figure out what the law

17    is, so.

18             MR. McCRARY:  Thanks.

19             THE COURT:  As soon as I said it, I knew what you

20    were thinking over there, so -- because I recognize the same

21    issue.

22        All right.  So moving to the Second Amendment.  As I

23    understand the government's position, it's that in Heller the

24    Court said that, you know, longstanding prohibitions on felons

25    and the mentally ill are presumptively constitutional, so we

1    don't even need to worry about that.  And this is like the

2    felon, it is like 922(g)(1), because at trial here we would

3    essentially have to prove a felony?

4         MR. McCRARY:  That is a portion of the government's

5    argument, correct.

6         THE COURT:  Okay.  What's the other portion?

7         MR. McCRARY:  Well, Your Honor, I would say --

8         THE COURT:  That was the main thrust, I thought,

9    but --

10        MR. McCRARY:  So I think that overall there are a

11   few different components of it.  The first is that the United

12   States does contend that Mr. Harrison, by virtue of his status,

13   falls beyond the protection of the Second Amendment in the

14   first instance.  It's his obligation to show that he has

15   conduct which is protected by the Second Amendment, which means

16   that he has to fall within that core right.  And we would

17   suggest that there's a long tradition of exclusion of certain

18   individuals from "the people."

19        THE COURT:  Let's talk about that for a minute.

20        MR. McCRARY:  Okay.

21        THE COURT:  Because I think that your conception of

22   the Bruen test is wrong, and I think that conclusion is wrong.

23   Let me explain why.  You keep treating it as -- listen, in

24   Heller we had this issue of post-Heller courts are engaging in

25   a two step; right?  Bruen comes along and said that's two

```
 1   steps, one step too many, two minus one is one, it's a one
 2   step.  And that one step, while they talk about first if we
 3   have conduct that's presumptively protected, right, if we look
 4   at the text and the conduct is presumptively protected, then
 5   the burden shifts to the government to show that there's a
 6   historic tradition of regulating in the -- the way you're
 7   looking at it is there's this, like, first step where I have to
 8   determine who the people are and whether the conduct is
 9   protected, but you're answering the question of, like, who "the
10   people" are by doing what?
11           MR. McCRARY:  Well, I'm simply suggesting that
12   there are historical --
13           THE COURT:  Right.  That's my point.  You're
14   answering the question by looking at -- pointing to a historic
15   tradition.
16           MR. McCRARY:  Well, Your Honor, I actually think
17   there are two different components of the historical tradition
18   analysis; one is whether or not the historic tradition can
19   include the exclusion of people based on their status as --
20   first, whether or not they can be excluded entirely based on
21   status, and, second of all, whether or not that status can be
22   based on a concern, as established by the legislature, that
23   somebody presents a danger to the community regardless of an
24   individual finding of dangerousness.  And then -- sorry --
25           THE COURT:  Go ahead.
```

1          MR. McCRARY:  Once we can establish that -- if we

2     get past that, if we get past the idea that he can be

3     categorically excluded from the Second Amendment, then and only

4     then should we proceed to the next test, which is, if he is

5     still somebody who would otherwise be a part of the people, is

6     there a historical analogue such as this is like a felon in

7     possession or this is like the mentally ill.

8          THE COURT:  And here's where I think you're going

9     wrong is that -- what you're calling the first step of the one

10    step.  You're taking the one step and dividing it into steps.

11    But what you're calling the first step of the one step, which

12    is when the Second Amendment's plain text covers an

13    individual's conduct, the Constitution presumptively protects

14    that conduct.  So my question to you is, to me that's just a

15    very low threshold of we just look at the text and it's

16    presumptively covered.  If so, then the burden shifts to you to

17    say, no, we look at history and tradition and these type of

18    people or this type of conduct are not protected.  Right?  And

19    you're rolling that second question into the first.

20       And so my question to you is, which words in the Second

21    Amendment in this plain text would I look to to support your

22    proposition that "the people" have some adjectives attached?

23          MR. McCRARY:  I think in the same way that we have

24    historically allowed the Supreme Court to interpret the

25    Constitution.  They have done so twice here in Heller -- well,

1   technically three times including McDonald, but Heller and

2   Bruen, both by attaching very important and consistent

3   adjectives to the term "citizen," "law-abiding," "ordinary,"

4   "responsible" and "normal."

5           THE COURT:  Let's talk about that.  So you cite to

6   Bruen, I think at 2129 to 2930, and that reference to it's

7   undisputed that petitioners, two ordinary, law-abiding adult

8   citizens are part of the people.  Right?

9           MR. McCRARY:  Correct.

10          THE COURT:  You say, therefore, "the people" are

11  only ordinary, law-abiding people.

12          MR. McCRARY:  That is one of many indications that

13  that would be who is covered by that, I would assert.

14          THE COURT:  What you seem to overlook is that the

15  Bruen court cites to Heller at Page 580.  Right?  And if you go

16  to Heller at Page 580, they conclude that, "We start,

17  therefore, with the strong presumption that the Second

18  Amendment right is exercised individually and belongs to all

19  Americans."  That is the conclusion of what "the people" means.

20  And the only status that was relevant in Heller with respect to

21  the people was citizenry.  If you are a citizen, you are part

22  of the people, full stop.

23          MR. McCRARY:  I think that reading that portion of

24  the Heller decision is -- as narrowly as you are, takes out of

25  context --

1          THE COURT:  No.  I'm not reading.  That is the

2     portion where they define who "the people" are.

3          MR. McCRARY:  Well, at 580 in Heller, you know, you

4     have this combination of what is -- you know, a discussion of

5     what is the people and -- and there is the argument of whether

6     or not it refers to a subsection of people.

7          THE COURT:  And they reject that idea.

8          MR. McCRARY:  But only in the context of discussing

9     whether or not the right to bear arms is tethered to militia

10    service, and that's the specific combination of words there

11    that they are discussing.  But I think that in the broader

12    sense of what Heller is doing, you see where later on they make

13    the assumption that, assuming Heller is not otherwise

14    disqualified, he has a right to bear arms in the home.  And so

15    there is an assumption under there that there are people who

16    are disqualified from the term -- there are individuals who are

17    disqualified from the term "the people."  And I think that --

18    that comports with the idea that there -- that in -- as they

19    say, when they created the Constitution, and ultimately the

20    Bill of Rights, they were affirming the existence of rights

21    that predated the creation of the Bill of Rights.  It was

22    basically affirming the current understanding.  And the current

23    understanding of "the people" is not one where all people could

24    not be stripped of rights.

25          THE COURT:  But again, that's -- the interpretive

1    part of the Bruen test comes with the reference to the historic

2    tradition of regulation of these types of people or this type

3    of conduct.  But that first step of the one step that you're

4    calling it, which is who are "the people," Heller makes it very

5    clear that presumptively "the people" are all Americans.  All

6    Americans.

7         From that point, then we look to history and tradition to

8    see if there are some tradition of carving out certain subsets

9    from the protections of the Second Amendment, but the starting

10   point is all Americans are the people.

11             MR. McCRARY:  All members of the citizenry at that

12   time, correct.

13             THE COURT:  All members of the citizenry, right.

14   And that's just -- that's literally reading from Heller.  And

15   again, I recognize that in Heller the question was -- the

16   question was whether there's an individual right, whether

17   there's a right separate from the militia-based right.  And so

18   they were looking at the individual right.  And the conclusion

19   was that, with respect to the individual right, "the people"

20   referenced in the Second Amendment's text are all Americans.

21   They said that's the starting point.

22             MR. McCRARY:  I think that to say that, in 580,

23   that that one term aggregates the import of all other specific

24   delineations and --

25             THE COURT:  I'm not saying that.  I'm saying that

1    the starting point, the starting point of the analysis at which

2    you said they have failed to satisfy their burden of proving

3    that the Second Amendment's plain text covers Mr. Harrison's

4    conduct.  Right?

5              MR. McCRARY:  Yes.

6              THE COURT:  So that you don't even have to get to

7    the history and tradition in proving that that's wrong.  And

8    what I'm saying is exactly what you're doing is looking -- is

9    putting forward history and tradition to establish that there's

10   a carve-out for this type of person.  But that's not the first

11   step.  The first step is just the plain text.  It's

12   presumptively covered: individual right to possess a gun.

13   That's where we start.  And then from there it becomes your

14   burden to then point to the history to say, but not these type

15   of people, not this type of conduct.

16             MR. McCRARY:  So I believe that, you know -- so I

17   will say that -- I don't agree with the supposition, but I will

18   operate off that supposition.

19             THE COURT:  Okay.  Ms. Deskin?

20             MS. DESKIN:  I mean, it sounds like you agree with

21   just what we wrote.  I don't really have anything to add.  I

22   think that Mr. Harrison is a member of the people.  I mean, we

23   are the people, Americans.  We have a Second Amendment right.

24        The question is, is this law then an appropriate

25   infringement on that right given the history?  That's the way

1    that I think that it should read, but yours is slightly

2    different than that, it's just in turning -- talking in terms

3    of subsets.

4              THE COURT:  I mean, it almost sounded like you were

5    describing the two step that Bruen rejected with appropriate

6    regulation of the Second Amendment right.  I think Bruen is

7    saying something different, saying we start with the plain

8    text, and if I have an individual citizen possessing a gun,

9    right, then it comes to you to prove that actually this type of

10   person or this type of conduct was not recognized as part of

11   "the people" or part of the -- of the type of conduct protected

12   by the Second Amendment.  So the answer is, it's not protected

13   by the Second Amendment.

14             MS. DESKIN:  The conduct?

15             THE COURT:  Or this type of person, this particular

16   class.  Right?  We're defining what the Second Amendment means.

17   We're not saying the Second Amendment protects it, but there

18   are times when we're going to allow it.

19             MS. DESKIN:  I think it's whether the -- the -- so

20   you have the people.  We're all Americans.  We all have these

21   rights, first, second, fourth, et cetera.  And then you have a

22   law that infringes on that right.  And the question is does --

23   is that law in keeping with our history of those types of

24   regulations?

25             THE COURT:  Okay.  Well, we'll just agree to

1    disagree with the formulation --

2              MS. DESKIN:  But I think it all gets to the same

3    place.

4              THE COURT:  -- because what Bruen is saying is the

5    Second Amendment is very clear, no law, there should be no law

6    infringing upon the right, none, zero, zilch, nada, that's why

7    we're rejecting the two step, the second step of the two step.

8    The question is, what is the Second Amendment right in the

9    first instance?  And if we have a historic tradition of these

10   types of regulations, then it would have been understood at the

11   time of the founding that that wasn't part of the Second

12   Amendment right in the first instance.

13             MS. DESKIN:  Got it.

14             THE COURT:  You see what I'm saying?

15             MS. DESKIN:  No, I do.  That makes sense.

16             THE COURT:  All right.  Now the conduct -- well,

17   let's go back to this.  I started with you're relying mainly on

18   the analogy to felons.  You also have an analogy to, like,

19   lunatics, mentally ill.

20             MR. McCRARY:  And then the intoxicated as well.

21             THE COURT:  The intoxicated.  You point to some

22   authorities, I think, with respect to, like, historic

23   prohibitions on those who are intoxicated.  And I went back and

24   looked, we looked at every single one of those, and they almost

25   all involve prohibitions on -- it's usually carrying, not just

1   bare possession, usually caring, often concealed carrying, and

2   while intoxicated.  Right?  This law goes way beyond that.

3            MR. McCRARY:  We agree.

4            THE COURT:  It's not a prohibition on carrying.

5   It's a prohibition on possession, full stop.  Right?  It's the

6   broadest possible prohibition.  And you don't have to be

7   intoxicated, you can be stone-cold sober.  Right?  Can you

8   point me, like, at least with respect to intoxicants, to any

9   historic law that's actually like 922(g)(3) in that respect?

10           MR. McCRARY:  Well, I think the intoxication laws

11   are --

12           THE COURT:  No.  I'm not asking categorically.  I

13   mean, like, can you -- were you able to find even a single law

14   that prohibited a person, not intoxicated person, but a person

15   who uses intoxicants, even when sober, from possessing a gun?

16           MR. McCRARY:  No.

17           THE COURT:  I couldn't either.  And so is that not

18   enough to break the analogy?  And if not, why not?

19           MR. McCRARY:  Well, because I think it's fairly

20   clear that we are not looking for a historical twin.  We're

21   looking for a historical analogue.  And one of the things that

22   you get through an intoxicant is an idea that you can

23   temporarily restrain somebody based on their use of an

24   intoxicant.  Here we have individuals who have to have, by our

25   own definition, you know, an ongoing and regular use of a

1   controlled substance.  Again, it cannot be a one-off.

2       I understand that you drew a distinction between the

3   carrying and the possessing.  I also seem to recall, you know,

4   in Stambaugh you made a suggestion that there is obviously no

5   legitimacy to the right of possession if you can't receive it.

6   We would suggest that that analysis might then go further to

7   say there's no legitimate right to possession if you can't use

8   your firearm.  So --

9           THE COURT:  I mean, I think that has kind of been

10  rejected.  I mean, Heller talked about, at least at the core,

11  at the very least I have a right to have a gun in my house to

12  protect from a home invasion.  Right?  And that that's

13  different then from sort of the carrying laws, which then

14  became at issue in later cases.

15          MR. McCRARY:  But even in this particular case --

16          THE COURT:  You see what I'm saying?  So even if I

17  can't carry my gun when I go out and about, there's definitely

18  some value in having a gun, you know, in the nightstand next to

19  the bed.

20          MR. McCRARY:  That's true, although I suppose -- I

21  would have to go back and look at the -- the ones that limit it

22  to discharging, I'm not sure if it's limited to discharging in

23  public or if it's just discharging.  So presumably one might

24  get in trouble if one was drunk at home discharging their

25  firearm in their own residence.

1              THE COURT:  I certainly understand that we don't

2    have to have, you know, a historic twin.  And, like, this whole

3    case comes down to, like, the level of generality that is

4    satisfactory with respect to the analogue, because you have

5    pointed to what you think are some analogues but none of them

6    are quite a perfect fit.  So it's like, well, how far can I go?

7         Would you at least agree in this case, I mean, because

8    I -- I made this point in the 922(n) case, that this was not a

9    new societal problem?  It was a -- this is a societal problem,

10   I think the same would be true here, that's existed since the

11   18th century, users of unlawful substances carrying guns.

12             MR. McCRARY:  Well, that depends on how one wants

13   to describe an unlawful user of a controlled substance or an

14   intoxicant.  I mean, certainly we fully acknowledge that in

15   1791 there were people getting housed in the, you know, the

16   local tavern regularly.

17        The question of controlled substances, however, I think,

18   is one that does represent a much more modern feature of

19   American society.  There is ample academic research, and I

20   could point you to at least one of them here.  This is David

21   Musto's The American Experience with Stimulants and Opioids

22   from the second Perspective on Crime and Justice at 51.  This

23   was from 1997, 1998, where it observed that there were -- that

24   intoxicants, being opioids and stimulants, were not in wide use

25   in the United States until the late 18th century and early --

1    excuse me -- late 20th -- 19th century and early 20th century,

2    which is why, for instance, you see the first federal

3    regulation on controlled substances in 1915, not in the 1800s.

4         So I think that the idea of controlled substances

5    themselves, as opposed to intoxicants, is a more recent

6    societal problem that is being addressed through legislation.

7              THE COURT:  That's a fair point, I think.  But, I

8    mean, the concern with controlled substances I thought was not

9    because they're controlled but because they're intoxicating.

10             MR. McCRARY:  I think that the ability to, yes,

11   diminish one's ability to make a rational decision is the

12   concern, but I --

13             THE COURT:  So my point is, with respect to the

14   issue of intoxicants, this concern about people -- intoxicated

15   people with guns, I mean, that's not a new -- I don't think

16   that's a new problem, and even some of the old statutes you

17   point to sort of recognize that.  Right?

18             MR. McCRARY:  Correct.

19             THE COURT:  At least with respect to other

20   intoxicants.  I agree that we have a lot of modern drugs now,

21   but -- and the thing there is, like, when you're reading Bruen

22   it talks about when you have, you know, sort of a societal

23   problem that's been around for awhile, you need, like, a

24   distinctly similar historic regulation.  And I'm trying to

25   figure out what "distinctly similar" means because this, again,

 1   does strike me as the case that this is a societal problem
 2   that's been in existence for a long time.
 3        I don't think that we have a good match in the -- in the
 4   history for this type of statute.  And how much of a problem is
 5   that?
 6             MR. McCRARY:  I think that, you know, again, one of
 7   the issues -- and I -- just a fundamental point which I -- I
 8   think the government would pause with what the analysis has
 9   been thus far is that, you know, looking at what the class is
10   at such a granular level, it's true that you're going to have a
11   problem finding a distinct historical equivalent because you're
12   looking for a historical twin, not an analogue.  Right?
13             THE COURT:  I don't think that's true because I
14   actually thought that I was -- my category was broader than
15   yours.
16             MR. McCRARY:  So I -- the government's category, as
17   set forth in its brief and as I would argue, is that, you know,
18   there are classes of individuals that can be, as a class, a
19   status class, disarmed because of concerns by the legislature
20   that they present a danger to the public good.  Right?
21             THE COURT:  Well, that's very broad.
22             MR. McCRARY:  That is broad.
23             THE COURT:  Extremely broad.
24             MR. McCRARY:  I believe there's a historic
25   tradition of that that exists well before the founding on

1  through the age of the Bill of Rights.  And then going forward,
2  in fact, I --
3          THE COURT:  We can't -- I mean, we can't rely on
4  the English Bill of Rights.  Heller rejected that idea because
5  they're a parliamentarian system.  I mean, it doesn't work with
6  our Constitution.
7          MR. McCRARY:  That's fine.  Even if you want to
8  dismiss the English Bill of Rights, you have plenty of
9  colonial-era statutes that systematically disarm people on
10 status based on perceived danger rather than actual danger.
11 You have the Catholics that were disarmed in Maryland following
12 the Seven Years' War.
13          THE COURT:  And we're -- but those were all the
14 things that prompted the Second Amendment, why we adopted -- so
15 I mean, I had this same -- recent Third Circuit opinion --
16          MR. McCRARY:  The Range opinion?
17          THE COURT:  Yeah, you probably read it.  And some
18 of those just really jumped out at me because they relied on
19 some of those colonial-era statutes where people were disarmed
20 based on, like, you know, for political reasons or religious
21 reasons.  And they pointed to that as, like, evidence of why
22 these are okay under the Second Amendment.  I'm like, oh, my
23 God, no.  That's why we enacted -- that's why we thought a
24 Second Amendment was important, because we didn't want a
25 monarch -- a monarchy imposing those types of laws on us.

```
1              MR. McCRARY:  But again, the language from Bruen is
2    that we're -- the Second Amendment simply codified a
3    preexisting not -- understanding of what the right action
4    entailed.
5              THE COURT:  So, I mean, but --
6              MR. McCRARY:  And even if you wanted to look at
7    the, you know, ratification debates as to the -- you know, the
8    minority dissent, which is referenced, where, you know, law --
9    you know, firearms could not be stripped unless a crime had
10   been committed.  Right?  That was something that was rejected.
11   And Ms. Deskin pointed that out,, but I would point out that
12   the historical connotation of that debate is what actually
13   matters.  I mean, that was the anti-federalists that were
14   proposing it.  Even the anti-federalists, the people who wanted
15   the strongest version of some sort of individual rights,
16   recognized that there were carve-outs based on systemic groups
17   of individuals.
18             THE COURT:  But, like, with respect to the Second
19   Amendment, though, I think -- I think it was you that relied
20   on, was it the Massachusetts analogue?
21             MR. McCRARY:  There's the Massachusetts analogue,
22   correct.
23             THE COURT:  Right.  As support for this idea that
24   certain classes of people are carved out from the people, and I
25   thought it cut exactly against you because the Massachusetts
```

 1    version contained limiting language, but the founders rejected
 2    that limiting language in the federal version.  So why would
 3    that not cut against you?
 4              MR. McCRARY:  Well, there has to be some
 5    recognition, I would think, that -- that as recognized, I think
 6    by both Heller and Bruen, that there are restrictions.  There
 7    have to be restrictions that exist.  So it cannot be simply the
 8    case that the right of the people to keep and bear arms shall
 9    not be infringed, full stop.
10              THE COURT:  Right.
11              MR. McCRARY:  Which is effectively, I think, where
12    you would be if you just look at the plain text.  So we have to
13    look beyond the text to understand --
14              THE COURT:  But what you're telling me is, like, I
15    can look at all of the stuff that happened pre-1791, and I
16    don't think it's that simple.  Some of the pre-1791 stuff, if I
17    look at it closely, supports the text and ratification of the
18    Second Amendment, but a lot of the pre-1791 stuff was the stuff
19    that prompted the Second Amendment and was the reason why we
20    opted for the language in the Second Amendment because we
21    didn't want those things to happen.  We were trying to prevent
22    that history from repeating itself.
23              MR. McCRARY:  I think what the pre-1791 legislative
24    history, if you want to call it that, does --
25              THE COURT:  Don't call it legislative history.

1          MR. McCRARY:  -- is point to what is the common

2    understanding of what can and cannot be done at that time.  The

3    same people who were ratifying, in 1791, the Constitution --

4    the Constitution's Bill of Rights are the same people in 1776

5    that suggested -- and I really enjoyed this one -- suggested in

6    1776 that colonies disarm people who are notoriously

7    disaffected from America, those same individuals.

8          THE COURT:  Well, that was wartime; right?

9          MR. McCRARY:  War does not necessarily change the

10   dynamic of what is understand -- what they understood to be the

11   contours of the right.

12         THE COURT:  Yeah.  I mean, there's one thing that

13   keeps jumping out at me, which is unless you look at this in

14   the broader context of incorporation and otherwise -- and

15   everything else that's happened, like, it's not particularly

16   surprising that the ratifiers of the -- drafters and ratifiers

17   of the Second Amendment were willing to impose on the federal

18   government, like, a quite -- quite broad prohibition.  And

19   again, remember, the primary drafters of the Constitution

20   didn't even think we needed a Bill of Rights.  And why?

21   Because no one thought the federal government had the power to

22   enact something like 18, U.S.C., Section 922.  Right?

23         MR. McCRARY:  Possibly.

24         THE COURT:  Why did 18, U.S.C., Section 922 and the

25   provisions that are relevant here not be enacted until the 20th

1   century?  Because it took *Wickard v. Filburn* and the massive

2   expansion of the federal government's commerce power for it to

3   even be a possibility for the federal government to enact such

4   a law.  And was it really such a controversial thing to tell

5   the federal government, you can't enact these type of laws when

6   no one thought the federal government would have the power in

7   the first instance to do it, one; and, two, the Second

8   Amendment didn't apply to the states?  So the states were free

9   to enact all sorts of prohibitions on their citizens because

10  the Second Amendment didn't apply to them.  They were simply

11  bound by their state constitutions.

12         MR. McCRARY:  So I would point out, as it relates

13  to state constitutions, if you will, that I think it may be

14  relevant that, if you want to talk about restrictions based on

15  class, just at large and dangerous people --

16         THE COURT:  Can I pause for a moment?  Because I

17  want to make a broader point real quick before you get into

18  that, which is that -- the same issue in the 922(n) case with

19  the surety statutes of, I don't think that we can look at all

20  state-enacted statute pre-1868 and -- incorporation, I should

21  say -- pre-1868 statutes and just say they represent evidence

22  that cuts in favor of what the Second Amendment means because

23  the Second Amendment didn't apply to the states.

24         MR. McCRARY:  Agree.

25         THE COURT:  You would have to, on a state-by-state

1  basis, look at that state's analogue to the Second Amendment,

2  if they had it, and decisions interpreting that Second

3  Amendment, ascertain that it was viewed the same as the federal

4  prohibition, the scope was the same, and then look at the

5  prohibition and say, now that prohibition is evidence that this

6  was not understood to be part of that type of right.

7          MR. McCRARY:  I only make this point because you

8  were referencing state constitutions.

9          THE COURT:  Do you disagree with what I just said?

10          MR. McCRARY:  I think that -- I think that it is

11  evidence.  You might not think that it bears much weight, but I

12  do think it informs the decision of what the underlying

13  individual understanding of the Second Amendment would be at

14  the time.

15          THE COURT:  Well, all right.  Let's take a

16  hypothetical state that had no state constitutional analogue --

17  I'm sorry, Ms. Deskin.  We're just ignoring you.

18          MS. DESKIN:  That's fine.

19          MR. McCRARY:  She likes it.

20          THE COURT:  That we had a state with no -- no

21  Second Amendment analogue and they enact a statute that places

22  some limitation on their citizens' right to possess a gun.

23  How -- you're saying that that does have some effect of

24  informing us as to what the Second Amendment means, and I'm

25  wondering how because the Second Amendment has nothing to do

1    with that.  It didn't apply to the state.

2              MR. McCRARY:  Well, but what I was going to suggest

3    was that we look at a 1776 statute from Pennsylvania where the

4    state constitution did protect the rights of the citizens to

5    possess arms.

6              THE COURT:  In the same manner as the federal

7    Second Amendment?

8              MR. McCRARY:  Not using the exact same language,

9    but consistent with the idea that the rights of the people

10   should not -- the right of individuals to bear arms existed.

11   At that time they had similarly passed a law that caused all

12   persons to be disarmed within the respective colonies who are

13   notoriously disaffected to the cause of America as well, even

14   with that prohibition in place in the state Constitution.

15        So at the time of, you know, the revolution, there are

16   states that still have some language in their Constitution that

17   protects the right to bear arms, that still recognizes that the

18   state has the right to strip out, based on status, groups of

19   individuals that they perceive to present a risk to the

20   overall, you know, security of the state.

21             THE COURT:  So you -- yeah.  And your assumption is

22   that that type of law would fit within your broad category of,

23   like, dangerous persons?

24             MR. McCRARY:  Correct.

25             THE COURT:  So we'd sort of roll in, like, felons,

1   drug users, mentally ill people, sort of dangerous persons

2   generally?

3           MR. McCRARY:  Correct.  And I --

4           THE COURT:  But can we categorically say that all

5   drug users are dangerous people?

6           MR. McCRARY:  We cannot, but I would also point out

7   that neither was, you know, the people who failed to swear an

8   oath of an allegiance to the United States categorically

9   dangerous people.

10          THE COURT:  I thought you just said they did fit in

11  within your category of dangerous --

12          MR. McCRARY:  No, of people that the government

13  perceived of as categorically dangerous.

14          THE COURT:  Well, you're the government here, so

15  I'm asking you.  Does the government perceive all unlawful

16  users of drugs as dangerous?

17          MR. McCRARY:  The government believes that there is

18  a rational -- you know, I don't even want to use that because

19  that gets into context of scrutiny -- but I think that there is

20  a class of people that the government has determined present a

21  risk of danger to the public because they lose control by

22  virtue of their habitual drug use, and that that is reasonable

23  and it is certainly supported by --

24          THE COURT:  That's second-step stuff, the

25  reasonable.  Right?  So let's --

```
 1              MR. McCRARY:  Well, no, but I would say that only
 2    in the context of it represents a group of people that the
 3    state -- that the legislature has determined presents a risk,
 4    which is something that historically the Second Amendment
 5    allows for the legislature, with discretion, to determine who
 6    fits into those categories of people.  So whether or not --
 7              THE COURT:  Is that full stop, though?  Because
 8    then we have the legislative circumvention problem, which is
 9    that I can strip people of their Second Amendment right just by
10    throwing them in the class of dangerous people.
11              MR. McCRARY:  Except for the fact that I think that
12    there is that language from Bruen, from Heller, which as a
13    general matter, that, you know, this Court has not given much
14    credence to, but I think it is an operating guidepost to this,
15    which is a law-abiding citizen.  That is why that first step
16    matters in the determination because --
17              THE COURT:  When they said law-abiding citizen,
18    they weren't defining the term of "the people."  They were
19    describing the two petitioners in that case, if you read that
20    sentence.
21              MR. McCRARY:  Correct.  And the --
22              THE COURT:  They clearly fall within "the people,"
23    but that was not in any way, shape or form defining what the
24    term of "the people" meant.  They had done that in Heller when
25    they said all Americans.
```

1          MR. McCRARY:  But I think that that -- that one

2 instance was then constrained, and I feel like we're just back

3 at the same place, and so I don't want to do that.  But simply

4 to say that I think that there is a tradition, as explained in

5 Range, of limiting those categories of individuals based on

6 their perceived dangerousness and --

7          THE COURT:  Well, let's talk about marijuana users

8 specifically then, because that's what's at issue here.  Is it

9 the government's position that marijuana -- unlawful users --

10 well, they're all unlawful users -- that marijuana users are

11 categorically dangerous people?

12          MR. McCRARY:  Congress has made that determination,

13 yes.

14          THE COURT:  You're kind of bound by that; right?

15          MR. McCRARY:  Correct.

16          THE COURT:  So how do we square that with your

17 decision not to prosecute any of these people and to let them

18 remain free?

19          MR. McCRARY:  Whether or not the government chooses

20 to prosecute any particular crime has no bearing on whether or

21 not it represents a danger to the community.

22          THE COURT:  So we think they're dangerous, but

23 we're not going to do anything about it, though.  But for

24 purposes of this case, assume they're dangerous.  But we don't

25 think they're dangerous enough to prosecute.

```
 1              MR. McCRARY:  That is a question that one might
 2   want to take up with Merrick Garland, but I don't think it has
 3   any bearing on the actual question of the constitutionality
 4   of --
 5              THE COURT:  You mean the Western District of
 6   Oklahoma doesn't get to do whatever it wants?
 7              MR. McCRARY:  Believe it or not, we all have
 8   masters.
 9              THE COURT:  Okay.  So let's go back to my
10   legislative circumvention problem, because that is the issue
11   that I think where we really begin to have trouble with the
12   analogue to felons, mentally ill, and, you know, those who are
13   intoxicated.
14       I mean, is it your belief -- and I get what Heller said
15   about we're not calling into doubt longstanding prohibitions on
16   felons; right?  Do you think that that would apply to all
17   felons, full stop?
18              MR. McCRARY:  I do.
19              THE COURT:  Okay.  So, like, if the state of
20   Oklahoma passed a law tomorrow saying that mowing your lawn on
21   Sunday is a felony, the Supreme Court would have no problem
22   with that under the Second Amendment, stripping that person of
23   their Second Amendment right, even though there's no historic
24   tradition of that sort of thing being a felony?
25              MR. McCRARY:  But I think that there is a -- you
```

1   know, I think the point made in Range mildly, but then broader

2   in a lot of the pre-Bruen decisions about the idea of civic

3   virtue and the virtuous citizen is a strain of understanding of

4   the Second Amendment that comports with this.  The issue is one

5   where we're not dealing with the severity of a particular

6   felony, but rather somebody's inability to comply with the

7   rules of the game.

8          THE COURT:  So if I break a law -- because we all

9   break laws every single day.

10          MR. McCRARY:  Correct.

11          THE COURT:  We all are lawbreakers.  That's a fact.

12   Okay?  We're all categorically like -- does that mean we're

13   dangerous people by -- for purposes of the Second Amendment, we

14   could be stripped of our Second --

15          MR. McCRARY:  For purposes of the Second Amendment,

16   if you were charged and convicted of the crime that you

17   committed today, then, yes, you could be stripped of your

18   Second Amendment rights.

19          THE COURT:  Because I have trouble believing

20   that -- for instance, you know, the state of New York,

21   post-Bruen is like, all right, we got told no, we can't do

22   this, so instead we're just going to make everything a felony.

23   Everything's a felony now, that way that's how we'll get the

24   guns away from the people because we don't want any of the

25   people to have any guns.  That that would be okay.  I have to

1    think that we would still be looking at the things that have

2    historically been understood to be felonies, that I can't

3    legislatively circumvent the Second Amendment just by being

4    creative legislatively and just saying everything's a felony.

5            MR. McCRARY:  I think that by that logic there are,

6    what, seven felonies that might qualify, but I think that it's

7    clearly broader than that, what the Second Amendment now carves

8    out through the history.  So there has to have been some

9    point --

10           THE COURT:  Well, I'm not -- I mean, I'm not so

11   sure.  The felon in possession law only came about in the '50s;

12   right?

13           MR. McCRARY:  Felon in possession was 1932, I

14   believe.

15           THE COURT:  Is that right?

16           MR. McCRARY:  That's when -- '32 or '38 was when

17   they precluded felons from (*)receiving firearms.  It was later

18   changed to being a felon in possession in the --

19           THE COURT:  In the '30s -- I'm sorry.  We keep

20   double talking.  I'm sorry.

21       At first it was a tax; right?  It was an act pursuant to

22   the taxing power in the '30s, that's why we didn't have a

23   commerce clause problem.  Then '42 comes along, *Wickard v.*

24   *Filburn*, then the '50s we have this rapid -- this big

25   expansion.  I mean, so is it your view that that's a

1   longstanding prohibition?

2           MR. McCRARY:  Well, it's the view, I believe, of

3   the majority of the Supreme Court justices that it's a

4   longstanding prohibition that felons can't have that.

5       I would also point out for the record that, in that

6   category of longstanding prohibitions, that they note was the

7   mentally ill, which was codified in the same bill that codified

8   (g)(3), so --

9           THE COURT:  And you don't think that there when

10  they say longstanding what they're saying is, "Well, we're

11  talking about the type of things that we can look back and find

12  a tradition of way back when"?

13          MR. McCRARY:  Well, I'm just simply --

14          THE COURT:  Not all felon in possession laws, but

15  those that there's a longstanding tradition of --

16          MR. McCRARY:  I would say that felon -- so is the

17  Court's question whether or not, apart from the felonies that

18  existed in 1791, can any other felony give rise to a

19  prohibition on firearm possession?

20          THE COURT:  I think Bruen would say we can look at

21  post-1971 so long as it's consistent with the text.  So you

22  could look at things, other things, even after the

23  ratification.  So I don't think it's a full stop at 1791, but I

24  also -- it seems logically, for this legislative circumvention

25  reason that I'm talking about, that it can't just be anything

1    that any legislature says is a felony, period.  It's got to be
2    something less than that, because you would have the same issue
3    with intoxicants because let's say that with the (g)(3), I know
4    that the attorney general can remove things from the schedule.
5                 MR. McCRARY:  That's true.
6                 THE COURT:  He can't add things.  But Congress,
7    let's -- Tylenol, Schedule I, controlled substance now.
8    Everyone who takes Tylenol is a -- stripped of their Second
9    Amendment right.  That can't be right.
10               MR. McCRARY:  I would point out that there are, you
11   know, remedies to that that exist within the law.  So Title 18
12   of the United States Code, section, I believe it's 925 -- let
13   me check -- yeah, 925(c) allows for the ATF to make an
14   assessment of whether or not somebody's status as a
15   disqualified member be revisited and then ultimately restored.
16   So there are --
17               THE COURT:  -- stripped of the right.  I mean, I'm
18   sure --
19               MR. McCRARY:  If you are convicted.
20               THE COURT:  Yeah.  So, but again, that's your
21   position that there's -- there's no qualification on the
22   felons, unlawful user, that it's anything that a legislature
23   says is a felony, anything that a legislature says is an
24   unlawful substance?
25               MR. McCRARY:  I believe that that is the -- yeah,

1  the position of the -- that is the position of the United

2  States.  I believe that that is the current state of the law as

3  well.

4           THE COURT:  I mean, that's what the statute says.

5  I mean, I keep going to, like, there has to be a limiting

6  principle, it seems like, because otherwise we have this

7  circumvention problem and just the -- the Second Amendment is

8  subject to the whims of a legislature.  And the whole idea

9  behind a Constitution is that it's things that aren't subject

10  to the whims of the legislature anymore; right?

11           MR. McCRARY:  True.  Although I would point out the

12  over-criminalization problem, you know, at the end of the day

13  represents a hypothetical that, I mean, may exist, but doesn't

14  represent a real-world answer to the question.

15    Now, you do raise a question about whether or not, you

16  know, all of us who may commit a felony on a day-to-day basis,

17  you know, represent people who could be stripped, and the

18  answer is yes under the current state of the law.  But I think

19  that there is something to be said about the necessarily

20  limiting factors of, you know, prosecution at large.  And you

21  obviously have not been prosecuted for the felony that you

22  committed today.

23           THE COURT:  What about a misdemeanor?  I mean, a --

24  I commit some misdemeanor, I'm acting unlawfully.  You would

25  say there's a historic tradition of stripping me of my Second

1   Amendment right?

2           MR. McCRARY:  I mean, I think that there are

3   individuals who have committed misdemeanors and are convicted

4   of misdemeanors that are, and appropriately, are currently

5   stripped of their rights, being those subject to the (g)(9)

6   restrictions, but that's for another day, I'm sure.  But I

7   think that the -- the ultimate question, though, like what was

8   being embodied through the exceptions that are carved out by

9   the Heller and Bruen court are those that recognize -- first,

10  they do recognize that there have to be exceptions.  Right?

11          THE COURT:  Yes.

12          MR. McCRARY:  They, full stop, say that this is not

13  an unqualified right.

14          THE COURT:  Yes, I agree.

15          MR. McCRARY:  In fact, I would note that Justice

16  Alito in his concurrence to the Bruen decision made a very

17  clear point, which is that nothing about this decision is meant

18  to expand the body of people who can lawfully possess guns.  So

19  this doesn't represent some sort of watershed by -- Justice

20  Alito's own opinion doesn't represent some sort of watershed

21  moment where restrictions on gun rights have to be stripped

22  away systematically, that there is an operating assumption that

23  the state legislature or the federal legislature can regulate

24  guns.  Right?

25          THE COURT:  So long as it's consistent with the

1    historic tradition.  And again, I'm having -- I'm just having

2    trouble swallowing the full stop, it's -- if you're someone who

3    acts unlawfully, there's a historic tradition of stripping you

4    of -- you're not part of the Second Amendment.

5                MR. McCRARY:  Well, I think that, again,

6    historically criminalizing Tylenol hasn't existed; right?  Such

7    minute violations have not given rise --

8                THE COURT:  You're the one that took it to that

9    level of generality though.  Right?  And I'm suggesting that

10    that level of generality doesn't work for all these reasons,

11    that it has to be something less and it has -- like with

12    felons, we would have to look to longstanding prohibitions on

13    felons.  We would look at the type of things that forever have

14    been understood to be felonies, that a legislature couldn't

15    just, like I said, say mowing your yard is a felony and strip

16    people of their Second Amendment rights.  So there has to be a

17    limitation.

18                MR. McCRARY:  Again, I'm not entirely sure that --

19    that that limitation -- the historic limitation is a limitation

20    of removing arms from somebody who fails to comport with the

21    law.  The fact that the law in 1791 had these ten factors, you

22    know, like these ten laws, and the law in 2022 has, you know --

23    I have no idea how many laws, that that can't -- that can't be

24    the limiting principle either because computer crimes didn't

25    exist in 1791.

1          THE COURT:  But you're taking it to a broader level
2     of generality in a way that I don't think works because you
3     keep saying people who were not acting lawfully, who were
4     breaking laws.  But all the historic traditions weren't.  They
5     were all with people who have been convicted or, like,
6     adjudicated or whatever the -- even with the intoxicants, those
7     normally required some sort of like -- you know, the -- we
8     talked about the surety laws.  You had to go in front of a
9     judge, right, in an adversarial proceeding and make a showing.
10         So here you keep trying to make the analogue to the felon
11    in possession laws, but at least with the felon in possession
12    laws regards to how we -- what's a felony, I have had my day in
13    court and I have been convicted of a felony.  And that is the
14    moment in time when I am stripped of my Second Amendment
15    rights, after that process.  Here I am stripped of my Second
16    Amendment rights, not when convicted under 922(g)(3).  I'm
17    stripped of my Second Amendment rights by operation of the
18    statute at the moment I become an unlawful user of the
19    substance.  Right?
20         MR. McCRARY:  Correct.
21         THE COURT:  And so there's never been an
22    adjudication of my status at the moment that I'm deprived of my
23    Second Amendment right.
24         MR. McCRARY:  But in order to prove that you are,
25    in fact, in violation of 922(g)(3), it necessarily requires the

1    government to prove a violation of law.

2              THE COURT:  I get that, but that just goes to then

3    the criminal punishment for my possession of a gun despite not

4    having a right.  But when we talk about the deprivation of the

5    right, I am deprived of the right with no process.  There's no

6    adjudication, no process, nothing.  It's just whatever moment

7    in time I become an unlawful user of marijuana, I no longer

8    have a Second Amendment right.  No one has determined I'm an

9    unlawful user, there's never been a finding that I'm an

10   unlawful user, it's just this some moment in time.

11             MR. McCRARY:  I suppose I find -- I see relevant,

12   you know, analogues there in terms of our history of

13   restricting firearms to those, you know, wartime statutes that

14   we talked about, those civil legions.  Like, I don't change.

15   There's never been a finding that I am, in fact, contra to the

16   United States, it's that I refuse as a Quaker to swear an oath

17   of allegiance to a country, and yet they deprived those

18   individuals of their right to arms.  And so I think there is

19   some tradition that exists.  In fact, I dare say a deeply

20   rooted tradition of removing firearms from groups of people,

21   even without a legal finding that predates it, as in the case

22   of a felony.

23             THE COURT:  And you would just point to those

24   wartime -- or Revolutionary War-era stripping of guns from --

25             MR. McCRARY:  Well, I mean, there's also the

1    Catholics that we stripped guns from, there's the

2    African-Americans that we stripped guns from, there's the, you

3    know, native Americans that we stripped guns from, there are

4    the Freedmens that we stripped guns from.  There are a variety

5    of individuals who, by virtue of their status without some sort

6    of adjudication at the time of the felony, that we understood

7    could not have guns.

8         Now, obviously, we don't endorse that idea now.  We

9    recognize that that is reprehensible, that you have less --

10                 THE COURT:  Right --

11                 MR. McCRARY:  -- but, I mean, they are consistent

12   with the idea that sans some sort of judicial finding, that

13   just the status alone, as defined by the legislature, can be

14   enough to warrant stripping somebody of their firearms and

15   still be consistent with our nation's historical traditions of

16   firearm regulation.

17                 THE COURT:  And you would point to the stripping of

18   Freedmen and others as that historic tradition?

19                 MR. McCRARY:  I'm not saying we have a great

20   tradition, Your Honor.  I'm saying that we have a tradition.

21                 THE COURT:  I don't know if I would be relying on

22   that, not sure that I would.

23                 MR. McCRARY:  I mean, I understand the argument

24   that they might be considered outside of the polity and,

25   therefore, you know, there's a problem with that.  But that's

1    certainly not the case of the Catholics that were stripped in

2    three -- three jurisdictions of their rights to possess

3    firearms.

4              THE COURT:  Give me a little more detail about

5    that.

6              MR. McCRARY:  Let's see.  In three different

7    instances we have individuals in Maryland and Virginia in 1756,

8    and then in Pennsylvania in 1759.  Catholics were disarmed

9    following the French and Indian war, which was viewed as a war

10   between Protestants and Catholics and they were worried that

11   they would not represent -- you know, would not be true to the

12   state.  And this all -- and by the way, follows from the

13   earlier -- and I know that you have some limitations as to your

14   value of English history --

15             THE COURT:  It's not a limitation as to the value.

16   It's just that so many of these examples, even that one, jumps

17   out at me as one that is no longer valid, right, post-1791

18   because we enacted the Bill of Rights, for example.  That was

19   no longer possible because the operation of the First

20   Amendment --

21             MR. McCRARY:  But, Your Honor, I think that your

22   argument there is one that 1791 represents a year zero, that we

23   have reset everything that predates that.

24             THE COURT:  That is not my argument at all.  I'm

25   just saying that you have to parse out the pre-1791 things that

1   our Bill of Rights were repudiating, the practices that we were

2   repudiating by enacting those rights versus the things that we

3   were codifying with those rights.  There's a stark difference

4   between those two things, and I don't think you're making that

5   distinction.  You're citing examples to me that seems very

6   clear that the Bill of Rights repudiated those practices.

7            MR. McCRARY:  So even if you want to say that the

8   Bill of Rights repudiated, you know, the restriction of

9   firearms from the Catholics, right -- pre -- post, you know,

10  post-amendment restrictions did continue to exist, admittedly,

11  though, they were in the context of those individuals that we

12  discussed earlier, the Freedmen, the African-Americans, the

13  native Americans, people that might be viewed as outside the

14  polity, and in that regard I understand that.

15           THE COURT:  Did any of those occur post civil war

16  amendments?

17           MR. McCRARY:  Post civil war amendments?

18           THE COURT:  Well, post recognition that those

19  people were part of the people?

20           MR. McCRARY:  No, Your Honor.  But, I mean, I would

21  suppose that if you wanted to go to that, then going back to

22  our earlier conversation about intoxicants, the overwhelming

23  number of intoxicant restrictions were post Reconstruction,

24  post Civil War, post 14th Amendment limitations on gun

25  ownership -- or gun carrying, excuse me.

```
 1              THE COURT:  But they were -- they were, you know,

 2   legally possible before then?

 3              MR. McCRARY:  Yes, they were legally possible

 4   before then, but most of them were passed after --

 5              THE COURT:  Right.

 6              MR. McCRARY:  -- after the Bill of Rights, then

 7   applied to the states, so states understood that they could

 8   still manage to impose these restrictions in the face of the

 9   Second Amendment.

10              THE COURT:  So you think that post-1868 you have a

11   historic tradition of -- again, I asked you before, at least

12   with respect to intoxicants, can you point to one statute

13   that's on all fours with (g)(3)?

14              MR. McCRARY:  No.

15              THE COURT:  No.  Because there's not one.

16              MR. McCRARY:  Correct.

17              THE COURT:  It's always about carrying while

18   intoxicated, generally; not possessing while sober, but I

19   happen to be a user.

20              MR. McCRARY:  Correct.

21              THE COURT:  Okay.  We're at that point where, like,

22   the burden is on the government, so I'm just asking the

23   government a ton of questions because it's their burden to

24   prove up the analogue.

25         Anything else I need to ask?
```

1    We have covered a lot of ground.  I'm sorry.  I'm sure

2  that was exhausting having to talk to me for that long

3  consecutively.

4            MR. McCRARY:  Always a pleasure, Your Honor.

5            THE COURT:  When I was a young lawyer, I had to go

6  over and argue one of the -- the Obamacare cases in front of

7  Judge White.  And he put me and the DOJ lawyer, who was down

8  from (*)Main Justice, at the podium at the same time and kept

9  us there for, like, two and a half hours standing at the

10 podium, and it was -- with no water either.  It was pretty

11 rough.

12    I came out of that one, I was sore for, like, two days.

13 My neck was so stiff because I had been up there for so long.

14 So I apologize for how long that went on.

15    Ms. Deskin, is there anything you would like to add?

16            MS. DESKIN:  No.

17            THE COURT:  I mean, I think this is a very

18 difficult case because we have this issue, I think, of I

19 understand the analogy to the felons and these other things,

20 but none of the analogies quite fit.  And when I look at this

21 issue, it's -- again, I do think that it's a societal problem

22 that existed, such that you might have some expectation that

23 there would be, you know, some better analogues, some analogues

24 that are more squarely on point.  And all the analogues have

25 problems, either problems of substance that they're -- they

1   don't go as far as this, or with respect to, like I said, the

2   process that -- you know, at least with a felon I can -- I have

3   been convicted of a felony, that's what deprives me of the

4   Second Amendment status, where that doesn't happen here.  And

5   like with the mentally ill, you know, you cite some of those

6   old statutes relating to, you know, lunatics and otherwise.

7   I'm not sure how I feel about the analogy of marijuana users to

8   lunatics, but -- most marijuana users I know are kind of the

9   opposite of that, pretty mellow folks.  Rather be around them

10  than a drunk, to be honest.

11      So, you know, even though those statutes, when I look at

12  those, the record -- I don't understand how those statutes are

13  on all fours with this.  Right?  I mean, really when we talk

14  about, like, the -- these sorts of things, we're really

15  pointing to 18, U.S.C., Section 922, and it came into law in

16  the mid-20th Century.  When we go back and look at the old

17  stuff, I mean, yeah, there's prohibitions like on the insane

18  and, you know, not allowing them to carry a gun, et cetera, et

19  cetera, but they're all just a far cry from this.  I'm just a

20  user of marijuana.

21              MR. McCRARY:  Well, Your Honor, I guess I would

22  say, first of all, that, again, I know that you know this, but

23  we're not looking for something on all fours.  Three would be

24  good enough, I would assume.  But I would simply suggest that,

25  like, the question of whether or not you view marijuana use as

1  equivalent to insanity doesn't change the fact that the

2  legislature should, in theory, have the ability to determine

3  that people fall into a category of people who might lose

4  control or otherwise be unable to exhibit self-restraint, and

5  that it's marijuana here doesn't change that fact because it --

6  because it could be heroin, it could be cocaine, it could be

7  methamphetamine; (g)(3) applies to all of those.

8          THE COURT:  But this is an as-applied challenge,

9  like I had in the Stambaugh case, as to this guy, and this is a

10 marijuana case.  And again, I think I have to reject that --

11 that premise because, again, you're just making a second

12 step -- the second step that was rejected by Bruen argument,

13 that we should defer to legislative judgments that certain

14 types of people should fit in these categories.  The answer is

15 no, we don't do that anymore.  We only look to see whether

16 historically these people are in the category, period.

17    And so, I mean, I appreciate that, and that's the

18 difficulty with this case.  We can look at a regulation like

19 this and be, like, perfectly sensible policy, right?  But Bruen

20 says, not your concern anymore, Judge, not your concern.

21 Instead we're just going to look at whether the Second

22 Amendment allows this, and that's where it gets a lot tougher.

23 And I suspect, I could be wrong, but at least with respect to

24 this one, I suspect the circuits will bend over every which way

25 to uphold this provision.  That -- that's what I suspect will

1   happen.  But when I -- I do the Bruen analysis, I do what Bruen

2   very explicitly tells me to do, I think this one's tough.  I

3   think this one's very tough because I don't have a good

4   analogue.  I have to stretch the analogies.  And -- well,

5   you'll get your answer, but this one may take a minute.

6        So, again, I know we have this issue.  Defendant's in

7   custody.  Are there -- help me, in the indictment, are there

8   other counts?  Is this the only count?

9                MR. HILL:  This is the only count, Your Honor.

10               THE COURT:  This is the only count.

11               MR. McCRARY:  Your Honor, I would say that in

12   speaking with Mr. --

13               THE COURT:  Are there pending state charges from

14   this --

15               MR. HILL:  Not here in Oklahoma, Your Honor.

16               THE COURT:  Right, but he was pending for the Texas

17   case?

18               MR. HILL:  Correct, there is a pending Texas case.

19               MR. McCRARY:  And I would also say that my

20   understanding, in speaking with Mr. Hill prior to this, is that

21   in light of the phone download that we just discussed, that he

22   intends to seek a continuance.

23               MR. HILL:  That's correct, Your Honor.

24               THE COURT:  Well, we have a pending motion.  So, I

25   mean, unless I rule on this tomorrow, then you might need your

1    continuance.  But I think this one's complicated and difficult

2    and may take a minute, but I'm trying to just make sure that

3    I'm not prejudicing Mr. Harrison in that respect.  He's in

4    federal -- primary federal custody; right?

5             MR. HILL:  Correct.

6             THE COURT:  But he was pending trial in Texas on

7    the aggravated assault charges?

8             MR. HILL:  Correct.

9             THE COURT:  Is anything going to happen in Texas or

10   are they waiting for this?

11            MR. HILL:  Yeah, not until he gets back to Texas.

12            THE COURT:  Okay.  I have never failed to be amazed

13   with the state courts on how certain people are out on bond

14   after certain crimes.  I feel like he shouldn't even been in a

15   position to be arrested for this, but here we are.

16      Okay.  Well, I will move as quickly as I can with respect

17   to making my decision here.  Again, I think we're all anxious

18   for the circuits to start weighing in on these various 922

19   issues, but until then we're left to do the best we can.

20      We're currently on the December setting.  I mean, we can

21   just strike that.  I mean, we have a pending motion and it's

22   not going to -- not going to happen before then.  I'm not going

23   to reset it as of now because the motion's pending, and we'll

24   reset it once we have the motion decided.  And at that time, if

25   you need to seek a continuance based on the discovery, you can

```
 1   do so.
 2        Anything further from either party?  And I appreciate -- I
 3   thought the briefing was helpful.  I appreciate how much time
 4   and attention you put into this, Mr. McCrary.  I enjoyed the
 5   conversation.
 6        Ms. Deskin, we didn't get to talk much, but I appreciate
 7   everything as well.
 8                MR. McCRARY:  Thank you, Your Honor.
 9                THE COURT:  Court's adjourned.
10                     (Court adjourned.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    REPORTER'S CERTIFICATION

2              I, Emily Cripe, Federal Official Realtime Court

3    Reporter, in and for the United States District Court for the

4    Western District of Oklahoma, do hereby certify that pursuant

5    to Section 753, Title 28, United States Code that the foregoing

6    is a true and correct transcript of the stenographically

7    reported proceedings held in the above-entitled matter and that

8    the transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10                        Dated this 3rd day of January, 2023.

11

12

13                    /S/ Emily Cripe
                      EMILY CRIPE, CSR
14                    Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

## <u>Certificate of Service</u>

This is to certify that on June 26, 2023, I electronically transmitted the attached appendix to the Clerk of Court using the NextGen PACER System for filing and transmittal of a Notice of Docket Activity to the following PACER registrant:  J.P. Hill and Laura K. Deskin, counsel for Jared Michael Harrison.


<u>s/ Steven W. Creager</u>
Assistant U.S. Attorney