No. 23-6028

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

**United States of America,**

**Plaintiff-Appellant,**

**v.**

**Jared Michael Harrison,**

**Defendant-Appellee.**

On Appeal from the United States District Court
For the Western District of Oklahoma
District Court No. CR-22-328-PRW
The Honorable Patrick R. Wyrick, District Judge

## Brief of Defendant-Appellee

Laura K. Deskin
Assistant Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee Avenue, Suite 109
Oklahoma City, Oklahoma 73102
(405) 609-5944
Attorney for Defendant-Appellee

Oral Argument is Requested.

TABLE OF CONTENTS

Prior or Related Appeals ................................................................................ 1

Statement of Jurisdiction ............................................................................. 1

Statement of the Issues ................................................................................ 2

Statement of the Case .................................................................................. 3

     A.    Mr. Harrison is arrested after police find a gun and
marijuana in his vehicle and is charged under § 922(g)(3). ............ 3

     B.    Mr. Harrison moves to dismiss the indictment arguing
it violates his Second Amendment right to possess a firearm. ....... 5

     C.    The district court finds § 922(g)(3) unconstitutional as
applied to Harrison and dismisses the indictment. ........................ 9

Summary of the Argument .................................................................... 10

Argument .................................................................................................. 12

     Section 922(g)(3) violates Mr. Harrison's Second Amendment
right to possess arms .................................................................... 12

     A.    The Second Amendment framework under *Bruen*. .............. 12

     B.    Harrison is a member of "the people," making his
conduct presumptively protected under the Second
Amendment. .................................................................................. 16

     C.    Application of § 922(g)(3) is inconsistent with the
Nation's historical tradition of firearm regulation ........................ 31

Conclusion ............................................................................................... 54

Statement Regarding Oral Argument .......................................................54

Certificate of Compliance .........................................................................56

Certificate of Service ................................................................................56

# TABLE OF AUTHORITIES

## CASES

*Ass'n of New Jersey Rifle and Pistol Clubs Inc. v. Att'y Gen. of New Jersey*, 974 F. 3d 237 (3d Cir. 2020) .................................. 42

*Folajtar v. Att'y General of the United States*, 980 F.3d 897 (3d Cir. 2020) .................................................................. 29, 38, 41

*Konigsberg v. State of California*, 366 U.S 36 (1961) ...................... 5

*McDonald v. Chicago*, 561 U.S. 742 (2010) ............................. 13, 44

*N.L.R.B. v. Noel Canning*, 573 U.S. 513 (2014) ....................... 36, 39

*New York State Rifle and Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022)………..2, 5, 10, 12, 13, 14, 15, 16, 17, 19, 20, 30, 32, 34, 35, 36, 39, 40, 44, 47, 51, 54

*Range v. Att'y General*, 69 F. 4th 96 (3d Cir. 2023)17, 20, 21, 22, 40

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas,* 139 S. Ct. 2449 (2019) ................................................................ 33

*Tyler v. Hillsdale County Sheriff's Dep't*, 837 F. 3d 678 (6th Cir. 2016) ................................................................... 45

*United States v. Brown*, No. CR-22-239-JNP, 2023 WL 4826846 (D. Utah July 27, 2023) .................................................. 21

*United States v. Carrero*, 635 F.Supp.3d 1210 (D. Utah 2022) ....................................................................... 21

*United States v. Coombes*, 629 F.Supp.3d 1149 (N.D. Okla. 2022) ....................................................................... 21

iii

*United States v. Daniels*, 77 F. 4th 337 (5th Cir. 2023) ... 12, 15, 31, 38, 42, 43, 44, 45, 47, 49

*United States v. Espinoza-Melgar*, No. CR-21-204-DAK, 2023 WL 5279654 (D. Utah Aug. 16, 2023) ................................... 21

*United States v. Gray*, No. CR-22-247-CNS, 2022 WL 16855696 (D. Colo. Nov. 10, 2022) ................................. 21

*United States v. Johnson*, No. CR-23-188-SLP, 2023 WL 6049529 (W.D. Okla. Sept. 15, 2023) ............................ 21

*United States v. Jones*, CR-22-0376-JD, 2022 WL 18026333 (W.D. Okla. Dec. 30, 2022) ............................................ 21

*United States v. Kays*, 624 F.Supp.3d 1262 (W.D. Okla. 2022) ............................................................................ 21

*United States v. Lewis*, CR-22-368-F, 2023 WL 187582 (W.D. Okla. Jan. 13, 2023) .......................................... 21

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ....... 13, 14

*United States v. McCane*, 573 F. 3d 1037 (10th Cir. 2009) .......... 49

*United States v. Patterson*, 431 F.3d 832 (5th Cir. 2005) ............. 47

*United States v. Rahimi*, 61 F. 4th 443 (5th Cir. 2023) ... 17, 21, 22, 30, 36, 37, 42, 43

*United States v. Reese*, 627 F. 3d 792 (10th Cir. 2010) ........... 13, 14

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ............ 18

*United States v. Yancey,* 621 F. 3d 681 (7th Cir. 2010) ................ 46

*Vincent v. Garland*, ___ F. 4th __, 2023 WL 5988299 (10th Cir. 2023) ....................................................................... 49

iv

STATUTES

1 W. & M., ch. 2, § 7, Eng. Stat. at Large 441 ...............................23

18 U.S.C § 922(g)(8) ................................................................ 13, 14

18 U.S.C. § 3231 ...........................................................................1

18 U.S.C. § 3742 ...........................................................................1

18 U.S.C. § 922(g)(3)...............................3, 5, 8, 9, 12, 15, 31, 35, 44

18 U.S.C. § 922(g)(4) ...................................................................50

21 U.S.C. § 811(a)(1)(A)...............................................................32

28 U.S.C. § 1291 ...........................................................................1

5 *The Statutes at Large of Pennsylvania from 1682 to 1801*
627 (W. Stanley Ray ed., 1898) .....................................................38

National Prohibition Act of October 28, 1919, c. 85, title 2,
§ 3, 41 Stat. 305, 308 ...................................................................33

OTHER AUTHORITIES

1 William Blackstone, *Commentaries* (St. George Tucker
ed. 1803). ...................................................................................25

Angela Dills, et al., *The Effect of State Marijuana
Legalizations: 2021 Update*, Policy Analysis, No. 908 (Feb.
2, 2021) ......................................................................................41

Carlton F.W. Larson, *Four Exceptions in Search of A
Theory: District of Columbia v. Heller and Judicial Ipse
Dixit*, 60 HASTINGS L.J. 1371, 1376 (2009) ...................................51

Daniel Okrent, Last Call: *The Rise and Fall of Prohibition* 7 (2010) ........................................................................ 33

*Documentary History of the Ratification of the Constitution*, Merrill Jensen ed. (Madison: State Historical Society of Wisconsin, 1976)................................................................ 26

James Madison, Notes for Speech in Congress, June 8, 1789, *The Papers of James Madison*, Charles F. Hobson *et al.* eds (Charlottesville: University Press of Virginia, 1979), vol. 12.......................................................................... 24

Jonathan Elliot ed., *Debates in the Several State Conventions on the Adoption of the Federal Constitution* (1836) ........................................................................ 29

Jonathan P. Caulkins et al., RAND Corporation, *Considering Marijuana Legalization: Insights for Vermont and Other Jurisdictions* (2015) ........................................ 48

Joyce Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 136 (1994)................................ 24

Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 GA. L. REV. 1  (1996) ................................ 37

Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield*, 16 L. AND SOC'Y REV. 487 (1985)............................................................ 51

Robert Dowlut, *The Right to Arms Does the Constitution or Predilection of Judges Reign?*, 36 OKLA. L. REV. 65, 96 (1983) ........................................................................ 52

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal*

*Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 143 & n.11 (2007) ............................................................ 34, 38

Ruibin Lu et al., *The Cannabis Effect on Crime: Time-Series Analysis of Crime in Colorado and Washington State*, 38 Just. Q. 4 (2021) ...................................................... 41

Stephen Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* (2008) ........ 23, 24, 25, 26, 28, 29

Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868) ............................................ 52

William Baude, *Constitutional Liquidation*, 71 STAN L. REV. 1 (2019) .................................................................. 39

## RULES

Fed. R. App. P. 32(a)(5) .................................................. 56

Fed. R. App. P. 32(a)(6) .................................................. 56

Fed. R. App. P. 32(a)(7)(B) ............................................. 56

Fed. R. App. P. 32(f) ...................................................... 56

Rule 4(b), Federal Rules of Appellate Procedure ........................... 1

## REGULATIONS

27 C.F.R. § 478.1 ......................................................... 46

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend I ...................................................... 19

U.S CONST., amend. II ................................................... 6, 13

U.S. Const. amend. IV ................................................................. 20

U.S. Const. amend. IX ................................................................ 20

## PRIOR OR RELATED APPEALS

Mr. Harrison has no prior or related appeals.

## STATEMENT OF JURISDICTION

The United States District Court for the Western District of Oklahoma had jurisdiction over this criminal case under 18 U.S.C. § 3231. This is a direct appeal of right taken pursuant to Rule 4(b), Federal Rules of Appellate Procedure. The Court of Appeals has jurisdiction to consider this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

In *New York State Rifle and Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court held that, when the plain text of the Second Amendment covers an individual's conduct, the Constitution presumptively protects that conduct. To overcome that presumption, the government must demonstrate the regulation of that conduct is consistent with the Nation's historical tradition.

In light of *Bruen*, this appeal presents two issues:

> Does the Second Amendment, which presumptively protects the right of "the people" to keep and bear arms, include "all members of the political community" or only "ordinary, law-abiding, responsible citizens"?

> If Mr. Harrison is a member of "the people" referred to in the Second Amendment, has the government met its burden of demonstrating that there is a historical tradition of prohibiting users of marijuana (like Mr. Harrison) from possessing a firearm, even when they are not intoxicated?

## STATEMENT OF THE CASE

**A.    Mr. Harrison is arrested after police find a gun and marijuana in his vehicle and is charged under § 922(g)(3).**

Jared Harrison is a young man without felony convictions. In May 2022 he was pulled over by police in Lawton, Oklahoma, for running a red light.[1] Mr. Harrison rolled his car window down for the officer who immediately smelled marijuana and asked if he had a medical marijuana card.[2] Mr. Harrison advised he did not have a state-issued medical marijuana card and was on his way to his job at a medical marijuana dispensary.[3] The officer had him step out of the car and then noticed Mr. Harrison's ankle monitor.[4] Mr. Harrison explained he was on probation in Texas for aggravated assault (he was actually not convicted, but on bond pending trial or other disposition).[5]

---

[1] App. 87.

[2] *Id.*

[3] *Id.* at 88

[4] *Id.*

[5] *Id.* at 88 & n.1.

The officer searched Mr. Harrison and found nothing of interest.[6] A vehicle search revealed a loaded revolver on the driver's side floorboard; two prescription bottles in the driver's door—one empty and one containing partially smoked marijuana cigarettes; and a backpack in the passenger seat.[7] The backpack contained marijuana, THC gummies, two THC vape cartridges, a pre-rolled cigarette, and marijuana stems.[8]

The officer made no effort to determine if Mr. Harrison was under the influence of marijuana, alcohol, or any other substance.[9]

Mr. Harrison was arrested at the scene and charged in Oklahoma state court with misdemeanor possession of marijuana, misdemeanor possession of paraphernalia, and with failure to obey a traffic signal.[10]

Federal charges ensued for the same event: in August 2022, the federal grand jury charged Mr. Harrison with a violation of 18 U.S.C. §

---

[6] *Id*. at 88.
[7] *Id*.
[8] *Id*.
[9] *Id*.
[10] *Id*.

4

922(g)(3) for being an "unlawful user of marijuana" in possession of a revolver.[11]

## B. Mr. Harrison moves to dismiss the indictment arguing it violates his Second Amendment right to possess a firearm.

Mr. Harrison moved to dismiss the federal indictment arguing that applying § 922(g)(3) to him unconstitutionally deprived him of his Second Amendment right to keep arms under the text-and-history framework announced in *Bruen*, 142 S. Ct. 2111.[12] *Bruen* held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2122. Such presumptively protected conduct can be burdened only by a firearms regulation if the government can demonstrate the regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* Only then "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130 (quoting *Konigsberg v. State of California*, 366 U.S 36, 50, n.10 (1961).)

---

[11] *Id.* at 8, 88.
[12] *Id.* at 25–30; 72–85.

5

Relying on *Bruen*, Mr. Harrison alleged the Second Amendment's plain text covered his conduct (possessing a handgun) and that the government could not prove that § 922(g)(3) aligned with this country's history and tradition of firearm regulation.[13] The government filed a response brief, Mr. Harrison filed a reply brief, and a motion hearing was held.[14]

The government argued it had no need to prove any relevant "history and tradition" because, in its view, Mr. Harrison was not a member of "the people"[15] referred to in the Second Amendment and therefore had no Second Amendment right. The government stated the Second Amendment only belonged to "law-abiding, responsible citizens" and that, as an (alleged) "current and unlawful drug user," Mr. Harrison did not fit that description.[16]

---

[13] *See id.*

[14] App. 52–55 (Government's Response Brief); App. 67–86 (Mr. Harrison's Reply Brief); App. 143–215 (Transcript of Hearing).

[15] The Second Amendment states it is "the right of the people to keep and bear arms." U.S CONST., amend. II.

[16] App. 52–56 (response brief); App. 170–176 (portion of hearing transcript in which the government made further argument on its position that Mr. Harrison is disqualified from membership in "the people").

The government also argued that even if the Second Amendment applied to Mr. Harrison, § 922(g)(3) was consistent with the nation's historical tradition of firearms regulations because prohibiting marijuana users from possessing firearms was analogous to "relevantly similar" historical regulations prohibiting possession of firearms by "presumptively risky persons" such as the intoxicated, convicted felons, and the mentally ill.[17] It also claimed at oral argument that there was a historical tradition permitting disarmament of entire categories of people based on any "status class" the legislature deemed a present danger to the public good, pointing to disarmament provisions for Slaves, Native Americans, Catholics, and Loyalists.[18]

Mr. Harrison argued no textual reading of the Second Amendment cabins the right of "the people" to "law abiding, responsible" citizens alone.[19] He pointed to *Heller*'s description of "the people" as "belonging to

---

[17] App. 57–62, 178.

[18] App. 183-184; 191–194; 204–206.

[19] App. 72.

7

all members of the political community" and other Bill of Rights amendments referring to "the people" that did not carry a restricted interpretation.[20] Mr. Harrison also pointed to evidence that the Founders actively rejected describing a more limited right.[21]

Mr. Harrison maintained the government had not proven § 922(g)(3) was consistent with the Nation's historical tradition of firearm regulation and that it had failed to meet its requirement under *Bruen* to provide any historical laws distinctly or relevantly similar to § 922(g)(3).[22] The government pointed to no law that disarmed that burdened a person's right so severely under comparable circumstances.[23] The government offered no historical source to suggest that citizens were disarmed for being mere users of intoxicants[24] and Mr. Harrison distinguished marijuana users from so-called "lunatics" strenuously.[25] As to

---

[20] *Id*. at 72–73.
[21] App. 74–78.
[22] App. 79–85.
[23] *See* App. 80–83.
[24] App. 80, 83.
[25] App. 82–83.

the government's dangerousness theory, Mr. Harrison argued the "dangerousness" of concern at the time of the founding was who "presented a perceived threat to the government itself" and was tied to "disloyalty"—and not those with the potential for faulty decision-making; thus, such regulations were not relevantly comparable to § 922(g)(3).[26]

## C. The district court finds § 922(g)(3) unconstitutional as applied to Harrison and dismisses the indictment.

Offering exhaustive analysis, the district court issued a 54-page order dismissing the indictment, finding Mr. Harrison's status as a marijuana user did not justify stripping him of his fundamental right to possess a firearm.[27] It ruled that Second Amendment's plain text covered Harrison's conduct (possessing a handgun for self-defense) and he remained a member of "the people;" therefore, the Second Amendment presumptively protected Harrison's conduct.[28] The district court then concluded the United States had not met its burden to demonstrate that prohibiting marijuana users from possessing firearms follows the Nation's

---

[26] App. 84–85.
[27] App. 87–140 (court's entire order).
[28] App. 93–96.

9

historical tradition of firearm regulation, and that, as a result, following *Bruen*, § 922(g)(3) was unconstitutional as applied to Mr. Harrison.[29]

The government appeals the district court's ruling. This Court should affirm.

## SUMMARY OF THE ARGUMENT

The district court's order dismissing Mr. Harrison's indictment should be affirmed: 18 U.S.C. § 922(g)(3) violates Mr. Harrison's Second Amendment right to keep and bear arms after application of *Bruen*. It correctly held that Mr. Harrison is a member of "the people" and that the Second Amendment's terms are not limited to only the "law abiding" or "responsible." Because the amendment's "plain text" covers the regulated conduct, the government must defend its regulation only one way—by proving that it is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

*Bruen* instructs how to interpret and define the relevant history: if a challenged regulation addresses a general societal problem faced by the

---

[29] App. 96–140.

founders, a distinctly similar law in place at the time of the founding is strong evidence of the modern law's constitutionality. If, on the other hand, the concern addressed was unimaginable at the founding, the government must demonstrate there existed relevantly similar historical laws by analogy to laws comparable in both burden and justification. The district court correctly held the government to its burden, and rightly ruled the government has proven no tradition and history comparable in burden and justification to that of § 922(g)(3).

The government, pointing to no historical law distinctly similar to § 922(g)(3), proffers two analogues on appeal: (1) statutes disarming those believed to be presumptively dangerous such as Catholics and loyalists and (2) statutes disarming the mentally ill or so-called lunatics. Neither satisfies the *Bruen* standard.

The district court conducted a searching analysis into the historical arguments offered by the government as required by *Bruen* and correctly ruled that Mr. Harrison's mere status as a marijuana user did not justify him of his fundamental right to possess a firearm. The district court's order dismissing the indictment should be affirmed.

11

ARGUMENT

**Section 922(g)(3) violates Mr. Harrison's Second Amendment right to possess arms.**

The district court correctly concluded that 18 U.S.C. § 922(g)(3), which criminalizes possession of a firearm by one who is an "unlawful user of" a controlled substance, violates the Second Amendment following *Bruen*, 142 S. Ct. 2111, as applied to Mr. Harrison as an alleged marijuana user. The Fifth Circuit Court of Appeals, the only circuit court to face the issue post-*Bruen* thus far, has likewise held § 922(g)(3) unconstitutional as applied to a marijuana user. *United States v. Daniels*, 77 F.4th 337, 355 (5th Cir. 2023). The government made nearly identical arguments in *Daniels* and the Fifth Circuit rejected each with careful, reasoned analysis. This Court too should hold that § 922(g)(3) is unconstitutional as applied to Mr. Harrison and affirm the district court's dismissal of the indictment.

**A.    The Second Amendment framework under *Bruen*.**

The Second Amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

12

U.S. CONST., amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court firmly interpreted this as an "individual right," striking down regulations that limited the right of people to possess firearms for self-defense.

Following these decisions, courts of appeal, including this Court, "coalesced around a two-step analysis" when reviewing firearm regulations that "combined history with means-end scrutiny.'" *Bruen*, 142 S. Ct. at 2126 (internal quotations and citations omitted). For example, in evaluating a Second Amendment challenge to 18 U.S.C § 922(g)(8) (criminalizing possession of firearms by those subject to a certain protective orders), this Court looked first to determine "'whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee.'" *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010) (quoting *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)). It found § 922(g)(8) "impose[d] a burden on conduct, i.e., Reese's possession of otherwise legal firearms, that generally falls within the scope of the right guaranteed by the Second Amendment." *Id*. at 801. It

13

then found it was required to "evaluate the law under some form of means-end scrutiny. *Id.* (quoting *Marzzarella*, 614 F.3d at 89). The court held § 922(g)(8) passed muster under intermediate scrutiny. *Id.* at 802–804.

Cases like *Reese* were abrogated under *Bruen*. Under *Bruen*, combining history with means-end history is "one step too many." *Bruen*, 142 S. Ct. at 2127. Only the historical approach established in *Heller* may be employed. The Supreme Court clarified that, while "judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not the deference that the Constitution demands." *Id.* at 2131.

*Bruen* reiterated the test for constitutionality as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30. Thus, to determine whether a modern firearms law like § 922(g)(3) is constitutional, a court must first determine whether the Second Amendment applies by its plain text. If it does, the government is required to "affirmatively prove" that the regulation "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. This second step "requires both close attention to history and analogical reasoning." *Daniels*, 77 F.4th at 341.

Justice Thomas explained the historical analysis might sometimes be straightforward. For example, "when a challenged regulation addresses a societal problem that has persisted since the 18th Century, the lack of a *distinctly similar* historical regulation in addressing that problem is relevant evidence that the challenged regulation is consistent with the Second Amendment." *Bruen*, 142 S.Ct. at 2131 (emphasis added). And "if earlier generations addressed the societal problem, but did so through *materially different means*, that also could be evidence that a modern regulation is unconstitutional." *Id.* (emphasis added).

On the other hand, if a modern regulation is one "unimaginable at the founding" and addresses "unprecedented social concern or dramatic

15

technological changes" it calls for a "more nuanced approach." *Id*. at 2132.

Then, the court must reason by analogy and consider whether historical

regulations are "relevantly similar" to the modern law. *Id*. The court need

not find a "historical twin" but a "representative historical analogue." *Id*.

at 2133. The "central considerations" when engaging in this "analogical

inquiry" are whether modern and historical regulations (1) impose a com-

parable burden on the right-holder and (2) whether that burden is com-

parably justified (i.e., a common "how" and "why"). *Id*. at 2133.

The district court carefully applied this framework to Harrison's

situation and correctly found § 922(g)(3) did not pass the *Bruen* test.

## B.    Harrison is a member of "the people," making his conduct presumptively protected under the Second Amendment.

The threshold question is whether the Second Amendment's "plain

text" covers an individual's conduct. *Id*. at 2129. Harrison's conduct (pos-

sessing a revolver) is covered by the Second Amendment. *See Heller*, 554

U.S. at 582 ("[T]he Second Amendment extends prima facie, to all instru-

ments that constitute bearable arms, even those that were not in exist-

ence at the founding."); *Range v. Att'y General*, 69 F.4th 96, 103 (3d Cir.

16

2023) (finding the Second Amendment's plain text covered a felon's request to possess a rifle and a shotgun for home defense); *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023) (finding a person subject to a domestic violence restraining order's possession of a pistol and rifle "easily falls within the purview of the Second Amendment"). The amendment grants Mr. Harrison "the right 'to keep' firearms, and 'possession' is included within the meaning of 'keep.'" *Id.* (citing *Bruen*, 142 S. Ct. at 2134–35).

The government does not contest Mr. Harrison's possession of a firearm as being covered by the text of the Second Amendment. But, according to the government, despite text giving the right to "the people," the Second Amendment is restricted to only "ordinary, law-abiding, responsible citizens."[30] And Mr. Harrison, as a marijuana user, is not "ordinary," "law-abiding," or "responsible."

But *Heller*'s exposition regarding the meaning of "the people" in the Second Amendment strongly indicates the government's interpretation

---

[30] *See* Gov't Opening Br. (hereinafter "OB") at 71–79. Page number cites correspond to PDF pagination.

is incorrect. The Supreme Court began its analysis in *Heller* with the "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans," and then confirmed that presumption. *Heller*, 554 U.S. at 581, 595. It explained that, in the Second Amendment, "'the people' … unambiguously refers to all members of the political community, not an unspecified subset," and that it refers to "a class of persons who are part of a national community to who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. at 580. (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). As the district court noted, nobody disputes that Mr. Harrison is an American citizen who lives in the United States and he is part of our "national community."[31] The government's proffered caveat is "precisely the sort of carving out of a subset from the "national community" that the *Heller* court rejected.[32]

While *Heller* referenced "law abiding, responsible citizens," that simply described the petitioners. The phrase was not used in the context

---

[31] App. 94.
[32] As noted by the district court. *See* App. 21.

18

of defining the term "the people." *See Heller*, 554 U.S. at 635.[33] And *Bruen* never said the Second Amendment *only* belongs to law-abiding citizens despite repetition of the term. To the contrary, *Bruen* reiterated that the Second Amendment right was guaranteed to "all Americans" subject only to "certain reasonable, well-defined restrictions" (none in play here) such as "the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials." *Bruen*, 142 S. Ct. at 2156 (quoting and citing *Heller*, 554 U.S. at 581).

*Heller* did suggest that the phrase "the right of the people" in the Second Amendment carries the same meaning in other amendments passed at the same time. *Heller*, 554 U.S. at 579. The First,[34] Second,

---

[33] *See also* App. 95, n. 20.

[34] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; of the right of *the people* peaceable to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend I (emphasis added).

Fourth,[35] and Ninth[36] Amendments all refer to "the people." And these amendments confer individual rights that generally are not stripped from individuals solely based on being not "law-abiding" or not "responsible" (whatever that term may mean). *See Range*, 69 F.4th at 101–102. Categorically excluding marijuana users (or even "unlawful drug users") from "the people" under the Second Amendment would endanger individuals' basic protections under the First and Fourth Amendment and stray from *Bruen*'s characterization of the Second Amendment as "not a second class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (cleaned up).

The Third and Fifth Circuits have both rejected the Government's contention that only "law-abiding, responsible citizens" are among "the

---

[35] "The right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV (emphasis added).

[36] "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by *the people*." U.S. CONST. amend. IX (emphasis added).

people" protected by the Second Amendment along these bases. *See Range*, 69 F.4th at 103; *Rahimi*, 61 F.4th at 451–53.[37] The Third Circuit stated, "Unless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude [a person] is not among 'the people' for Second Amendment purposes would exclude him from those rights as well." *Range*, 69

---

[37] In the Western District of Oklahoma, every district court that has taken the opportunity to consider the question has declined to read into the Supreme Court's jurisprudence a qualification that the Second Amendment right only belongs to "law-abiding" individuals to the exclusion of all others. *See, e.g., United States v. Kays*, 624 F. Supp. 3d 1262, 1265 (W.D. Okla. 2022); *United States v. Lewis*, CR-22-368-F, 2023 WL 187582, at *2 (W.D. Okla. Jan. 13, 2023); *United States v. Jones*, CR-22-0376-JD, 2022 WL 18026333, at *5–*9 (W.D. Okla. Dec. 30, 2022); *United States v. Johnson*, No. CR-23-188-SLP, 2023 WL 6049529, at *4–5 (W.D. Okla. Sept. 15, 2023). Many district courts in the Tenth Circuit have reached the same conclusion. *See, e.g., United States v. Carrero*, 635 F.Supp.3d 1210, 1212 (D. Utah Oct. 14, 2022);*United States v. Brown*, No. CR-22-239-JNP, 2023 WL 4826846, at *5-6 (D. Utah July 27, 2023); *United States v. Espinoza-Melgar*, No. CR-21-204-DAK, 2023 WL 5279654, at *3 (D. Utah Aug. 16, 2023); *United States v. Coombes*, 629 F.Supp.3d 1149, 1161 (N.D. Okla. 2022); *United States v. Gray*, No. CR-22-247-CNS, 2022 WL 16855696, at *2 (D. Colo. Nov. 10, 2022).

F.4th at 102. If the Second Amendment is not a second class right, there is "no reason to adopt an inconsistent reading of 'the people.'" *Id*.

The two circuit courts also had similar concerns regarding the vagueness of the phrase and its susceptibility to expansive interpretation at the whim of legislators. *See Range*, 69 F. 4th at 102–103 (the government's interpretation "devolves authority to legislators to decide whom to exclude from 'the people'" and is "as expansive as it is vague"); *Rahimi*, 61 F. 4th at 453 (the government's interpretation has "no true limiting principle"). The Fifth Circuit asked whether speeders, political nonconformists, or even non-recyclers or non-electric car drivers could be stripped of their right to keep and bear arms as non-law-abiding or irresponsible citizens. *Rahimi*, 61 F. 4th at 453. Our district court voiced similar concerns at oral argument. App. at 199 (stating "there has to be a limiting principle, it seems like, because otherwise we have this circumvention problem [and then] … the Second Amendment [would be] subject to the whims of a legislature."); App. 109 ("It's as if *Bruen*'s command regarding the inappropriateness of … deference to the legislative judgments has been lost in translation.).

The government's attempt to limit the applicability of the Second Amendment to people it deems "law abiding" or "responsible" has no support in the history books either. Had the founders intended to protect a right to bear arms for only *some* of the citizens, or to make that right subject to Congressional judgment about who should, and who should not, be trusted with firearms, they could have saved themselves a lot of trouble. They already had a ready-made template in England's 1689 Declaration of Rights:

> That the Subject *which are Protestants*, may have Arms for their Defence *suitable to their Conditions, and as allowed by Law.*

*Heller*, 554 U.S. at 593 (emphases added) (quoting 1 W. & M., ch. 2, § 7, Eng. Stat. at Large 441). Even 100 years after its adoption, this provision was so well known to James Madison that he mentioned its shortcomings in his notes for a speech introducing what became the Bill of Rights. *See* Stephen Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 251 (2008); James Madison, Notes for Speech in Congress, June 8, 1789, *The Papers of James Madison*, Charles F. Hobson *et al.* eds (Charlottesville: University Press of Virginia, 1979), vol. 12, at

23

193. The "fallacies" of the declaration included the fact that it was only an Act of Parliament (and thus could be overcome when Parliament wanted); moreover, it only protected the rights of *some* of the citizens—protestants. Halbrook, *supra*, at 252.

The "American drafters" of the Bill of Rights "adopted some English rights verbatim," but "the language of the two pronouncements on arms differs markedly and importantly." Joyce Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 136 (1994). "The American language is much broader" than its British predecessor, in part because it "claims for 'the people'–presumably regardless of their religion, state, or condition—a right to keep and carry weapons that the government, or at least the federal government, must not breach, unless one restricts the entire right to members of a well-regulated militia." *Id*. at 137.

The founding generation understood that the English Declaration gave the government too much power to disarm its subjects under the pretense of combatting lawbreaking. The English government, for example, could seize people's guns to enforce (or on the pretense of enforcing)

hunting laws. Halbrook, *supra*, at 311. The American Bill of Rights, by contrast, did not "permit *any* prohibition of arms to the people." *Id*. at 312 (quoting 1 William Blackstone, *Commentaries* 315–16 (St. George Tucker ed. 1803)).

There were also proposals in America to protect some, but not all, citizens' rights to own guns. At the Pennsylvania convention to consider ratification of the unamended Constitution, 46 delegates voted to ratify it and 23 delegates voted not to ratify without a separate bill of rights. Halbrook, *supra*, at 195. Those who lost the vote published a "dissent," and that dissent included a demand for a separate bill of rights. *Id*. One of those proposed amendments would have protected the people's right to own and carry firearms, but that right could be lost "for crimes committed" or "danger of public injury":

> 7. That the people have a right to bear arms for the defence of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, *unless for crimes committed, or real danger of public injury from individuals*; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil powers.

*Id.* (emphasis added) (quoting *Documentary History of the Ratification of the Constitution*, Merrill Jensen ed. (Madison: State Historical Society of Wisconsin, 1976), vol. 2, at 623–64).

In the Massachusetts ratification convention, Samuel Adams proposed a slightly different formulation of the right: "peaceable" citizens could never be disarmed:

> And that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States*,* who are peaceable citizens, from keeping their own arms . . . ."

*Id.* at 205 (citing *Documentary History of the Ratification of the Constitution*, vol. 6, at 1453.). Adams's proposal—like the Pennsylvania Dissenters' earlier suggestion—failed to secure majority support even within the single convention in which it was proposed, so he withdrew his proposal. *Id.* at 205–06.

Several other state conventions *did* vote in favor of individual-rights amendments, including amendments protecting the right to weapons of self-defense. But they all suggested amendments *without* Pennsylvania's and Massachusetts's limiting language:

- New Hampshire: "Congress shall never disarm any citizen, *unless such as are or have been in actual rebellion.*" *Id.* at 213 (emphasis added);

- Virginia: "That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free state . . . ." *Id.* at 230.;

- New York: "That the people have a right to keep and bear arms; that a well regulated militia, including the body of the people capable of bearing arms, is the proper, natural, and safe defence of a free state." *Id.* at 239 & n.26; and

- North Carolina: That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free state . . . . *Id.* at 246 & n.74.

The most important thing to know about the "limiting language" proposed in Pennsylvania, Massachusetts, and New Hampshire, is that it "did not find its way into the Second Amendment." *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (Sykes, J., dissenting).

No version of the Second Amendment introduced in Congress included the limiting language proposed in Pennsylvania, Massachusetts, or even New Hampshire's rebellion limitation. There was no suggestion

27

that the right should be limited to "peaceable," "law-abiding," or "responsible" citizens. In fact, there is contemporaneous evidence that such a proposal would have been rejected. As *Heller* recognized, 554 U.S. at 589, James Madison's "original draft of the Second Amendment" included a "conscientious-objector clause":

> The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: *but no person religiously scrupulous of bearing arms shall be compelled to render military service in person.*

Halbrook, *supra*, at 253 (emphasis added); *see also Heller*, 554 U.S. at 589 (quoting this same draft). Massachusetts Representative Elbridge Gerry vigorously objected to the freedom-of-conscience provision *because* it might give the government too much power to decide who could be disarmed:

> This declaration of rights, I take it, is intended to secure the people against the mal-administration of the government; if we could suppose that, in all cases, the rights of the people would be attended to, the occasion for guards of this kind would bere-moved. Now, I am apprehensive, sir, that this clause would give an opportunity to the people in power to destroy the constitution itself. *They can*

28

> *declare who are those religiously scrupulous, and*
> *prevent them from bearing arms.*

Halbrook, *supra*, at 266 (emphasis added) (quoting Jonathan Elliot ed., *Debates in the Several State Conventions on the Adoption of the Federal Constitution* (1836), vol. 3, at 660). The Senate later deleted the conscientious objector clause, and both houses adopted the final version of the amendment that was ratified by the states. Halbrook, *supra*, at 275–76, 278.

This history shows the Founders knew how to adopt a more limited right if they had wanted, and even had access to language proposing more limited guarantees. It evinces its adopters' desire to ensure legislatures do not retain unreviewable power to determine who could and could not exercise the right. *See Folajtar v. Att'y General of the United States*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) ("Disarming all felons not only ignores history, but also gives legislatures unfettered power over a fundamental right.").

The Founders could have followed the English Declaration and guaranteed a right to bear arms "as allowed by Law," which would give Congress the same power that the British Parliament had to decide who

should and should not be trusted with guns. They could have taken Samuel Adams's suggestion and protected only "peaceable" citizens' right to keep guns. They even could have provided for a revocable right that could be lost upon conviction of a crime, presentation of danger, or participation in rebellion, as the Pennsylvania Dissenters or New Hampshire majority suggested. None of those proposals made the final cut. *See Skoien*, 614 F.3d at 648 (Sykes, J., dissenting). The text ultimately adopted and ratified "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.

So, even someone who is "hardly a model citizen" is "nonetheless among 'the people' entitled to the Second Amendment's guarantees." *Rahimi*, 61 F.4th at 453. The "plain text of the Second Amendment" offers protection to all of the "people," not just those deemed by the Government to be "law-abiding" or "responsible." Mr. Harrison, being a member of "the people" of this country, presumptively, maintains a right to possess firearms. The government must prove § 922(g)(3) follows the nation's historical tradition of firearms regulation. *See Bruen*, 142 S. Ct. at 2135.

**C.　Application of § 922(g)(3) is inconsistent with the Nation's historical tradition of firearm regulation.**

It is the government's "burden to find and explicate the historical sources that support the constitutionality of § 922(g)(3)." *Daniels*, 77 F.4th at 344. It has not done so.

### 1. Substance abuse is not new; the lack of historical laws distinctly similar to § 922(g)(3) is dispositive.

The lack of any distinctly similar historical regulation establishes that § 922(g)(3) is inconsistent with the Second Amendment. Section 922(g)(3) is a modern attempt to address a problem that has existed since the founding: firearm violence by those who, by intoxication, are likely to demonstrate inhibition or lack of self-control.[38] The government has not identified any historical law disarming citizens based on being a mere user of intoxicants.[39] Further, it seems to have abandoned its argument below that state laws prohibiting carrying or using a firearm while under

---

[38] *See* App. 98 (district court noting possession of firearms by users of substances with the potential for abuse is not new).

[39] Mr. Harrison is not alleged to have been intoxicated at the time he possessed a firearm.

31

the influence of alcohol are relevant,[40] and for good reason: such statutes do not evince a "comparable" burden to that of § 922(g)(3).

The government's regulation denies the right to possess any gun, in any setting, for any purpose. It thus presents a total infringement of the core right to possess guns in the home for self-defense. By contrast, early American laws only punished the use or carrying of an arm outside the home by someone who was actually intoxicated in the moment. That the societal concern surrounding the idea of intoxicated people bearing arms was addressed "through materially different means" is further evidence the modern regulation is unconstitutional. *Bruen*, 142 S. Ct. at 2131.

The government claims it has no need to point to a distinctly similar law, because substances were not "controlled" in the eighteenth century. But, as the district court noted, it is the "potential for abuse" that is the driving factor as to whether a substance is "controlled" under the Controlled Substances Act. App. 98; 21 U.S.C. § 811(a)(1)(A). Substances had the "potential for abuse" long before the federal government or any state

---

[40] *See* App. 61–62.

chose to control them. Alcohol is a substance with the potential for abuse as is marijuana—like marijuana, possession of alcohol too has been banned. *See* National Prohibition Act of October 28, 1919, c. 85, title 2, § 3, 41 Stat. 305, 308 (making it illegal for anyone to, among many other things, "possess any intoxicating liquor"). Yet, despite this, and despite "[t]he country's early years [being] a time of notoriously hard drinking," no historical law has restricted one's right to armed self-defense based on the mere fact of being a user of intoxicants. *Tennessee Wine & Spirits Retailers Ass'n v. Thomas,* 139 S. Ct. 2449, 2463 (2019) (citing Daniel Okrent, Last Call: *The Rise and Fall of Prohibition* 7 (2010)). As *Bruen* advised, the lack of any distinctly similar regulation demonstrates that § 922(g)(3) is inconsistent with the Second Amendment.

## 2. Historical laws are not sufficiently analogous.

Even if the "societal problem" addressed by § 922(g)(3) is couched instead as addressing a modern phenomenon of "drug abuse" as the government posits, it has not pointed to any historical laws comparable in burden and justification.

### a. A danger-based justification for disarmament of marijuana users falls apart under *Bruen*'s framework.

33

In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142. This included even "dangerous" citizens. *Id.* at 164. This being the case, the government alleges a "historical tradition of disarming those who are in a class believed to be presumptively dangerous."[41] This is a level of generalization far afield from what could rightfully be considered a "comparable justification." *Bruen*, 142 S. Ct. at 2133.

---

[41] OB 30.

34

Perhaps most concerningly, it has no limiting principle. It would allow a legislature to call any class of people "presumptively dangerous" on whim and disarm them. Our Nation's history, and the passing of the Bill of Rights, shows our founders actively rejected the idea of a federal legislature with such unchecked power.

### i.     *The disarming of Catholics and Loyalists does not provide an analogue.*

The government's proffered analogue to the disarming of groups like Catholics and loyalists fails to show a tradition of a similar regulation to § 922(g)(3). In *Bruen*, the government offered some laws that were comparable to a modern state statute in severity but were outliers in their time. *See Bruen*, 142 S. Ct. at 2153. Other laws were not enforced often enough to establish a historical tradition of comparable firearms regulation. *See id.* at 2149–50. Others impacted a limited portion of the population, faced little judicial scrutiny, or came too late after the Founding to assist with the original understanding of the Second Amendment. *See id.* at 2154–55. *Bruen* said, "[W]here a governmental practice has been open, widespread, and unchallenged since the early days of the Re-

35

public, the practice should guide our interpretation of an ambiguous con-
stitutional provision." *Id.* at 2137 (quoting *N.L.R.B. v. Noel Canning*, 573
U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)). And "[a] long,
unbroken line of common-law precedent stretching from Bracton to
Blackstone is far more likely to be part of our law than a short-lived, 14th-
century English practice." *Id.* at 2136. The disarmament of Catholics and
loyalists is neither; the government's comparison of § 922(g)(3) to the dis-
arming of Catholics and loyalists (and Slaves and Native Americans)
stretches to a level generality well beyond anything contemplated as an
acceptable historical analogue in *Bruen*.

The pre-founding laws cited by the government are simply not in
keeping with the Second Amendment. There is a reason the Second
Amendment exists. That Catholics were disarmed via the English Militia
Act of 1662, which allowed officers of the Crown to "seize all arms in the
custody or possession of any person" who they "judge[d] dangerous to the
Peace of the Kingdom" does not support the government's position.
*Rahimi*, 61 F.4th at 456. The Fifth Circuit found that "the Militia Act's

36

provenance demonstrates that it is <u>not</u> a forerunner of our Nation's historical tradition of firearm regulation." *Id*. (emphasis added). It explained that the Militia Act of 1662 was intended to disarm King Charles II's political opponents and was used by the Catholic James II for the same reasons once he took the throne in 1685. *Id*. (citing Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 GA. L. REV. 1, 8 (1996)). The Militia Act was later qualified by the 1689 English Bill of Rights after Protestants William and Mary took the throne following the "Glorious Revolution," guaranteeing that Protestants could have arms for their defense. *Id*. That right "*restricted* the Militia Act's reach in order to prevent the kind of politically motivated disarmaments pursued by Charles II and James II, [and] 'has long been understood to be the predecessor to our Second Amendment.'" *Id*. (quoting *Heller*, 554 U.S. at 593). "This understanding, and the history behind it, defeats any utility of the Militia Act of 1662 as a historical analogue for § 922(g)(8)." *Id*. For the same reasons, it is not relevant as a historical analogue for § 922(g)(3).

The Third and Fifth Circuits rejected the government's argument that pre-founding laws disarming Catholics and loyalists provides historical justification for modern firearm laws. The justification for laws targeting Catholics and loyalists was radically different from that justifying § 922(g)(3). As the district court noted, such disarmament laws were based "on the fear that the covered groups were likely to wage active war against the colonies or interfere with the colonists' war efforts." App. at 136-37 (citing *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting)); *accord Daniels*, 77 F. 4th at 351. Therefore, such laws do not fit *Bruen*'s metric, and do not serve as sufficient historical analogues to hold § 922(g)(3) to be constitutional under the Second Amendment, especially as applied to Mr. Harrison. *See Daniels,* 775 F. 4th at 351–55.

At any rate, only two colonies (Virginia in 1756 and Pennsylvania in 1759) ever acted to disarm Catholics.[42] As the district court noted,

---

[42] *See* 5 *The Statutes at Large of Pennsylvania from 1682 to 1801* 627 (W. Stanley Ray ed., 1898); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157 n. 47 (2007). Maryland may have also disarmed Catholics, but this has been debated. *See* App. 136, n. 166.

38

"Two laws in place during time of war hardly demonstrate a course of consistent practice sufficient to establish a constitutionally significant tradition."[43] The Supreme Court would likely agree, noting in *Bruen* that it "doubt[ed] that *three* colonial regulations could suffice to show a tradition of public-carry regulation." *Bruen*, 142 S. Ct. at 2142 (emphasis in original); *cf. N.L.R.B.*, 573 U.S. at 524–26; *id.* at 572–74 (Scalia, J., concurring); William Baude, *Constitutional Liquidation*, 71 STAN L. REV. 1, 16–18 (2019). Further, when these provisions were enacted, Catholics were excluded from the protections of the operative rights-protecting document, the English Bill of Rights. As the district court noted, "Laws applying to a group that was not protected by the right to armed self-defense cannot provide any insight into that right's scope."[44]

Ultimately, "[t]hat Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics and Blacks does nothing to prove that [Mr. Harrison] is part of a similar group today. And any such analogy would be "far too broad [ ]." *Range*,

─────────────────────

[43] App. 136.
[44] App. 136.

69 F. 4th at 105. *See Bruen*, 142 S. Ct. at 2134 (noting that historical restrictions on firearm in "sensitive places do not empower legislatures to designate any place 'sensitive' and then ban firearms there.").

### ii. *Marijuana users are not in a class of dangerous people.*

The government posits there is a connection between marijuana use and violence, and that therefore it can place marijuana users in a class of those who are presumptuously dangerous.[45] It says individuals involved with marijuana were more likely to have used marijuana; it says adolescents who used marijuana were twice as likely to engage in violence.[46] But there is a disconnect in causation. Studies illuminating such statistics do not suggest, much less prove, that it is marijuana that *causes* a person to be more violent than anyone else. And there is contradictory evidence the government does not cite. *See*, *e.g.*, Ruibin Lu et al., *The Cannabis Effect on Crime: Time-Series Analysis of Crime in Colorado and*

---

[45] The government goes even further than that, claiming research backs up that marijuana users are "more likely to be violent with a firearm." OB 38. But no source cited by the government so far makes that claim.
[46] OB 38.

*Washington State*, 38 Just. Q. 4, p. 6 (2021) (citing multiple studies evidencing marijuana use either has no effect on or may decrease violent tendencies). Violent behavior is complex and multifaceted, and social environments and socioeconomic factors play a role. There is no straightforward statistical connection between marijuana use and violent crime.

Ultimately, the government draws overly broad, alarmist conclusions from scant, cherry-picked, dated studies. If marijuana users were "dangerous" as the government claims, one would expect there to be an uptick in violent crimes in the many states that have legalized its use. Yet the statistics show that "violent crime has neither soared nor plummeted in the wake of marijuana legalization." Angela Dills, et al., *The Effect of State Marijuana Legalizations: 2021 Update*, Policy Analysis, No. 908, p. 9 (Feb. 2, 2021) (and citing statistics).

Stripping a person's fundamental rights based on "projected crimes untethered from past dangerous actions is a risky game indeed." *Folajtar*, 980 F. 3d at 923 (Bibas, J., dissenting) (emphasis omitted). As the district court correctly observed, "That is why *Bruen* rejected the very interest-balancing approach that the United States asked the

41

Court to adopt."[47] "The Second Amendment demands more than the United States' interest balancing approach that is based on speculative assessments of future risk and 'back of the envelope' math.'" App. 125, citing *Ass'n of New Jersey Rifle and Pistol Clubs Inc. v. Att'y Gen. of New Jersey*, 974 F.3d 237, 260 (3d Cir. 2020) (Matey, J., dissenting), *cert. granted, judgment vacated sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (2022). The government's proffered "history of class-based disarmament based on perceived dangerousness" is a bridge too far.

The government proffered the same "dangerousness principle" to the Fifth Circuit Court of Appeals in *Daniels*. The Fifth Circuit found this argument had "no true limiting principle." *Daniels*, 77 F.4th at 353 (citing *Rahimi*, 61 F. 4th at 454). It opined that "Congress could claim that immigrants, the indigent, or the politically unpopular were presumptively 'dangerous' and eliminate their Second Amendment rights

---

[47] App. 125.

without judicial review." *Id*. Permitting this "would render the Second Amendment a dead letter." *Id*.

The government's level of generalization is simply too broad to be considered relevant analogy. It is dangerously close to permitting the government to slap whatever label it wants to on a group without actual evidence, call it "tradition," and then strip them of their fundamental right. That flies in the face of the very existence of the Second Amendment.

The Fifth Circuit rejected the government's argument; so too should this Court: "Marihuana users are not a class of political traitors, as British Loyalists were perceived to be. Nor are they like Catholics … who were seen as potential insurrectionists. And even if we consider the racially discriminatory laws at the Founding, [Harrison] is not like the minorities who the Founders thought threatened violent revolt." *Daniels*, 77 F. 4th at 354. It is eighteenth century alcoholics who comprise the historical group most closely analogous to 21st century marijuana users. *Id*. at 355. But "even as the Founders were disarming Catholics and politically disaffected citizens, they left ordinary drunkards unregulated."

43

*Id.* at 354. And "[w]hich are marihuana users more like: British Loyalists during the Revolution? Or repeat alcohol users? The answer is surely the latter." *Id.* at 355.

The government's request that this Court strip Mr. Harrison of his Second Amendment right because the government judges him to be "presumptively risky" as a user of marijuana "is the kind of toothless rational basis review that *Bruen* proscribes." *Id.* at 355.

### b. Section 922(g)(3) is not relevantly similar to alleged historical laws disarming the mentally ill.

The government claims those who unlawfully use controlled substances, including users of marijuana as Harrison is alleged to be, are relevantly similar to those who are mentally ill.[48] This likeness is claimed due to *Heller*'s caveat that "longstanding prohibitions on the possession of firearms by … the mentally ill" are still "presumptively lawful." *Heller*, 554 U.S. at 626; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting that portion of *Heller*) *and McDonald*, 561 U.S. at 786

---

[48] OB 61–63.

44

(quoting same). But nothing in *Bruen* allows the government to sidestep its required analysis by simply comparing drug users to the mentally ill. *Heller* "did not invite courts onto an analytical off-ramp to avoid constitutional analysis." *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F. 3d 678, 686 (6th Cir. 2016).

### 1. Marijuana users are not akin to the mentally ill.

The government says marijuana users are akin to the eighteenth century "mentally ill" in that "intoxication" was allegedly "regarded as temporary insanity."[49] But § 922(g)(3) does not punish merely the "intoxicated," it punishes anyone who is an unlawful user of controlled substances, as already discussed above. A marijuana user is thus subject to the law, regardless of whether he is sober. *See Daniels*, 77 F. 4th at 349. At any rate, marijuana users are not "mentally ill."

The government also says "habitual drug users" are more likely to have difficultly exercising self-control, like mentally ill people, and so it is dangerous for them to have firearms.[50] It provides no proof for this

---

[49] OB 61.
[50] OB 62.

statement. It also provides no proof that marijuana users are too danger-ous to have firearms. Most importantly, it provides no proof that the Founders would have made such a statement, even if marijuana use had been widespread in their time. The government cites to *United States v. Yancey,* 621 F.3d 681, 685 (7th Cir. 2010)[51] which referenced the Code of Federal Regulations which in turn defines an unlawful user as "a person who uses a controlled substance and has lost the *power of self-control with reference to the use of controlled substance*." 27 C.F.R. § 478.1 (emphasis added). The CFR does not state anything about a user's loss of self-control vis-à-vis violence or firearms usage.

Essentially, the government is doing no more than stating that it views marijuana users as dangerous and so they must be disarmed. This *is* sidestepping the careful *Bruen* analysis that is required. The argument strays from text and history and borders on a means-end justification (or perhaps that is what it is). For example, the government claims "historic laws disarming the mentally ill" satisfies *Bruen*'s "how" metric because

---

[51] *See* OB 62.

46

the disarmament is to a "'limited, narrowly tailored specific' group," citing to a pre-*Bruen* Fifth Circuit case upholding the constitutionality of § 922(g)(3).[52] But post-*Bruen*, the Fifth Circuit has held §922(g)(3) unconstitutional. *Daniels*, 77 F. 4th at 355. Post-*Bruen*, the narrowness of the population affected by a government regulation is irrelevant. Also, *Bruen* requires a demonstration that laws existed comparable in burden to the right-holder and justification for the burden. *Bruen*, 142 S.Ct. at 2133. This proffered "how" is neither.

The government criticizes the district court's concern that the same logic could be used to disarm those with autism, attention deficit disorder, and nicotine dependence, stating they are "irrelevant" because such conditions were not "conceptualized as mental disorders when the Second Amendment was ratified."[53] But the government provides no proof that marijuana use (much less unlawful marijuana use) was considered a "mental illness" in or around 1791, or that it would have been. So the

_____

[52] OB 46, citing *United States v. Patterson*, 431 F.3d 832, 835 (5th Cir. 2005).
[53] OB 65.

47

significance of its complaint regarding the district court's commentary on that point is unclear.

The government suggests a link between mental illness itself and marijuana use;[54] again, correlation does not imply causation. And, significantly, there have not been large increases in incidence of psychoses in line with rise in rates of cannabis use in young adults in recent decades. *See* Jonathan P. Caulkins et al., RAND Corporation, *Considering Marijuana Legalization: Insights for Vermont and Other Jurisdictions*, p. 37 (2015). Moreover, *"if* cannabis use does have a causal impact on psychosis, it appears to be highly contingent on the timing and intensity of cannabis use and possibly on a genetic propensity or other existing personal and environmental risk factors." *Id*. (emphasis added). Any association between marijuana and mental illness is a complex and debated topic within the field of public health and medicine. And here, the government has not even attempted to demonstrate that Harrison's use of marijuana

---

[54] OB 45.

has permanently impaired him in a way that is comparable to ongoing mental illness. *See Daniels*, 77 F.4th at 350.

> **2. The Supreme Court has only stated laws disarming the mentally ill are presumptively lawful; this does not mean they are not subject to the test of history and tradition.**

Even if this Court were to take the surprising and unprecedented step of lumping in marijuana users with the mentally ill, the Supreme Court has only stated in dicta that "longstanding prohibitions" on the mentally ill are presumptively lawful. *Heller*, 554 U.S. at 626. But the court did not undertake a survey of relevant history or claim a tradition of laws disarming the mentally ill. It did not state any presumption could not be overcome.[55] Nor has the government pointed to any longstanding

---

[55] In the recent case of *Vincent v. Garland*, this Court adhered to its precedent in *United States v. McCane*, 573 F. 3d 1037, 1047 (10th Cir. 2009), holding that, despite *Bruen*, this Court is bound by *Heller*'s dicta that it was not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons." *Vincent v. Garland*, ___ F. 4th __, 2023 WL 5988299 at *1 (10th Cir. 2023) (citing *Heller*, 554 U.S. at 626). *McCane* only dealt with *Heller*'s dicta on felons. *See McCane*, 573 F. 3d at 1047. There was no discussion of the mentally ill, nor of what *Heller* meant by the term. Perhaps this Court, if presented with a challenge on firearm possession by one "adjudicated as a mental defective or who has been committed to a mental institution" under 18 U.S.C. § 924(g)(4), would

prohibitions on the mentally ill from possessing guns, especially when, like Harrison, they have never been adjudicated mentally ill. And Harrison has been neither adjudicated mentally ill nor a marijuana user (it remains a mere accusation made in the dismissed indictment). Even current federal law only specifically prohibits firearm possession by "one has been adjudicated as a mental defective or who has been committed to a mental institution." 18 U.S.C. § 922(g)(4).

The government's suggestion that there is a tradition and history of disarming the mentally ill ("lunatics") if they "may be dangerous" is dubious and, at any rate, not relevantly similar to disarming marijuana users, either in scope or justification. The argument relies only on an alleged practice of confining the mentally ill which necessarily would result in disarmament, as "[o]ne searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." Carlton F.W. Larson, *Four Exceptions in Search of A*

---

find itself bound by *McCane* in that case. That situation, however, is not before the Court here.

*Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HAS-
TINGS L.J. 1371, 1376 (2009). Even the alleged practice of locking up "dan-
gerous lunatics" is questionable. The Moran article cited by the govern-
ment in support of its proposition[56] states that, "[p]rior to the Nineteenth
Century, persons acquitted on the grounds of insanity were legally enti-
tled to release." Richard Moran, *The Origin of Insanity as a Special Ver-
dict: The Trial for Treason of James Hadfield*, 16 L. AND SOC'Y REV. 487
(1985). Civil commitment proceedings still existed for those alleged to be
"dangerous lunatics," and two justices of the peace were required to con-
fine a person under the Vagrancy Act of 1744, though "the system was
mainly informal and irregular." *Id.* at 487–88. Per Moran, acquittals for
reason of insanity were rare, but when they happened, most were sent
home. *Id.* at 488. Moran's article is not a primary source demonstration
of a "well-established and representative historical *analogue*" to §
922(g)(3). *Bruen*, 142 S. Ct. at 2133. The government is far afield from its
task.

---

[56] *See* OB 60.

As it did below, the government also attempts to rely on a 1983 article by Robert Dowlut published in the Oklahoma Law Review and a single statement by nineteenth century legal scholar Thomas Cooley. OB 59–60 (citing Robert Dowlut, *The Right to Arms Does the Constitution or Predilection of Judges Reign?*, 36 OKLA. L. REV. 65, 96 (1983) *and* Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28–29 (1868)). The district court correctly pointed out why the government's quotes from Dowlut and Cooley do not demonstrate the government's claim:

> In a single, three-sentence paragraph, Dowlut argued that "Colonial and English societies of the eighteenth century ... excluded ... [idiots and lunatics]" from the right to keep and bear arms. Dowlut's article, however, does not discuss or cite a single seventeenth, eighteenth, or nineteenth-century law or case demonstrating that point. In fact, he relies on a lone source for this proposition: the 1903 edition of Thomas Cooley's famed treatise on state constitutional law. Elsewhere in its brief, the United States relies on the same Cooley passage, which it claims stands for the proposition that "certain persons—namely, 'the idiot, the lunatic, and the felon, on obvious grounds'—had long been 'almost universally excluded' from exercising certain civic rights in America, including the right to bear arms."

52

> The problem is that the Cooley passage doesn't actually say anything about the right to keep and bear arms. Instead, the passage falls in the middle of Cooley's discussion of who may "participat[e] in the government"—that is, who may hold office or "exercise the elective franchise." Cooley's point in the passage is that "in every State, although all persons are under the protection of the government, and obliged to confirm their action to its laws, there are some who are altogether excluded from participation in the government." His reference to "the idiot, the lunatic, and the felon"—the passage the United States and Dowlut rely on—comes in reference to "[c]ertain classes [that] have been almost universally excluded" from voting because "they lack either the intelligence, the virtue, or the freedom of action *essential to the proper exercise of the elective franchise.*"

App. 111–12. This passage from Cooley may prove a tradition of stripping voting rights from the "idiot, the lunatic and the felon" but it does not prove a tradition of stripping Second Amendment rights from anyone.

At any rate, § 922(g)(3) which requires no judicial determination of dangerousness and is not limited to those with a history of violent behavior, is not relevantly similar to any tradition the government alleges. Even as to the concept of dangerousness itself, the government has not shown that Mr. Harrison has a history of drug-related violence. The government has gone much too far afield from *Bruen*'s comparable "how and

why" test in its attempt to square § 922(g)(3) with "tradition." The alleged practice of locking up "lunatics" in the eighteenth century is simply not a comparable regulatory tradition sufficient to meet *Bruen*'s demand.

The failure to present a comparable historical regulatory tradition is fatal; § 922(g)(3)'s application to Mr. Harrison runs afoul of the Second Amendment.

## CONCLUSION

Mr. Harrison is a member of the "people" and his conduct in possessing a firearm is covered by the Second Amendment's plain text. After *Bruen*, the government must prove that laws regulating conduct covered by the Second Amendment plain text align with this Nation's history and tradition. It has not met its burden. Section 922(g)(3)'s ban on possession of firearms by a marijuana user is an "outlier[ ] that our ancestors never would have accepted." *Bruen*, 142 S. Ct. at 2133. The district court's dismissal of the indictment should be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Harrison requests oral argument because counsel believes it will substantially aid this Court in its analytical process.

Respectfully submitted,

s/ *Laura K. Deskin*
Laura K. Deskin
Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee Avenue, Suite 109
Oklahoma City, OK 73102
(405) 609-5944
Laura_Deskin@fd.org
Counsel for Defendant-Appellee

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,039 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook font, Size 14.

s/ <em>Laura K. Deskin</em>

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2023, I electronically transmitted the attached brief to the Clerk of Court using the NextGen PACER System for filing, which will send notification to: Steven Creager, Assistant United States Attorney.

s/ <em>Laura K. Deskin</em>