No. 23-6028

# In the United States Court of Appeals for the Tenth Circuit

UNITED STATES OF AMERICA, PLAINTIFF-APPELLANT,

V.

JARED MICHAEL HARRISON, DEFENDANT-APPELLEE.

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

THE HONORABLE PATRICK R. WYRICK
DISTRICT JUDGE

D.C. NO. CR-22-328-PRW

REPLY BRIEF OF PLAINTIFF-APPELLANT

ROBERT J. TROESTER
United States Attorney

STEVEN W. CREAGER
Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
Telephone (405) 553-8700
Attorneys for Plaintiff-Appellee

# Table of Contents

**Page(s)**

Introduction ...................................................................................... 1

Discussion ........................................................................................ 2

I.     Violence by unlawful users of controlled substances is a general societal problem that did not exist in 1791, and analogical reasoning would still apply even if it did. ............. 2

II.     To maintain the balance struck by the traditions of the American people, the justification of both historical and modern firearms laws should be viewed broadly. ................. 5

III.     This Court should reject Mr. Harrison's critiques of the historical analogues proffered by the government. .............. 15

     A.     While not the most persuasive analogue, the Militia Act 1662 provides a relevant starting point for the government's argument. ............................................... 15

     B.     There is no bright-line requirement that there must be three or more 18th century laws to make a historical tradition well-established. ........................... 16

     C.     Mr. Harrison's critiques of the government's arguments regarding disarmament of the mentally ill are misplaced. ......................................................... 19

         1.     The Supreme Court has spoken regarding disarming the mentally ill. ................................. 19

         2.     The government presented a well-established historical tradition of disarming the mentally ill. ....................................................................... 20

         3.     Mr. Harrison's critique of Cooley, echoing the district court, fails once again to consider the full context of the quote. ..................................... 22

IV.   Showing the reason for a modern regulation can be based on modern evidence that does not have to show causation..23

    A.   The government has not advocated for means-end test. ................................................................................25

    B.   Causation is not required. ..........................................25

    C.   Mr. Harrison's challenges to the studies cited by the government should be rejected. .............................27

V.   The "people" protected by the Second Amendment only includes ordinary, law-abiding, responsible citizens. ..........29

Conclusion ............................................................................31

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements .......................................33

Certificate of Service ...............................................................33

## Table of Authorities

Page(s)

### Federal Cases

*Alleyne v. United States*,
570 U.S. 99 (2013) ................................................................. 4

*Atkinson v. Garland*,
70 F.4th 1018 (7th Cir. 2023) .............................................. 9

*Barrett v. United States*,
423 U.S. 212 (1976) .............................................................. 24

*Begay v. United States*,
553 U.S. 137 (2008) .............................................................. 24

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) .............................................................. 7

*Caron v. United States*,
524 U.S. 308 (1998) .............................................................. 24

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................... 1, 5, 7, 8, 20, 27, 30, 31

*Folajtar v. Atty. Gen.*,
980 F.3d 897 (3d Cir. 2020) ................................................. 9

*Goldstein v. Hochul*,
___ F. Supp. 3d ___, 2023 WL 4236164 (S.D.N.Y June 28, 2023) ......... 9

*Heller v. D.C.*,
670 F.3d 1244 (D.C. Cir. 2011) .......................................... 31, 32

*Henderson v. United States*,
575 U.S. 622 (2015) .............................................................. 24

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ................................................ 10

*Kipke v. Moore*,
___ F. Supp. 3d ___, 2023 WL 6381503 (D. Md. Sept. 29, 2023).......8–9

*Lewis v. United States*,
445 U.S. 55 (1980) ...................................................................................24

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ................................................................14

*New York Rifle & Pistol Assn., Inc. v. Bruen*,
142 S. Ct. 2111 (2022)......... 1, 2, 5, 6, 7, 8, 11, 12, 13, 14, 16, 17, 18, 30

*Range v. Atty. Gen.*,
69 F.4th 96 (3d Cir. 2023) ...............................................................6, 10

*Rehaif v. United States*,
139 S. Ct. 2191 (2019) ............................................................................24

*Small v. United States*,
544 U.S. 385 (2005) ..........................................................................24, 26

*Spooner v. McConnell*,
22 F. Cas. 939 (C.C.D. Ohio 1838) .......................................................22

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023) ...................................................................7

*United States v. Bennett*,
329 F.3d 769 (10th Cir. 2003) ................................................................4

*United States v. Daniels*,
77 F.4th 337 (5th Cir. 2023) ......................................... 9, 10, 11, 12, 13

*United States v. Holden*,
70 F.4th 1015 (7th Cir. 2023) ................................................................9

*United States v. Jackson*,
69 F.4th 495 (8th Cir. 2023) ...........................................................9–10

*United States v. Rahimi*,
143 S. Ct. 2688 (2023) ............................................................................2

iv

## Federal Statutes

18 U.S.C. § 922(g)(3)..........................................................................2, 3 4,

21 U.S.C. § 802 ..................................................................................3

21 U.S.C. § 802(6) ............................................................................4

## Other

Thomas Cooley, *A Treatise on the Constitutional Limitations Which
    Rest Upon the Legislative Power of the States of the American
    Union* 21–37 (1868).....................................................................22, 23

Angela Dills, et al., *The Effect of State Marijuana Legalization:
    2021 Update*, CATO Institute, Policy Analysis No. 908
    (Feb. 2, 2021)................................................................................27, 29

R. Lu, et al., *The Cannabis Effect on Crime:  Time-Series Analysis
    of Crime in Colorado and Washington State*, 38 Just. Q. 4
    (2021).............................................................................................27, 28

Brenda A. Miller, *The Interrelationships Between Alcohol and Drugs
    and Family Violence, in* Drugs and Violence: Causes, Correlates,
    and Consequences Use (M. De La Rosa, et al. eds. 1990)...................28

## <u>Prior or Related Appeals</u>

Since the United States filed its opening brief, an additional

appeal has been filed raising the same issue:

- *United States v. Martinez*, 10th Cir. No. 23-6140

## Introduction

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in *Heller* more explicit." *New York Rifle & Pistol Assn., Inc. v. Bruen*, 142 S. Ct. 2111, 2134 (2022) (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008)). The *Heller/Bruen* "methodology center[s] on constitutional text and history." *See id.* at 2127–28. It also requires the application of analogical reasoning. *See id.* at 2131–32 (explaining that *Heller* considered colonial-era and founding-era historical precedent and "concluded that the handgun ban was unconstitutional" only after "finding none was analogous to the District's ban"). Analogical reasoning is how courts decide "which modern 'arms' are protected by the Second Amendment," *id.* at 2132, and the "*new* and analogous sensitive places" where legislatures can prohibit the possession of firearms, *id.* at 2133.

This case asks how to properly apply the *Heller/Bruen* test, and it presents several questions: (1) What is the general societal problem at issue? Is it new? Does the analysis change if the problem is not new?; (2) How broadly or narrowly should courts construe the reasons why legislatures enacted historical and modern firearms regulations?;

1

(3) What type and how much evidence must be presented to identify a well-established and historical analogue?; (4) How does the government show a modern statute is analogous?; and (5) Who are "the people" protected by the Second Amendment?  These questions are the subject of this reply brief and are discussed below.

One final consideration, while the constitutionality of 18 U.S.C. § 922(g)(3) will not be addressed by the Supreme Court this term, many of the questions identified above will be answered in *United States v. Rahimi*, 143 S. Ct. 2688 (2023).  Oral argument is scheduled in *Rahimi* on November 7, 2023, and a decision is expected by June 2024.

<u>Discussion</u>

I.    **Violence by unlawful users of controlled substances is a general societal problem that did not exist in 1791, and analogical reasoning would still apply even if it did.**

One of the first questions the *Bruen* test asks is "whether the statute 'addresses a general societal problem that has persisted since the 18th century.'"  Aplt. Br. at 6 (quoting *Bruen*, 142 S. Ct. at 2131). Because, if such a problem existed, how the founding generation addressed the problem is relevant evidence on the issue of whether the modern regulation is consistent with the Second Amendment.  *Id.*

But even on this simple, fundamental question, the parties are far apart. Mr. Harrison alleges that the general societal problem addressed by § 922(g)(3) is "firearm violence by those who, by intoxication, are likely to demonstrate inhibition or lack of self-control." Aplee. Br. at 31 & n.38 (citing App. at 98). But this is "a fundamental error" because "the group Congress prohibited from possessing guns was more restrictive—'*unlawful* user[s] of or [those] addicted to any *controlled* substance (*as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802*))." Aplt. Br. at 8 (quoting 18 U.S.C. § 922(g)(3)). Mr. Harrison offers no contrary argument; instead, he merely repeating the district court's conclusion that "[s]ubstances had the 'potential for abuse' long before the federal government or any state chose to control them." Aplee. Br. at 32–33. But ignoring the actual problem Congress chose to address does not change the statute as written.

The plain language of the statute makes clear that Congress was not concerned about the potential violence of all users of any substance or even all users of substances that have a potential for abuse. Instead, Congress was worried about the enhanced risk of violence created by those (1) whose judgment is more likely to be affected by intoxicants

and (2) who have already shown a disregard for the law by using those intoxicants unlawfully.[1]  The district court and Mr. Harrison both err by  treating the second concern as irrelevant.

Moreover, Mr. Harrison attempts to use his disregard of the problem Congress identified to his advantage.  He notes that "[t]he government has not identified any historical law disarming citizens based on being a mere user of intoxicants."  Aplee. Br. at 31.  While that might be true, neither "unlawful use" nor "addiction" was an issue in the 18th century.  As explained previously, there was no such thing as a controlled substance (and, thus, there could be no unlawful use) until 1877, *see* Aplt. Br. at 7, and drug addiction was not an issue in 1791, *see id.* at 10.  It is only by redefining the problem Congress addressed that Mr. Harrison can argue that § 922(g)(3) addresses an issue that has persisted since the 18th century, and only then by relying on alcohol— which Congress excluded as a controlled substance, *see id.* (citing 21 U.S.C. § 802(6)).

---

[1] To obtain a conviction under § 922(g)(3), "the government must show a defendant's [unlawful] drug use was contemporaneous with his firearm possession."  *United States v. Bennett*, 329 F.3d 769, 776–77 (10th Cir. 2003), *abrogated on other grounds by Alleyne v. United States*, 570 U.S. 99 (2013).

Finally, even if Mr. Harrison could permissibly redefine the problem Congress addressed in § 922(g)(3) and, thus, make it a general societal problem that has persisted since the 18th century, it does not follow that "[t]he lack of any distinctly similar historical regulation *establishes* that § 922(g)(3) is inconsistent with the Second Amendment." Aplee. Br. at 31 (emphasis added). Instead, it would be "relevant evidence." This is clear from *Heller* and *Bruen*, which applied analogical reasoning to determine if there were any relevantly similar historical statutes, and concluded that the modern regulations were unconstitutional only after concluding there were no relevantly similar historical statutes. *See* Aplt. Br. at 11–12.

## II. To maintain the balance struck by the traditions of the American people, the justification of both historical and modern firearms laws should be viewed broadly.

> The Second Amendment "is the very *product* of an interest balancing by the people" and "it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." It is *this balance*—struck by the traditions of the American people—that demands our unqualified deference.

*Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635).

In its opening brief, the United States cited a variety of English and American laws disarming: (1) those lieutenants of the militia judged to be dangerous, (2) Scotsmen, (3) Catholics, (4) loyalists, and (5) those who may have given aid and support to an uprising as establishing a historical tradition of disarming those believed to be or presumptively dangerous. *See* Aplt. Br. at 14–19. In response, Mr. Harrison alleges that "[t]his is a level of generalization far afield from what could rightfully be considered a 'comparable justification.'" Aplee. Br. at 34 (quoting *Bruen*, 142 S. Ct. at 2133); *see also id.* at 36 ("[T]he government's comparison of § 922(g)(3) to the disarming of Catholics and loyalists (and Slaves and Native Americans) stretches to a level of generality well beyond anything contemplated as an acceptable historical analogue in *Bruen*."); *id.* at 39 (claiming the analogy proffered by the United States "would be 'far too broad[.]'" (quoting *Range v. Atty. Gen.*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc), *pet. for cert. filed*, No. 23-374 (U.S. Oct. 10, 2023)). But it is Mr. Harrison's argument that is inconsistent with the *Bruen*. This can be seen by looking at the level of generality *Bruen* used in addressing the meaning of "arms" and "sensitive places."

6

Starting with "arms," the Court explained that the term "does not apply 'only [to] those arms in existence in the 18th century.'" *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582). Instead, it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (quoting *Heller*, 554 U.S. at 582). "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that *general* definition covers modern instrumentalities that facilitate armed self-defense." *Id.* (emphasis added). Thus, "even if . . . colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Id.* at 2143. As a result, courts have construed "arms" broadly. *E.g. Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam) (holding stun guns are arms protected under the Second Amendment); *Teter v. Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023) (butterfly knives).

On the restriction side of the balance, *Bruen* explored the example "of 'longstanding' 'laws forbidding the carrying of firearms in sensitive

7

places such as schools and government buildings.'" *Bruen*, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626). Notably, it admitted that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses.'" *Id.* Still, it was "also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* Thus, it "assume[d] it as settled that [those] locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* More importantly for present purposes, it held that "courts [could] use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* Like "arms," what constitutes a "sensitive place" has been construed broadly, even by the district court in this case. *See* App. at 97 n.26 (airport); *see also, e.g.*, *Bruen*, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626) (schools); *Kipke v. Moore*, ___ F. Supp. 3d ___, 2023 WL 6381503, at *7–11 (D. Md. Sept. 29, 2023) (finding museums, health care facilities, and mass transit facilities are "sensitive places" but parks, forests, and locations selling alcohol are

not "sensitive places"); *Goldstein v. Hochul*, ___ F. Supp. 3d ___, 2023 WL 4236164, at *12 (S.D.N.Y June 28, 2023) (finding "houses of worship are sensitive places"), *appeal docketed*, No. 23-995 (2d Cir. July 6, 2023).

Applying the principles *Bruen* explained makes Mr. Harrison's error apparent. He contends the historic laws identified by the government "were based 'on the fear that the covered groups were likely to wage active war against the colonies or interfere with the colonists' war efforts." *Id.* at 38 (quoting App. at 136–37 (citing *Folajtar v. Atty. Gen.*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting)); citing *United States v. Daniels*, 77 F.4th 337, 351 (5th Cir. 2023), *pet. for cert. docketed*, No. 23-376 (U.S. Oct. 10, 2023)). In effect, he identifies the narrowest common trait of the laws identified by the government. But this is far narrower than how *Bruen* treated "arms" and "sensitive places." Instead, the laws identified by the government disarmed groups the legislature believed were dangerous. *See Atkinson v. Garland*, 70 F.4th 1018, 1035 (7th Cir. 2023) (Wood, J., dissenting); *United States v. Holden*, 70 F.4th 1015, 1017 (7th Cir. 2023), *pet. for cert. docketed*, No. 23-5726 (U.S. Oct. 6, 2023); *United States v. Jackson*,

9

69 F.4th 495, 505 (8th Cir.), *reh'g en banc denied*, 2023 WL 5605618

(8th Cir. Aug. 30, 2023); *Range*, 69 F.4th at 111 (Ambro, J.,

concurring); *id.* at 122 (Krause, J., dissenting); *Kanter v. Barr*, 919 F.3d

437, 458 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated on other*

*grounds by Bruen*, 142 S. Ct. 2111; *see also Daniels*, 77 F.4th at 352

("Founding-era governments took guns away from persons perceived to

be dangerous."); *id.* at 353 (explaining that "the sheer number of

disarming statutes at the time of the Founding . . . suggest a public

understanding that when a class of individuals was thought to pose a

grave danger to public peace, it could be disarmed").  Just as it would be

too broad to derive a rule from these laws that Congress may disarm

any group it pleases, it is too narrow to say that the Second Amendment

only permits stopping violence because of anger at the government and

for no other reason.

Even if this Court adopts the narrower view of the historical

disarmament laws advocated by Mr. Harrison, the question remains:

how should this Court compare the reasons for the historical law

against the reasons for the modern law?  If this Court takes a narrow

view of the reason historical disarmament laws were enacted, it can and should still uphold relevantly similar laws using analogical reasoning.

Of course, analogies can go "far too broadly." *Bruen*, 142 S. Ct. at 2134. As *Bruen* explained, it would be too broad "to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* This would effectively "exempt cities from the Second Amendment and would eviscerate the general right to public carry arms for self-defense." *Id.* Thus, the *Heller*/*Bruen* test is not "a regulatory blank check," which allows courts to "uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* at 2133 (cleaned up).

But just as the Second Amendment is not "a regulatory blank check," "neither [is it] a regulatory straight jacket." *Id.* The modern regulation does not need to be "a historical *twin*" nor does it need to be "a dead ringer for historical precursors" proffered by the government. *Id.* Instead, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*," one sufficiently "analogous to pass constitutional muster." *Id.*

So how do courts determine what is a proper analogue?  Luckily, *Bruen* answered that question.  It explained that "because everything is similar in infinite ways to everything else, one needs some metric enabling the analogizer to assess which similarities are important and which are not."  *Id.* at 2132 (cleaned up).  It then provided "two metrics" based on precedent:  "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  By utilizing these two metrics, courts can determine "whether modern historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."  *Id.* Conspicuously, Mr. Harrison never mentions these metrics in their entirety.

The Fifth Circuit's analysis in *Daniels*, which Mr. Harrison urges this Court to follow, is a perfect example of how application of the wrong metrics will yield erroneous results.  As mentioned above, *Daniels* began with the correct level of generality when discussing the historical laws disarming certain groups, concluding they "took guns away from persons perceived to be dangerous."  *Daniels*, 77 F.4th at 353.  In doing so, *Daniels* addressed the two questions *Bruen*'s metrics posed:  (1) "how

. . . the regulations burden a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2133, they "took guns away from persons" belonging to specific groups, *Daniels*, 77 F.4th at 353; and (2) "why the regulations burden a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2133, the groups were "perceived to be dangerous," *Daniels*, 77 F.4th at 353.  If *Daniels* had ended its analysis with the metrics *Bruen* identified, it would have correctly held § 922(g)(3) was constitutional and affirmed.

Instead, having applied *Bruen*'s metrics, *Daniels* then asked additional and different questions, claiming they were "*Bruen*'s 'why' and 'how' analysis."  *Id.* at 354.  Among others, it asked:  "*Why* was the group considered dangerous at the founding and therefore disarmed? And *why* does the modern law classify a person as presumptively dangerous?"  *Id.*  It was only in answering these new questions that *Daniels* rejected the government's analogies to loyalists and Catholics, concluding unlawful users of controlled substances "are not a class of political traitors" nor are they "seen as potential insurrectionists."  *Id.*

Using *Bruen*'s metrics to exclude statutes that would otherwise qualify is antithetical to the purpose of analogical reasoning in the

Second Amendment.  Analogical reasoning is used because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791," yet the Second Amendment is "'intended to endure for ages to come, and consequently, [it must] be adapted to the various crises of human affairs." *Bruen*, 142 S. Ct. at 2132 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819)).  This is not to say that statutes cannot be unconstitutional after application of analogical reasoning, *Heller* and *Bruen* prove that point.  But if the modern regulation passes *Bruen*'s metrics, then it is improper to change those metrics for the purpose of holding the modern regulation unconstitutional and attribute that holding to *Bruen*.  This is how the Fifth Circuit erred in *Daniels*.

To demand the closeness required by *Daniels* and the district court in this case and for which Mr. Harrison advocates requires the government not to prove an analogue but require a twin.  *Bruen* was clear, the analogical reasoning test it applied does not require such a close analogy.  *Bruen*, 142 S. Ct. at 2133.

In the end, this Court should use the same level of generality to the reasons for enacting historical disarmament laws and § 922(g)(3) as

14

is used for other parts of the Second Amendment.  To adopt the narrow view of the reason for the disarmament or turn the analogical reasoning test of *Bruen* to restrict the reasoning for the laws would upset the balance struck by the Second Amendment.

## III.  This Court should reject Mr. Harrison's critiques of the historical analogues proffered by the government.

### A.  While not the most persuasive analogue, the Militia Act 1662 provides a relevant starting point for the government's argument.

Mr. Harrison contends that the Militia Act 1662 "is not relevant as a historical analogue" because it was used to disarm political opponents of the king and "was later qualified by the 1689 English Bill of Rights."  Aplee. Br. at 36–37.  While the Militia Act 1662 might be less persuasive in the context of this appeal, Mr. Harrison's account of the history is inaccurate.  The Militia Act 1662 survived failed attempts to repeal it in 1689, 1690, and 1691, and remained in use into the 18th century.  *See* Aplt. Br. at 15–16 (collecting sources including 18th century state papers confirming this fact).  The value of the Militia Act 1662 in this case is to show that at its foundation the pre-existing right to bear arms did not extend to those believed to be dangerous.

**B.    There is no bright-line requirement that there must be three or more 18th century laws to make a historical tradition well-established.**

Next, Mr. Harrison urges this Court to reject laws disarming Catholics because they were only enacted in two or three colonies.  *See* Aplee. Br. at 38–39.  For this proposition, he quotes *Bruen*'s "doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."  *Id.* (quoting *Bruen*, 142 S. Ct. at 2142; App. at 136).  Mr. Harrison's argument, however, is devoid of important context.  This can be seen both by how the quote ends, what the Supreme Court said immediately after, and how it treated "sensitive places."

First, in the statement quoted by Mr. Harrison, the Supreme Court addressed broad "public-carry regulations," i.e. "regulating public carry by the general public."  *Bruen*, 142 S. Ct. at 2142.  It defined this as a "broad prohibition[] on all forms of public carry."  *Id.* at 2145.  It makes sense that a broad prohibition on all forms of public carry by all members of the public would require a much broader tradition than a restriction on a much narrower group of individuals defined by their unlawful activity, such as is the case with § 922(g)(3).

16

Second, the Court's dissatisfaction with the laws identified by New York in *Bruen* was not as much with the number but with how different they were from New York's may-issue licensing regime. The statutes identified by New York only prohibited carrying of dangerous, unusual, or unlawful weapons, not weapons commonly used for self-defense. *Bruen*, 142 S. Ct. at 2142–43. The Court, thus, whittled the laws down to "[a]t most eight years of history in half a Colony roughly a century before the founding" and concluded that was insufficient. *Id.* at 2144. When the government raised this in its opening brief, *see* Aplt. Br. at 38, Mr. Harrison did not respond.

Third, *Bruen* explained, "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited," *Bruen*, 142 S. Ct. at 2133, and cited sources pointing to only two or three states that prohibited possession of firearms in different places in each state. The Supreme Court held this was sufficient not only to "assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," but also created a well-established tradition that permits courts to "use analogies to those historical

regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 2133. Put simply, having differing laws from two or three states was sufficient to create the sensitive places doctrine. Again, despite the government making this very argument in its opening brief, *see* Aplt. Br. at 38–39, Mr. Harrison offers no explanation why *Bruen*'s treatment of sensitive places laws is contrary to the numerical limitation he wishes to impose.

Ultimately, the government does not rely on two or three laws to establish anything on their own. Instead, it has relied upon laws disarming Catholics—along with a history of laws including the Militia Act 1662, English laws disarming Scots and Catholics, and American laws disarming loyalists and those who aided a rebellion—to establish a historical tradition that existed from at least the mid-17th century through the ratification of the Second Amendment permitting the legislature to disarm members of those groups it believes to be dangerous. That only two or three states disarmed Catholics is the same as saying to only one state prohibiting firearms in the legislative assembly or only one state prohibited firearms at a polling place. Mr.

Harrison's argument would say those laws are insufficient to establish any tradition, but the Court has made clear that several similar laws can demonstrate a broader principle, even if they are not identical.

### C. Mr. Harrison's critiques of the government's arguments regarding disarmament of the mentally ill are misplaced.

In its opening brief, the government argued a historical tradition of disarming the mentally ill exists based on both the Supreme Court's assurance that the history supports that conclusion as well as academic articles and primary sources. *See* Aplt. Br. at 43–44. In response, Mr. Harrison contends the Supreme Court "did not undertake a survey of relevant history or claim a tradition of laws disarming the mentally ill." Aplee. Br. at 49. He also alleges that "the alleged practice of locking up 'dangerous lunatics' is questionable," chiding the government because the academic documents it cites are not "primary source[s]." *Id.* at 50–53. Each challenge is addressed below.

#### 1. The Supreme Court has spoken regarding disarming the mentally ill.

As noted above, Mr. Harrison argues that *Heller* did not conduct a historical analysis when it stated that laws prohibiting the possession of firearms by the mentally ill was presumptively lawful. *Id.* at 49. He

is wrong. Keeping in mind that *Heller* established the text, history, and tradition test that *Bruen* clarified, the Court explained that "nothing in [*Heller*] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill." *Heller*, 554 U.S. at 626. While it did not write out its historical analysis, the Court was clear that it conducted such an analysis. *See id.* at 635 ("[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."). Thus, Mr. Harrison is incorrect that the Supreme Court "did not undertake a survey of relevant history or claim a tradition of laws disarming the mentally ill." Aplee. Br. at 49.

### 2.   The government presented a well-established historical tradition of disarming the mentally ill.

Mr. Harrison also either misunderstands or misrepresents the argument the government made in its opening brief. The United States did not rely on academic articles by Carlton Larson or Richard Moran to support a claim that there is a historical tradition of locking up or disarming the mentally ill. Instead, the government used them as a springboard into the primary sources they cite. *See* Aplt. Br. at 43–44, 47–48. Larson and Moran concluded justices of the peace could "lock up

20

'dangerous lunatics' and seize their property," with Moran citing the English Vagrancy Act 1744. *See* Aplt. Br. at 43–44. For its part, the government quoted a 1788 New York law that allowed the seizure of property of an ordinary "lunatic," an 1849 Supreme Court opinion noting the "acknowledged right" to "exclude . . . lunatics", and an 1868 treatise that recognized that the idiot and the lunatic are among those who were almost universally excluded from the people in whom sovereignty is vested. *See* Aplt. Br. at 44 (collecting sources). The government also corrected Moran claim regarding the English Vagrancy Act 1744 by quoting the language of the Act, which did not require actual dangerousness but, instead, permitted the seizure of one who was mentally ill if they *may be* dangerous. *See id.* at 48.

Thus, to clarify, the United States' position is consistent with *Heller*'s conclusion that there is a historical tradition for disarming the mentally ill. This historical tradition is well-established, as represented by analogues such as the English Vagrancy Act 1744 and the 1788 New York statute. Contrary to the qualifiers suggested by Larson and Moran, those statutes did not require proof of dangerousness but, at most, a conclusion that the individual might be dangerous.

Consequently, this Court should affirm what *Heller* said and hold there is a well-established historical tradition of disarming the mentally ill.

> **3.    Mr. Harrison's critique of Cooley, echoing the district court, fails once again to consider the full context of the quote.**

One of the lesser supporting documents the government relied upon to support *Heller*'s conclusion that there is a historical tradition of disarming the mentally ill was Thomas Cooley's treatise.  *See* Aplt. Br. at 44.  Mr. Harrison contends that Cooley was only discussing voting rights.  *See* Aplee. Br. at 52–53 (quoting App. at 111–12).  The text of Cooley's treatise shows Mr. Harrison is wrong.

The chapter from which the quotation at issue comes is entitled "The Formation and Amendment of State Constitutions."  Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 21–37 (1868).  Cooley began the relevant discussion on the page before, explaining: "The theory of our political system is that the ultimate sovereignty is in the people, from whom springs all legitimate authority."  *Id.* at 28 (citing *Spooner v. McConnell*, 22 F. Cas. 939, 943 (C.C.D. Ohio 1838) (No. 13,245)).  After discussing the powers exercised by the people,

Cooley then poses the question:  "Who are the *people* in whom is vested the sovereignty of the state?"  *Id.*  It is in answering that question— "[w]ho are the *people*"—that Cooley states, "[c]ertain classes have been almost universally excluded," including "the idiot [and] the lunatic."  *Id.* at 29.  While Cooley explained that "[a]s a practical fact, the sovereignty is vested in those persons who by the constitution of the State are allowed to exercise the elective franchise," *id.*, the ultimate question Cooley had posed and was answering—"[w]ho are the *people*," *id.* at 28—should not be forgotten.

**IV.   Showing the reason for a modern regulation can be based on modern evidence that does not have to show causation.**

Having discussed how to determine the reason behind a historic regulation, the next question is determining the reason for the modern regulation.  There are two ways this could be accomplished:  (1) using normal tools of statutory interpretation to determine legislative intent; and/or (2) using modern evidence to determine if the legislature's reason is valid.  These ways are not mutually exclusive, and the government submits that both show Congress enacted § 922(g)(3) to prevent the possession of firearms by those it believes to be dangerous.

As for the first option, the Gun Control Act of 1968—including § 922(g)(3)—was enacted to keep firearms out of the hands of groups of people Congress believed to be dangerous.  *See* Aplt. Br. at 20–21 (collecting sources).  In addition to the sources cited in the opening brief, the Supreme Court and its members have repeatedly reached this conclusion.  *See Rehaif v. United States*, 139 S. Ct. 2191, 2208 (2019) (Alito, J., dissenting); *Lewis v. United States*, 445 U.S. 55, 64 (1980); *Barrett v. United States*, 423 U.S. 212, 218 (1976); *cf. Henderson v. United States*, 575 U.S. 622, 629 (2015); *Begay v. United States*, 553 U.S. 137, 161 (2008) (Alito, J., dissenting) (citing *Caron v. United States*, 524 U.S. 308, 315 (1998)); *Small v. United States*, 544 U.S. 385, 393 (2005); *id.* at 403 (Thomas, J., dissenting).  Given the repeated statements about § 922(g)'s purpose, this Court could easily answer the question of "why [§ 922(g)(3)] burden[s] . . . [the] right to armed self" without having to go farther.

Still, the government understands that courts in the modern era may wish for or expect more than Congress' stated reason or the Supreme Court's assurance.  The are thus two remaining questions: (1) What type of evidence?; and (2) Is the evidence presented by the

United States in this case sufficient?  Those questions are answered below.

### A.    The government has not advocated for means-end test.

To prove the reasons for § 922(g)(3), the United States cited several studies that had been relied upon by the Fourth and Seventh Circuits.  *See* Aplt. Br. at 20–22, 45–47.  Mr. Harrison contends this "argument strays from text and history and borders on a means-end justification (or perhaps that is what it is)."  Aplee. Br. at 46.  But when you have a modern problem, how else can one confirm that the legislature's motives are permissible.  This does not stray into prohibited means-end test; instead, it is used to inform the modern side of the analogical reasoning required by the history-based *Heller*/*Bruen* test.  Otherwise, the only thing that would be left is to take the legislature at its word.  As explained above, if that is the case, the government has carried its burden.

### B.    Causation is not required.

Mr. Harrison's main critique of the government's use of modern studies is the fact that they do not prove causation.  *See* Aplt. Br. at 40, 48.  But Mr. Harrison cites nothing to support his contention that

causation rather than correlation is required to support the conclusion that the reason for a modern law is relevantly similar to the reason for a historic law.  Supreme Court precedent suggests the opposite.

One of the most instructive cases on this issue is *Small*.  In that case, the Supreme Court addressed the question of whether the phrase "convicted in any court" applies "only to convictions entered in any *domestic* court or to *foreign* courts as well."  *Small*, 544 U.S. at 387. The Court held that the phrase was limited to domestic courts because § 922(g)(1) would "somewhat less reliably identif[y] dangerous individuals for the purposes of U.S. law where foreign convictions, rather than domestic convictions, are at issue."  *Id.* at 390.  The dissent likewise noted that "[i]t was eminently reasonable" for Congress to use most felony convictions "as a proxy for dangerousness" in § 922(g)(1). *Id.* at 403 (Thomas, J., dissenting, joined by Scalia and Kennedy, J.J.). The important teaching of *Small* for purposes of this case is that neither the majority nor the dissent in *Small* suggested that a felony conviction is what *caused* one to be dangerous, only that it was an appropriate proxy for dangerousness.  While *Small* is not itself a Second Amendment decision, it is noteworthy that three years later the same

justices saying that it would be eminently reasonable to use a felony conviction as a proxy for dangerousness to disarm someone formed the core of the majority describing felon dispossession statutes as presumptively lawful based on history.  *See Heller*, 554 U.S. at 626–27 & n.26, 635.

### C.    Mr. Harrison's challenges to the studies cited by the government should be rejected.

Mr. Harrison's third challenge to the studies presented by the government in support of Congress' conclusion that unlawful users of marijuana are the type of dangerous people who may be disarmed is that two studies call the government's argument into doubt.  *See* Aplee. Br. at 40–41 (citing R. Lu, et al., *The Cannabis Effect on Crime:  Time-Series Analysis of Crime in Colorado and Washington State*, 38 Just. Q. 4 (2021) (Lu); Angela Dills, et al., *The Effect of State Marijuana Legalization: 2021 Update*, CATO Institute, Policy Analysis No. 908 (Feb. 2, 2021) (Dillis)).  Neither study provides Mr. Harrison the support he suggests.

As for the Lu article, it first recognized that "a number of empirical studies find that marijuana use enhances the likelihood of engaging in violent and property crimes and other forms of serious

delinquent behavior." Lu p.5 (collecting studies). It also noted that "[c]annabis users' risk of offending is also confirmed by a meta-analysis that investigated the connection between drug use and crime." *Id.* (collecting studies). The primary study Lu cites for the proposition that "cannabis use either will not affect or it may even ameliorate drug user's violent tendencies," *id.* at p.6, is Brenda A. Miller, *The Interrelationships Between Alcohol and Drugs and Family Violence*, *in* Drugs and Violence: Causes, Correlates, and Consequences Use (M. De La Rosa, et al. eds. 1990) (Miller). Miller's study shows that while drug abuse might decrease violence in those who also have high alcohol use, an individual who abuses drugs (including marijuana) is more violent than a person who does not abuse drugs or alcohol or only uses a moderate amount of alcohol, i.e. an ordinary, law-abiding, responsible citizen. *See* Miller pp. 184–85 & figs. 1 & 2. Simply put, the Lu and Miller studies largely support Congress' conclusion that unlawful drug users are dangerous.

The Dillis study relied upon by Mr. Harrison largely is irrelevant to the question of whether unlawful users of marijuana are dangerous for two reasons. First, the study did not address whether there was any

correlation between marijuana use and violence, it only examined the effects of state-level legalization. In fact, Dillis noted that the trend in marijuana utilization remained the same before and after state-level legalization. *See* Dillis pp. 4–5. Second, marijuana use remained illegal at the federal level. Absent a change in the federal lawfulness, one might not expect a big change, which is what the study found. *Id.* at 9.

Ultimately, this Court need not address the outer boundaries of when a legislature may disarm a group because it believes they are dangerous. Under any burden, Congress clearly was justified in concluding that unlawful users of controlled substance are sufficiently dangerous as a class to warrant disarmament.

## V. The "people" protected by the Second Amendment only includes ordinary, law-abiding, responsible citizens.

As the government previously noted, this Court need not address the meaning of "the people" in the Second Amendment because the government has carried is burden under the *Heller*/*Bruen* test. *See* Aplt. Br. at 14 n.3. Still the government will address a couple of points.

First, Mr. Harrison omits from his discussion of "the people" any explanation of why *Bruen* repeatedly emphasized and connected the Second Amendment right to "ordinary, law-abiding citizens." At best,

he states:  "*Bruen* never said the Second Amendment *only* belongs to law-abiding citizens despite repetition of the term."  Aplee. Br. at 19. That assertion ignores the metrics identified by the Supreme Court at the heart of the analogical reasoning test in *Bruen*, which specifically reference "a law-abiding citizen's right," *Bruen*, 142 S. Ct. at 2133, and, thus, identify "law-abiding citizen[s]" as the right holder.  Moreover, *Bruen* explained those metrics are important because it "enable[s] the analogizer to assess which similarities are important and which are not."  *Id.* at 2132.  Therefore, *Bruen* concludes that the Second Amendment protects " a law-abiding citizen's right," not the rights of a broader group.

Second, Mr. Harrison inverts and misstates what *Heller* said, claiming that the Court confirmed it and citing the evidence it used to find a strong presumption existed in the first place.  *See* Aplee. Br. at 18.   He alleges that *Heller*

> explained that, in the Second Amendment, "'the people' . . . unambiguously refers to all members of the political community, not an unspecified subset," and that it refers to "a class of persons who are part of a national community who have otherwise developed sufficient connection with this country to be considered  part of that community."

Aplee. Br. at 18 (quoting *Heller*, 554 U.S. at 580).  But *Heller* did not *hold* or *explain* that about the Second Amendment.  The first quote addressed "all six *other* provisions that mention 'the people'" and the second quote repeated that it was a "sugges[tion]."  *Heller*, 554 U.S. at 580 (emphasis added).  Moreover, these quotes did not "confirm" the strong presumption, they were the basis for it.  *See id.* at 580–81.  If *Heller* confirmed its strong presumption, that fact was lost on both the *Heller* dissent and members of the Court in subsequent opinions.  *See* Aplt. Br. at 55–60 (collecting opinions).

## Conclusion

The Second Amendment is not a regulatory straight jacket and modern laws do not need a historical twin nor must they be dead ringers for historical precursors, but that is what the district court required and what Mr. Harrison wants.  Under their standard, it is unclear what regulations would survive, if any.  But governments "have *more* flexibility and power to impose gun regulations under a test based on text, history, and tradition than they would under strict scrutiny," under which "presumably very few gun regulations would be upheld." *Heller v. D.C.*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J.,

dissenting). The *Heller/Bruen* test "largely preserved the status quo of gun regulation in the United States" and "simply pushed back against an outlier local law . . . that went far beyond the traditional line of gun regulation." *Id.* at 1270. Because the district court misapplied *Heller* and *Bruen*, this Court should reverse and remand.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney


s/ Steven W. Creager
STEVEN W. CREAGER
Assistant United States Attorney
Bar Number:  30052 (OK)
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405)553-8700 - office
(405)553-8888 - fax
steven.w.creager@usdoj.gov

## Certificate of Compliance with Type-Volume Limitation, <u>Typeface Requirements, and Type Style Requirements</u>

As required by Fed. R. App. P. 32(g), I certify that this brief is proportionally spaced and contains 6,435 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  I relied on my word processor to obtain the count and it is:  Microsoft Word 365.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.


<u>s/ Steven W. Creager</u>
Assistant U.S. Attorney

## <u>Certificate of Service</u>

This is to certify that on October 30, 2023, I electronically transmitted the attached brief to the Clerk of Court using the NextGen PACER System for filing and transmittal of a Notice of Docket Activity to the following PACER registrants:  J.P. Hill and Laura K. Deskin, counsel for Jared Michael Harrison.


<u>s/ Steven W. Creager</u>
Assistant U.S. Attorney