IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff-Appellant, | ) | |
| v. | ) | No. 23-6028 |
| JARED MICHAEL HARRISON, | ) | |
| Defendant-Appellee. | ) | |

## SUPPLEMENTAL RESPONSE BRIEF OF THE UNITED STATES

Pursuant to this Court's June 25 and July 17, 2024 orders, the United States submits this response to Mr. Harrison's supplemental brief.

**I. The district court did not conduct a proper as-applied analysis.**

Mr. Harrison attempts to defend the district court's order as an as-applied challenge. Aplee. Supp. Br. at 1–3, 9–10. In doing so, he claims "the district court's analysis and conclusion finding [§] 922(g)(3) unconstitutional as applied [to him does not] conflict with *Rahimi*." *Id.* at 2 (citing *United States v. Rahimi*, 144 S. Ct. 1889 (2024)). He is wrong.

As previously discussed, *see* Aplt. Supp. Br. at 2–4, one of the key errors that the Fifth Circuit made in *Rahimi* was distorting precedent governing constitutional challenges. *See Rahimi*, 144 S. Ct. at 1903. When considering such challenges, a court's "'task is to seek harmony, not manufacture conflict'" between the statute and the Constitution. *Id.* (quoting

*United States v. Hansen*, 599 U.S. 762, 781 (2023)). In the context of as-applied challenges, courts do not consider hypothetical applications of the statute but, instead, are restricted to the concrete facts at hand. *See Harmon v. City of Norman, Okla.*, 61 F.4th 779, 789, 792 (10th Cir. 2023).

The district court's analysis of Mr. Harrison's as-applied challenge conflicts with this aspect of *Rahimi*. For example, the district court based its analysis on the hypothetical minimal conduct that a person could commit rather than Mr. Harrison's actual conduct. App. at 93, 96. It made up its own societal problem, broader than the facts of this case or the statute. *Id.* at 98. It distinguished laws for reasons that were unrelated to the facts of this case. *Id.* at 100–02; *see* Aplt. Supp. Br. at 3–4 (contrasting the facts of this case with the district court's armed intoxication laws). It rejected the use of laws regulating the possession of firearms by the mentally-ill based on a comparison to state-authorized medical marijuana users, App. at 126, despite Mr. Harrison not having state authorization to use medical marijuana, *id.* at 87. In fact, it expressly declined to consider Mr. Harrison's individualized circumstances. *See id.* at 123 n. 119 ("That Harrison may have other characteristics that indicate he may fall within the category of persons Congress may disarm is irrelevant to this case."). The district court "focused on hypothetical scenarios where Section 922(g)([3]) might raise constitutional concerns," something that directly conflicts with *Rahimi*. 144 S. Ct. at 1903.

One final note—despite the label Mr. Harrison has used, he has not raised an as-applied challenge. This Court's precedent is clear: "the labels the parties attach to claims are not determinative" of whether there is a facial or as-applied challenge. *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 914 (10th Cir. 2016). Mr. Harrison has not said what makes his case different than any other § 922(g)(3) case or suggested any difference is constitutionally significant. *See United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (distinguishing between facial and as-applied challenges). Without such explanation, his challenge should be viewed as a facial one.

## II. *Rahimi* did not foreclose the government's reliance on the principle that the legislature may disarm those who it believes to be dangerous.

Mr. Harrison claims "*Rahimi* provides no support for the government's claim that it has the authority to disarm any individual protected by the Second Amendment based on the incredibly broad and malleable notion that this nation has a historical tradition of disarming 'those who are in a class believed to be presumptively dangerous.'" Aplee. Supp. Br. at 5 (quoting Aplt. Br. at 30). He bases that argument on three things: (1) a statement in Justice Barrett's concurrence; (2) the grounds on which the majority opinion chose to reverse; and (3) a misreading of what the majority opinion rejected. A closer inspection reveals none of these bases support Mr. Harrison's claim.

3

First, while Justice Barrett cautioned courts to "be careful not to read a principle at such a high level of generality that it will water down the right," *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring), that was not the point she was making. To the contrary, Justice Barrett rejected the view advanced by the district court in this case. She explained that "a challenged regulation need not be an updated model of a historical counterpart." *Id.* at 1925. Justice Barrett also explained that "demand[ing] overly specific analogues has serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber'" and "assum[ing] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Id.* In the end, Justice Barrett's concurrence supports the government's argument that § 922(g)(3) is constitutional and is critical of the analysis performed by the district court in this case.

Second, Mr. Harrison argues that *Rahimi* rejected the view that the legislature could disarm presumptively dangerous people on a class-wide basis because it focused on the narrowest reason for reversing the Fifth Circuit. Aplee. Supp. Br. at 5–6. He is wrong. *Rahimi* explained that it did "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse[.]" 144 S. Ct. at 1901

Third, Mr. Harrison views *Rahimi*'s rejection of "the Government's contention that Rahimi may be disarmed simply because he is not 'responsible,'" *Rahimi*, 144 S. Ct. at 1903, too broadly. The Court rejected that argument because "'[r]esponsible' is a vague term" and "[i]t is unclear what such a rule would entail." *Id.* This is a situation where context is key. At oral argument, the Chief Justice noted that "[r]esponsibilty is a very broad concept," and could include "not taking your recycling to the curb on Thursdays" or "[s]etting a bad example . . . by yelling at a basketball game in a particular way." *See* Transcript of Oral Argument, *United States v. Rahimi*, No. 22-915, at 9 (Nov. 7, 2023). In response, the Solicitor General suggested that the word "responsibility" was limited to how the Court had previously used the term. *Id.* at 10–11. But *Rahimi* clarified that the Court's prior opinions had not limited the term "responsible" as the United States suggested and the Court would not adopt "responsible" as a standard because the word is vague. *Rahimi*, 144 S. Ct. at 1903. Contrary to Mr. Harrison's argument, *Rahimi* did not reject the government's argument in this case—based on historic laws, *see* Aplt. Br. at 14–42—that Congress can disarm classes of people that it believes to be dangerous or present a special danger of misuse[.]" 144 S. Ct. at 1901.

Mr. Harrison also claims *Rahimi* forecloses the government's use of the laws it relied upon to establish the principle that the legislature could disarm

5

classes of people that it believed to be dangerous. Aplee. Supp. Br. at 7. Relying on Justice Thomas's dissent, he contends that the laws the United States relied upon targeted political opponents and were the reason for the Second Amendment. *Id.* (quoting *Rahimi*, 144 S. Ct. at 1934–35 (Thomas, J., dissenting)). The problem for Mr. Rahimi is that Justice Thomas dissented; thus, his position did not have the support of the majority. The majority cited laws like the "Militia Act of 1662" to explain that "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Rahimi*, 144 S. Ct. at 1899. While the Court explained that "governmental authority to disarm political opponents on this side of the Atlantic" had "largely [been] eliminated" "[b]y the time of the founding," it did not foreclose the possibility that principles such as disarming "brigands and highwaymen" could be derived from those laws, nor did it address laws enacted on this side of the Atlantic. *Id.*

Next, Mr. Harrison contends that the dangerousness posed by marijuana users who possess firearms "has not been proven in any court, nor has it proven this is a generally accepted proposition." Aplee. Supp. Br. at 9. Setting aside that legislatures historically were the ones to determine dangerousness on a class-wide basis, *see Kanter v. Barr*, 919 F.3d 437, 451 (Barrett, J., dissenting), Mr. Harrison's claim is contradicted by numerous

6

court decisions and studies cited in the government's opening brief. *See* Aplt. Br. at 20–22 (collecting sources).

Finally, Mr. Harrison points to a fact that was not before the district court: marijuana might be rescheduled. Aplee. Supp. Br. at 9–10. But just because some people might be able to use marijuana in the future lawfully at the direction of a physician, it does not follow that those who use marijuana illegally and without medical guidance present a lesser risk of misusing a firearm whether before or after marijuana is rescheduled.

## Conclusion

For these reasons and those in the United States' opening brief, reply brief, and supplemental brief, this Court should reverse the district court's order dismissing the indictment and remand for further proceedings.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

s/ Steven W. Creager
STEVEN W. CREAGER
Bar Number: 30052 (OK)
Assistant U.S. Attorney
210 W. Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (office)
(405) 553-8888 (fax)
steven.w.creager@usdoj.gov