No. 23-6028

# In the United States Court of Appeals for the Tenth Circuit

UNITED STATES OF AMERICA, PLAINTIFF-APPELLANT,

V.

JARED MICHAEL HARRISON, DEFENDANT-APPELLEE.

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

THE HONORABLE PATRICK R. WYRICK
DISTRICT JUDGE

D.C. NO. CR-22-328-PRW

OPENING BRIEF OF PLAINTIFF-APPELLANT
ORAL ARGUMENT IS REQUESTED

ROBERT J. TROESTER
United States Attorney

STEVEN W. CREAGER
Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
Telephone (405) 553-8700
Attorneys for Plaintiff-Appellee

## **Fed. R. App. P. 26.1(b) Statement**

The United States is not aware of any organizational victims of

the alleged criminal activity in this case.

# **Table of Contents**

Page

Jurisdictional Statement............................................................1

Statement of the Issue .............................................................1

Statement of the Case ..............................................................2

Summary of the Argument ........................................................4

Argument ................................................................................5

    Section 922(g)(3) does not violate the Second Amendment.............5

        A.    This court's review is de novo.........................................5

        B.    In determining whether § 922(g)(3) is constitutional, analogical reasoning applies. .........................................6

            1.    Using analogical reasoning is appropriate because § 922(g)(3) addresses a general societal problem that arose after the Second Amendment was ratified. ....................................6

                a.    The societal problem addressed by § 922(g)(3) could not have existed in the 18th century because there were no drug laws. .............................................7

                b.    Firearms possession by drug abusers was not a general societal problem in 1791. ...........................................10

            2.    Regardless of whether § 922(g)(3) addresses a general societal problem that existed in the 18th century, analogical reasoning still applies. ...............................................11

C.    Section 922(g)(3) is relevantly similar to laws disarming those believed to be dangerous. .................. 14

    1.    This Nation has a historical tradition of disarming those who are in a class believed to be presumptively dangerous. .......................... 14

    2.    Unlawful users of controlled substances are a class the legislature rightfully believes to be dangerous if armed. ............................................. 20

    3.    Application of analogical reasoning shows that § 922(g)(3) is constitutional. ........................ 23

    4.    The district court erred in reaching the contrary conclusion. ............................................. 24

        a.    The district court erred in requiring proof of individualized dangerousness. ..... 24

        b.    The district court erred when it substituted its judgment, based solely on the number of persons authorized by Oklahoma to possess marijuana, for the collective wisdom of other courts, researchers, and Congress. ........................ 29

        c.    The district court erred when it rejected laws disarming Catholics and loyalists. ..... 32

            i.    The district court misapprehended the reason for the laws and the government's argument about them. .................................................. 32

            ii.    The analysis the district court adopted leaves the historical record barren. ..................................... 34

iii

   iii. The district court erred when it disregarded firearms regulations enacted during a time of war. ............ 35

   iv. The district court's rejection of laws disarming Catholics is both self-contradictory and involves a misreading of *Bruen*. ......................... 37

   v. The district court construed the reason for the colonial laws too narrowly. ........................................... 40

 D. Section 922(g)(3) is relevantly similar to laws disarming the mentally ill. ........................................... 43

  1. This Nation has a historical tradition of disarming the mentally ill. ................................... 43

  2. Those who unlawfully use or are addicted to controlled substances are relevantly similar to those who are mentally ill. ............................. 45

  3. The district court erred in rejecting the disarmament of the mentally ill as analogous to § 922(g)(3). ....................................... 47

 E. The "people," whose rights the Second Amendment protects, are ordinary, law-abiding, responsible citizens. ....................................................... 53

  1. *Heller*'s Strong Presumption ............................. 53

  2. Ordinary, Law-Abiding, Responsible Citizens ... 55

3.    The district court erred by latching on to *Heller*'s strong presumption without considering the Court's reiteration of *Heller*'s description of the scope of the Second Amendment right. ..............................................60

Conclusion..................................................................................64

Statement Regarding Oral Argument .......................................64

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements ........................................65

Certificate of Service ................................................................65

Order (Doc. 36) (Filed Feb. 2, 2023).....................................Attachment 1

## <u>Table of Authorities</u>

<u>Page</u>

### Federal Cases

*Binderup v. Atty. Gen. of the United States*,
    836 F.3d 336 (3d Cir. 2016) .................................................... 19, 27, 28

*Debs v. United States*,
    249 U.S. 211 (1919) ........................................................................ 36

*Dickerson v. New Banner Inst., Inc.*,
    460 U.S. 103 (1983) ........................................................................ 20

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .............. 1, 11, 12, 14, 15, 35, 36, 41, 43, 44, 46,
                        52, 53, 54, 55, 56, 57, 59, 60, 61, 62

*Ex Parte Milligan*,
    71 U.S. 2–21 (1866) ........................................................................ 36

*Folajtar v. Atty. Gen. of the United States*,
    980 F.3d 897 (3d Cir. 2020) .............................. 19, 26, 27, 39, 40, 42

*Fried v. Garland*,
    ___ F. Supp. 3d ___, 2022 WL 16731233 (N.D. Fla. Nov. 4,
    2022) ........................................................................................... 47

*Gilbert v. Minnesota*,
    254 U.S. 325 (1920) ........................................................................ 36

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ........................ 16-17, 19, 24, 25, 28, 39

*Korematsu v. United States*,
    323 U.S. 214 (1944) ........................................................................ 36

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) ................................................................... 43, 57

*Millard v. Camper,*
　　971 F.3d 1174 (10th Cir. 2020) ..................................................... 63

*N.Y. State Rifle & Pistol Assn. v. Bruen,*
　　142 S. Ct. 2111 (2022) ..................... 1, 5, 6, 7, 10, 11, 12, 13, 14, 17,
　　　　　　　　　　　　　　　　　23, 27-28, 34, 35, 37, 38-39, 41,
　　　　　　　　　　　　　　　　　42, 43, 46, 52, 58, 59, 60, 61, 62

*NRA v. ATF,*
　　700 F.3d 185 (5th Cir. 2012) ...................................................27-28

*Range v. Atty. Gen. of the United States,*
　　___ F.4th ___, 2023 WL 3833404 (3d Cir. Jun. 6, 2023) ............... 19

*Robinson v. California,*
　　370 U.S. 660 (1962) ...................................................................... 45

*Scarborough v. United States,*
　　431 U.S. 563 (1977) ...................................................................... 33

*Shuttlesworth v. Birmingham,*
　　394 U.S. 147 (1969) ....................................................... 23, 46, 60

*Smith v. Turner,*
　　48 U.S. 283 (1849) ........................................................................ 44

*Smith v. United States,*
　　508 U.S. 223 (1993) ...................................................................... 20

*Trump v. Hawaii,*
　　138 S. Ct. 2392 (2018) .............................................................36, 37

*United States v. Alanz,*
　　___ F.4th ___, 2023 WL 3961124 (9th Cir. Jan. 13, 2023) ............ 11

*United States v. Bass,*
　　404 U.S. 336 (1971) ...................................................................20-21

*United States v. Brune,*
　　767 F.3d 1009 (10th Cir. 2014) ...................................................... 5

vii

*United States v. Carel,*
    668 F.3d 1211 (10th Cir. 2011) ................................................ 31, 63

*United States v. Carter,*
    750 F.3d 462–69 (4th Cir. 2014) ............................................. 21, 22

*United States v. Cheeseman,*
    600 F.3d 270 (3d Cir. 2010) ............................................................ 21

*United States v. Connelly,*
    ___ F. Supp. 3d ___, 2023 WL 2806324 (W.D. Tex. Apr. 6,
    2023) ......................................................................................... 47

*United States v. Costianes,*
    No. CR-JKB-21-458, 2023 WL 3550972 (D. Md. May 18,
    2023) ......................................................................................... 47

*United States v. DeRusse,*
    859 F.3d 1232 (10th Cir. 2017) ....................................................... 50

*United States v. Dugan,*
    657 F.3d 998 (9th Cir. 2011) ........................................................... 46

*United States v. Durham,*
    902 F.3d 1180 (10th Cir. 2018) ................................................. 31, 33

*United States v. Hernandez,*
    777 F. App'x 947 (10th Cir. 2019) ................................................. 50

*United States v. Lewis,*
    ___ F. Supp. 3d ___, 2023 WL 187582 (W.D. Okla. Jan. 13,
    2023) ......................................................................................... 47

*United States v. Martinez-Fuerte,*
    428 U.S. 543 (1976) ....................................................................... 48

*United States v. Morales,*
    961 F.3d 1086 (10th Cir. 2020) ..................................................... 30

*United States v. Morrison,*
0529 U.S. 598 (2000) ........................................................................ 5

*United States v. Patterson,*
431 F.3d 832 (5th Cir. 2005) .................................................... 23, 46

*United States v. Posey,*
___ F. Supp. 3d ___, 2023 WL 1869095 (N.D. Ind. Feb. 9,
2023) ............................................................................................... 47

*United States v. Raines,*
362 U.S. 17 (1960) .................................................................... 50, 63

*United States v. Randall,*
___ F. Supp. 3d ___, 2023 WL 3171609 (S.D. Iowa Feb. 14,
2023) ............................................................................................... 47

*United States v. Richard,*
350 F. App'x 252 (10th Cir. 2009) ................................................. 46

*United States v. Salerno,*
481 U.S. 739 (1987) ........................................................................ 62

*United States v. Seiwert,*
No. 20-CR-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) ....... 47

*United States v. Skoien,*
614 F.3d 638 (7th Cir. 2010) (en banc) ......................................... 25

*United States v. Stennerson,*
No. CR 22-139-BLG-SPW, 2023 WL 2214351 (D. Mont. Feb.
24, 2023) ........................................................................................ 47

*United States v. Tooley,*
717 F. Supp. 2d 580 (S.D. W.Va. 2010) ................................... 15-16

*United States v. Verdugo-Urquidez,*
494 U.S. 259 (1990) ........................................................................ 54

*United States v. White*,
   782 F.3d 1118 (10th Cir. 2015) ........................................ 5

*United States v. Wilks*,
   58 F.3d 1518 (10th Cir. 1995) ........................................ 5

*United States v. Yancey*,
   621 F.3d 681 (7th Cir. 2010) ........................... 20, 21, 46

*Voisine v. United States*,
   579 U.S. 686 (2016) ................................................. 57, 58

*Wash. St. Grange v. Wash. St. Repub. Party*,
   552 U.S. 442 (2008) ................................................. 62, 63

## Federal Constitution

U.S. Const. amend. I ........................................................ 54

U.S. Const. amend. II ....................................................... 58

U.S. Const. amend. IV ...................................................... 54

U.S. Const. amend. IX ...................................................... 54

## Federal Statutes

18 U.S.C. § 922(g)(3) ................................................. 1, 3, 8

18 U.S.C. § 3231 .............................................................. 1

18 U.S.C. § 3731 .............................................................. 1

21 U.S.C. 802 .................................................................. 8

21 U.S.C. § 802(6) ........................................................ 9, 10

21 U.S.C. § 811 ................................................................ 8

21 U.S.C. § 811(a) ........................................................... 9

21 U.S.C. § 811(a)(1) ....................................................... 8

21 U.S.C. § 811(b) ................................................................ 9

21 U.S.C. § 811(c) ................................................................ 9

21 U.S.C. § 812(b) ................................................................ 8

4 Journals of the Continental Congress 205 (Mar. 1776)....................... 17

Gun Control Act of 1968,
    Pub. L. 90-618, 82 Stat. 1213 (1968) ........................................ 20, 21

Firearms Owners' Protection Act,
    Pub. L. 99-308, 100 Stat. 449 (1986) ........................................ 21

# Rules

10th Cir. R. 28.1(A)(1) .......................................................... 1

# State and Colonial Constitutions

Mass. Const. pt. 1, art. XVII (1780) ........................................... 18

N.C. Declaration of Rights, § 17 (1776) ........................................ 18

Penn. Declaration of Rights, cl. XIII (1760) ................................... 18

# State and Colonial Statutes

52 Archives of Maryland 454 .................................................... 17

5 The Acts and Resolves, Public and Private, of the Province of
    Massachusetts Bay 479 (May 1, 1776)......................................... 18

Private and Special Statutes of the Commonwealth of Massachusetts
from the Year 1780 to the Close of the Session of the General Court,
Begun and Held on the Last Wednesday in May, A.D. 1805, at 145..... 18

1777 N.J. Laws 80, ch. 40, § 20 ................................................ 17-18

1788 N.Y. Laws Ch. 12 .......................................................... 44, 48

24 The State Records of North Carolina 89 ...................................... 17

5 Statutes at Large of Pennsylvania 627 ................................................ 17

9 Statutes at Large of Pennsylvania 348 ............................................... 17

7 Laws of Virginia 35 ............................................................................ 17

9 Va. Stat. at Large 282 ....................................................................... 17

## English Statutes

Militia Act 1662, 14 Car.II Ch. 3,
    5 Statutes of the Realm 360 ................................................... 14, 15

Declaration of Rights 1689 1 W.&M. Ch. 2,
    3 Eng. Stat. at Large 441 .............................................................. 15

1 W.&M. Ch. 15 (1689),
    6 Statutes of the Realm 71 ............................................................. 16

Vagrancy Act 1744, 17 Geo.II Ch. 5,
    6 The Statutes at Large:  From Magna Charta to the End of the
    Last Parliament 519 ................................................................... 44, 48

19 Geo. II Ch. 39 (1746),
    C. Grant Robertson, *Select Cases & Documents to Illustrate
    English Constitutional History, 1660–1832*, at 214 (4th ed.
    Rev. 1923) ....................................................................................... 17

## Other

Bonnie Evans, *How Autism Became Autism: The Radical
Transformation of a Concept of Child Development in Britain*,
    26 History of Human Sciences 3 (2013) ........................................ 49

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,
    32 Harvard J. of L. & Pub. Poly. 695 (2009) ................................. 39

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District
of Columbia v. Heller and Judicial Ipse Dixit*,
    60 Hastings L. J. 1371 (2009) ...................................................43-44

Carrie B. Oser et al., *The Drug-Violence Nexus Among Rural Felony Probationers*,
 24 J. Interpersonal Violence 1285 (2009) ..................................... 22

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*,
 13 Charleston L. Rev. 205 (2018) ................................................. 38

Dana Glei, et al., *Changes in Mental Health, Pain, and Drug Misuse Since the mid-1990s: Is There a Link?*,
 Soc. Sci. Med., Vol. 246 (Feb. 2020) ............................................ 45

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*,
 60 Hastings L.J. 1339 (2009) ........................................................ 28

Edward Bateson, ed., *Calendar of State Papers, Domestic: William III, 1700–1702* (1937) .................................................................. 16

Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America, 1776–1914* (2023) ........................................................................... 7

Erik Grant Luna, *Our Vietnam: The Prohibition Apocalypse*,
 46 DePaul L. Rev. 483 (1997) ...................................................... 10

Evelyn H. Wei, et al., *Teasing Apart the Developmental Associations Between Alcohol and Marijuana Use and Violence*,
 20 J. Contemp. Crim. Just. 166 (2004) ......................................... 22

Ivan Urtis, et al., *Cannabis Use and Its Association with Psychological Disorders*,
 Psychopharmacology Bulletin, Vol. 50, No. 2 (May 15, 2020) ....... 45

James Gray Pope, *Republican Moments: The Role of Direct Popular Power in the American Constitutional Order*,
 139 U. Pa. L. Rev. 287 (1990) ...................................................... 32

Jane Francis Smith, *'Astonishing': State leads nation in number of cannabis dispensaries*,
 The Journal Record (Feb. 5, 2020) ............................................... 29

John Rublowsky, *The Stoned Age: A History of Drugs in America* (1974) ................................................................ 10-11

Joyce Lee Malcom, *The Creation of a "True Ancient and Indubitable" Right: The English Bill of Rights and the Right to Be Armed,*
    32 J. of British Studies 226 (Jul. 1993) ......................................... 16

Klaus W. Lange, et al., *The History of Attention Deficit Hyperactivity Disorder,*
    2 Attention Deficit and Hyperactivity Disorders 241 (2010) ........ 49

Lana Harrison & Joseph Grfroerer, *The Intersection of Drug Use and Criminal Behavior: Results from National Survey on Drug Abuse,*
    38 Crime & Delinquency 422 (1992) ............................................... 22

Office of Applied Studies, Substance Abuse and Mental Health Services Administration, Illicit Drug Use Among Persons Arrested for Serious Crimes, NSDUH Report (2005) ............................................... 21

Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield,*
    19 L. and Soc'y Rev. 487 (1985) ...................................................... 44

Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?,*
    36 Okla. L. Rev. 65 (1983) ............................................................ 43

Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the Union* (1868) ........ 44

U.S. Census Bureau, *Quick Facts: Oklahoma* ......................................... 31

William Cobbett, *The Parliamentary History of England from the Earliest Period to the Year 1803* (London, T.C. Hansard 1806) ............. 16

## **Prior or Related Appeals**

There are no prior or related appeals.

## Jurisdictional Statement

On August 17, 2022, a federal grand jury in the Western District of Oklahoma charged Jared Michael Harrison with knowingly possessing a firearm while an unlawful user of marijuana.  App. at 8–9.[1]  On February 3, 2023, in a final order, the district court granted Mr. Harrison's motion to dismiss the indictment, finding that 18 U.S.C. § 922(g)(3) violates the Second Amendment.  *Id.* at 87–140.  The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

On March 3, 2023, the United States filed a timely notice of appeal.  App. at 141–42.  This court has jurisdiction pursuant to 18 U.S.C. § 3731.

## Statement of the Issue

Does 18 U.S.C. § 922(g)(3), which prohibits unlawful users of controlled substances from possessing firearms, violate the Second Amendment as interpreted in *N.Y. State Rifle & Pistol Assn. v. Bruen*, 142 S. Ct. 2111 (2022), and *District of Columbia v. Heller*, 554 U.S. 570 (2008)?

---

[1] Citations are to documents included in the appendix, e.g., "App. at ___."  *See* 10th Cir. R. 28.1(A)(1).

1

## **Statement of the Case**

The district court gave the following summary of the facts, which

is not disputed on appeal:

> On May 20, 2022, Harrison was pulled over
> by an officer of the Lawton Police Department for
> failing to stop at a red light. When Harrison rolled
> down his window to speak to the officer, the officer
> smelled marijuana and questioned Harrison about
> the source of the smell. Harrison told the officer
> that he was on his way to work at a medical
> marijuana dispensary, but that he did not have a
> state-issued medical-marijuana card.
>
> The officer asked Harrison to step outside of
> his car. When he did, the officer noticed that
> Harrison was wearing an ankle monitor. Harrison
> told the officer that he was on probation in Texas
> for an aggravated assault.

App. at 87–88. But Harrison's claim was not accurate, he "was actually

on bond pending trial in Texas for that aggravated assault." *Id.* at 88

n.1. He "and another man are alleged to have shot into a crowd at a

college party, seriously wounding at least one partygoer." *Id.* The

district court continued:

> The officer searched Harrison and found no
> contraband. The officer did not conduct a field
> sobriety test, nor did he request a blood draw to
> determine if Harrison was under the influence of
> marijuana or some other unlawful substance.

2

Another officer arrived, and the two officers searched Harrison's car. They found a loaded revolver on the driver's side floorboard; two prescription bottles in the driver's door, one empty and one containing partially smoked marijuana cigarettes; and a backpack in the passenger seat. The backpack contained marijuana, THC gummies, two THC vape cartridges, and a pre-roll marijuana cigarette and marijuana stems in a tray.

Harrison was arrested at the scene. The next day, the State of Oklahoma charged Harrison with possession of marijuana, possession of paraphernalia, and failure to obey a traffic signal. Harrison is awaiting trial on those charges. Then, on August 17, 2022, a federal grand jury returned an indictment charging Harrison with possessing a firearm with knowledge that he was an unlawful user of marijuana, in violation of 18 U.S.C. § 922(g)(3).

*Id.* at 88.

On October 11, 2022, Mr. Harrison filed a motion to dismiss. *Id.* at 10–31. As relevant to this appeal, Mr. Harrison argued that § 922(g)(3) violated his Second Amendment right to bear arms. *Id.* at 25–29. The United States argued that the Second Amendment did not apply to Mr. Harrison's possession of a firearm because he was not an ordinary, law-abiding, responsible citizen, *id.* at 51–55, and that even if the Second Amendment covered Mr. Harrison's possession, § 922(g)(3) is consistent

with this Nation's historical tradition of firearms regulations, including the disarmament of those whom the legislature found to be presumptively risky, *id.* at 55–65.

After holding a hearing on the motion, *see generally id.* at 143–214, the district court found § 922(g)(3) violates the Second Amendment and dismissed the indictment with prejudice, *id.* at 87–140. From that order, the United States filed its notice of appeal. *Id.* at 141–42.

## Summary of the Argument

Guns and drugs are a dangerous combination. That is why Congress placed unlawful drug users alongside felons and the mentally ill when it restricted their access to guns and later disarmed them. Congress viewed those classes as presumptively risky people, i.e. those who may not be trusted to possess a firearm without becoming a threat to society. Disarming drug abusers is consistent with this Nation's historical tradition of disarming those believed to be more dangerous than ordinary, law-abiding citizens and akin to disarming the mentally ill. The district court erred when it reached the opposite conclusion.

## Argument

**Section 922(g)(3) does not violate the Second Amendment.**

**A.     This court's review is de novo.**

This court "review[s] challenges to the constitutionality of a statute de novo." *United States v. Wilks*, 58 F.3d 1518, 1519 (10th Cir. 1995); *see also United States v. White*, 782 F.3d 1118, 1123 (10th Cir. 2015). "'As part of [this] de novo review, however, [this court] must presume that the statute is constitutional.'" *White*, 782 F.3d at 1123 (quoting *United States v. Brune*, 767 F.3d 1009, 1015 (10th Cir. 2014)). This court can "'invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.'" *Id.* (quoting *United States v. Morrison*, 529 U.S. 598, 607 (2000)).

For Second Amendment challenges, the Supreme Court has provided: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and "[t]o justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

5

**B.    In determining whether § 922(g)(3) is constitutional, analogical reasoning applies.**

    **1.    Using analogical reasoning is appropriate because § 922(g)(3) addresses a general societal problem that arose after the Second Amendment was ratified.**

The first thing a court must do in determining whether a statute is consistent with this "Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, is determine whether the statute "addresses a general societal problem that has persisted since the 18th century," *id.* at 2131. If the general societal problem existed, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Similar evidence would include "if earlier generations addressed the societal problem[] but did so through materially different means" or "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds." *Id.*

But just because an issue existed in the 18th century does not mean that it was a "general societal problem." *See id.* at 2132 (explaining that some "cases [may] implicat[e] unprecedented societal

6

concerns" or present challenges that are "not . . . the same as those that preoccupied the Founders in 1791").  The risk of dangerousness posed by the possession of firearms by individuals who unlawfully use or are addicted to controlled substances is one such societal issue.  "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy," i.e., "a determination of whether the two regulations are 'relevantly similar.'"  *Id.* (citation omitted).

> **a.    The societal problem addressed by § 922(g)(3) could not have existed in the 18th century because there were no drug laws.**

Inherent in § 922(g)(3) is that the defendant's use of a controlled substance must be "unlawful" and that the substance he uses or to which she is addicted is "controlled," i.e., regulated by law.  Unlawful use or addiction to a controlled substance could not have been an issue in the 18th century because "[n]o state would require a prescription for the purchase of any drug until Nevada placed such a restriction on opium sales[] in 1877."  Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America*, 1776–1914, at 25 (2023).  Because there were no laws controlling the obtaining or using of drugs, the danger created by

7

those who violated the drug laws could not have been a societal problem in 1791.

The district court avoided this issue by redefining and broadening the class covered by § 922(g)(3)—a fundamental error in its analysis. In its order, the district court defined the societal problem as "possession of firearms by users of substances with potential for abuse." App. at 98. But the group Congress prohibited from possessing guns was more restrictive—"*unlawful* user[s] of or [those] addicted to any *controlled* substance (*as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)*)." 18 U.S.C. § 922(g)(3) (emphasis added). The only reason the district court gave for its substantial modification was: "Potential for abuse is the driving factor when it comes to whether a substance is 'controlled' under the Controlled Substances Act." App. at 98 n.29 (citing 21 U.S.C. § 811). But the district court was only partially correct.

While the potential for abuse may be a major factor in the decision of whether to schedule a substance, the Attorney General also considers other factors listed in 21 U.S.C. § 812(b). *See* 21 U.S.C. § 811(a)(1). But even that is only a step in the process. In addition to the findings in

8

§ 811(a)(1), the decision must undergo the normal rulemaking process and a hearing must be conducted. *Id.* § 811(a). Moreover, the Attorney General cannot schedule a substance without the concurrence of the Secretary of Health and Human Services, *id.* § 811(b), whose decision is bound by an additional eight-factor test, *id.* § 811(c).

The district court's alteration of the societal issue that Congress addressed is perhaps clearest from the district court's conclusion that laws prohibiting the bearing of arms by those who were intoxicated "prove[d] the point" that the societal problem addressed in § 922(g)(3) "is not new." App. at 98. Largely, those statutes prohibited possession of firearms while the person was under the influence of alcohol. *See id.* at 100 n.34 (collecting statutes). But Congress expressly excluded "distilled spirits, wine, [and] malt beverages" from the definition of "controlled substance." 21 U.S.C. § 802(6). Thus, the laws prohibiting the possession of a firearm while a person is drunk do not "prove[] the point" that the possession of firearms by those who unlawfully use controlled substances "is not new."

9

### b.    Firearms possession by drug abusers was not a general societal problem in 1791.

While the United States does not suggest that possession of firearms by those who used or were addicted to drugs never happened in the 18th century, its mere occurrence does not mean that it was a "general societal problem."  As the Court explained, some "cases [may] implicat[e] unprecedented societal concerns" or present challenges that are "not . . . the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132.  Such is the case for the possession of firearms by abusers of what have been identified as controlled substances (which excludes alcohol and tobacco, *see* 21 U.S.C. § 802(6)).

"Despite unrestricted availability, narcotics addiction was a negligible phenomenon in the eighteenth and nineteenth centuries." Erik Grant Luna, *Our Vietnam: The Prohibition Apocalypse*, 46 DePaul L. Rev. 483, 487 (1997).  As for marijuana, the drug Mr. Harrison unlawfully used, "almost no accounts or reports have come down to us of cannabis being used as an intoxicant during the period when the plant was widely cultivated as an agricultural commodity."  John Rublowsky, *The Stoned Age: A History of Drugs in America* 98 (1974).  Similarly,

there is no evidence that opium "was ever 'abused' in any marked degree." *Id.* at 123. Thus, history shows gun possession by those who unlawfully use controlled substances is a modern-day problem. *Cf. United States v. Alanz*, ___ F.4th ___, 2023 WL 3961124, at *4 (9th Cir. Jan. 13, 2023) ("Illegal drug trafficking is a largely modern crime.").

> **2. Regardless of whether § 922(g)(3) addresses a general societal problem that existed in the 18th century, analogical reasoning still applies.**

Contrary to the district court's suggestion otherwise, *see* App. at 98, courts must still apply analogical reasoning to determine whether a specific regulation violates the Second Amendment regardless of whether the challenged regulation addresses a general societal problem that existed in the 18th century. *Bruen* and *Heller* make this clear.

Both the handgun ban in *Heller* and the proper-cause requirement in *Bruen* were enacted to address "firearm violence in densely populated communities" and both were measures "that the Founders themselves could have adopted to confront that problem." *Bruen*, 142 S. Ct. at 2131 (citing *Heller*, 554 U.S. at 628, 631). Nevertheless, *Heller* "concluded that the handgun ban was unconstitutional" only "after considering 'founding-era historical precedent,' including 'various restrictive laws in

11

the colonial period,' and finding that none was analogous to the
District's ban." *Id.* (quoting *Heller*, 554 U.S. at 631, 634). Similarly, it
was only after *Bruen* explained that the use of analogical reasoning will
generally be necessary that it applied analogical reasoning to a variety
of historical sources from the late 1200s to the early 1900s. *Id.* at 2138–
50. Thus, following *Bruen*, the question is whether § 922(g)(3) is
relevantly similar to historical firearms regulation.

Applying "analogical reasoning requires only that the government
identify a well-established and representative historical *analogue*, not a
historical *twin*." *Id.* at 2133. "So even if a modern-day regulation is not
a dead ringer for historical precursors, it still may be analogous enough
to pass constitutional muster." *Id.* In fact, the two regulations may
look very different in some respects, yet they still can be analogous on
the relevant metrics. "For instance, a green truck and a green hat are
relevantly similar if one's metric is things that are green. They are not
relevantly similar if the applicable metric is things you can wear." *Id.*
at 2132 (quotation marks omitted).

For purposes of determining whether a statute is consistent with
the Second Amendment, the Supreme Court identified "two metrics:

how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* While the district court quoted the Supreme Court's elaboration of those metrics, *see* App. at 97 (explaining that whether a law is "sufficiently analogous . . . turns on whether the historical laws 'impose[d] a comparable burden on the right of armed self-defense' and were 'comparably justified'" (quoting *Bruen*, 142 S. Ct. at 2133)), it omitted the key phrase from the metrics actually identified by the Supreme Court: law-abiding.[2] Admittedly, applying the qualifier "law-abiding" in addressing § 922(g)(3) is difficult because it applies to *unlawful* users of controlled substances; thus, by definition, § 922(g)(3) does not "burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. But even setting aside that qualifier, the district court erred.

_____

[2] The district court may have disagreed with the qualifier "law-abiding," rhetorically asking: "Who among us, after all, isn't a 'lawbreaker'?" App. at 95 n.21. While the district court may disagree with the "law-abiding" qualifier, *see id.* at 95 nn. 20 & 21, the Supreme Court used it 14 times in *Bruen*, *see* 142 S. Ct. at 2122, 2124–2125, 2131, 2132–33, 2134, 2138 & nn. 8 & 9, 2150, 2156. In our hierarchical judicial system, the district court was not free to disregard that qualifier. By doing so, the district court erred.

### C.    Section 922(g)(3) is relevantly similar to laws disarming those believed to be dangerous.

Assuming *arguendo* that Mr. Harrison is part of "the people" protected by the Second Amendment,[3] § 922(g)(3) is consistent with the Second Amendment because (1) this Nation's historical tradition of firearms regulation supports disarming those who are believed to be dangerous if they possessed a firearm and (2) those who unlawfully use controlled substances are such a category of people.  The district court's rejection of both points was error.

### 1.    This Nation has a historical tradition of disarming those who are in a class believed to be presumptively dangerous.

In looking at historical analogues, the Court in *Heller* and *Bruen* focused primarily on "English history dating from the late 1600s, along with American colonial views leading up to the founding."  *Bruen*, 142 S. Ct. at 2127; *see also Heller*, 554 U.S. at 595–601.  Thus, the first relevant piece of English legislation was the Militia Act 1662, 14 Car.II. Ch.3, § 13, 5 Statutes of the Realm 360.  Through the Militia Act 1662,

---

[3] Whether unlawful users of controlled substances are part of "the people" protected by the Second Amendment, given the defining characteristic of the class in that they are not law-abiding, is addressed below.  But this court can and should reverse without reaching that question

14

Parliament authorized certain officials "to search for and seize all Armes in the custody or possession of any person or persons whom the said [official] . . . shall judge dangerous to the Peace of the Kingdome." *Id.* While the Militia Act 1662 preceded the English Bill of Rights,[4] it provides one of the clearest contemporary statements that English history permitted disarmament of people believed to be dangerous.

The next piece of English legislation is the English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. It provided in pertinent part: "'That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law.'" *Id.* (quoting 1 W.&M., ch.2, § 7, in 3 Eng. Stat. at Large 441). But just as important for present purposes, "the Declaration of Rights did not repeal the 1662 Militia Act. Thus, lieutenants of the militia retained the authority to disarm 'any person or persons' judged 'dangerous to the Peace of the Kingdome.'" *United States v. Tooley*, 717 F. Supp. 2d 580,

---

[4] The English Bill of Rights is also called the English Declaration of Rights. For purposes of this brief, the United States will refer to it as the English Bill of Rights unless quoting from a document referring to it as the English Declaration of Rights.

15

589 (S.D. W.Va. 2010); *see also* Joyce Lee Malcom, *The Creation of a "True Ancient and Indubitable" Right: The English Bill of Rights and the Right to Be Armed*, 32 J. of British Studies 226, 247 (Jul. 1993) (discussing failed attempts in 1689, 1690, and 1691 to "remove[] the militia's power to seize the weapons of suspects"). Indeed, even into the 18th century, William III utilized the Militia Act 1662 to "charge all lieutenants and deputy-lieutenants, within the several counties of [England] and Wales, that they cause search to be made for arms in the possession of any persons whom they judge dangerous[] and seize such arms according to law." *Calendar of State Papers, Domestic: William III, 1700-1702*, at 233–34 (Edward Bateson, ed. 1937).

The same year that it enacted the English Bill of Rights, Parliament enacted a statute disarming Catholics unless they swore an oath required by law. 1 W.&M., ch.15, § 3, 6 Statutes of the Realm 71–73. It did so "to preserve . . . the peace and security." William Cobbett, *The Parliamentary History of England from the Earliest Period to the Year 1803*, Vol. 5, at 20 (London, T.C. Hansard 1806) (reprinting Meeting of the Peer at Guild-Hall—Their Declaration, Dec. 11, 1688); *cf. Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J,

16

dissenting), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022). Similarly, Parliament also enacted a series of disarmament statutes in Scotland, in part, because of "the terror and great loss of his Majesty's faithful subjects . . . by lawless, wicked, and disaffected persons." *E.g.*, 19 Geo.II ch.39 (1746), as reprinted in C. Grant Robertson, *Select Statutes Cases & Documents to Illustrate English Constitutional History, 1660–1832*, at 214–21, 216 (4th ed. Rev. 1923).

The history of disarming those believed to be dangerous moved to the United States. Like England, at least three American colonies had laws disarming Catholics. *See* 5 Statutes at Large of Pennsylvania from 1682 to 1801, at 627 (1759); 52 Archives of Maryland 454 (1756); 7 Laws of Virginia 35–39 (1756). Additionally, leading up to the Revolutionary War, the Continental Congress recommended that states "cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America." 4 Journals of the Continental Congress 205 (March 1776). And states acted on this recommendation. *E.g.* 9 Statutes at Large of Pennsylvania 348 (1779); 9 Va. Stat. at Large 282 (1821) (1777 Act); 24 The State Records of North Carolina 89 (Walter Clark, ed. 1905) (1777 Act); 1777 N.J. Laws

17

80, ch. 40, § 20; 5 The Acts and Resolves, Public and Private, of the Province of Massachusetts Bay 479–84 (May 1, 1776).  Notably, Pennsylvania did so despite guaranteeing the right to bear arms.  *See* Penn. Declaration of Rights, cl. XIII (1766).  North Carolina likewise guaranteed the right to bear arms, albeit "for the defence of the  State." N.C. Declaration of Rights, § 17 (1776).  These categorical bars were instituted without individualized findings of dangerousness.

Similarly, after the Revolutionary War, in response to an uprising, Massachusetts authorized a pardon to all those who were or *may have been* guilty of treason or *who had given aid or support* to those who participated in the uprising.  *See* Private and Special Statutes of the Commonwealth of Massachusetts from the Year 1780 to the Close of the Session of the General Court, Begun and Held on the Last Wednesday in May, A.D. 1805, at 145–48 (1805).  The Massachusetts legislature conditioned receipt of the pardon on requiring the recipient to "deliver up their arms."  *Id.*  Massachusetts did this without any objection, despite having a right to keep and bear arms in their state constitution. *See* Mass. Const. pt.1, art. XVII (1780).

18

"In sum, founding-era legislation categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting); *see also Folajtar v. Atty. Gen. of the United States*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("In England and colonial America, the Government disarmed people who posed a danger to others."), *abrogation recognized by Range v. Atty. Gen. of the United States*, ___ F.4th ___, 2023 WL 3833404 (3d Cir. Jun. 6, 2023; *Binderup v. Atty. Gen. of the United States*, 836 F.3d 336, 367 (3d Cir. 2016) (Hardiman, J., concurring in part and concurring in the judgment) ("The most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms."), *abrogation recognized by Range*, 2023 WL 3833404 (3d Cir. Jun. 6, 2023).[5]  And that they could do so without a conviction.

---

[5] The district court repeatedly relied upon the separate opinions of then-Judge Barrett, Judge Bibas, and Judge Hardiman in finding that § 922(g)(3) violated the Second Amendment.  But, as discussed throughout this brief, those separate opinions do not disagree with the United States' position regarding § 922(g)(3).

### 2. Unlawful users of controlled substances are a class the legislature rightfully believes to be dangerous if armed.

"[D]rugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993) (noting that "[i]n 1989, 56 percent of all murders in New York City were drug related" and "during the same period, the figure for the Nation's Capital was as high as 80 percent"). This is because "habitual drug abusers . . . are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010). As a result, Congress prohibited unlawful users and those addicted to controlled substances from shipping, transporting, or receiving firearms as part of the Gun Control Act of 1968 (GCA), Pub. L. 90, 618, § 102, 82 Stat. 1213, 1220–21 (Oct. 22, 1968). "Congress' intent in enacting §§ 922(g) and (h) . . . was to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112–13 n.6 (1983), *superseded by statute on other grounds*, Firearms Owners' Protection Act, Pub. L. 99-308, 100 Stat. 449 (1986); *see United States v. Bass*, 404 U.S. 336, 345 (1971) (noting that § 922(g) "forbid[s] every possession of any firearm by specified classes of

20

*especially risky people*" (emphasis added)); *see also* GCA, § 101, 82 Stat at 1213 (declaring the purpose of the GCA "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence" without "plac[ing] any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms"); *United States v. Cheeseman*, 600 F.3d 270, 279 (3d Cir. 2010).

"Ample academic research confirms the connection between drug use and violent crime." *Yancey*, 621 F.3d at 686 (collecting academic research); *see also United States v. Carter*, 750 F.3d 462, 466–69 (4th Cir. 2014) (same). "For example, nearly four times as many adults arrested for serious crimes had used an illegal drug in the previous year than had not." *Yancey*, 621 F.3d at 686 (citing Office of Applied Studies, Substance Abuse and Mental Health Services Administration, Illicit Drug Use Among Persons Arrested For Serious Crimes, NSDUH Report (2005)). Even for those who unlawfully use marijuana, like Mr. Harrison, research "amply demonstrate[s] a connection between marijuana use specifically and violence." *Carter*, 750 F.3d at 467. For example, *Carter* pointed to a "study [that] used logistic regression and

21

found that individuals who used marijuana in the past year were more
than twice as likely to report both committing and being booked for
violent crimes." *Id.* at 467 n.7 (citing Lana Harrison & Joseph Gfroerer,
*The Intersection of Drug Use and Criminal Behavior: Results from the
National Household Survey on Drug Abuse*, 38 Crime & Delinquency
422, 432–35 & tbl.6 (1992))).  Another study found "among probationers,
individuals who had been involved in violence were more likely to have
used marijuana." *Id.* at 467 (citing Carrie B. Oser et al., *The Drug-
Violence Nexus Among Rural Felony Probationers*, 24 J. Interpersonal
Violence 1285, 1293 tbl.1 (2009)).  And yet another study that found
"that adolescents who used marijuana were almost *twice* as likely to
engage in violence when they became young adults." *Id.* at 468 (citing
Evelyn H. Wei et al., *Teasing Apart the Developmental Associations
Between Alcohol and Marijuana Use and Violence*, 20 J. Contemp. Crim.
Just. 166, 177–78 & tbl.3 (2004)).  Simply put, research backs up
Congress' belief expressed in the GCA, unlawful users of controlled
substances—including marijuana—are more likely to be violent with a
firearm than an ordinary, law-abiding person.

### 3.    Application of analogical reasoning shows that § 922(g)(3) is constitutional.

Applying the two metrics that *Bruen* identified, § 922(g)(3) and the historical laws that disarmed those who the legislature believed posed a substantial risk of violence if armed are relevantly similar. Starting with the how, both § 922(g)(3) and the historical laws identified above disarm a "limited, narrowly tailored specific" group. *United States v. Patterson*, 431 F.3d 832, 835 (5th Cir. 2005) (quotation marks omitted); *cf. Bruen*, 142 S. Ct. at 2138 n.9 (suggesting shall-issue licensing regimes are constitutional because they are based on "'narrow, objective, and definitive standards' guiding licensing officials" (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)).  As for the why, both the laws identified above and § 922(g)(3) disarmed those who were believed to pose an increased risk of dangerousness if they were armed compared to ordinary, law-abiding citizens—something academic studies confirmed regarding unlawful users of controlled substances. Thus, under the test set forth in *Bruen*, the restriction imposed by § 922(g)(3) is consistent with the Second Amendment.

23

### 4.    The district court erred in reaching the contrary conclusion.

#### a.    The district court erred in requiring proof of individualized dangerousness.

In its order, the district court found that "our Nation's history and tradition . . . support[s] . . . [the] proposition[] 'that the legislature may disarm those who have demonstrated a proclivity for violence.'" App. at 117 (quoting *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting)).  And demonstrating a proclivity for violence, according to the district court, must be shown "through past violent, forceful, or threatening conduct (or past attempts at such conduct)." *Id.* at 118.  But the sources the district court cited do not support this conclusion.

Starting with then-Judge Barrett's dissent in *Kanter*, she began by explaining that "[i]n 1791—and for well more than a century afterward—legislatures disqualified *categories* of people from the right to bear arms only when they judged doing so was necessary to protect the public safety." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) (emphasis added).  One representative example then-Judge Barrett gave, was when Parliament disarmed Catholics because, "perhaps unsurprisingly[,] . . . they were presumptively thought to pose a similar

24

threat or terror." *Id.* at 457. She also noted that "[s]imilar laws and restrictions appeared in the American colonies, adapted to the fears and threats of that time and place." *Id.* "And this practice of keeping guns out of the hands of 'distrusted' *groups* continued after the Revolution." *Id.* at 458 (emphasis added).

Finally, then-Judge Barrett explained that history "does support the proposition that the [government] can take the right to bear arms away from *a category of people* that it deems dangerous." *Id.* at 464 (emphasis added). In doing so, she noted that the Seventh Circuit's precedent was "consistent with this principle," explaining: "'Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court.'" *Id.* (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc)). "Instead, the legislature can make that judgment on a class-wide basis." *Id.* (citing *Skoien*, 614 F.3d at 640). "And it may do so based on present-day judgments about categories of people whose possession of guns would endanger the public safety." *Id.* Then-Judge Barrett ultimately cited *Yancey*—holding

25

§ 922(g)(3) was constitutional—with approval as a statute consistent with her understanding of the Second Amendment.  *Id.* at 466.

The district court cited a second jurist in support of its view on the dispossession of those believed to be dangerous: Judge Bibas.  *See* App. at 118 n.94 (citing *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting)).  But like then-Judge Barrett, Judge Bibas did not understand history to require an individualized determination that a person was dangerous based on the use, attempted use, or threatened use of violence in the past.  Instead, he pointed to laws disarming Catholics because they "were potentially violent and thus dangerous."  *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting).  Similarly, he noted that there were laws that disarmed loyalists during the American Revolution because they "were potential rebels who were dangerous before they erupted into violence."  *Id.*  Regarding unlawful drug users, Judge Bibas distinguished the Seventh Circuit's decision to uphold § 922(g)(3) in *Yancey* because § 922(g)(3) disarmed "people who posed dangers for reasons apart from criminal records."  *Id.* at 919–20.  Moreover, while Judge Bibas spoke in terms of "drug dealing" rather than drug use, he noted—consistent with the Supreme Court's statement in *Smith*—that

26

drug dealing "often leads to violence" and is "inherently dangerous." *Id.* at 922.

The district court likewise relied upon Judge Hardiman's concurrence in *Binderup* to support its conclusion that only those who demonstrated violent, forceful, or threatening conduct or attempted such conduct in the past can be disarmed. *See* App. at 118 n.95 (citing *Binderup*, 836 F.3d at 369 (Hardiman, J., concurring in part & concurring in the judgments)). But Judge Hardiman's writing reveals the opposite. Instead, Judge Hardiman explained, "[t]he most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep and bear arms to extend to certain *categories of people* deemed too dangerous to possess firearms." *Binderup*, 836 F.3d at 367 (Hardiman, J., concurring in part & concurring in the judgments) (emphasis added). He also explained that loyalists were disarmed in the early days of the United States even though they "'were neither criminals nor traitors'" because "'American legislators had determined that permitting these persons to keep and bear arms posed a potential danger.'" *Id.* at 368 (quoting *NRA v. ATF*, 700 F.3d 185, 200 (5th Cir. 2012), *abrogated on other grounds by Bruen*,

27

142 S. Ct. at 2127 & n.4).  Judge Hardiman noted that "[t]his principle had some roots in the English arms tradition, wherein the Crown had the authority to disarm not only papists, but dangerous and disaffected persons as well." *Id.* (quotation marks omitted).  But perhaps most contrary to the individualized assessment the district court cited Judge Hardiman to support is Judge Hardiman's statement:  "In short, 'from time immemorial, various jurisdictions recognizing a right to arms have . . . taken the step of forbidding *suspect groups* from having arms,' and 'American legislators at the time of the Bill of Rights seem to have been aware of this tradition.'" *Id.* (quoting Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009)) (emphasis added).  Like Judge Bibas, Judge Hardiman also noted the link between drug crimes and violence.  *Id.* at 376.

Simply put, the district court erred by rejecting the well-trod historical precedent that legislature can disarm those classes of people believed to be more dangerous than ordinary, law-abiding citizens.  It is not restricted to only disarming people after an individualized assessment of dangerousness.

28

**b.    The district court erred when it substituted its judgment, based solely on the number of persons authorized by Oklahoma to possess marijuana, for the collective wisdom of other courts, researchers, and Congress.**

The district court's erroneous conclusion that the Second Amendment required an individualized determination that the person being disarmed "demonstrated a proclivity for violence through past violent, forceful, or threatening conduct (or past attempts at such conduct)," App. at 123, led it to commit a second, more practical error. Specifically, the district court found that "the mere use of marijuana carries none of the characteristics that the Nation's history and tradition of firearms regulation supports." *Id.* at 123–24, 126. To support this conclusion, the district court noted, "[t]he use of marijuana—which can be bought legally (under state law) at more than 2,000 ordinary store fronts in Oklahoma—is not in and of itself a violent, forceful or threatening act," *id.* at 124 (citing Jane Francis Smith, *'Astonishing': State leads nation in number of cannabis dispensaries*, The Journal Record (Feb. 5, 2020)), and that "[t]here are likely nearly 400,000 Oklahomans who use marijuana under state-law authorization," *id.* at 126. Its conclusion that unlawful users of

29

controlled substances are not dangerous based on its legality under state law was error for several reasons.

To start, the factual underpinning of the district court's conclusion—the number of individuals who have state authorization to use marijuana or businesses to sell marijuana—is clearly erroneous. Neither party presented any evidence addressing the number of state-authorized marijuana users or dispensaries. "[W]ithout factual support in the record," the district court's finding is clearly erroneous. *United States v. Morales*, 961 F.3d 1086, 1090 (10th Cir. 2020) (quotation marks omitted). As a result, the district court's conclusion that unlawful users of marijuana are not dangerous lacks any foundation. This is especially true given that the district court's conclusion runs counter to the Supreme Court's conclusion based on facts in *Smith* and Congress' conclusion as identified in *Dickerson*, both of which found support in the research discussed by *Yancey* and *Carter*.

Even if the numbers were not clearly erroneous, whether 2,000 or more businesses sell marijuana or 400,000 individuals or more use marijuana with the permission of the state but in violation of federal law is inconsequential to whether § 922(g)(3) violates the Second

30

Amendment, especially as applied to Mr. Harrison.  Mr. Harrison was

not authorized under state law to use marijuana.  *See* App. at 87.  Thus,

whatever impact state-authorized use of marijuana may have on an as-

applied challenge to the constitutionality of § 922(g)(3) by a person

authorized to use marijuana under state law, it has no impact in Mr.

Harrison's as-applied challenge and, by extension, his facial challenge.

*See United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011)

(explaining that an as-applied challenge looks at the party's "*own*

*circumstances*"); *see also United States v. Durham*, 902 F.3d 1180,

1192–93 n.3 (10th Cir. 2018) (explaining that a facial challenge fails if

the as-applied challenge fails).

But even if the numbers identified by the district court could be

properly considered, § 922(g)(3) still fits comfortably within this

Nation's historical tradition of disarming those believed to be

dangerous.  The district court's estimate of state-authorized users of

marijuana—400,000, *see* App. at 126—represents approximately 10% of

the population of Oklahoma, *see* United States Census Bureau, *Quick*

*Facts: Oklahoma*, available at http://census.gov/quickfacts/OK (last

accessed June 26, 2023).  The district court found "[l]umping" 10% of

31

the population into a category of dangerous people was "a bridge too far." App. at 126.  But history does not support the district court's conclusion.  For example, "[i]t is estimated that up to 20 percent of the white population retained its loyalty to Britain throughout the revolution."  James Gray Pope, *Republican Moments: The Role of Direct Popular Power in the American Constitutional Order*, 139 U. of Penn. L. Rev. 287, 328 n.180 (1990).  Nevertheless, the founders—the same people who ratified the Second Amendment—disarmed loyalists.  Given the laws disarming loyalists found more than twice the number of people, relative to population,, as sufficiently dangerous to be disarmed, the district court erred by relying on the number of people disarmed as a reason for concluding they were not sufficiently dangerous.

> c.  **The district court erred when it rejected laws disarming Catholics and loyalists.**
>
> i.  **The district court misapprehended the reason for the laws and the government's argument about them.**

The district court erred for several reasons when it rejected the use of founding-era laws disarming Catholics and loyalists.  To begin, the district court as a factual matter misconstrued the reason the laws

were enacted and the government's argument regarding them.  In its order, the district court described those laws as "a variety of rather ignominious historical restrictions that [the government] argues demonstrates a historical tradition permitting legislatures to disarm those whom the legislature views as 'untrustworthy.'"  App. at 128–29. But the government never argued that the legislature historically disarmed those they deemed "untrustworthy."

The only time the government mentioned anything close to this was when the government quoting the Supreme Court:  "And so, in prohibiting felons from bearing arms, 'Congress sought . . . to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society.'" *Id.* at 118–19  (quoting *Scarborough v. United States*, 431 U.S. 563, 572 (1977).  Neither the government's argument nor the quote from *Scarborough* were about disarming those who were untrustworthy or unvirtuous.  Instead, the government's argument was that the legislature could disarm those "who posed a risk to public safety." *Id.* at 63.  The district court's error tainted its analysis.

### ii.     The analysis the district court adopted leaves the historical record barren.

In rejecting laws disarming Catholics and loyalists as valid comparators, the district court set a standard for historical evidence that, when read in conjunction with the limits placed on historical evidence by *Bruen*, prohibits the use of virtually any historical law or at least narrows the historical record to the point that virtually no law would qualify for use as a comparator.  The district court did so by quoting *Bruen*'s statement that "'when it comes to interpreting the Constitution, not all history is created equal.'"  *Id.* at 131 (quoting *Bruen*, 142 S. Ct. at 2136).  It then relied on this quote as a basis for rejecting the use of laws prior to the adoption of the Constitution "because the liberty-protecting provisions of the Constitution were responding to both ancient *and* recent abuses."  *Id.*  Thus, the district court used this quote from *Bruen* as license to set aside 18th century American firearms regulations for use as historical comparators.

The district court's use of *Bruen* to support this view was not merely error, but it turned what the Supreme Court said on its head. When *Bruen* said, "not all history is created equal," it was rejecting the

use of "a variety of historical sources from the late 1200s to the early 1900s." *Bruen*, 142 S. Ct. at 2135–36. It explained: "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence *that long predates either date* may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136 (emphasis added). It then went on to say that courts "must also guard against giving *postenactment history* more weight than it can rightly bear." *Id.* (emphasis added). To this end, the Supreme Court has considered history starting in "the latter half of the 17th century . . . to be particularly instructive," *id.* at 2140, and described the English Bill of Rights as "the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593.

The district court erred by misunderstanding *Bruen* as excluding the very historical traditions the Court viewed as the most relevant.

### iii.   The district court erred when it disregarded firearms regulations enacted during a time of war.

Next, the district court erred when it concluded that regulations enacted during or in preparation for war could be disregarded because "[t]imes of war tend to bring out the worst in governments, at least

35

when it comes to civil liberties." App. at 134–35.  But rights do not

mysteriously disappear during times of war, *see Ex Parte Milligan*, 71

U.S. 2, 120–21 (1866), and the Second Amendment was "not intended to

lay down a novel principle but rather codified a right inherited from our

English ancestors," *Heller*, 554 U.S. at 599 (quotation marks and

alteration omitted).

    While the district court is correct that "we do not look to

*Korematsu* to determine whether the government may discriminate

base on race[,] nor do we rely on World War I-era laws that criminalized

political dissent to determine the scope of the First Amendment," App.

at 135 & n.164 (citing *Korematsu v. United States*, 323 U.S. 214 (1944),

*abrogated by Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018); *Gilbert v.

Minnesota*, 254 U.S. 325 (1920); *Debs v. United States*, 249 U.S. 211

(1919)), it failed to understand why we do not base constitutional

understanding on those things.

    *Korematsu* is not irrelevant to understanding the original

meaning of the equal protection component of the Fifth Amendment's

Due Process clause and World-War-I-era statutes are not irrelevant to

understanding other provisions of the constitution because they

36

occurred during a time of war. *See Trump*, 138 S. Ct. at 2423 ("*Korematsu* was gravely wrong the day it was decided."). They are irrelevant (or minimally relevant) to understanding the original meaning of the constitution because they came about long after the relevant provisions had been ratified. *See Bruen*, 142 S. Ct. at 2136. The laws rejected by the district court for use as comparators were both far closer temporally and, more importantly, enacted before ratification of the Second Amendment, not after.

Thus, unlike the internment policy in *Korematsu* or the World-War-I-era laws, the laws disarming Catholics and loyalists are instructive on the meaning of the Second Amendment. The district court erred by concluding otherwise.

### iv. The district court's rejection of laws disarming Catholics is both self-contradictory and involves a misreading of *Bruen*.

Focusing specifically on the laws disarming Catholics, the district court provided three additional reasons why it believed they failed to "provide any insight into the meaning of the Second Amendment." App. at 135–36. None withstand scrutiny.

37

First, the district court concluded that laws disarming Catholics were insufficient because there were only three colonies that enacted such laws. *See id.* at 136 & n.166. There is some facial support in *Bruen* for that conclusion. The Supreme Court "doubt[ed] that *three* colonial regulations could suffice to show a tradition of public-carry regulation." *Bruen*, 142 S. Ct. at 2142. But *Bruen*'s statement was informed by the fact the laws only stood for the proposition that people were not allowed to publicly carry strange or unusual weapons. *Id.* at 2143. *Bruen*'s discussion of the "sensitive places" doctrine makes it clear that the number of historical statutes is not the driving factor.

As, the Supreme Court explained, "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited," *id.* at 2133 (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–36, 244–47 (2018)), and the law review article it cited only listed 18th-century statutes from two colonies—Maryland and Delaware—which prohibited arms in different places, *see Sensitive Places*, 13 Charleston L. Rev. at 236. Despite only having such laws in two colonies, the Court held that it could "assume it settled that these locations were 'sensitive

38

places' where arms carrying could be prohibited consistent with the Second Amendment" because it was "aware of no disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2133.

There is no indication that laws disarming Catholics based on the legislature's belief that they were dangerous ever encountered a legal challenge. Thus, the district court erred by not affording the same assumption to those laws as the Court gave to "sensitive places" laws.

Second, the district court concluded that because the English Bill of Rights was limited to protecting the right of Protestants to have arms, laws disarming Catholics "cannot provide any insight into that right's scope." App. at 136. The fact that the English Bill of Rights did not afford Catholics the right to have arms might decrease the relevance of laws disarming Catholics. But it does not follow that such laws are wholly irrelevant, something even the sources relied upon by the district court concluded. *See Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting); *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harvard J. of L. & Pub. Poly. 695, 721 (2009) (noting the disarmament of Catholics "is instructive"). Even if laws disarming Catholics were not sufficient on

their own to establish a historical tradition for purposes of understanding the Second Amendment, laws disarming Catholics provide additional evidence that the Second Amendment permits the legislature to disarm classes of persons believed to be more dangerous than ordinary, law-abiding citizens.

Third, the district court found, "[t]here is little to no evidence that many of these laws, including the infamous 1688 parliamentary act disarming Catholics, were ever to be in force in the colonies." App. at 135–36 n. 165. This is clearly error, as discussed above, at least three colonies disarmed Catholics.

### v. The district court construed the reason for the colonial laws too narrowly.

The final reason the district court gave for rejecting colonial laws disarming Catholics and loyalists was because "the justifications for these laws—one of the two central considerations under *Bruen*—are dissimilar." *Id.* at 136. The district court understood the laws to be "justified on the fear that the covered groups were likely to wage active war against the colonies or interfere with the colonists' war efforts." *Id.* at 136–37 (citing *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting)).

40

But the justification the district court distilled from those laws is far too narrow. Instead, courts generally look at broader justifications when it has come to arms prohibition. For example, when addressing the prohibition on possessing firearms in "sensitive places," the Court noted that history provided "relatively few . . . 'sensitive places' where weapons were altogether prohibited," limited to "legislative assemblies, polling places, and courthouses." *Bruen*, 142 S. Ct. at 2133. The most restrictive comparison for those locations is where core functions of government take place. But such a restrictive comparison would not include schools, which the Supreme Court identified as a "sensitive place," *id.* (quoting *Heller*, 554 U.S. at 626), or "an airport," which the district court identified as an example, App. at 97 n.26.

Similarly, the Supreme Court said that disarming felons and the mentally ill is "presumptively lawful," explaining that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms," *Heller*, 554 U.S. at 626–27 & n.26, 635, strongly suggesting that disarming felons is justified because they are not "law[] abiding" and disarming the mentally ill is justified because they are not "responsible." Even sources the district court

41

relied upon in support of its narrow view of the justification for these laws, took a much broader view of them. *See* App. at 137 n.169 (citing *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting)). While Judge Bibas noted that many of the laws were designed to quell rebellions, he understood that those laws' purpose supported an understanding that the Second Amendment allowed disarming those who were believed to be dangerous. *See Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting) ("To ensure peace and safety, the colonies had to disarm them. The touchstone was not virtue, but danger.").

Ultimately, the district court did not heed the instructions of the Supreme Court in *Bruen*: "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133. Because laws disarming Catholics and loyalists, among others, were enacted to disarm those believed to pose a greater risk of danger than an ordinary, law-abiding citizen and because § 922(g)(3) addresses the same problem, they are "analogous enough to pass constitutional muster."

42

**D.     Section 922(g)(3) is relevantly similar to laws disarming the mentally ill.**

**1.     This Nation has a historical tradition of disarming the mentally ill.**

Another possible comparator is laws disarming the mentally ill. The Supreme Court and its various members have been adamant that the Court's decisions do not call such laws into question.  *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *id.* at 2189 (Breyer, J., dissenting); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (plurality opn.); *id.* at 925 (Breyer, J., dissenting); *Heller*, 554 U.S. at 626–27 & n.26.  And for good reason; they have a historical basis. "Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded . . . idiots [and] lunatics" from the right to possess firearms.  Robert Dowlut, *The Right to Arms: Does the Constitution or Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983).  While some historical sources permitted justices of the peace to lock up "dangerous lunatics" and seize their property, *see* Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1371, 1377 (2009) ("[I]n eighteenth-century America, justices of the peace were

43

authorized to lock up 'lunatics' who were 'dangerous.'"); Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield*, 19 L. and Soc'y Rev. 487 1985) (citing Vagrancy Act 1744, 17 Geo.II, Ch. 5), others did not require dangerousness, *see* 1788 N.Y. Laws Ch. 12 (allowing the state to seize the property of a "lunatic" until "he comes of his right mind" or his death, at which point the property is released to his next of kin); *cf. Smith v. Turner*, 48 U.S. 283, 463 (1849) (noting states have an "acknowledged right" to "exclude . . . lunatics"). *See also* Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28–29 (1868) (hereinafter "Constitutional Limitations") (in addressing who is part of "the people" in whom "sovereign is vested," explaining that "[c]ertain classes have been almost universally excluded [including] . . . the idiot, the lunatic, and the felon, on obvious grounds").[6]

---

[6] Even the district court acknowledged that Cooley's treatise "has long been considered a helpful source in interpreting the state of American constitutional law." App. at 111 n.67; *see also Heller*, 554 U.S. at 616 (describing Cooley's treatise as "massively popular").

2.    **Those who unlawfully use or are addicted to controlled substances are relevantly similar to those who are mentally ill.**

Drug abusers and the mentally ill have long been analogized. For example, Cooley noted that intoxication was "regarded as temporary insanity." Constitutional Limitations 599 n.1. Similarly, scientific studies have noted the link between mental illness and illicit drug use. *E.g.* Ivan Urtis, et al., *Cannabis Use and its Association with Psychological Disorders*, Psychopharmacology Bulletin, Vol. 50 No. 2 at 65 (May 15, 2020) (finding "cannabis use disorder (CUD) is highly prevalent in individuals with mental illness"); Dana Glei, et al., *Changes in Mental Health, Pain, and Drug Misuse Since the mid-1990s: Is There a Link?*, Soc. Sc. Med., Vol. 246 (Feb. 2020) (finding that "43% of US adults aged 18 and older with a substance abuse disorder also had co-occurring mental illness" and that those "with a serious mental illness were also much more likely to report a substance abuse disorder (25%) than those without serious mental illness (7%)"). Likewise, outside the Second Amendment context, the Supreme Court has analogized drug addiction and mental illness. *See Robinson v. California*, 370 U.S. 660, 667 (1962).

45

Applying the metrics identified in *Bruen* confirms that § 922(g)(3) is relevantly similar to the historic laws disarming the mentally ill. The "how" is disarmament of a "limited, narrowly tailored specific" group. *United States v. Patterson*, 431 F.3d 832, 835 (5th Cir. 2005); *cf. Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Shuttlesworth*, 394 U.S. at 151). The "why" is because neither the mentally ill nor unlawful users of and those addicted to controlled substances are "responsible," *Bruen*, 142 S. Ct. at 2131, 2138 n.9, 2148, 2156; *Heller*, 554 U.S. at 635, or "ordinary" as that term was used in *Bruen*, 142 S. Ct. at 2122, 2134, 2150, 2156; *id.* at 2161 (Alito, J., concurring); *id.* (Kavanaugh, J., concurring). As the Seventh Circuit explained, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *See Yancey*, 621 F.3d at 685. The Ninth Circuit echoed this understanding. *See United States v. Dugan*, 657 F.3d 998, 999–1000 (9th Cir. 2011). And at least one panel of this court reached the same conclusion, albeit in an unpublished decision without much analysis. *See United States v. Richard*, 350 F. App'x 252, 260 (10th Cir. 2009). Similarly, several courts have analogized those who are unlawful users of or addicted to

controlled substances and the mentally ill for purposes of upholding

§ 922(g)(3) since *Bruen*. *E.g.*, *United States v. Costianes*, No. CR-JKB-21-458, 2023 WL 3550972, at *5  (D. Md. May 18, 2023); *United States v. Stennerson*, No. CR 22-139-BLG-SPW, 2023 WL 2214351, at *2 (D. Mont. Feb. 24, 2023); *United States v. Randall*, ___ F. Supp. 3d ___, 2023 WL 3171609, at *3 (S.D. Iowa Feb. 14, 2023); *United States v. Posey*, ___ F. Supp. 3d ___, 2023 WL 1869095, at *9–10 (N.D. Ind. Feb. 9, 2023); *United States v. Lewis*, ___ F. Supp. 3d ___, 2023 WL 187582, at *4 (W.D. Okla. Jan. 13, 2023); *Fried v. Garland*, ___ F. Supp. 3d ____, 2022 WL 16731233, at *8 (N.D. Fla. Nov. 4, 2022); *United States v. Seiwert*, No. 20-CR-443, 2022 WL 4534605, at *2 (N.D. Ill. Sept. 28, 2022); *but see United States v. Connelly*, ___ F. Supp. 3d ___, 2023 WL 2806324, at *10 n.13 (W.D. Tex. Apr. 6, 2023), *appeal filed*, No. 23-50312 (5th Cir. May 4, 2023).

> ### 3.  The district court erred in rejecting the disarmament of the mentally ill as analogous to § 922(g)(3).

The district court erred in at least three ways when it rejected the use of the historical practice of disarming the mentally ill as analogous to § 922(g)(3).  First, the district court erred when it found that "history

47

and tradition would limit disarmament to *dangerous* lunatics." App. at 126. But as noted above, not all the laws disarming the mentally ill or imprisoning them required poof of dangerousness. *E.g.*, 1788 N.Y. Laws Ch. 12. And even when a law spoke of dangerousness, it did not necessarily require a finding of actual dangerousness at the exact moment an individual was locked up or their property seized. Instead, the law permitted a mentally ill person to be seized if they "*may be dangerous.*" *E.g.* Vagrancy Act 1744, § 20, 6 Statutes at Large: From Magna Charta to the End of the Last Parliament, 1761, at 519 (1763) (emphasis added). Moreover, to the extent that the historical law required imprisoning the mentally ill rather than simply disarming them, analogical reasoning would permit inclusion of a broader group of people. *Cf. United States v. Martinez-Fuerte*, 428 U.S. 543, 558 (1976) (explaining the Fourth Amendment permits a lesser standard when an intrusion "is appreciably less"). Notably, every time that the Supreme Court or one of the justices has explicitly approved of laws disarming the mentally ill, it was never qualified by a finding of dangerousness.

Second, the district court was concerned that the same logic could be used to disarm those with "autism, attention deficit disorder, and

nicotine dependence," claiming the comparison of those who unlawfully use or are addicted to controlled substances to the mentally ill "appears to have no limit." App. at 126. But the district court's *sua sponte* concern does not render § 922(g)(3) unconstitutional.[7]

To begin, none of the conditions cited by the district court were conceptualized as mental disorders when the Second Amendment was ratified. *See* Bonnie Evans, *How Autism Became Autism: The Radical Transformation of a Central Concept of Child Development in Britain*, 26 History of Human Sciences 3, 4 (2013) ("The concept of autism was coined in 1911."); Klaus W. Lange et al., *The History of Attention Deficit Hyperactivity Disorder*, 2 Attention Deficit and Hyperactivity Disorders 241, 244 (2010) ("The Goulstonian Lectures of Sir George Fredric Still in 1902 are by many authors considered to be the scientific starting point of the history of ADHD."). Thus, they are irrelevant to the question at issue.

---

[7] Despite the district court's statement that its inquiry would be guided by rules, "including the principle of party presentation," App. at 97–98 n.28, the first mention of autism, attention deficit disorder, and nicotine dependence was in the district court's order granting the motion to dismiss. As a result, the United States had no opportunity below to address this basis for the district court's decision.

Moreover, the Supreme Court has warned against hypothesizing to the point of finding statutes unconstitutional. *See United States v. Raines*, 362 U.S. 17, 21 (1960) ("This Court, as is the case with all federal courts, has no jurisdiction to pronounce any statute, either of a state or of the United States, void, because [it is] irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies." (quotation marks omitted)). Because laws prohibiting possession of firearms by those with autism, attention deficit disorder, and nicotine dependence were not before the district court, it erred in rejecting the government's analogy based on how a hypothetical law might be defended.

But even if a distinction were necessary, a sample of this court's sentencing decisions shows that drug addiction and mental illness are often blamed for dangerous or criminal activity. *E.g. United States v. Hernandez*, 777 F. App'x 947, 949 (10th Cir. 2019) (noting that drug addiction was one of the factors "'a large percentage of individuals who . . . commit crimes . . . point to . . . [as what] partially fuels their decision to commit those crimes'" (quoting *United States v. DeRusse*, 859 F.3d 1232, 1242 (10th Cir. 2017) (Baldock, J., dissenting)). But the

United States is unaware of when a defendant has blamed autism, attention deficit disorder, and nicotine addiction for criminal activity.

Ultimately, whether a statute disarming people with autism, attention deficit disorder, or nicotine addiction would be consistent with this Nation's historical tradition of firearms regulation is not before this court. Thus, it should decline to follow the district court down the path of hypothesizing § 922(g)(3) into unconstitutionality.

Third, the district court erred when it rejected analogizing the disarmament of the mentally ill because it believed the analogy was just "another attempt by the United States to transform distinct historical examples into roving warrants applicable to whatever conduct it desires." App. at 126–27 n.134. The district court disagreed with that approach because the government took "a historical example that applied to a distinct class of persons (e.g., dangerous lunatics), extract[ed] from it a broad principle (e.g., concerns about people "lacking self-control"), and then fit into that broad category whole new classes of people." *Id.*

For better or for worse, what the district court described is the analysis that *Heller* and *Bruen* require. The Supreme Court identified

51

distinct classes of persons, e.g. "prohibitions on the possession of firearms by felons and the mentally ill," *Heller*, 554 U.S. at 626–27 & n.26, extracted from them a broad principle, e.g. the Second Amendment protects "the right of law-abiding, responsible citizens to use arms," *id.* at 635; *see also Bruen*, 142 S. Ct. at 2122, and then directed the courts to apply analogical reasoning to determine whether a distinct class of persons fit within that category, *see Bruen*, 142 S. Ct. at 2132–33.

While the district court concluded that those who are unlawful users of or addicted to controlled substances "aren't remotely the sort of persons that were historically regulated," App. at 126–27 n.134, this conclusion is wholly divorced from the metrics that *Bruen* identified. And those metrics are exceptionally important. If the average person were asked if a green truck and green shirt are similar, their initial reaction might be to laugh and say not even remotely. But if they begin with the relevant metric—in *Bruen*'s hypothetical, are they similar colors, 142 S. Ct. at 2132—the reaction would be completely different.

Ultimately, § 922(g)(3) is relevantly similar to longstanding prohibitions on the possession of firearms by the mentally ill and, thus,

is consistent with this Nation's historical tradition of firearm

regulations.  Because the district court erred in concluding otherwise,

this court should reverse and remand for further proceedings.

### E.  The "people," whose rights the Second Amendment protects, are ordinary, law-abiding, responsible citizens.

Not only does § 922(g)(3) not violate the Second Amendment

because disarming unlawful users of controlled substances is consistent

with this Nation's historical tradition of firearms regulation, but it is

also constitutional because unlawful drug users are not part of the

"people" protected by the Second Amendment.  The district court erred

when it reached the opposite conclusion, because it stopped at *Heller*'s

strong presumption and disregarded everything the Court later said.

### 1.  *Heller*'s Strong Presumption

In *Heller*, the Supreme Court took its "first in-depth examination

of the Second Amendment" but warned that "one should not expect it to

clarify the entire field."  554 U.S. at 635.  The Court's task was to

determine whether the Second Amendment "protects only the right to

possess and carry a firearm in connection with militia service" or

whether "it protects an individual right to possess a firearm

unconnected with service in a militia, and to use that arm for
traditionally lawful purposes, such as self-defense within the home."
*Id.* at 577.  In settling this dispute, the Court turned to the text,
starting with the phrase "right of the people."  *Id.* at 579–81.

Looking at how the Constitution uses "right of the people" in other
contexts, the Court observed that the three other times the Constitution
used that phrase, it "unambiguously refers to individual rights, not
'collective' rights, or rights that may be exercised only through
participation in some corporate body."  *Id.* at 579 (citing U.S. Const.
amends. I, IV, IX).  It also explained that the six times the Constitution
mentions "the people," it "unambiguously refers to all members of the
political community, not an unspecified subset."  *Id.* (citing *United
States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).  Thus, in
interpreting the Second Amendment, the Court "start[ed] . . . with a
strong presumption that the Second Amendment right is exercised
individually and belongs to all Americans."  *Id.* at 581.

The district court began and ended with this strong presumption.
*See* App. at 94–95 & nn.17–21.  But the Supreme Court did not end its
discussion there.

54

## 2.    Ordinary, Law-Abiding, Responsible Citizens

Later in *Heller*, the Court explained that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626.  It provided that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," *id.*, explaining that such restrictions are "presumptively lawful regulatory measures," *id.* at 627 n.26.

It discussed felons and the mentally ill again when it addressed Mr. Heller's ability to obtain a handgun license if the District's handgun ban were struck down.  The District informed the Court that Mr. Heller would be able to obtain a license "assuming he is not otherwise disqualified." *Id.* at 631.  The Court understood "otherwise disqualified" to "mean he [Mr. Heller] is not a felon and is not insane." *Id.*  The only other reference the Court made to disqualification comes from its ultimate holding:  "*Assuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Id.* at 635 (emphasis added).  By premising its holding on this assumption, the Court amplified the limits of its holding.

55

One final portion of *Heller* discussed the scope of the Second Amendment and proves to be the explanation of the scope to which the Court has repeatedly returned.  In rejecting the "judge-empowering 'interest-balancing inquiry'" proposed by Justice Breyer, the Court explained that the Second Amendment was already "the very *product* of an interest balancing by the people," which "surely elevates above all other interests the right of *law-abiding, responsible citizens* to use arms in defense of hearth and home."  *Id.* at 634–35 (emphasis added).

With the Court's "strong presumption" at the beginning and its identification of the scope of the Second Amendment to protect the "right of law-abiding, responsible citizens" at the end, *Heller* did not fully resolve the scope of "the people" protected by the Second Amendment.  Justice Stevens noted as much in his dissent, pointing out that the Court first recognized that other parts of the Constitution "unambiguously refer[] to all members of the political community, not an unspecified subset" but the Court then "limit[ed] the protected class to 'law-abiding, responsible citizens.'"  *Id.* at 644 (Stevens, J., dissenting).  He then noted that "[t]he Court offer[ed] no way to harmonize its conflicting pronouncements."  *Id.*

56

If this case arose immediately after *Heller*, then the district court's reliance on the first part of *Heller* while omitting the second part might be understandable. But the nearly fifteen years since *Heller* have provided valuable insight into how this ambiguity should be resolved. More recent Supreme Court cases reveal that, contrary to the district court's conclusion, it was *Heller*'s more constrained view of the people covered by the Second Amendment right that prevailed, rather than its broader strong presumption.

The Court's first post-*Heller* foray into the Second Amendment came in *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010). Writing for a plurality, Justice Alito repeated the assurance that nothing in *Heller* or *McDonald* "cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" *Id.* at 786 (plurality opn.) (quoting *Heller*, at 626–27).

Justice Thomas, the author of *Bruen*, gave the clearest statement on the issue in his dissent in *Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting). Noting *Heller*'s approval of statutes that prohibit felons and the mentally ill from possessing weapons, he explained, "[t]o be constitutional," those laws "must target individuals

57

who are beyond the scope of the "People" protected by the Second Amendment." *Id.*; *see* U.S. Const. amend. II.

In *Bruen*, the Court made it even clearer which side of the ambiguity ultimately prevailed. To begin, *Bruen* used a variation of *Heller*'s "law-abiding, responsible citizen" phrase at least eleven times in the body of the opinion and three more times in footnotes. *Bruen*, 142 S. Ct. at 2122, 2124–25, 2132–33, 2134, 2136 n.8, 2138 & n.9, 2150, 2156. Justice Alito also used a variation of the term six times in his concurrence, *id.* at 2157–61 (Alito, J., concurring). But it is not just the number of times the Court used the phrase that is important, it is how the Court used the phrase.

To begin with, in the opening line of the opinion, the Court made clear which side of the *Heller* ambiguity it landed upon. *See Bruen*, 142 S. Ct. at 2122 ("In *District of Columbia v. Heller* . . . and *McDonald v. Chicago* . . . , we recognized that the Second and Fourteenth Amendments protect the right of *an ordinary, law-abiding citizen* to possess a handgun in the home for self-defense." (emphasis added)). The Court reiterated that it was the balance between "all other interests [and] the right of *law-abiding, responsible citizens*" that was

58

"struck by the traditions of the American people" and "demands our unqualified deference." *Id.* at 2131 (emphasis added). The two metrics from *Heller* and *McDonald* it identified for determining whether modern statutes are relevantly similar to historic regulations were: "how and why the regulations burden *a law-abiding citizen's* right to armed self-defense." *Id.* at 2133 (emphasis added). When identifying the petitioners as "part of 'the people' whom the Second Amendment protects," the Court characterized them as "two ordinary, law-abiding, adult citizens." *Id.* at 2134. Its ultimately held that New York's statute was unconstitutional because "it prevent[ed] *law-abiding citizens* with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2156 (emphasis added); *see also id.* at 2136 n.8.

Additionally, the Court explained that nothing in its opinion "should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Id.* at 2138 n.9. It explained that those regimes are not constitutionally suspect because "they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* (quoting *Heller*, 554 U.S. at 635). Instead, it noted that those regimes "are designed to

59

ensure that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *id.* (quoting *Heller*, 554 U.S. at 635), and "appear to contain only 'narrow, objective, and definite standards' guiding licensing officials,'" *id.* (quoting *Shuttlesworth*, 394 U.S. at 151). The Court nevertheless recognized that those schemes could "be put toward abusive ends" and, thus, "d[id] not rule out constitutional challenges . . . where, for example, lengthy wait times in processing license applications or exorbitant fees deny *ordinary citizens* their right to public carry." *Id.* (emphasis added).

### 3. The district court erred by latching on to *Heller*'s strong presumption without considering the Court's reiteration of *Heller*'s description of the scope of the Second Amendment right.

In its order, the district court only identified *Bruen's* use of the term "ordinary, law-abiding, and [sic] adult citizen" one time when it described the petitioners and explained that they were part of "the people" covered by the Second Amendment. App. at 95 n.20 (quoting *Bruen*, 142 S. Ct. at 2134). The district court then found that the United States' reliance on it was "reading too much into the dicta because immediately after describing the plaintiffs, the *Bruen* Court

cited *Heller*'s holding that 'the people' includes 'all members of the political community,' not just 'an unspecified subset.'" *Id.* (purporting to quote *Bruen*, 142 S. Ct. 2134 (citing *Heller*, 554 U.S. at 580)). This was error for a few reasons.

First, out of a dozen or more references to variations of "ordinary, law-abiding, adult citizens" in *Bruen*, the district court focused on one reference as if it were the sole reference. At a minimum, the district court's omission of over 90% of the references to variations of "ordinary, law-abiding, adult citizens" suggests the district court did not give full consideration of the Court's use of that term in *Bruen*.

Second, the district court erred by purporting to quote from something that *Bruen* never said. Specifically, contrary to the district court's assertion, the phrases "all members of the political community" and "an unspecified subset" are not in *Bruen*.

Third, while *Bruen* cited the portion of *Heller* containing the language the district court attributed to *Bruen*, the district court erred in suggesting that *Bruen* classified it as a holding. To the contrary, in addressing what *Heller* did, *Bruen* explained that it "recognized that the Second . . . Amendment[] protect[s] the right of *an ordinary, law-*

*abiding citizen* to possess a handgun in the home for self-defense."
*Bruen*, 142 S. Ct. at 2122 (emphasis added).  In the phrases quoted by
the district court, the Supreme Court in *Heller* was speaking of "all six
other provisions of the Constitution that mention 'the people,'" *Heller*,
554 U.S. at 580.  Regarding how "the people" is used in the Second
Amendment, the Court only "start[ed] . . . with a strong presumption
that the Second amendment right is exercised [by] . . . and belongs to all
Americans."  *Id.* at 581.  A "strong presumption" is not a holding.

Perhaps the district court's driving concern was its belief that, if
the scope of the Second Amendment right articulated by *Heller* and
*Bruen* were adopted, the federal government could "deprive practically
*anyone* of their Second Amendment right" because "[w]ho among us,
after all, isn't a lawbreaker?"  App. at 95 n. 21.  But such a concern is
outside the scope of either a facial or an as-applied challenge.  A facial
challenge "can only succeed . . . by 'establishing that no set of
circumstances exists under which the Act would be valid,' *i.e.*, that the
law is unconstitutional in all of its applications."  *Wash. St. Grange v.
Wash. St. Repub. Party*, 552 U.S. 442, 449 (2008) (quoting *United States
v. Salerno*, 481 U.S. 739, 745 (1987) (brackets omitted)).  Moreover, "[i]n

62

determining whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 449–50 (citing *Raines*, 362 U.S. at 22). In an as-applied challenge, courts "are limited to analyzing the contours of [the] claim 'under the particular circumstances' of" the defendant. *Millard v. Camper*, 971 F.3d 1174, 1180 (10th Cir. 2020) (quoting *Carel*, 668 F.3d at 1217). As a result, the district court erred in basing its decision, in part, on its concern that the Supreme Court's explanation of the scope of the Second Amendment right would allow the government to legislate more broadly than § 922(g)(3).

Ultimately, the district court erred by fixating on the first portion of *Heller* and dismissing both what the Court explained later in the opinion and what it repeated multiple times throughout *Bruen*. Through repetition, the Supreme Court has explained that the Second Amendment guarantees the right of ordinary, law-abiding, responsible adult citizens to possess firearms for self-defense. Because a person who *unlawfully* uses a controlled substance is, by definition, not "law-abiding," they do not fall within the protections of the Second Amendment.

63

## Conclusion

For these reasons, this Court should reverse the district court's order dismissing the indictment and remand for further proceedings.

## Statement Regarding Oral Argument

This case involves the review of a district court order finding a federal statute violates the Second Amendment.  Because Second Amendment jurisprudence is rapidly evolving, the United States believes oral argument is necessary and will be beneficial.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney


s/ Steven W. Creager
STEVEN W. CREAGER
Assistant United States Attorney
Bar Number:  30052 (OK)
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405)553-8700 - office
(405)553-8888 - fax
steven.w.creager@usdoj.gov

**Certificate of Compliance with Type-Volume Limitation,
<u>Typeface Requirements, and Type Style Requirements</u>**

As required by Fed. R. App. P. 32(g), I certify that this brief is proportionally spaced and contains 12,367 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I relied on my word processor to obtain the count and it is: Microsoft Word 365.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

<u>s/ Steven W. Creager</u>
Assistant U.S. Attorney

**<u>Certificate of Service</u>**

This is to certify that on June 26, 2023, I electronically transmitted the attached brief to the Clerk of Court using the NextGen PACER System for filing and transmittal of a Notice of Docket Activity to the following PACER registrant: J.P. Hill and Laura K. Deskin, counsel for Jared Michael Harrison.

<u>s/ Steven W. Creager</u>
Assistant U.S. Attorney